1        IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TEXAS
2                   MARSHALL DIVISION

3  SIMPLEAIR, INC.              *    Civil Docket No.
                                *    2:11-CV-416
4  VS.                          *    Marshall, Texas
                                *
5                               *    January 13, 2014
                                *
6  MICROSOFT CORPROATION, ET AL *    9:25 A.M.

7                TRANSCRIPT OF JURY TRIAL
        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
8              UNITED STATES DISTRICT JUDGE

9  APPEARANCES:

10 FOR THE PLAINTIFFS:    MR. GREGORY DOVEL
                          MR. JEFFREY EICHMANN
11                        Dovel & Luner
                          201 Santa Monica Blvd.
12                        Suite 600
                          Santa Monica, CA    90401
13
                          MR. CALVIN CAPSHAW
14                        Capshaw DeRieux
                          114 East Commerce Avenue
15                        Gladewater, TX    75647

16 FOR THE DEFENDANTS:    MR. MITCHELL STOCKWELL
                          MR. RUSSELL KORN
17                        Kilpatrick Townsend & Stockton
                          1100 Peachtree Street, Suite 2800
18                        Atlanta, GA    30309

19
   APPEARANCES CONTINUED ON NEXT PAGE:
20

21
   COURT REPORTERS:       MS. SHELLY HOLMES, CSR
22                        MS. SUSAN SIMMONS, CSR
                          Official Court Reporters
23                        100 East Houston, Suite 125
                          Marshall, TX    75670
24                        903/935-3868

25 (Proceedings recorded by mechanical stenography,
   transcript produced on CAT system.)

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:     MS. DANIELLE WILLIAMS
                        Kilpatrick Townsend & Stockton
                        1001 West Fourth Street
                        Winston-Salem, NC   27101

                        MS. JENNIFER PARKER AINSWORTH
                        Wilson Robertson & Cornelius
                        909 ESE Loop 323, Suite 400
                        Tyler, TX   75701

                        *****************************************

                              P R O C E E D I N G S

                  COURT SECURITY OFFICER:  All rise.

                  THE COURT:  Good morning.  Be seated,
please.

                  I want to thank you, ladies and
gentlemen, for being here on time and ready to go this
morning.  My name is Rodney Gilstrap.  I'm the resident
United States District Judge here in the Marshall
Division of the Eastern District of Texas.  I've lived
in Marshall since 1981, practiced law here until I went
on the bench in 2007.  Grew up in Florida, but I got to
Texas as quick as I could to attend Baylor University
and Baylor Law School.

                  I'm married.  I have two grown children
and my wife owns and operates a retail floral business

here in Marshall.  Now, I tell you all those things

because in a few minutes, we're going to ask each of you

to tell us basically the same information about each of

you.  And I think it's only appropriate that you know as

much about me as I'm about to find out about each of

you-all.

We're about to engage in the selection of

a jury in a civil case involving allegations of patent

infringement.  I know that you've seen the patent film

this morning, since patent cases involve certain things

that ordinary civil cases do not.  In a civil case such

as this one, the United States is the only country in

the world -- say that again -- the United States is the

only country in the world that guarantees a right to a

trial by jury in a civil case.

Your being here this morning and

participating, you are in a very real way doing your

duty as ordinary citizens to preserve, protect, and

defend our United States Constitution and particularly

the 7th Amendment, which is a part of our Bill of Rights

which guarantees that right to a jury trial in a civil

case.

I always tell jury panel members, and I

believe it more each time I select a jury, that jury

service in my view is the second highest form of public

service that any American citizen can perform.  Of
course, the highest form of public service are those
young men and women that serve in our armed forces and
put their lives on the line.  But you are -- you are
rendering a very real and significant public service by
being here this morning.  And I commend each one of you
for being here.

Now, when the lawyers address you this
morning, which will happen shortly, they're going to ask
you questions.  And I want you to understand that
they're not seeking to pry into your personal affairs or
to inquire unduly into your personal circumstances.

They're entitled to ask questions, and
that's for the sole purpose of securing a fair and
impartial jury to hear the evidence in this case.

I don't know if it will happen today.  It
usually doesn't, but it is possible that you could be
asked a question that you believe is so personal and so
private that you are uncomfortable answering it in front
of the entire jury panel.  If that happens, you just
simply need to say you'd like to discuss that with Judge
Gilstrap, and I'll make arrangements for you to discuss
that outside of the presence of everybody else on the
jury panel.

Again, you have that option.  It rarely

comes up.  I don't suspect it will this morning, but in case it does, you do have that option.

It's critically important that when you're asked questions this morning as a part of this jury selection process that you give full, complete, and truthful answers.  Please be assured, ladies and gentlemen, there are no wrong answers as long as your responses are full, complete, and truthful.

The trial in this case is going to begin today, after we select the jury.  And I expect the evidence in this case will go through the end of this week.  So we're looking at selecting a jury that can be available to serve from today through the end of this week, which, as I calculate it, is the 17th of January.

If there are any of you on the jury panel that have scheduled surgery for yourself; you have a prepaid vacation with non-refundable airline tickets; if you have something that would prevent you from serving on this jury over that period of time, I need you to raise your hand and let me make a note of it right now.

Anybody have a problem like that?  And you'll keep them up until I get everybody down.

Okay.  No. 10, Ms. Cox; No. 14, Mr. Powell.

And I saw a lady back there.  What is

1  your number, ma'am?

2                   JUROR CROW:  20.

3                   THE COURT:  20?  Thank you.  I couldn't

4  see you for the gentleman in front of you.  That's

5  Ms. Crow.

6                   Is there anybody else that raised their

7  hand?  Those three, okay.

8                   At this time, I'm going to call for

9  announcements in the case of SimpleAir, Inc., versus

10  Google, Inc.  This is Case No. -- Civil Case

11  No. 2:13-CV-587.

12                   And, Counsel, when you give your

13  announcements, if you would, please introduce everybody

14  on your trial team.  And if you have a corporate

15  representative with you who will be here through the

16  trial, please introduce your corporate representative.

17  So with that, what says the Plaintiff?

18                   MR. CAPSHAW:  Your Honor, Calvin Capshaw

19  for SimpleAir, and we're ready to proceed.

20                   With me at counsel table is Mr. John

21  Payne, one of the inventors of the '914 patent.  And

22  Mr. Tim von Kaenel; he's another inventor on the patent.

23  They'll be with us as representatives for SimpleAir

24  throughout the trial.

25                   Mr. Greg Dovel of Dovel Luner will be

counsel. Mr. Jeff Eichmann of Dovel Luner will be assisting us. And my partner, Elizabeth DeRieux, will be helping us as well. We'll also have Caitlin Walker and Diane Kim. They're in the audience. There they are. And they'll be keeping us straight in our case today.

THE COURT: Good.

MR. CAPSHAW: Thank you, Your Honor.

THE COURT: Thank you, Mr. Capshaw. What says the Defendant?

MS. AINSWORTH: Good morning, Your Honor. Jennifer Ainsworth on behalf of Google.

And with me today as co-counsel are Mitchell Stockwell, Ms. Danielle Williams, and Mr. Russell Korn. And we'll be putting on the -- the case together. And also from Google is Mrs. Angana Ghosh who's a product manager in Android, and she will be a witness in the case and will be sitting with us representing Google.

And we're ready to proceed.

THE COURT: Thank you, Ms. Ainsworth.

Ladies and gentlemen, as I've told you, this is a patent case arising under the patent laws of the United States. What the Plaintiff is claiming in this case as -- is that its patent was infringed by the

Defendant, and they're seeking money damages because of that infringement.

The Defendant denies that they've infringed the Plaintiff's patent and contend that the patent is invalid. Now, what I've just told you is a very brief and very informal way of describing the case in layman's terms. Having seen the patent film, you know more about patent cases than most people in East Texas do already.

Again, just a couple reminders. During the questioning in this selection process, there are no wrong answers as long as your responses are full, complete, and truthful.

And, again, as I mentioned, the lawyers are not trying to pry unduly. They're simply seeking to secure a jury that can serve in this case that is fair and impartial. If any of the lawyers should ask a question that I don't think is proper, I'll certainly let them know that.

But you should understand, ladies and gentlemen, these are experienced lawyers, and I don't expect that to be a problem. I'm confident that they understand and will stay within the rules of this Court.

One thing I want to call to your attention, because it's quite possible that some of the

lawyers might ask you about it during the questioning of the jury panel, is the burden of proof.  In a patent case, the members of the panel that are selected to comprise our jury will be called upon to apply two different burdens of proof to the evidence in this case.

The jury will apply a burden of proof known as a preponderance of the evidence as well as a second burden of proof known as clear and convincing evidence.

When responding to lawyer's questions about the burden of proof, I need to instruct you that when a party has the burden of proof on any claim or defense by a preponderance of the evidence of the evidence, it means that you, the jury, must be persuaded by the credible or believable evidence that the claim or defense is more probable true than not true.  I'll say that again.  More probably true than not true.

Sometimes this is talked about as being the greater weight and degree of credible testimony.

Let me give each of you an illustration in this regard, and I think all of you can see in front of our court reporter, Ms. Holmes, a statue, the Goddess of Justice or Lady Justicia as she's sometimes called. You notice she has three distinct features.  In her right hand, she holds a sword of justice.  You notice

that she's blindfolded, so she is supposed to be impartial. And in her left hand, she has raised the Scales of Justice. And it's the Scales of Justice I want you to focus on as a part of this illustration.

At the close of evidence in this case the Court's going to submit questions to the jury, and the party that has the burden of proof as to those questions by a preponderance of the evidence, if you'll consider that all the evidence during the trial is placed on those two perfectly balanced scales that she's holding, when all the evidence is in and the trial is over, if the party who has the burden of proof by a preponderance of the evidence has those scales tip in their favor, even if it's ever so slightly, then they have met their burden of proving that by a preponderance of the evidence.

On the other hand, when a party has the burden of proving any defense by clear and convincing evidence, it means that you, the jury, must have an abiding conviction that the truth of the parties' factual contentions are highly probable. Clearly that's a higher standard of proof than the preponderance of the evidence.

So turning back to the same illustration, if you imagine the Scales of Justice perfectly balanced

1  and during the trial all of the evidence is placed on

2  those scales, then when the trial is over and the

3  evidence has all come in, the party that has the burden

4  of proof by clear and convincing evidence must have

5  those scales tip in their favor more than ever so

6  slightly.  They must tip substantially in their favor to

7  meet the burden of proof of clear and convincing

8  evidence.

9          Now, none of this is to be confused with

10 the third burden of proof called beyond a reasonable

11 doubt.  That's the burden of proof used in a criminal

12 case, and it has no application in a civil case such as

13 this whatsoever.  So you should not confuse clear and

14 convincing evidence with evidence beyond a reasonable

15 doubt.  It's -- it is not as high as beyond a reasonable

16 doubt.  But it is a higher burden of proof than by a

17 preponderance of the evidence.

18          I give you these instructions in case

19 some of the lawyers during their questioning ask you

20 about your ability to understand and apply those two

21 burdens of proof to the evidence that will come in

22 during the trial of this case.

23          Now, as I said when I came in, I'm about

24 to learn as much about you as I told you about myself.

25          You'll see on the screen across from the

jury box a list of nine questions. We're going to start

with Panel Member No. 1, Ms. Foster, and the Court

Security Officer, Mr. Floyd, is going to bring you a

handheld microphone and I'm going to ask each person one

at a time to stand, use that microphone, and answer

those nine questions. Then we'll go to the next person

until we've been through the whole panel.

I want -- it's very important in a room

this large with as many people as we have, that you do

two things, and this applies not only to giving me the

answers to these nine questions, but it applies in your

responses to any questions that the lawyers may ask you

in a little bit. Please stand and please use that

handheld microphone. Without -- if you begin to give an

answer or you start an answer without that, I guarantee

you everybody that needs to hear your response won't

hear your response. So please use the handheld mic and

please stand whenever you're giving a response.

Okay. Mr. Floyd, if you'll take the

microphone to Ms. Foster.

Ms. Foster, if you'll answer those nine

questions for us, please.

JUROR FOSTER: My name is Joyce Hill

Foster. I live in Bivins, Texas. I have five grown

children, six grands. I'm currently retired, and I

retired from Northeast Texas Mental Health Mental
Retardation Center where I was an HR director.  I am
single, so No. 7 does doesn't apply.  And No. 8 -- and I
have never served on a jury.

THE COURT:  Thank you.  And if you'll
pass that down to Mr. Prestidge.  If you'd give us your
answers, please, sir.

JUROR PRESTIDGE:  Good morning.  I'm
Rickey Prestidge.  I live in Marshall, Texas, one mile
outside the city limits.  I'm currently unemployed,
waiting to kick a job off in Houston down at Port
Arthur.  I work pipeline construction, work out of Local
Union 798 out of Tulsa.  Been in the union 10 years.
Just got back from New York on a job up there.  Been off
a couple months.  Quit high school in the 10th grade.
Got tired of being poor.  My wife -- been married for 41
years.  Her name is Rita Daucet Prestidge.  Housewife,
mother, grandmother.  She hasn't worked anywhere in a
long, long time.  And I've served on a civil jury in
this courthouse and a criminal case in this courthouse.

THE COURT:  Thank you, sir.
Next, Mr. Dilday.

JUROR DILDAY:  My name is Randy Dilday,
and I live in Hallsville, Texas.  I have two children,
both boys, 7 and 13.  I work at ICS/NCIC.  It's a

telecommunication company in Longview, Texas. Our base
is inmate telecom. I run the call center there as
customer service manager, as well. Lived currently in
my home 14 years in Hallsville. Graduated high school
in New Diana, Texas. Went to ETBU and Kilgore College.
My spouse's name is Karen. She currently works at
Kilgore College. She's been in her new position the
past year and a half. And I've never been selected on a
jury as of yet.

          THE COURT: All right. Mr. Brooks.

          JUROR BROOKS: My name is Dale Brooks. I
have two grown children. I work for Crosby Lebus in
Longview, Texas, and I'm the electric shop supervisor
there. I've been there 41 years. I graduated high
school, went to Vietnam. My wife's name is Betty.
She's the team leader at Sam's in Longview in the
Jewelry Department. She's been there about 15 years.
I've never been chosen in court for jury duty.

          JUROR NORRIS: My name is Philip Norris.
I live in Jefferson, Texas. I have three children, 12
grandchildren that do not live with me. And I have -- I
worked for the Made-Rite Company. I retired after 35
years. And my educational background is Central High
School of Jefferson, Texas. My spouse's name is Marver.
And she worked for Old Navy for the last 20 years. And

1 I've served on a civil and a criminal -- criminal court.

2         THE COURT:  Thank you, Mr. Norris.

3 Mr. Davis.

4         JUROR DAVIS:  Hi, my name is Richard

5 Davis.  I was -- I live in Waskom, Texas.  I'm single.

6 I have no children.  I work for Legal Services of North

7 Louisiana in Shreveport.  I've been there 15 years.

8 I've got -- I graduated high school in Marshall.  Went

9 to some college at BPC in Bossier.  I'm not married.

10 And I've served on one criminal case before.

11         THE COURT:  Thank you.

12 Ms. Love.

13         JUROR LOVE:  I'm Mary Love.  I have two

14 grown children, ten grandchildren.  At present, I work

15 for Jackson Hewitt Tax Services there in Atlanta, Texas.

16 I've been with that company for nine years.  Before

17 then, with H & R Block.  I'm -- graduated from Fairview

18 High School in Linden, Texas.  My spouse is Calvin Love,

19 which is deceased for two years.  I have never served on

20 either criminal or civil.

21         THE COURT:  Thank you, ma'am.

22         And if you'll take that around to Mr.

23 Bryant, we'll start with him next, please.

24         JUROR BRYANT:  My name is Myles Bryant.

25 I live in Elysian Fields, Texas.  I have four grown

children, all away from home.  I'm a retired postal

worker.  I'm a DAV, Vietnam.  Two years of college, no

degree.  My wife's name is Laura, also medically retired

from U.S. Post Office.  Both of those been away from

over there since '95 and '97, and I have never served on

a jury.

           THE COURT:  Thank you, sir.

Mr. Howell.

           JUROR HOWELL:  My name is Lonnie Howell.

I live in Hallsville, Texas.  I have two children, an

18-year-old and a 16-year-old.  I work at Peters

Chevrolet Chrysler Dodge.  I've been there about a year

and a half.  My educational background is high school,

some college.  My wife's name is Rebecca Howell.  She

works at Good Shepherd, has been there for -- right at

eight years.  She's in the IT Department there.  And I

have never served on a jury.

           THE COURT:  All right, sir.

           JUROR COX:  My name is Susan Cox.  I live

in Gilmer, Texas.  I have one grown daughter.  I am a

retired school counselor, but I never quit.  I'm working

at Region 7 Educational Service Center as a behavior

specialist, finishing my fourth year there.  I went to

Baylor University and Master's degree from Texas A&M

commerce.  My spouse is Doug Cox.  He's a semiretired

jeweler.  He was working at McCarley's Jewelry for 22 years and then retired.  I have served on two civil cases before.

JUROR ALLEN:  My name is Conrett Allen. I live in Marshall, Texas.  I have three grown kids.  I currently work for Jordan Health Services.  I've worked there four years.  Before then, I worked in the oilfield for 10.  My educational background is high school.  I graduated from South Garland High and Garland High.  And I don't have a spouse.  And I've never served on a civil or a criminal jury.

THE COURT:  All right, sir.  Thank you, Mr. Allen.

Mr. Bright.

JUROR BRIGHT:  My name is Kevin Bright. I live in Longview.  I have two daughters, 27 and 16. I'm a pastor of First Baptist Church, Greggton First Baptist Church in Longview.  I've been there a year.

Before that, I was about 12 years at Oakland Heights Baptist Church as an associate pastor. I have a bachelor and master's degree in business from Baylor University and a master's degree in divinity from New Orleans Baptist Theological Seminary.

My wife's name is Yolanda.  She's a sixth-grade bilingual teacher at Pine Tree School

District.  She's worked there about seven years.  I've
never been selected to be on a jury before.

           THE COURT:  Thank you, sir.

           Ms. Palmer.

           JUROR PALMER:  Good morning.  My name is
Amanda French Palmer.  I live in Marshall.  I have a
stepson 40 -- 40, maybe a little older.  I am a
self-employed writer and Christian speaker.  And I've
been doing that for about 25 years.  Prior to that, I
practiced law for five years.

           My educational background, of course, is
I have a BA in English Lit and a JD from LSU Law Center.
I'm married to Paul.  He is an investor.  He's been
doing that about 35 years.  Prior to that, he was a
forester for Georgia-Pacific.  I have never served on a
jury.

           THE COURT:  Thank you.

           Mr. Powell.

           JUROR POWELL:  My name is Adam Powell.  I
live in Hallsville, Texas.  I do not have any children.
I currently work at Energy Well Fab in White Oak, Texas,
as a welder.  I've worked there, be a year in March.  I
graduated high school from Hallsville High School and
went to Tulsa Welding School and have a certificate from
there.  I do not have a spouse, and I have never served

on a jury.

            THE COURT: All right, sir.

            If you'll carry that microphone, Mr. Floyd, over to No. 15, Mr. Williams.

            JUROR WILLIAMS: My name is Jonathan Williams. I live in Longview, Texas. I have one daughter. She's 19 years old. She's currently about to complete basic training for the United States National Guard. I'm a store manager for Top Notch Supply in White Oak, Texas. Been there about six months. It's a brand new company. Was hired on on the ground floor. Went to school at Hallsville. Left about one credit shy. Been on my own since I was 16 and was working 60-70 hours a week. Had to eat, and so no diploma from there. Been married about a year. Julie Lightfoot Williams is her name. She is an independent inventory auditor for Riggins Inventory Services.

            I have served on juries before. One was a civil (sic) case in which the Defendant pled, and so we never continued that case. And I served on a grand jury in the 188th District Court for Gregg County for about two months about two years ago.

            THE COURT: Thank you, sir. Mr. Pawlak.

            JUROR PAWLAK: Good morning. My name is

1  Steven Pawlak.  I'm from Longview, Texas.  I have four

2  children.  I currently work as a manager for United

3  States Steel and Pipe Manufacturing and Processing.

4  It's located in Lone Star, Texas.  I've been with United

5  States Steel for about 15 and a half years.

6            Graduated high school, some college.

7  Spouse's name is Bridgette May Pawlak.  Doesn't work;

8  homemaker.  She's the CEO at my address.  No prior jury

9  service.

10            JUROR PEMBERTON:  Sam Pemberton.  I have

11  two kids; one 10, one 5.  I work for US Steel as a

12  machinist in central maintenance.  And I've been there

13  about 13 years.  I have a certificate of completion of

14  computer-integrated manufacturing through a trade school

15  here in Marshall.

16            And my wife is Kelly Pemberton, and she

17  works for Hughes Springs ISD School District where she

18  teaches high school math.  And I have never served on a

19  jury.

20            JUROR BROWN:  I'm Kay Brown.  I live in

21  Atlanta.  I have no children.  I work at Christus

22  St. Michaels as a RN.  Been there for a year and a half.

23  I graduated from Atlanta High School and Texarkana

24  College.  I'm not married and never been on a jury.

25            THE COURT:  All right.  Next is No. 19,

Mr. Burnam.

JUROR BURNAM: My name is Marty Burnam. I live in Gladewater, Texas. I have two children. I work at Pegues Hurst. Been a couple years, in Longview, Texas. I graduated from Hereford High School in Hereford, Texas.

My wife's name is Beatrice. She works for Texas Bank and Trust. She's been there eight, nine years. And I've been on a civil case before.

THE COURT: Thank you, sir. Ms. Crow.

JUROR CROW: Hi. I'm Katherine Crow from Atlanta, Texas. I have two sons, 18 and 20. I am currently a nursery worker at First United Methodist Church in Atlanta. And I also baby-sit for my sister and brother-in-law for an 18-month-old.

Let's see. I graduated from high school. I'm divorced. I don't have a husband. I've been on one jury once, and that was civil.

THE COURT: Thank you, ma'am.

JUROR BAKER: My name is Todd Baker. I live in Queen City, Texas. I have two children. I've worked at Cooper Tire and Rubber for a little over 15 years as production supervisor. Previous to that, I worked for the Atlanta Fire Department as a

firefighter/medic.  A lot of my educational background was in units for medical and fire stuff.

My wife, Michelle, works at Queen City Independent School District as a teacher's aide.  She's been there about 10 years.  And I've never served on any civil or criminal case.

THE COURT:  Thank you, sir.

Ms. Cerliano.

JUROR CERLIANO:  My name is Becky Cerliano; technically, Rebecca.  I currently live in Linden, Texas.  I have no children.  I work for the Linden-Kildare Consolidated Independent School District.  I'm a classroom teacher at the high school.  I've been in Linden -- this is -- I'm a 39-year educator.  This is 14 years in Linden, after 25 in Jefferson.

I graduated Longview High School, Stephen F. Austin State University with a bachelor's; Stephen F. Austin University with a master's and numerous hours after that.  I have no spouse, and I previously served on a civil jury in this district that never went to deliberation.  They settled at lunch on the fourth day.

THE COURT:  All right.

Mr. Murray.

JUROR MURRAY:  My name is Yancy Murray. I'm from Harleton, Texas.  I've got two kids.  I work

 1  for Legacy Ag Credit.  I'm a loan officer.  I've been

 2  there about six years.

 3              Graduated from Harleton High School.

 4  Also have a bachelor's degree from East Texas Baptist

 5  University here in Marshall.  My wife's name is Jamie.

 6  She is a homemaker.  She also works some at the Harleton

 7  High School as a sub, and she's been doing that for

 8  about three years.  And I have been on one criminal

 9  case.

10              THE COURT:  Thank you, sir.

11              Next is No. 24, Mr. Hale.

12              JUROR HALE:  I am Robert Hale.  I have

13  one son.  I've worked for East Texas Fuels for about

14  five months.  I'm a high school grad, some college, not

15  married.  And I've never served on a jury.

16              JUROR DARDEN:  I'm Steve Darden.  I've

17  got two sons, 27 and 23.  I'm a financial advisor with

18  Williams Financial Advisors in Shreveport, Louisiana.

19  Been there for eight years.  I've got a business degree

20  from Stephen F. Austin State University.

21              My wife's name is Sandy, and she is an

22  administrator with Cumberland Presbyterian Church here

23  in Marshall.  She's been there for 12 years.  And I've

24  served in two criminal cases.

25              THE COURT:  Thank you.

1          Ms. Martin.

2          JUROR MARTIN:  My name is Mary Martin.

3 I -- I don't have my glasses; I forgot them.  I have two

4 daughters, grown daughters and four grandsons.  I worked

5 for Walmart for 20 years, retired.  I was a supervisor

6 all over the country as a remodel crew.  I was an

7 assistant manager for four years.  And now I'm retired.

8          And --

9          THE COURT:  Educational background?

10          JUROR MARTIN:  High school graduate.

11          THE COURT:  Spouse's name?

12          JUROR MARTIN:  James Gossett.  He works

13 at Turner Industries at the Eastman facility in

14 Longview.

15          THE COURT:  And how long has he worked

16 there?

17          JUROR MARTIN:  Five years.  He worked at

18 Lone Star and retired from there 30 years as a

19 maintenance supervisor.

20          THE COURT:  And what about prior jury

21 service?

22          JUROR MARTIN:  I was on a criminal case,

23 and that's all.

24          THE COURT:  And tell us where you live,

25 please, Ms. Martin.

1                 JUROR MARTIN:  Avinger, Texas.

2                 THE COURT:  Thank you.

3                 JUROR SAMFORD:  My name is George

4 Samford, and I'm like her, I didn't bring my glasses and

5 it's hard to read.

6                 THE COURT:  Where do you live, Mr.

7 Samford?

8                 JUROR SAMFORD:  I live in northwest

9 Upshur County.

10                THE COURT:  And how many children do you

11 have?

12                JUROR SAMFORD:  I have one son, who is 41

13 years old, and I'm currently retired from US Steel.

14                THE COURT:  What did you do --

15                JUROR SAMFORD:  And General Motors, and

16 my wife, she's retired.  She used -- she worked at SFG.

17                THE COURT:  What did you do for US Steel

18 and General Motors?

19                JUROR SAMFORD:  I worked in the chemical

20 and destructive lab at US Steel, and I drove a forklift

21 at General Motors.

22                THE COURT:  And what about your

23 educational background?

24                JUROR SAMFORD:  I have a high school

25 education, and I have -- my wife and I both have our

1   real estate license.

2              THE COURT:  And tell me about your wife's

3   employment, what does she do?

4              JUROR SAMFORD:  She worked on a receiving

5   dock.

6              THE COURT:  Okay.  And how long did she

7   work there?

8              JUROR SAMFORD:   Seven years.

9              THE COURT:  What about prior jury service

10  for you?

11             JUROR SAMFORD:  I was on two criminal

12  cases.

13             THE COURT:  All right, sir.

14             JUROR SAMFORD:  In Upshur County.

15             THE COURT:  Thank you.

16             And No. 28 is our last panel members, and

17  that's Ms. Nolen.

18             JUROR NOLEN:  My name is Shannon Nolen.

19  I'm from Queen City, Texas.  I have two children.  I

20  currently work at the Fix Your Well Company there in

21  Queen City, along with my husband.  It is a family

22  business.  We joke, I run the inside, he runs the

23  outside.  So he has been there for 20 years.  I have

24  been there for 15 years.  And I have no prior jury

25  service.

1          THE COURT:  Thank you, ma'am.  If you'll

2   pass that microphone back to Mr. Floyd.

3          Thank you very much, ladies and

4   gentlemen.  I need to tell you just a couple more things

5   before I turn the questioning over to the lawyers.

6          The jurors that are actually selected to

7   serve in this case will serve in the role of the judges

8   of the facts, and the jurors who are selected will make

9   the sole determination about what the facts are in the

10  case.

11          Now, my job as the Judge is to rule on

12  questions of law, evidence, procedure, and to control

13  the decorum and flow of evidence through the courtroom.

14  I want to say a couple things to you about our judicial

15  system that hopefully will put things in a proper

16  perspective as we head toward your service -- some of

17  your service as jurors in this case.

18          In any jury trial -- in every jury trial,

19  there are -- other than the parties themselves, there

20  are three principal participants, the jurors, the Judge,

21  and the lawyers.

22          Now, with regard to the lawyers, our

23  judicial system is an adversary system which means

24  simply that during the trial, each of the parties will

25  seek to present through their lawyers their respective

cases to the jury in the very best light possible.

Now, lawyers are frequently criticized by the public and in the media, and the Court has observed that this criticism is often the result of a basic misunderstanding of our adversary system in which the lawyers act as advocates for the competing parties. As an advocate, a lawyer is ethically and legally obligated to zealously assert his or her client's position under the rules of our court system. And by presenting the best case possible on behalf of their clients, the lawyers hopefully will enable the jury to better weigh the relevant evidence and determine the truth and arrive at a just verdict based on that evidence.

Our American system of justice has served our country well for over 200 years, and America's lawyers have been and continue to be a critical part of that process. So as we go forward and as we begin the trial in this case, even though I may occasionally frown or growl at the lawyers from time to time, that's simply because I'm trying to make sure they stay within the boundaries of our adversary system and the rules of procedure. But the members of the jury that are selected from this panel need to keep in mind that they are simply doing their jobs, and I think it's important for everyone to be aware of that as we go forward.

1          Also, ladies and gentlemen, I want you to

2  understand that those of you who are selected to serve

3  as our jury during the trial of this case, you'll notice

4  that I am going to do my very best to make sure that you

5  have no idea about what I think of the evidence because

6  deciding the facts from the evidence is the jury's job,

7  not the Judge's job.  So you should not take any

8  expressions that come from me or that you think come

9  from me as something to consider or as a factor in

10 making your decision about what the ultimate facts in

11 this case are.

12          At this time, we'll let counsel for each

13 of the parties address the panel.  We'll start with

14 Plaintiff's counsel.

15          Mr. Capshaw, you have 30 minutes.  Would

16 you like a warning?

17          MR. CAPSHAW:  Yes, sir.  Five-minute

18 warning.

19          THE COURT:  All right.  You may proceed.

20          MR. CAPSHAW:  Thank you, Your Honor.

21          Ladies and gentlemen, my name is Calvin

22 Capshaw, and I represent SimpleAir in this lawsuit.

23 Good morning.  I want to thank you all for your service

24 and for being here.

25          I have two children.  I have a

17-year-old named Hannah, and she's at Baylor University
now as a freshman.  Her mother is now with her.  Her
mother's name is Bonnie.  She is a costumer for Artsview
Children's Theater in Longview.  My oldest daughter is
Amanda.  She's a theater major.  She's getting her
Master's at SMU in Dallas.  I hope you'll join me in
wishing that she'll go date across the street at
Southwestern Medical School, instead of in the Theater
Department.  I hope for that, but that's not happening.
I work with Capshaw DeRieux.  It's a law firm with
offices in Gladewater.  I've been there since 2008.
Before that, I worked for a law firm in Longview.  I
went to Baylor University and graduated from there with
a law degree.  I was on one jury once.  Someone picked
me, and it was a civil case.

I want to begin my questions to you by
introducing you to SimpleAir.  SimpleAir is a company
formed by two inventors, Mr. Payne and Mr. Von Kaenel,
and their business partner.  And SimpleAir owns a patent
that has to do with sending wireless notification
messages to computing devices about new information
that's on the Internet.  And one of the -- the patent
that they own, the '914 patent, is alleged to be
infringed by Defendant Google.  Google is a U.S.-based
company, and they sell Internet products and services

that relate to searches, messaging services, and
advertising.  Now, it's the messaging services that are
involved in the case.

I want to ask anybody on the panel if you
or your spouse have ever worked for Google, Motorola, or
Motorola Mobility?  Has anybody on the panel -- okay.  I
take it by your silence that no one has worked for
Google or their spouses work for Google.

Does anyone own stock in Google,
Motorola, or Motorola Mobility?

Now, some of the attorneys that represent
Google are Ms. Jennifer Parker Ainsworth.  She's with
Wilson Roberts & Cornelius in Tyler.  Does anybody know
Ms. -- Ms. Ainsworth or have had any dealings with her
law firm?  Would you please raise your hand?

Another attorney that may be involved
helping Google in this case is Jessica Hannah.  Ms.
Hannah used to work for Judge Love in Tyler.  She's now
an attorney with Kilpatrick Townsend.  Does anybody know
Ms. Jessica Hannah?  Okay.  Thank you.

Now, I'm going to talk very briefly to
you about the patents and technology in a minute, but I
wanted to mention something about voir dire.  And when I
served on a civil jury, the people -- some of the folks
that I was with -- was with thought that if during voir

dire they didn't say anything, if they kept quiet, that

they might avoid being on the jury panel. And I can

tell you that when you don't say anything and you're

quiet when the lawyers are asking questions, they'll

just assume that you agree with them and you enhance

your chances of making it to the panel. So it's very

important that you -- you answer questions and speak up

because this is your chance to talk to the lawyers.

Now, I'm sure you wanted to all -- all

wanted to come to court today being fair to both sides

and not leaning to one side or the other. However,

personal beliefs in life sometimes influence how we look

at things. For example, just from my personal life, I

had a bad experience in a construction matter, my wife

and I. And we didn't get involved in a lawsuit, but

it's something we won't talk about to this day. It

consumed two years of our life. And I would probably be

the wrong kind of a juror in a construction dispute. So

that's the kind of thing I'm talking about, and leaning

is what the law calls bias or prejudice. Bad words

outside the courthouse, but it just means you start out

leaning to one side or the other. So that's why I want

you talking to me and trying to find out whether today

you're leaning one way or the other before you hear the

evidence.

1           Now, Judge Gilstrap has allowed me to

2   talk to you really briefly about the -- about the case

3   before I start asking questions.

4           Now, this is a patent infringement case

5   as you know about a patent that SimpleAir owns.  It's

6   the '914 patent, and that's how you'll hear it referred

7   to.

8           Now, Google provides a feature on its

9   smartphones and computers that we contend uses

10  SimpleAir's invention without our permission.

11          SimpleAir's '914 patent was born in late

12  1995 when the Internet was just beginning to get

13  popular.  And at that time, people really didn't know

14  how to use the Internet.  And it was a lot of

15  information out there, but people didn't know how to

16  access it.  So that was before Google and other people

17  had Internet everywhere you went.

18          Mr. Payne and Mr. von Kaenel, who are

19  here in the courtroom today, and their co-inventors

20  thought about how to make it easier for people to find

21  information that they cared about on the Internet,

22  information that was available, and then tell people how

23  to find their way to get that information.

24          And their solution was a notification

25  service that would send user's computer an alert when

there was new information on the Internet.  The user
would sign up to receive notifications about the things
they cared about, like breaking news; or if you're a
baseball fan like me, baseball scores.  And when
something happened on the Internet, Mr. von Kaenel and
Mr. Payne's invention would send a wireless alert to the
user's computer, and it would pop up in an application
that matched the information.

So if you got a breaking news alert from
CNN, it would pop up on your CNN application.  And then
the user could go back to the Internet, find CNN, and
read more about the matter they were interested in.  The
idea was more than a decade ahead of its time, and
Mr. Payne and his co-inventors applied for a patent and
received the '914 patent.

Now, to finish up, SimpleAir contends
that -- that Google infringes the '914 patent because it
provides a notification service that uses the patent's
technology.  And the two products you're going to hear
about are Android Cloud to Device Messaging Service, or
C2DM, and Google Cloud Messaging Service.  And those are
applications you see on Android and other smartphones.

How many of you have an Android
smartphone?  Anybody?

Okay.  We've got some with their hands.

All right.  If you'll just keep them up.  Ms. Palmer --
Ms. -- excuse me -- Ms. Palmer.

                    JUROR PALMER:  Yes.

                    MR. CAPSHAW:  Okay.  And Ms. Brown,
Mr. Murray, and Ms. Nolan.

                    Oh, I'm sorry.  Thank you, Mr. Pemberton.

                    JUROR DARDEN:  I've got one, too.

                    MR. CAPSHAW:  Thank you, Mr. Burnam
(sic).

                    JUROR DARDEN:  Darden.

                    MR. CAPSHAW:  Darden.  Sorry.

                    Ms. Palmer, do you get message alerts on
your Android phone?

                    JUROR PALMER:  Yes, sir.

                    MR. CAPSHAW:  How many applications do
you get those alerts on?

                    JUROR PALMER:  Probably two.

                    MR. CAPSHAW:  Okay.

                    JUROR PALMER:  Maybe three.

                    MR. CAPSHAW:  Okay.  Is that a feature
that you find -- that you find useful?

                    JUROR PALMER:  Yes.

                    MR. CAPSHAW:  Who agrees with Ms. Palmer?
Do you find your alert features useful on your Android
phones?

1          I see some of you nodding.  Okay.  Thank

2 you.

3          Now, I want to get to -- to patent

4 lawsuits and lawsuits in general.  There's one patent at

5 issue in the case that was issued by the Patent and

6 Trademark Office, and that's the '914 patent.  And you

7 saw the video this morning.  The Patent Office issues

8 patents, but they don't enforce patents, so if I have a

9 patent that says I own something, the only place I can

10 enforce that patent is the United States District Court.

11          Is there anybody who believes on the

12 panel that a person should not come to court to enforce

13 their patent rights?  If you would raise your hand, if

14 you have that belief.

15          Is there anybody on the panel that

16 believes that we have too many patent lawsuits?

17          Okay.  I take it by your silence that no

18 one feels that way.

19          Now, there -- I've often heard it said

20 that people fall kind of into two camps when it comes to

21 patents.  One group says that patents are great

22 inventions -- are great things.  They promote

23 inventions; they help us compete in the world market.

24          And without intellectual property, you

25 won't have as much research and development, because

1  people wouldn't justify all the effort it takes to

2  invent and get patents.  That's one group.

3            The second group believes that patents

4  shouldn't be protected by the Constitution; that we

5  should have a free market.  If you get a product out

6  there whether it infringes a patent or not, you should

7  be able to do that free from any kind of -- any kind of

8  patent protection.  That's Group 2.

9            I want to ask a few of you if you fall

10  into one of those camps.

11            Mr. Brooks, do you have a view one way or

12  the other where -- about patents and patent protections?

13            JUROR BROOKS:  No, sir.

14            MR. CAPSHAW:  You're shaking your head

15  no.  Okay, thank you, sir.

16            Mr. Dilday, you're close to the

17  microphone.  Hi.

18            JUROR DILDAY:  Hello.

19            MR. CAPSHAW:  Do you fall into either one

20  of those groups?

21            JUROR DILDAY:  Yes.  I believe that they

22  should be able to be protected.

23            MR. CAPSHAW:  Thank you, sir.

24            Let me see if we can ask Mr. Williams.

25  Mr. Williams, thank you, sir.  If I can pick on you for

a minute.

JUROR WILLIAMS:  Yes, I do believe they should be able to be protected.

MR. CAPSHAW:  Thank you.

And, Mr. Pemberton, how about you, sir?

JUROR PEMBERTON:  Yes, sir.

MR. CAPSHAW:  All right.  Thank you.

How many people agree there are too many lawsuits in general?

Going to be a lot of you.  And there are a lot of lawsuits, even frivolous lawsuits.  When I was a law clerk with Judge Steger, one time I saw a lawsuit by an inmate because he wasn't allowed to wear his socks in the shower.  He didn't want to take a communal shower, I guess, with his feet exposed.  But I saw that lawsuit.  I don't think that one had a lot of merit.

But I want to talk to some of you that may have had experience as a defendant in a lawsuit.

Has anybody had experience that perhaps you were a defendant in a lawsuit that maybe gives you an attitude about lawsuits in general?  Would you raise your hand?

Is there anybody who -- some of you filled out a questionnaire and you had some experience as to lawsuits.  Is there anybody who had an experience

with a lawsuit that maybe was negative or difficult for
you that causes you to maybe have a negative attitude
about people who come to Court?  Is there anybody who
feels that way.

Okay.  I take it by your silence that no
one feels --

JUROR POWELL:  I haven't had any --

MR. CAPSHAW:  I'm sorry.  Thank you, sir.
Mr. Powell.

JUROR POWELL:  I haven't had any court
experience, but in my opinion, I think a lot of
people -- not all people, but I think a lot of people do
take advantage of some of the freedoms that are meant to
protect the hard-working American and use it as an
escape goat to get ahead the easy way.

MR. CAPSHAW:  And because you feel that
way, sir, do you come to the courtroom today sort of
leaning towards more towards the Defendant?

JUROR POWELL:  I'm not really leaning
either way.  I don't use technology very much.  I always
say that I hate my cell phone, but at the same time, in
the today's world, you can't live without one.  So I'm
not really leaning one way or another.  I'm just -- in
my opinion, a lot of people take things too far as far
as going to court.  Not all the times.  There's a lot of

1  things that do need to go to court, but -- I mean, a lot

2  of people go -- take things too far.

3            MR. CAPSHAW:  Thank you, Mr. Powell.

4            Based on how you feel about that, do

5  you -- do you have any feelings about this lawsuit

6  before you've heard any evidence?

7            JUROR POWELL:  I don't know anything

8  about it, so, no, I don't have any feelings about it.

9            MR. CAPSHAW:  You haven't formed any

10 beliefs about it.

11            JUROR POWELL:  No.

12            MR. CAPSHAW:  Thank you, sir.  I

13 appreciate your candor.

14            Now, when you're -- if you're selected

15 for this panel, you'll hear in the case about the fact

16 that SimpleAir has brought a patent infringement

17 litigation suit against other Defendants.  For example,

18 Microsoft and Apple and those companies eventually

19 licensed the SimpleAir patents.

20            Is there anyone who feels like they might

21 lean towards the Defendant because SimpleAir enforced

22 its patents against other companies, like Microsoft and

23 Apple?  Does anybody hold that against SimpleAir?

24            Okay.  I take it by your silence, you

25 don't feel that way.

1          Is there anybody on the panel that

2 belongs to an organization whose purpose is either to

3 lobby the legislature or be involved with lawsuits and

4 addressing the lawsuit situation?

5          Does anybody get literature from any of

6 those organizations?

7          Yes, ma'am, Ms. Cerliano?

8          JUROR CERLIANO:  Totally unrelated to

9 this, I've belonged to for 39 years and have been a

10 state delegate to our local president for my local Texas

11 State Teacher's Association.  And while our primary

12 purpose is not leg -- lobbying, it is a part of our

13 mission to lobby the state legislature on education

14 issues.

15          MR. CAPSHAW:  Concerning education?

16          JUROR CERLIANO:  Right.  Right.  It is

17 lobbying.  It's not related to IT, but it is lobbying.

18 And that is the way you phrased your question.

19          MR. CAPSHAW:  Yes, ma'am.  Thank you.  I

20 appreciate that.

21          Does anybody -- is anybody a member of or

22 get literature from the East Texas Against Lawsuit Abuse

23 or the Texans for Lawsuit Reform?  Anybody get that?

24          Now, who like me reads the Wall Street

25 Journal?

1          Okay.  Ms. Palmer, you read the Wall

2  Street Journal.  Anybody else?

3          Ms. Palmer, when you get the Wall Street

4  Journal, have you ever heard any articles about patents

5  and patent litigation in the paper?

6          JUROR PALMER:  I probably glanced at them

7  but not taken them in internally to remember them.

8          MR. CAPSHAW:  Do you just go to that

9  column on the left and read the news read quick and then

10 pitch it?

11         JUROR PALMER:  (Nods head.)

12         MR. CAPSHAW:  That's what I do, too.

13 Okay.  Thank you.

14         All right.  I want to talk to you a

15 little bit about patents and patent validity.  Judge

16 Gilstrap will tell you about the presumption of

17 validity.  A patent that goes to the Patent Office is

18 presumed valid, and that's a presumption.  And we don't

19 have to prove that to you, that the patent is valid.

20         Does anybody have a problem or feel that

21 that's not fair, that patents are presumed valid when

22 they're issued by the Patent Office?

23         Okay.  No hands.  Thank you.

24         Does anybody agree with this statement:

25 The U.S. Patent and Trademark Office probably makes a

lot of mistakes when issuing patents. And it issues a
lot of patents that are not any good? Anybody agree
with that?

Yes, ma'am. Ms. Cerliano, No. 22?

JUROR CERLIANO: I believe with the
exponential growth in technology and a lot of other
areas nowadays that it's practically impossible for the
Patent Office to research everything and always be
right.

MR. CAPSHAW: Okay. Who agrees with
Ms. Cerliano about that?

Yes, sir, Mr. Powell.

Anyone else?

Mr. Howell.

Ms. Cox, did you raise your hand? Okay.
Thank you.

Ms. Cox and Mr. Conrett (sic). And we
have No. 23, Mr. Murray, No. 25, Mr. Darden.

JUROR DARDEN: Right.

MR. CAPSHAW: Thank you, sir.

And Ms. Nolen. All right. Thank you.

Now, there are some people today who,
because of the way things are, believe the government is
so out of touch or out of control that they're not
interested in anything, an agency of the government,

like the U.S. Patent Office has to say.  And it's okay
to feel that way, but I need to ask you:  Does anybody
feel that way; that the government is so out of control
that you don't have any interest in what a government
agency might say about something?

Okay.  I don't see any hands.

Now, SimpleAir is a company founded by
the inventors of the patent, the '914 patent.  And
SimpleAir owns the patents, but it does not manufacture
cell phones, smartphones.  It does not offer a messaging
service.

Is there anyone here who believes that a
company that owns patents and invents but doesn't
manufacture or sell -- is there anybody believes they're
entitled to less protection of their patent rights than
a company that sells products?

Okay.  I don't see any hands.  Thank you.
Is there anybody who believes -- this is a little bit
different question -- that companies who do not
manufacture or sell products should not even have
patents?  Is there anybody who feels that way?

Okay.  I don't see any hands.  All right.
Thank you.

Now, I want to talk to you and ask you a
few questions about burden of proof, the preponderance

of the evidence burden of proof. Now, SimpleAir has the
burden of proving by a preponderance of the evidence its
case on infringement and also on damages. And we gladly
accept that burden. And as Judge Gilstrap described
that to you, it was -- our burden is to tip the Scales
of Justice just ever so slightly on infringement and
damages to carry our burden.

Is there anybody that would have a
problem applying that burden and following Judge
Gilstrap's instructions in this case on preponderance of
the evidence?

Okay. I don't see any hands.

Is there anyone else who thinks this is a
big case; it's important so SimpleAir's burden on
infringement and damages ought to be heavier? Anybody
feel our burden out to be heavier than a preponderance
of the evidence?

All right. Now, the Defendant, as one of
their defenses, Google will say that our patent is
invalid. And Judge Gilstrap's already talked to you
about that burden being a heavier burden; that you have
to tip the scales substantially and that you have to
have an abiding conviction that the matter is highly
probable.

Is there anybody that would have trouble

applying that heavier burden to Google's claim that the
'914 patent is invalid?  Is anybody -- anybody have a
problem with that?

Now, some people say it's not fair that
the Plaintiffs have a lesser burden to prove
infringement and damages than the Defendant has to prove
invalidity.  And it's okay to feel that way.

Is there anybody that feels it's not fair
that Google has the burden to prove by clear and
convincing evidence that the patent is invalid and that
that burden is heavier than SimpleAir's burden?  Anybody
think that's unfair?

I don't see any hands.  Thank you.

Has anybody ever been elected to a
position like a school board president, a water
district, a hospital district, where you were elected
and then appointed by your fellow board members to be a
chairperson or an officer?

Ms. Cerliano, I know you were a
representative.

Anybody else had that experience where
you were elected?

Anybody been on a committee and been a
chairperson of that committee?

Ms. Cox, No. 10.  Yes, ma'am, were you

```
 1  elected as a committee -- as a chairperson?
 2              JUROR COX:  Yes, sir.  I have several
 3  different committees at school and foreman of a jury
 4  once.
 5              MR. CAPSHAW:  Thank you.
 6  Anyone else?
 7              Ms. Palmer.  I don't mean to pick on you,
 8  Ms. Palmer.
 9              JUROR PALMER:  That's okay.  I figured
10  I'd be a natural target.  I've served on church
11  committees.  I've served on Chamber of Commerce
12  committees, various civic organizations.
13              MR. CAPSHAW:  Okay.  Thank you very much.
14              All right.  I want to ask a little bit
15  different question.  Has anybody here ever had an
16  opportunity -- I'm sorry.  Thank you.  Yes, sir?
17              JUROR DARDEN:  Just various civic and
18  church committees.
19              MR. CAPSHAW:  Okay.
20              THE COURT:  Let's wait until you get the
21  microphone, Mr. Darden, so we can hear you.
22              If you'll stand up, sir.
23              Go ahead and give us your answer.
24              JUROR DARDEN:  Just a member -- Steve
25  Darden.  Just a member of civic and church committees.
```

1          MR. CAPSHAW:  Yes, sir.  And you were the

2     chairperson?

3          JUROR DARDEN:  Chairperson, yes.

4          MR. CAPSHAW:  Thank you, Mr. Darden.

5          Has anybody had an opportunity to join a

6     collective bargaining unit or a union and declined to do

7     so?

8          Okay.  Mr. Bryant?  Mr. Bryant, did you

9     have an opportunity to join a collective bargaining unit

10    and decided not to?

11         JUROR BRYANT:  Yes, I have.

12         MR. CAPSHAW:  Have you ever also been a

13    member of collective bargaining unit?

14         JUROR BRYANT:  Yes, I have.

15         MR. CAPSHAW:  Done both?

16         JUROR BRYANT:  Yes, sir.

17         MR. CAPSHAW:  Anyone else like Mr. Bryant

18    who had an opportunity to join a collective bargaining

19    unit and you declined?

20         Okay.  Ms. Cox -- excuse me --

21    Ms. Cerliano.

22         JUROR CERLIANO:  I was saying -- I was

23    pointing out that it's illegal in my profession.

24    Collective bargaining doesn't exist and school districts

25    are considered public employees, so collective

bargaining is not an option for me.

MR. CAPSHAW:  Yes, ma'am.  Thank you.

Anybody a member of a collective bargaining unit or union?

Okay.  I've got three:  2, Mr. Prestidge; 4, Mr. Brooks; and Mr. Pemberton.

Mr. Prestidge, do you remember if it was a collective bargaining unit or a union, I guess.

JUROR PRESTIDGE:  Yes, sir.  Union.

MR. CAPSHAW:  Yes, sir.  And that was for 10 years, if I'm remembering correctly?

JUROR PRESTIDGE:  Yes, sir.

MR. CAPSHAW:  Thank you, sir.

Mr. Brooks, are you a member of a collective bargaining unit?

JUROR BROOKS:  Teamsters.

MR. CAPSHAW:  Teamsters.  And you're still a member now?

JUROR BROOKS:  Always.

MR. CAPSHAW:  Thank you, sir.

Mr. Pemberton?

JUROR PEMBERTON:  The US Steelworkers of America.

MR. CAPSHAW:  Okay.  All right.

JUROR PEMBERTON:  Thirteen years.

1           MR. CAPSHAW:  Thirteen years.  Thank you,

2   sir.

3           Ms. Cerliano, any NEA/TSTA?

4           JUROR CERLIANO:  That's a part of -- it

5   is a part of the NEA, which is a union and does do

6   collective bargaining in other states, but it's illegal

7   in Texas.

8           MR. CAPSHAW:  Thank you.  All right.  Is

9   anybody a member of the Chamber of Commerce?  We have

10  any Chamber of Commerce members here?  Okay.

11          THE COURT:  Five minutes, Mr. Capshaw.

12          MR. CAPSHAW:  Thank you, sir.

13          Now, ladies and gentlemen, I'm going to

14  try to wrap up quickly.  I want to miss any growls from

15  the Judge, so I'm going to try to wrap it up.

16          In this case you're going to hear later,

17  SimpleAir is going to have a damage expert that's going

18  to say that SimpleAir's royalties in this case should be

19  $126 million.  And my question really doesn't concern

20  damages.  But I want to know if there are any of you for

21  whatever reason that thinks an award up to $126 million

22  is just simply too much money to give to one company,

23  doesn't matter what the evidence is, doesn't matter the

24  value of the -- the invention, doesn't matter what the

25  evidence shows, that's just too much money.  Does

anybody feel that way?  Okay.  I take it by your

silence, that -- that no one does.

All right.  I'm going to close up, and

then turn it over to Google.  But sometimes, you know,

people wish I would have asked a question.  I don't ask

all the questions that I should probably, and I'm not

perfect.  So after all you've heard, there may be some

of you that are sitting there that are thinking, well,

if that lawyer had just asked me the right question, he

would not want me on his jury.  And so I'm going to ask

you right now, is there anyone who is thinking that way

right now, that I should have asked you a question and

didn't?

All right.  Is -- after all you've heard

and you haven't heard any evidence yet, is there anybody

that just maybe -- maybe feels like they're leaning

toward the Defendant Google in this case before we start

the case?  Anybody feel that way?

Well, ladies and gentlemen, I thank you

for your time.  I think that those of you selected will

get to participate in a great American tradition.  I

think you'll enjoy your service, and I'll look forward

to working with you, as does SimpleAir.

Thank you, Your Honor.

THE COURT:  All right.  Ms. Ainsworth,

 1   you may address the panel on behalf of the Defendant.

 2                   MS. AINSWORTH:  Thank you, Your Honor.

 3                   THE COURT:  And would you like a warning?

 4                   MS. AINSWORTH:  Yes, Your Honor, five

 5   minutes, please.

 6                   THE COURT:  All right.  You may proceed.

 7                   MS. AINSWORTH:  Good morning, ladies and

 8   gentlemen.  We met a few minutes ago, but my name is

 9   Jennifer Ainsworth and I represent Google, along with my

10   co-counsel, and we look forward to presenting this case

11   to the people that are eventually selected on this jury.

12                   Let me start out the same way that you

13   guys did and answer the same questions that you did for

14   the Court.  I live in Tyler.  I've got two sons who are

15   10 and 13.  I work at a -- at a law firm in Tyler, and

16   I've been there about 12 years.  I worked in Houston

17   before that.  I went to -- I'm from Hallsville

18   originally; graduated from Hallsville High School.  And

19   then went to University of Texas and then UT also for

20   law school.  My husband's name is Charlie Ainsworth, and

21   he's a lawyer also in Tyler.  And I have never served on

22   a jury.  I've been on jury panels like you're doing this

23   morning, but for some reason they've never selected me.

24   So that's my background, and we appreciate you sharing

25   your background with us.

1            So I'd like to start out -- the Judge --

2   Judge Gilstrap gives us an opportunity to take just a

3   couple of minutes and tell you a little bit about what

4   we think the issues are in the case so you have some

5   context.  And then I want to ask, you know, some of your

6   opinions and thoughts.

7            As you may have kind of gathered already,

8   this case has to do with smartphones and smartphone

9   technology, and particularly the issue of how

10  notifications or messages are sent to smartphones.

11           Google's come a long way from when it

12  started.  It's an Internet search engine started by two

13  guys who were students, but they've developed other

14  products and services.  And one of the things that they

15  developed a few years ago is the Android operating

16  system.

17           And some of you said you had Android

18  phones.  Android is an operating system that can be

19  integrated into smartphones, and those are built by

20  other companies, for example, Samsung, or LG, they're

21  some of the companies that manufacture Android phones.

22  Google provides the Android operating system free of

23  charge.  It's called Open Source.  And you may hear

24  about some of that in the case.

25               Now, the Plaintiff in this case

represented by Mr. Capshaw, SimpleAir, is saying that

Google is infringing their patent in the way messages

are sent from application developers to smartphones.  We

disagree.  Google says that we did not infringe their

patent.  And so the issue in the case is going to --

you're going to hear about Google messaging service, and

-- and Mr. Capshaw mentioned that earlier.

Some of you said that you had smartphones

that have apps on them.  Apps are applications that are

usually developed by other companies like, for example,

Facebook or The Weather Channel, ESPN.  And you might

install them on your phones.  Google has some apps of

its own, but most of them are like GMail.  But most of

the apps come from outside companies.  And so the

messaging service is a system where the app companies

can convey a message to a cell phone or a smartphone.

The app provider sends a message to Google who forwards

that on to the smartphone.

Now, we believe that Google's messaging

system operates in a different way than what's covered

by SimpleAir's patent, and we also say that their patent

should not have been issued and that it's not valid --

or it's invalid.

THE COURT:  We need to move on to

specific questions, Ms. Ainsworth.

MS. AINSWORTH: Thank you, Your Honor.

Let me ask you first if anyone here knows any of the counsel that represents SimpleAir, Mr. Capshaw or Ms. DeRieux from her firm in Gladewater? Has anybody worked with them or been represented by them in the past? Or any of the other counsel, Mr. Eichmann and Mr. Dovel representing SimpleAir?

Anybody here -- I know that Mr. Capshaw asked if anybody had rep -- had worked for Google. Anybody here has not used Google? Anyone here who has not used any of our services or products? That's great. We're -- we're glad that you do.

Does anyone -- and let me start with the folks who are in the jury box. Anyone have any opinions about Google or their reputation or their policies or their products that would make you start out this case with some hard feelings or bad feelings about Google? Anything that you've run into or heard that you would hold against Google? Don't worry about hurting our feelings because this is the point that we need to know it.

And, Mr. Bryant, if I could ask you -- have you had some kind of issue in the past that -- that you didn't like?

JUROR BRYANT: Yes, ma'am.

1          MS. AINSWORTH:  Okay.  Can you tell us

2    generally what that was?

3          JUROR BRYANT:  I'm a -- I'm a member of

4    several online forums that have to do with firearms, and

5    Google has in the past year stopped allowing any firearm

6    industries to advertise with them, sell their products

7    through their services, or whatever.  And I -- I think

8    that's about as un-American as you can get in this

9    country.

10         MS. AINSWORTH:  So you believe that

11   policy is un-American, and I gather that's something

12   that -- that you believe in fairly strongly?

13         JUROR BRYANT:  Yes, ma'am, it is.

14         MS. AINSWORTH:  Okay.  Is that something

15   that you would hold against Google if you were sitting

16   on the jury in this case?

17         JUROR BRYANT:  In a patent case, I don't

18   think it would apply.

19         MS. AINSWORTH:  What if you heard about

20   Google's policies and procedures in this case and that

21   was something that you had to -- that you had to hear

22   evidence about.  Would you start out Google behind

23   SimpleAir at the beginning of the case?

24         JUROR BRYANT:  No, I wouldn't.  I -- I

25   believe in let's get to the truth.  I think that's --

that's the root of everything right there.  We got to
get to the truth.

MS. AINSWORTH:  Okay.  Thank you very
much.  I appreciate that.

JUROR BRYANT:  Okay.

MS. AINSWORTH:  Let me ask the folks that
are sitting in the -- in the benches here.  Like Mr.
Bryant, has anyone there had any issues or concerns with
Google that you might hold against the company as we
start this case?  Bad experiences?  Problems with a
product?  Anything like that?  Okay.  I don't see any
hands.  Thank you.

As you've heard, we're going to be
talking about smartphones, and in particular about
Android smartphones.

Let me start back with the people in the
jury box.  Let me ask you kind of a general question.
When you purchased your smartphone -- there's a lot of
different smartphones on the market these days -- when
you purchased yours, what made you decide on that
particular smartphone?  Anybody have any, you know,
features, things they like, things they didn't like?

Okay.  I'm going to have to -- I'm going
to have to call on someone.

Mr. Dilday, could you tell us what things

1   made you pick one phone over another?

2                   JUROR DILDAY:  I have currently the

3   iPhone 4S, and it's simply because I had an

4   Android-based phone prior.  Everybody was raving about

5   it that I was around, and so I figured I'd give it a

6   shot.  And that's about it.  I mean, I do utilize it.  I

7   do like it, but I also liked my previous phone, as well.

8                   MS. AINSWORTH:  Okay.  So you had an

9   Android phone in the past.  You don't have one now.  Is

10  that -- would that cause you any problem if you're

11  hearing about Android issues in this case?

12                  MR. DILDAY:  No, ma'am.  My wife has an

13  Android phone, so it -- it doesn't matter to me.

14                  MS. AINSWORTH:  While I've got you --

15  while you've got the microphone, if you don't mind ask

16  -- can you tell us a little bit about your business.

17                  You said that it deals with telephone

18  technology?

19                  JUROR DILDAY:  Yes, ma'am.  We are an

20  inmate telephone communications company.  We actually

21  originated with old pay phones that we served in

22  transition, then to the inmate industry as the cell

23  phones took over.

24                  MS. AINSWORTH:  Do you deal with

25  smartphone technology as part of your daily business?

1          JUROR DILDAY:  No, ma'am, not as far as

2   the technology portion, no, ma'am.  Phone calls to

3   smartphones or cellular phones, yes, ma'am, but not

4   actual -- not at this moment.

5          MS. AINSWORTH:  Thank you very much.

6          JUROR DILDAY:  You're welcome.

7          MS. AINSWORTH:  Let me -- let me ask a

8   more general questions about your smartphones.  You've

9   heard that one of the issues in the case has to do with

10  notifications or messages and how they're sent to

11  smartphones.  When you bought your phone, did anybody

12  take into account or make your decision based on how it

13  handled notifications?  Did anyone on the jury box take

14  that into account when you made your decision?  I don't

15  see any hands there.

16          Did anyone take that into account -- the

17  people sitting in the court, when you made your decision

18  on what phone to purchase?  Thank you very much.

19          We're obviously here today because

20  SimpleAir has a patent, and they told you they believe

21  that that's infringed.  And we disagree.  But we saw in

22  your questionnaires that there were some people who knew

23  somebody who had a patent or maybe had applied for a

24  patent.  And I wanted to follow up with a couple of

25  people about that.

1           Let's see, Mr. Williams, No. 15.

2           JUROR WILLIAMS:  Yes, ma'am.

3           MS. AINSWORTH:  It looked like -- had

4 your father obtained a patent?

5           JUROR WILLIAMS:  Yes, ma'am.

6           MS. AINSWORTH:  Okay.  What was that on?

7           JUROR WILLIAMS:  He and his wife.  It was

8 called a Spar-Pro.  It was a sparring dummy, basically

9 upper torso with a weighted base.  My father used to be

10 a Golden Gloves boxer and -- and boxed for years and I

11 grew up around it.  And he eventually -- selling it to

12 -- or at least the idea to -- to police forces because

13 the material was tense enough to accept thousands of

14 rounds from firearms.  And so they use it at police

15 academies.  And it's -- as far as I know, it's still

16 being sold.

17           MS. AINSWORTH:  Do you know if -- was

18 there ever any -- any situation where your father filed

19 a lawsuit or had any litigation over his patent?

20           JUROR WILLIAMS:  Not that I was aware of.

21 I know there's -- I mean, just like the case we're

22 probably going to hear today -- I mean, there's --

23 things can be so closely related, you know, when it

24 comes to products or services, that some very minute --

25 minute detail could be the main separation, you know,

1  between, you know, the Spar-Pro and its competition.

2             So, you know, I believe it's -- if

3  there's an idea that makes one product better than the

4  other or one service better than the other, by all

5  means, you know, protect that right.

6             MS. AINSWORTH:  And let me ask you.  The

7  fact that your father obtained a patent, you could say

8  it sort of puts you in a similar position to SimpleAir

9  because they own a patent that's going to be discussed

10 in this case.  Does that fact cause you to start out

11 this case favoring SimpleAir over Google?

12            JUROR WILLIAMS:  Not at all.  Not at all.

13            MS. AINSWORTH:  Thank you very much.

14            I think Ms. Foster, No. 1, I believe, had

15 you mentioned on your questionnaire that your son had

16 developed a product or had he applied for a patent?

17            JUROR FOSTER:  He never applied for the

18 patent.  He developed a product and it was used for

19 quite a long time to protect a computer device, I think,

20 in the semitrucks, but he never applied for a patent.

21 He talked about it, but just felt like it was not going

22 to be worthwhile.

23            MS. AINSWORTH:  Okay.  Is there anything

24 about that experience with your son and hearing about

25 that that would cause you to favor SimpleAir over Google

1   in this case?

2               JUROR FOSTER:  No, I don't think so.

3               MS. AINSWORTH:  Thank you very much.

4               Has anybody else on the panel -- either

5   they or someone in their family obtained a patent or

6   tried to obtain a patent?

7               Ms. Cox?  Who was that, if you could tell

8   us?

9               JUROR COX:  My dad a long time ago

10   developed and got a patent for -- it's funny, a bathroom

11   toilet magazine holder.

12               MS. AINSWORTH:  Important thing.

13               JUROR COX:  Well, he thought it was, and

14   he had them made and gave them away because he couldn't

15   sell them.  But, yes, he did get a patent.  And then he

16   complained because somebody else stole his idea, but he

17   never did anything with it, so...

18               MS. AINSWORTH:  Okay.  So he thought

19   someone had -- had used --

20               JUROR COX:  Copied it, yes.

21               MS. AINSWORTH:  Okay.  But he didn't file

22   a lawsuit?

23               JUROR COX:  No, he didn't.  He was a

24   Baptist preacher.  He didn't do that.

25               MS. AINSWORTH:  Anything about that

1  experience that would cause you to favor SimpleAir?

2                  JUROR COX:  No, not really.

3                  MS. AINSWORTH:  Mr. Dilday, did you

4  indicate that --

5                  JUROR DILDAY:  Yes.

6                  MS. AINSWORTH:  Do you have a patent or

7  know someone who --

8                  JUROR DILDAY:  No, ma'am.  Well, the

9  company I work for, my brother-in-law's co-owner of

10  that, and they've applied for different patents.  I

11  don't know exactly the content of each one of them, but

12  I do know one of them had to do with three-way call

13  detect, so...

14                  MS. AINSWORTH:  And do you know if those

15  patents have issued, or is that process still pending?

16                  JUROR DILDAY:  I believe it's still

17  pending, but I'm not certain as to the -- where -- where

18  it actually lies at this point.

19                  MS. AINSWORTH:  Okay.  Has there ever

20  been any kind of litigation or suits having to do with

21  those patents or those applications?

22                  JUROR DILDAY:  No, not those

23  applications.  I know that we were involved in a -- a

24  lawsuit company-wise where we were told that our -- the

25  company I worked for had infringed on a -- a patent, but

1  that was settled.

2           MS. AINSWORTH:  When -- was that

3  something fairly recent or when was that?

4           JUROR DILDAY:  I believe it was in the

5  last year.

6           MS. AINSWORTH:  And the suit was brought

7  against your company?

8           JUROR DILDAY:  Yes.

9           MS. AINSWORTH:  Was it resolved before

10  it went to court?

11           JUROR DILDAY:  Yes, ma'am.

12           MS. AINSWORTH:  Okay.  Is there anything

13  about that circumstance that would cause you to favor

14  SimpleAir over Google in this case?

15           JUROR DILDAY:  No, ma'am.

16           MS. AINSWORTH:  Thank you very much.

17           Anybody else in the jury box that either

18  has a patent, you family -- someone in your family does?

19           How about in the audience, anybody have a

20  patent or someone in their family?

21           Mr. Pemberton, were you wondering --

22  okay.  Sorry, I misunderstood.

23           Ms. Cox mentioned something about -- and

24  her father's idea maybe being used by someone else.  I

25  want to ask if there's anyone who ever has seen a

product that had a new idea and thought that they
thought of that product first or they thought of that
idea first and someone was using it without their
permission?

Mr. Powell, have you had that situation
in the past?

JUROR POWELL:  I wouldn't necessarily say
that it's something that I have thought about and
somebody else is using, but I am a welder.  I have
always -- even since I was a little kid, worked with my
hands.  If there's something that I think of that would
help benefit me, I build it and I use it for myself.  I
do not try to sell it, don't try to patent it.  It's
something to benefit me, and I have built stuff and seen
something similar later.  But it's not like, oh, these
people stole my idea.  I do it to benefit and make my
life easier.  And what other people do is other people's
business.

MS. AINSWORTH:  Is there anything about
that experience or your -- the decisions that you made
there that would cause you to start out this case
favoring SimpleAir before you've heard any of the
evidence?

JUROR POWELL:  No.  All the stuff I do is
little.  I mean, it's just -- you know, they're

talking -- I mean, I get -- in fact, I have an MLB app

on my phone. And every time the Texas Rangers score or

the team they're playing scores, I get a notification

that lets me know about it. I work nights. I can't

watch the games. And so the -- it's not something as

small as being around the house. I mean, it's

worldwide. So their situation and my situation is

completely different.

            MS. AINSWORTH: Thank you very much. I

appreciate it.

            In your questionnaires, I think, Mr.

Bryant, did you mention that maybe you had had an idea

that you thought had been taken by someone else having

to do with some packaging?

            JUROR BRYANT: Seriously, I'm not trying

to be funny, but yeah, I had stuck that on there. I was

just laughing at myself. Many, many years ago, someone

would take a bowling ball and put it in a cow patty. It

could be sold as ashtrays. Two years later, they were

doing it.

            MS. AINSWORTH: Well, is there anything

about that situation that would cause you to favor

SimpleAir over Google in this case?

            JUROR BRYANT: No, I don't think so.

            MS. AINSWORTH: Thank you.

1           Okay.  Well, while I've got you,

2   Mr. Bryant, if you don't mind, let me ask you:  I think

3   there's some people that indicated in there

4   questionnaires that they had brought a lawsuit or

5   thought about bringing a lawsuit for one reason or

6   another through the years.  Had you been in a situation

7   where someone in your family had brought a lawsuit

8   before?

9           JUROR BRYANT:  I did.

10          MS. AINSWORTH:  Okay.  And was -- who was

11  that against if -- and if you -- if I'm treading on

12  something that's private.

13          JUROR BRYANT:  I cannot remember the name

14  of the company.  It was in 1965.  It was frozen food.  A

15  tractor/trailer rig run a stop sign, run over me on my

16  motorcycle.

17          MS. AINSWORTH:  So it was an injury that

18  you suffered.

19          JUROR BRYANT:  Yes, ma'am.

20          MS. AINSWORTH:  That puts you sort of in

21  the position of the Plaintiff in this case because

22  they're the ones bringing this lawsuit:  Would that

23  cause you to start out this case favoring SimpleAir over

24  Google?

25          JUROR BRYANT:  No, ma'am.

1          MS. AINSWORTH:  And how long ago was

2   that?

3          JUROR BRYANT:  '64.

4          MS. AINSWORTH:  Thank you very much.

5          Has anybody else in the jury box had a

6   situation where they brought a lawsuit against somebody?

7   Mr. -- Mr. Prestidge?

8          JUROR PRESTIDGE:  Yes.

9          MS. AINSWORTH:  What type of case was

10  that, if you could tell us just in general?

11         JUROR PRESTIDGE:  Defamation of character

12  and slander.

13         MS. AINSWORTH:  Okay.

14         JUROR PRESTIDGE:  Contractor fired us

15  all.  Put out letters on us.  Called us a bunch of

16  shitheads.  I sued them.  It might be one day they don't

17  call me one.

18         THE COURT:  Mr. Prestidge, I'm sure

19  that's an accurate answer, but I'm going to instruct you

20  not to use profanity in this courtroom.

21         JUROR PRESTIDGE:  Yes, sir.

22         MS. AINSWORTH:  Mr. Prestidge, how long

23  ago was that lawsuit?

24         JUROR PRESTIDGE:  '86/'87.

25         MS. AINSWORTH:  And has anyone else in

1  your family been involved in any kind of litigation?

2           JUROR PRESTIDGE:  My wife fell at

3  Walmart, injured herself.  Walmart didn't want to do

4  nothing.  It's what they got lawyers for.

5           MS. AINSWORTH:  The fact that you were

6  involved or your wife was involved in -- in lawsuits in

7  the past, does that make you in any way, before you hear

8  this evidence, favor SimpleAir over Google?

9           JUROR PRESTIDGE:  None at all.

10           MS. AINSWORTH:  All right.  Thank you,

11  sir.

12           Let me ask the people sitting in the

13  audience.  There's -- anyone there that has been

14  involved where you were in the position of bringing a

15  lawsuit or thought about bringing a lawsuit, seriously

16  considered it?  Anybody?

17           Okay.  And I just noticed a couple things

18  in the questionnaires.  Mr. Williams, let me ask you one

19  other question.  Did you consider bringing one in a

20  case, but decided not to do that?

21           JUROR WILLIAMS:  Yes, ma'am.  It was a

22  wrongful termination lawsuit against a local company,

23  and the only attorneys locally that handled that type of

24  suit were already in cahoots with the company I was

25  trying to sue.  And they basically hung the phone up on

me. And after about four months of pursuing other

avenues, I gave up and just got another job.

MS. AINSWORTH: Anything about that

experience, about considering filing a lawsuit that

would make you have hard feelings about Google or make

you lean toward the Plaintiff in this case?

JUROR WILLIAMS: No, ma'am, not at all.

MS. AINSWORTH: Thank you very much.

We're obviously here today because

SimpleAir has sued Google. Does anybody have an issue

or a problem with Google wanting to defend themselves in

this case and wanting to bring the case to trial and put

on our side of the case for you?

Does anybody have a problem with that, or

would you hold that against Google?

I don't see anybody in the jury box or

anyone in the chairs. Thank you.

Ladies and gentlemen, one of the other

issues in this case is going to be whether SimpleAir's

patent is valid or whether it should have been issued by

the Patent and Trademark Office. Let me ask you if --

Mr. Capshaw asked you some questions about whether

people had opinions on one side about patents. Let me

kind of ask you on the other.

Patents are issued by the Patent and

1  Trademark Office, and you heard a little bit about that

2  on the video this morning.  But does anybody feel like,

3  you know, regardless of what the evidence is, regardless

4  of what the Judge says, if a patent was issued by the

5  United States Government, I could never find it invalid?

6  If it was issued by a governmental agency, I don't care

7  what the evidence is, there is no way I would ever find

8  that invalid or question what was valid, does anybody

9  feel that way?

10            Mr. Bryant, you feel that way?

11            JUROR BRYANT:  Yes, ma'am, I do.  If the

12  Patent Office gives somebody a patent, it's their

13  patent.  It should never be invalidated until the patent

14  time limit runs out.

15            MS. AINSWORTH:  All right.  Thank you

16  very much.

17            Does anybody feel the same as Mr. Bryant,

18  that, you know, outside of whatever the evidence is, it

19  was issued by the Patent and Trademark Office and,

20  therefore, it is valid and shouldn't be questioned?

21            Mr. Powell, you feel that way, too?

22            JUROR POWELL:  I don't necessarily feel

23  never, but it would take a lot, because -- I mean,

24  it's -- it's their job.  I'm not saying everybody that

25  they're perfect, but it is their job to look at

1  everything.  And without them, then who knows how the

2  system would be.

3              The patents are a good thing, and very

4  minor details are very easily looked over.  So it would

5  take a lot, but I'm not going to say never I wouldn't be

6  able to ever find one invalid, but it would take a lot.

7              MS. AINSWORTH:  Thank you very much.

8              A patent is what we would call a property

9  right.  It's not property like real estate, but it's

10 intellectual property.  Let me ask you one kind of

11 further question along this:  Does anyone feel like if a

12 patent is a property right, regardless of what the

13 evidence is or what the Judge says, I could never take

14 that away from somebody?  I could never take that away

15 from a company or a person and find it invalid?

16             Does anyone -- other than Mr. Bryant or

17 Mr. Powell who have kind of told us their views, does

18 anybody else kind of feel that way?

19             JUROR COX:  Can you repeat that, please?

20             MS. AINSWORTH:  Yes, ma'am, Ms. Cox.  If

21 a patent is considered a property right, does anyone

22 feel like, regardless of the evidence, I could never

23 take someone's property away?

24             Yes, Mr. Bryant?

25             JUROR BRYANT:  The way you're wording

1   that --

2                   MS. AINSWORTH:  I understand that you

3   feel that way and thank you very much.  Does anybody

4   else feel like Mr. Bryant in that respect?

5                   THE COURT:  You have five minutes,

6   Counsel.

7                   MS. AINSWORTH:  Thank you, Your Honor.

8                   Ms. Cox, you're kind of questioning

9   there?

10                   JUROR COX:  I am.  I sort of -- I agree

11  with him, but, you know, people make mistakes.  But I

12  also know where I work they have intellectual property

13  rights for things that I have developed and I develop

14  things all the time.  But if you were to leave them, I

15  could change a minute detail, make it mine.  Is that

16  wrong?  I don't know.

17                   MS. AINSWORTH:  Thank you very much.  I

18  appreciate it.

19                   Let me ask some questions of some people

20  that we haven't heard from yet and not let you get off

21  without -- without asking you a couple of questions.

22                   Mr. Davis, No. 6, I understand that you

23  work in the legal profession.  You work for -- is it

24  Legal Services of Northern Louisiana?

25                   JUROR DAVIS:  Yes.

1          MS. AINSWORTH:  What kind of work do you

2 do for the company?

3          JUROR DAVIS:  I'm the office assistant.

4 I file all the stuff at the courthouse, and we just --

5 we do civil cases.  There's no criminal; just family

6 law.

7          MS. AINSWORTH:  Okay.  And are you --

8 does your -- does your office usually represent people

9 who are bringing the cases or people who are being sued?

10          JUROR DAVIS:  It's the people, either/or.

11          MS. AINSWORTH:  Okay.

12          JUROR DAVIS:  It's either/or.

13          MS. AINSWORTH:  Thank you very much.

14          Ms. Love, if I could ask you a couple of

15 questions.  You're a certified medication --

16          JUROR LOVE:   Yes.

17          MS. AINSWORTH:  -- aide?  How long have

18 you been doing that work?

19          JUROR LOVE:  Basically since about '97.

20          MS. AINSWORTH:  And then you also work on

21 tax preparation?

22          JUROR LOVE:  Yes, but I'm not working in

23 the medical field.

24          MS. AINSWORTH:  Okay.  So you don't do

25 the medical work anymore.  You're just doing the tax

1  preparing?

2          JUROR LOVE:  I just do the tax preparing,

3  but I still keep my certification up.

4          MS. AINSWORTH:  Okay.  Thank you very

5  much.

6          And, Ms. Palmer, since you are a

7  lawyer -- and is your law license still active?  Are you

8  still practicing in any respect?

9          JUROR PALMER:  I do not practice.  I took

10  inactive status with the Louisiana State Bar in the

11  early '90s.

12          MS. AINSWORTH:  When you practiced, did

13  you do any kind of patent work or intellectual property

14  work?

15          JUROR PALMER:  No, I did commercial -- I

16  had pretty much an office practice.  I did some

17  commercial litigation.  But generally speaking, I

18  avoided intellectual property matters.

19          MS. AINSWORTH:  Thank you.  Does anybody

20  on this jury panel know anybody else on the jury panel?

21  Mr. Williams, who do you know?

22          JUROR WILLIAMS:  I just realized I knew

23  Randy Dilday.

24          MS. AINSWORTH:  Okay.  You're both in the

25  Hallsville area.

JUROR WILLIAMS:  Our fathers were very
close when we were younger.  They used to be friends.

MS. AINSWORTH:  Thanks.

Anybody else on the panel know anybody
else?

That's all.

Ladies and gentlemen, you spent a lot of
time this morning.  We appreciate your time.  We
appreciate your being straightforward and talking to us
and sharing your thoughts and opinions, and we look
forward to presenting this case to you.

Thank you.

THE COURT:  All right.  Counsel, approach
the bench, please.

(Bench conference.)

THE COURT:  Plaintiff have any members of
the panel they wish to challenge for cause?

MR. CAPSHAW:  None from the Plaintiff,
Your Honor.

THE COURT:  Defendants have any they wish
to challenge?

MS. AINSWORTH:  Yes, Your Honor.  No. 8,
Mr. Bryant.

THE COURT:  What's the basis for that?

MS. AINSWORTH:  The basis?

1          THE COURT:  Other than he doesn't like
2     you dropping your gun ads off Google?
3          MS. AINSWORTH:  Right.  That and his
4     comments that he could never find patents invalid.
5          THE COURT:  Okay.
6          MR. STOCKWELL:  He's pretty firm in that,
7     Your Honor.
8          THE COURT:  Anybody else you'd like to
9     challenge for cause?
10          MR. STOCKWELL:  I did have questions
11     about the conflicts that 10, 14, and 20 raised, but I
12     assume the Court will address that.
13          THE COURT:  Yes.  I'll do that.  So
14     otherwise, no challenges for cause other than Mr. Bryant
15     from the Defendant?
16          MS. AINSWORTH:  No.  That's all, Your
17     Honor.
18          THE COURT:  Okay.  Y'all have a seat.
19          (Bench conference concluded.)
20          THE COURT:  All right.  Ladies and
21     gentlemen, I'm going to excuse the majority of the
22     panel.  I'm going to ask some of you to remain, and I
23     have some questions to talk about you -- talk about with
24     you at the bench.
25          For those of you that I'm excusing, a

couple instructions. No. 1: Stay inside the building.

Restrooms are out these double doors and to the left as

are the water fountains, but please stay close by.

Second instruction: Don't discuss

anything that happened during jury selection this

morning. You have not heard any evidence yet, but

nonetheless talk about any subject; the weather, the NFL

playoffs, or anything you want to, but don't talk about

what happened in here during the process this morning.

And for those of you who I'm asking to

stay, if you'll just step out of the way and keep your

same seats, and I'll call you up here one at a time.

So with that, I'm going to excuse

everybody on the panel temporarily with those

instructions, except Panel Members No. 8, 10, 14, 15,

and 20. So everybody but those folks, you are excused

at this time.

COURT SECURITY OFFICER: All rise.

(Jury panel out.)

THE COURT: All right. Be seated,

please.

If you'll make sure that back door is

closed, Mr. Floyd.

Counsel, if you'll approach the bench.

(Bench conference.)

1          THE COURT:  I'm going to take these in a

2   different order.  Mr. Williams, will you come up,

3   please?

4          This is -- step up, Mr. Williams.  If

5   you'll be sure to speak to that -- speak quietly.

6          This is my question:  You indicated you

7   served on the Gregg County Grand Jury before?

8          JUROR WILLIAMS:  Correct.

9          THE COURT:  Do you live in Gregg County?

10         JUROR WILLIAMS:  I used to, two years

11  ago.

12         It's a Longview address, but it's

13  Harrison County.

14         THE COURT:  I understand.  I just wanted

15  to make sure, because Gregg County is not in our

16  division; Harrison County is.  You're excused.  Just

17  don't discuss anything about the case.

18         JUROR WILLIAMS:  So I go outside?

19         THE COURT:  Yes, sir.

20         Mr. Bryant, would you come up, please,

21  sir?

22         We're going to talk softly.  You're

23  perfect.

24         Let me ask you this, Mr. Bryant:  I heard

25  your comments about Google, and you didn't like the fact

that they'd stop their -- allowing gun-related

advertisements and things like that.  I also heard you

say you didn't think that would apply in a patent case.

I need to know if you can be fair and impartial on this

jury and treat Google just like SimpleAir, or whether,

for whatever reason, you're going to treat Google a

little differently, probably more negatively, than you

would SimpleAir?  That's basically my question to you.

JUROR BRYANT:  I don't think I would.  I

think I would treat both parties the same.

THE COURT:  Okay.  Now, you've made a

comment about being able to declare a patent invalid.  I

think you said that would be a difficult thing for you

to do.

JUROR BRYANT:  Yes, sir.  I think the

Patent Office may make mistakes occasionally, but not

that often.

THE COURT:  Okay.  If the evidence showed

you by clear and convincing evidence that the patent in

this case was invalid, could you find it invalid?

JUROR BRYANT:  Yes, sir, I sure could.

THE COURT:  All right.  Any questions,

Mr. Stockwell, Ms. Ainsworth?

MS. AINSWORTH:  If I could ask one

question, Your Honor.

1             Mr. Bryant, you mentioned that you

2 thought Google's policy about -- can you hear, Your

3 Honor -- you mentioned that you thought Google's policy

4 about taking those ads down was un-American.

5             Do you have strong feelings about whether

6 Google's -- Google is an un-American company or a deeply

7 held view of the type of company they are because of

8 that?

9             JUROR BRYANT:  No, ma'am.  I just think

10 that that policy is un-American.  Google is an American

11 company.  I know that, so it's not it's not the issue.

12             MS. AINSWORTH:  Okay.  All right.  Thank

13 you, sir.

14             JUROR BRYANT:  You're welcome.

15             THE COURT:  Any questions from the

16 Plaintiff?

17             MR. CAPSHAW:  No, Your Honor.

18             THE COURT:  All right.  Mr. Bryant, I'm

19 going to excuse you to join the rest of the group

20 outside.  Just don't discuss anything that's happened in

21 here.

22             JUROR BRYANT:  Yes, sir.

23             THE COURT:  Thank you.

24             I'm not going to excuse Mr. Bryant.  He's

25 indicated he can be fair and impartial.  He may think

one of their policies is un-American, but I think that

stems more from his strong feelings about the Second

Amendment than Google itself. And he was clear that he

could treat Google just like he could SimpleAir. So I'm

going to overrule the challenge for cause to Mr. Bryant.

                Ms. Cox, would you join us, please?

                And we're going to talk softly, but if

you'd just talk right into that little microphone with

me.

                JUROR COX: Okay.

                THE COURT: You indicated you had a

scheduling problem that might prevent you from being

available all week.

                JUROR COX: Well, for Friday. I've got a

prepaid flight at 11:30 on Friday.

                THE COURT: Where are you going?

                JUROR COX: Austin for a family reunion.

                THE COURT: Okay. When's the family

reunion?

                JUROR COX: Friday night, Saturday.

                THE COURT: Okay. Well, it's possible we

might be through by Friday, but probably not at 11:00,

and certainly probably not early enough for you to get

to the airport. Are you flying out of Longview?

                JUROR COX: Gregg County.

1          THE COURT:  Gregg County?

2          JUROR COX:  Uh-huh.

3          THE COURT:  Okay.  All right.

4          JUROR COX:  I would be happy to do it if

5   I -- you know, if it could be done.

6          THE COURT:  Well, that's -- that's what I

7   asked.  Okay.  Why don't you join the group outside?

8   Just don't discuss anything about this case.  But I'm

9   going to excuse you so you don't have to worry about

10  being selected.

11         JUROR COX:  Thank you.  Okay.

12         THE COURT:  Mr. Powell.

13         All right.  I'm going to excuse Ms. Cox.

14         MS. AINSWORTH:   Your Honor, if we might,

15  just for the record, object to her being excused just

16  because Austin is not that far away and she could

17  probably join the family reunion that evening.

18         THE COURT:  Your objection is noted.

19         MS. AINSWORTH:  Thank you.

20         THE COURT:  We've got plenty of people on

21  the panel.  There's no way she can get to Austin by 11

22  o'clock unless you all give me back a lot of time during

23  this trial.  So all things considered, I don't see a

24  reason to make her be late for a family reunion,

25  especially since she's already got a prepaid ticket

1  that's been bought.

2           All right.  Mr. Powell, you indicated you

3  would have possibly a scheduling problem with serving

4  during the whole week if you were selected on the jury?

5           JUROR POWELL:  Yes.

6           THE COURT:  Tell me about that.

7           JUROR POWELL:  I have an eye appointment

8  this Wednesday at 2:00 o'clock.  I'm currently in the

9  process of getting fitted for contacts.  I'm going

10 skiing at the end of January, and I've been noticing my

11 vision has been a little off, so I'm trying to get my

12 vision back right so I can steer right down the slope.

13          THE COURT:  Where -- where do you have

14 this appointment?

15          JUROR POWELL:  It's at Kilgore Eyecare or

16 Kilgore Eye Center, I believe.

17          THE COURT:  Okay.

18          JUROR POWELL:  But it's in Kilgore,

19 Texas.  It's at 2:00 o'clock this Wednesday.

20          THE COURT:  All right.  If we needed you

21 to serve, could you reschedule that and still get your

22 eyes fixed before you go skiing at the end of the month?

23          JUROR POWELL:  Well, this is my first

24 re-fitting and I have -- don't know how long -- they try

25 and leave a week in between, like I went originally last

Wednesday.

THE COURT: Uh-huh.

JUROR POWELL: And I got to go back this Wednesday and possibly go back the next Wednesday. They try and leave about a week in between, and I don't know -- they said normally it takes two to three trips. I'm leaving Friday, the 31st, to go to Colorado.

THE COURT: Okay. All right. Anything else I need to know about your schedule for this week other than the eye appointment?

JUROR POWELL: I believe that's it.

THE COURT: Okay. I'm going to excuse you to join the rest of the group outside. Just don't discuss anything about what we talked about in here.

JUROR POWELL: Okay.

THE COURT: Thank you.

I'm not going to excuse Mr. Powell. He can certainly reschedule at the eye clinic without any difficulty, and he didn't give the Court any concrete reason as to why he could only go this week, so those things considered, I'm not going to excuse him.

Ms. Crow, would you come up, please? Ms. Crow, you indicated you might have a scheduling problem serving this week. Tell me about that.

JUROR CROW: Yes, for one, I mentioned

that I do baby-sit for my sister and my brother-in-law
for their 18-month-old.  Well, my sister is starting
college this week, and we don't have a day care center
anywhere in Atlanta.  And, two, I'm sick.  I've got a
rash --

THE COURT:  I see that.

JUROR CROW:  -- under my arm, and it's
not just my arm.  It's my stomach and my legs and hips,
as well.  And I was going to go to the doctor for it
this morning, but I had to come here.

THE COURT:  Okay.

JUROR CROW:  And I was going to call, but
I didn't have a phone number.

And, three, I don't have a car.  I had to
borrow my son's.  Luckily he was off today.

THE COURT:  But he's not going to be off
every day of this week?

JUROR CROW:  No.

THE COURT:  Okay.  I'm going to excuse
you, Ms. Crow.

JUROR CROW:  Plus his car, the starter is
going out so I have to constantly click it -- click it
to get it to start.

THE COURT:  Well, you've got more
problems than anybody I have to deal with.  I'm going to

excuse you.  Go ahead and join the rest of the group

outside.  Don't discuss anything about what we said in

here, but you're not going to be on the panel for jury

selection.

JUROR CROW:  Okay.  Thank you.

THE COURT:  Thank you.  Uh-huh.

All right.  Counsel, how long do you need

to exercise your peremptory challenges?

MR. CAPSHAW:  Can we have 20?

THE COURT:  Let's make it 11:30.  I'll

give you 17.  All right.

MS. AINSWORTH:  Thank you.

MR. CAPSHAW:  Thank you.

(Bench conference concluded.)

THE COURT:  All right.  The Court will

stand in recess while counsel exercises their peremptory

challenges.  We'll reconvene at 11:30.  The Court stands

in recess.

COURT SECURITY OFFICER:  All rise.

(Recess.)

(Jury panel in.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Be seated, please.

All right.  Ladies and gentlemen, if you

will listen carefully as your name is called, if you'll

come forward and take your seat in the jury box. We're
going to seat eight jurors in this case, so I'd like to
put the first four on the front row and the second four
on the back row. And given that there are extra seats
in the box and to -- to position the jury so that it
will be in the center of the box, I'd like to leave the
last two seats on each row. And that means the seats
toward the doors coming into the courtroom. I'd like to
leave those two seats empty.

So Juror No. 1 will actually come to the
front row of the box and sit in the third seat down, and
I think that should be clear. And then the second row
will do likewise.

So with that, Ms. Lockhart, our courtroom
deputy, will call the names of the persons selected to
serve on our jury at this time.

COURTROOM DEPUTY: Joyce Foster, Randy
Dilday, Philip Norris, Richard Davis, Mary Love, Conrett
Allen, Jonathan Williams, and Samuel Pemberton.

THE COURT: All right. Would you be
seated, please.

Those of you that were not selected to
serve in this case, I'm about to excuse you at this
time. I excuse you with the sincere thanks of the
Court. As I said earlier, you're performing a

significant public service by being here.  And I
recognize, as does everyone on the Court staff, that
each of you not selected had other places you could have
been this morning, other important things you could have
been doing, but it's vital to our system of justice that
you come and be willing to serve and be a part of the
panel, even though you weren't selected.  And you have
our sincere thanks for doing that.

The only thing I would ask is when your
name is called again and you get to come back for jury
service in the future, just have the same positive
attitude we've seen today, and we'll appreciate it very
much.

If you need anything for your employment,
please see Ms. Martin and the ladies in the Clerk's
Office.  They'll be glad to furnish you anything
regarding that.  And with that, ladies and gentlemen,
those of you not selected to serve on this jury are
excused at this time.

(Jury panel out.)

THE COURT:  Members of the jury, if you
will stand at this time, Ms. Lockhart will administer
the oath to you.

(Jurors sworn.)

THE COURT:  Be seated, ladies and

gentlemen.

I'm about to excuse you for lunch, but before I do, I need to give you a few additional instructions. This case is going to be decided solely on the evidence that you hear in the courtroom and the exhibits that are permitted to be received into evidence during the trial. Those are the only two sources of the evidence that you'll base your verdict on.

Up until this point, ladies and gentlemen, you've heard absolutely no evidence in this case. What the lawyers tell you in this case is not evidence. That is simply their contentions of what they think the evidence will show, but it is not evidence.

Therefore, it's essential that the case be decided solely upon the evidence that is presented during the trial so that you as the judges of the facts can make your decisions based solely on that evidence.

Accordingly, it is absolutely essential that there be no outside influences, no outside information, nothing other than the sworn testimony and the exhibits admitted into evidence that you should base your verdict and your decision about the facts in this case on.

So as I excuse you for lunch today, I'm excusing you with the specific instruction that you not

1   discuss the case among yourselves or with anyone else.

2                    And I can promise you that you'll hear

3   that instruction from me just about every time you get

4   up and step out of that jury box until the case is over.

5   And the reason I'm so repetitive with it is that it is

6   so vital and critical that there be no outside

7   influences, no outside information, that your decisions

8   in this case as the jury are based solely upon the sworn

9   testimony of the witnesses and the exhibits that come in

10  during the trial.  So don't discuss the case with

11  anyone.

12                   And until the evidence is all in and I

13  excuse you to retire to the delib -- to the jury room to

14  deliberate on your verdict, don't discuss the case among

15  yourselves.  Only after all the evidence is in and I've

16  excused you to deliberate on the verdict, then and only

17  then can you discuss the case among yourselves.  Until

18  then, not among yourselves and not with anyone else

19  anywhere else to any degree whatsoever.

20                   Along those same lines about avoiding any

21  possible outside influences, whether it's over lunch

22  today and you're using your smartphone, whether it's at

23  home tonight and you're using your computer, don't go

24  online and do any research about this case.  Don't seek

25  to gain any information from any source other than the

sworn testimony of the witnesses and the exhibits that
are admitted during the trial.

Also, as far as not communicating about
the case in any way, that not only means verbal
communications, like a conversation, that means any
other type of communications.  So if you're users of
social media, whether it's Facebook or MySpace or
Twitter or any of the other many, many types of social
media out there, don't post anything, don't -- don't
publish anything digitally, electronically about this
case whatsoever.  That's just as much an unpermitted
communication as having a conversation with somebody
about the case would be.

And as I said earlier, don't seek to do
any research, whether it's online or at the local
library or the newspaper or anywhere else.  Don't seek
to do any research.  Again, the point is your
information that you base your verdict on in this case
must be limited solely to the sworn testimony from the
witnesses during the trial and the exhibits that are
admitted into evidence.  Those are the only two sources
from which you should make a decision.

I don't think it will happen in this
case, it -- it is possible, but it is very rare.  But
now that you have been selected as jurors in this case,

it is possible that some third party at some point might
try to approach you and influence you to rule a certain
way or to make a certain decision in this case.  Again,
I think that's very unlikely, but I want you to know
it's possible.  Therefore, if at any time you feel that
you've received or someone's attempted to communicate
with you in an in -- in an inappropriate way, for
possibly the purpose of influencing you or getting you
to rule a certain way, then you should let the Clerk's
Office know immediately.  They'll notify me, and the
Court will deal with it.  Again, I don't think that's
likely, but it is possible.  So I want to at least put
you on notice about that.

I'm going to excuse you for lunch until
1:00 o'clock.  I'd like you back in the jury room
assembled and ready to go about five minutes until 1:00,
and we'll do our best to start the evidence at 1:00
o'clock -- or start the trial at 1:00 o'clock this
afternoon.

A couple other housekeeping matters.  If
you brought your cell phones with you, leave them in
your cars.  Don't bring your cell phones into the
courtroom.  There will be breaks and recesses during the
day where if you need to check e-mail or something like
that, you'll have an opportunity to go to your vehicle

1  and do that, but don't bring any electronic devices into

2  the courtroom.

3            Also, if you haven't already done so, at

4  some convenient time, at least before you leave today to

5  go home, make sure that Ms. Martin in the Clerk's Office

6  has an accurate cell phone number that can be used to

7  reach you at any time.  If for any reason the Court

8  needed to get a message to you, I'd need a cell phone

9  number where we could do that.

10           Again, don't discuss the case among

11 yourselves or with anyone else.  Have a good lunch.  And

12 we'll see you back here ready to go at 1:00 o'clock.

13           You're excused for lunch at this time.

14           COURT SECURITY OFFICER:  All rise.

15           (Jury out.)

16           THE COURT:  All right.  Be seated,

17 please.

18           Is there anything from the Plaintiff

19 before we recess for lunch?

20           MR. CAPSHAW:  Nothing from the Plaintiff,

21 Your Honor.

22           THE COURT:  Anything from the Defendant?

23           MR. STOCKWELL:   Your Honor, I would

24 like to know if we can use this opening slide.

25           THE COURT:  I will get you an answer

1  before 1:00 o'clock.  I've got a copy of it and my clerk

2  has a copy of it.

3                 MR. STOCKWELL:  Thank you, Your Honor.

4                 THE COURT:  All right.  Anything else,

5  Mr. Stockwell?

6                 MR. STOCKWELL:  That's it, Your Honor.

7                 THE COURT:  All right.  Counsel, you're

8  excused for lunch.  We'll start back at 1:00 o'clock.

9                 COURT SECURITY OFFICER:  All rise.

10                 THE COURT:  Court stands in recess until

11  then.

12                 (Recess.)

13                 ******************

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

          I HEREBY CERTIFY that the foregoing is a

true and correct transcript from the stenographic notes

of the proceedings in the above-entitled matter to the

best of my ability.




/s/_____          _____1-13-14_____
SHELLY HOLMES, CSR                      Date
Official Court Reporter
State of Texas No.:  7804
Expiration Date  12/31/14


/s/_____          _____1-13-14_____
SUSAN SIMMONS, CSR                  Date
Official Court Reporter
State of Texas No.:  267
Expiration Date  12/31/14