```
 1           IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TEXAS
 2                   MARSHALL DIVISION

 3  SIMPLEAIR, INC.              *     Civil Docket No.
                                 *     2:11-CV-416
 4  VS.                          *     Marshall, Texas
                                 *
 5                               *     January 14, 2014
                                 *
 6  MICROSOFT CORPROATION, ET AL *     8:30 A.M.

 7               TRANSCRIPT OF JURY TRIAL
        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
 8              UNITED STATES DISTRICT JUDGE

 9  APPEARANCES:

10  FOR THE PLAINTIFFS:   MR. GREGORY DOVEL
                          MR. JEFFREY EICHMANN
11                        Dovel & Luner
                          201 Santa Monica Blvd.
12                        Suite 600
                          Santa Monica, CA   90401
13
                          MR. CALVIN CAPSHAW
14                        Capshaw DeRieux
                          114 East Commerce Avenue
15                        Gladewater, TX   75647

16  FOR THE DEFENDANTS:   MR. MITCHELL STOCKWELL
                          MR. RUSSELL KORN
17                        Kilpatrick Townsend & Stockton
                          1100 Peachtree Street, Suite 2800
18                        Atlanta, GA   30309

19
    APPEARANCES CONTINUED ON NEXT PAGE:
20

21
    COURT REPORTERS:      MS. SHELLY HOLMES, CSR
22                        MS. SUSAN SIMMONS, CSR
                          Official Court Reporters
23                        100 East Houston, Suite 125
                          Marshall, TX   75670
24                        903/935-3868

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:    MS. DANIELLE WILLIAMS
                       Kilpatrick Townsend & Stockton
                       1001 West Fourth Street
                       Winston-Salem, NC   27101

                       MS. JENNIFER PARKER AINSWORTH
                       Wilson Robertson & Cornelius
                       909 ESE Loop 323, Suite 400
                       Tyler, TX   75701

                       * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

P R O C E E D I N G S

          (Jury out.)

          COURT SECURITY OFFICER:  All rise.

          THE COURT:  Be seated, please.

          All right.  Is the Plaintiff prepared to
read into the record those exhibits from the list of
preadmitted exhibits published and used before the jury
yesterday?  If so, go to the podium and read them into
the record.

          MR. EICHMANN:  One moment, Your Honor.
For the Court's information, we have -- we have Mr.
Simon Franzini also from our law firm sitting at counsel
table today.

          THE COURT:  All right.

          MR. EICHMANN:  Your Honor, yesterday we

1 | used Exhibits 1, 112, 115, 116, 117, 118, 120, 121, 146,

2 | and 263.

3 |           THE COURT:  All right.  Are there

4 | objections from the Defendant as to that rendition from

5 | the Plaintiff?

6 |           MS. AINSWORTH:  No, Your Honor.

7 |           THE COURT:  Okay.  Since the Defendant

8 | hasn't asked the first question yet, I assume the

9 | Defendant has no exhibits to read into the record.

10 |           MS. AINSWORTH:  Not at this time, Your

11 | Honor.

12 |           THE COURT:  All right.  Thank you.

13 |           Is there anything else we need to take up

14 | before we bring the jury in?

15 |           MR. EICHMANN:  The depo clips of the

16 | Google deponents will be played after their cross of

17 | Dr. Knox.  Depending on how -- we probably have about

18 | another hour with Dr. Knox on direct, 45 minutes to an

19 | hour.  I don't know how long their cross is.  I don't

20 | know what the Court's preference is, whether to take up

21 | those clips --

22 |           THE COURT:  Well, we'll see where they

23 | are.  We're working through the objections now.  We

24 | didn't get them until this morning.  I assume you

25 | remember my rule is that deposition clip objections are

1  to be heard or presented the day before they're to be

2  used so that the Court can review them on a rolling

3  basis, but we'll do the best we can.  We'll see where we

4  are after the cross on Dr. Knox.

5            MR. EICHMANN:  Yes, sir.

6            THE COURT:  Anything else?

7            MR. EICHMANN:  Your Honor, we'd like to

8  reurge our request to have Mr. von Kaenel be able to

9  attend.  I know the Court already made a ruling about

10 invoking the Rule.  We do not intend to call Mr. von

11 Kaenel in our case-in-chief.  He will likely not be

12 called in our rebuttal case.

13            We would point out that essentially

14 Google has several corporate representatives in the

15 room.  They have one of their witnesses sitting at the

16 counsel table, but really their corporate

17 representative, the person responsible for this case,

18 are the various in-house counsel who are all here and

19 able to attend.  Meanwhile, one of our two most

20 important decision-makers, Mr. von Kaenel, is excluded

21 from the entirety of the trial about his patent at this

22 point.

23            THE COURT:  Well, obviously if he's

24 subject to the Rule, he's going to be a witness in this

25 case.  Are you telling me that's not -- that's not

1    accurate?

2                    MR. EICHMANN:  Your Honor --

3                    THE COURT:  If he's not a witness, he's

4    not subject to the Rule.

5                    MR. EICHMANN:  He's not a witness from

6    our standpoint.  They say they may call him, and we are

7    asking for an exception here.  We've asked them to agree

8    to an exception given the circumstances.

9                    I understand the Rule, but on behalf of

10   my client, I have to urge an exception.

11                   THE COURT:  Are the Defendants planning

12   to call him as a witness?

13                   MR. STOCKWELL:  Your Honor, it's

14   possible, but I won't know until after I cross

15   Mr. Payne.  I understand he's the last witness.  I

16   obviously wouldn't have a problem with letting him see

17   the rest of the case after that.  We had planned to

18   cross him because they had identified him as a direct

19   witness.

20                   THE COURT:  Well, you know, the Rule was

21   invoked by the Plaintiff on the basis that it would

22   apply to all witnesses, other than party representatives

23   and experts.  If he -- if he's a potential witness,

24   until the issue of whether or not he's going to be

25   testify -- testifying is resolved, then he's subject to

1  the Rule.

2              MR. EICHMANN:  Well, Your Honor, we did,

3  when we invoked it, seek to have him stay as one of the

4  corporate representatives.  There's also a possibility

5  that after Mr. Payne is called, we could have Mr. Payne

6  be the one who is then excluded so that he doesn't --

7  Mr. von Kaenel doesn't see Mr. Payne's testimony, and he

8  is the one who's able to then sit at the table.

9              Frankly, this is probably something that

10  needs to be resolved between counsel.

11              THE COURT:  You all need to talk about

12  that some more.  We'll take it up later after you meet

13  and can confer further.

14              MR. EICHMANN:  Thank you.

15              THE COURT:  Also by way of housekeeping,

16  if co-counsel has something to share with counsel at the

17  podium, I don't like the jury seeing the back of the

18  lawyers.  So if you're at the Plaintiff's table, go

19  around.  Don't walk in front of the jury to give a

20  message to your co-counsel.  And if you're Defendants,

21  don't come around the front, come around from behind.

22              All right.  Anything else from either

23  side before we bring in the jury?

24              MR. EICHMANN:  No, Your Honor.

25              MS. AINSWORTH:  No, Your Honor.

```
1                    MR. STOCKWELL:  No, Your Honor.

2                    THE COURT:  All right.  Dr. Knox, you

3  want to return to the witness stand, please.

4                    THE WITNESS:  Yes, Your Honor.

5                    THE COURT:  And you may return to the

6  podium, Mr. Eichmann, when you're ready.

7                    All right.  Mr. Floyd, let's bring in the

8  jury, please.

9                    (Jury in.)

10                   THE COURT:  Welcome back, Members of the

11 Jury.  Please be seated.

12                   We'll continue with the direct

13 examination of Dr. James Knox by the Plaintiff.

14                   You may proceed, Counsel.

15                   MR. EICHMANN:  Thank you, Your Honor.

16   JAMES M. KNOX, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

17               DIRECT EXAMINATION (CONTINUED)

18 BY MR. EICHMANN:

19      Q.   Good morning, Dr. Knox.

20      A.   Good morning.

21      Q.   Yesterday when we finished off, we had your

22 summary of opinions with respect to Claim 1; is that

23 right?

24      A.   That's correct.

25      Q.   Now, just to recap, was it your opinion, sir,
```

1 that when Google uses the GCM, the cloud connection --

2 excuse me -- was it your opinion, sir, that when Google

3 uses the Google Cloud Messaging service and the C2DM

4 service to send app notifications from third-party

5 applications to the Android phones that all of the steps

6 and the preamble of Claim 1 are infringed?

7     A.    That's correct.  I identified all of the steps

8 and the preamble.

9     Q.    There was one thing that I skipped over

10 unintentionally yesterday.  We talked about the GCM

11 frontend.

12           And is there something else, another version

13 of that, that's called the cloud connection server?

14     A.    There's a new system.  I don't know if it's

15 currently fully online at Google or not, but it's been

16 developed by Google.  It's kind of an upgrade -- further

17 upgrade to GCM.

18     Q.    Well, this -- it's not for the whole GCM, is

19 it?

20     A.    No, just for this frontend.

21     Q.    And what's the difference between the cloud

22 connection server frontend, the one that we talked about

23 yesterday, for purposes of what's relevant here?

24     A.    For what's relevant here, there really is no

25 significant difference.  It allows for some additional

1  protocols, some different ways of checking credentials,

2  nothing that changes what we're talking about.

3      Q.   Based on your review of the evidence,

4  including the testimony from Google, did you also

5  conclude that when the messages come in through that

6  version of the frontend, the cloud connection server,

7  that infringement for Claim 1 is also found?

8      A.   That would be true.

9      Q.   Now, we focused mostly in walking through

10  Claim 1 on the third-party applications, like Facebook

11  and CNN, and how they make use of the service.  I'd like

12  to just briefly go back to the first-party applications.

13  And can you remind us what that term first-party

14  application means?

15      A.   The first-party app just means that the server

16  is one that actually is owned and operated by Google;

17  for instance, Google Mail as opposed to CNN or ESPN.

18      Q.   And you said Google Mail do you mean Gmail?

19      A.   Yes.  Gmail is short for Google Mail.

20      Q.   This diagram we showed in the overview of this

21  system -- and it's very similar to the other one for

22  third-party applications -- can you remind us what this

23  shows?

24      A.   I -- well, the first thing obviously that's

25  changed is we've substituted with first party for third

1  party.  Now, the first party, as I mentioned, just goes

2  through the frontend like always.  But because Google

3  already knows these are good guys -- they're Google

4  things talking to Google things -- they allow these

5  first-party apps, if they choose to go to transmit this

6  information directly to the backend.

7       Q.   On here, we just have two examples.  One is

8  Google Calendar and one is Gmail.  Are there other

9  examples of Google applications that make use of the GCM

10 and C2DM?

11      A.   Yes.  The Google's witness identified more

12 than that.

13      Q.   Did that include Google Plus?

14      A.   I believe that's correct, yes.

15      Q.   Is that their version basically of Facebook?

16      A.   To be honest, I don't recall.

17      Q.   Okay.  What about Google Hangouts; do you

18 recall that application?

19      A.   I recall the name.  It's not one I'm familiar

20 with, but it was listed.  Yes.

21      Q.   As one of the applications that use the

22 service?

23      A.   That's correct.

24      Q.   Now, remind us, please, what is the difference

25 between the process that happens when it's Google's own

1  applications that are sending the messages through the

2  system as opposed to the third-party applications?

3       A.   Because we go directly to the backend.  If

4  you'll recall from yesterday, the messages arrived at

5  the frontend.  The frontend checks credentials, parses

6  the thing apart, and then made an RPC as the procedure

7  call to the GCM backend.

8            If it's a first party like Gmail, that's going

9  to go directly to the backend.  They send that data

10 already as an RPC call.  So essentially, at the high

11 level we're talking about here, the backend doesn't

12 really care where he got it from, whether it was from

13 the frontend or from the first-party server.  After

14 that, it's pretty much all the same.

15      Q.   And yesterday, we talked about one of Google's

16 arguments about how they don't do the first step of the

17 patent.  It's the third-party applications.

18           Does that argument apply to when Google uses

19 the service for its own applications?

20      A.   I don't see how it could.  I mean, these are

21 Google servers.

22      Q.   Now, very briefly, we'll walk through and I'd

23 like you to -- each of the elements and I'll ask you

24 whether the element is also infringed specifically by

25 this scenario when the Google application occurs.

1          For element (a), the element where -- where

2    you have to transmit data from an information source to

3    a central broadcast server, is that element, in your

4    opinion, infringed when Google uses the GCM and the C2DM

5    for its own services?

6        A.   Yes.  We've still got the Google being the

7    information source.  And you'll recall this MCS Buzz and

8    backend are by themselves a central broadcast server.

9    So the answer would be yes.

10        Q.   Element (b) of the patent was the one about

11   parsing the data with parsers.  In your opinion, does

12   the GCM and C2DM service perform element (b), that

13   parsing step, when the data comes in from the Google

14   applications?

15        A.   That would also be correct.  The one thing

16   that's on your slide that wouldn't be is the frontend

17   wouldn't be involved in this case, but, of course, the

18   central broadcast server would still be those remaining

19   three, which would still do parsing.

20        Q.   We went through the parsing routines at the

21   GCM backend, the Buzz, and the MCS yesterday.

22          Are those same parsing routines used to parse

23   data from the Google information sources, the

24   first-party apps?

25        A.   That's correct.

1     Q.    Element (c) of the patent requires sending the

2  data to an information gateway.  For the third-party

3  scenario, third-party apps, you identify the Buzz as the

4  information gateway.

5           How about when the application is a Google

6  application?

7     A.    There's no change.  Basically, once we've made

8  it to the backend, it's all treated the same.

9     Q.    Your opinion is still that the Buzz acts an

10 information gateway?

11    A.    That's correct.

12    Q.    Element (d) of the patent requires that the

13 data blocks are sent to a transmission gateway.  And

14 yesterday, you identified the transmission gateway as

15 the MCS for the third-party apps.

16          Is that the same, in your opinion, for the

17 first-party apps?

18    A.    Again, there's no change.  So, yes, that would

19 still be the -- the transmission gateway.

20    Q.    Element (e) of Claim 1 requires transmitting

21 preprocessed data to receivers communicating with the

22 remote computing devices, which yesterday you identified

23 as the CPUs within the Android phones; is that right?

24    A.    That's correct.

25    Q.    And in the case of first-party applications,

1  when the system is used, is that element infringed, in

2  your opinion?

3      A.   Again, there's no change.  So, yes, it would

4  still be infringed.

5      Q.   The last element, element (f), says that the

6  remote computing device, which, again, you identified as

7  the CPU within the phone, is instantaneously notified

8  whether that remote computing device is online or

9  offline from a data channel associated with each device.

10          Did you find that that element is also

11  infringed when the GCM and C2DM are used for the

12  first-party applications, the Google apps?

13     A.   That's correct.  Again, it proceeds exactly as

14  before.

15     Q.   And for both first-party and third-party

16  applications, is it your opinion that the Google

17  service, the C2DM and GCM, also perform all these steps

18  with respect to not just the Android smartphones but

19  these tablets?

20     A.   That's correct.  The Android system works the

21  same in both.

22     Q.   Does the Android operating system -- is that

23  the same operating system, the 2.2 and above, that's on

24  the smartphones that they -- that they put on the

25  tablets as well?

1        A.     The kernel system, yes, is the same.

2        Q.     What do you mean kernel system?

3        A.     Oh, the -- the heart of it.  Their

4   customizations that have to be made for a tablet as

5   opposed to a phone.  But, again, for the level we're

6   talking about, it's all the same.  The part that Google

7   provides basically is the same.

8        Q.     Now, let's move on to this question:  How many

9   times Google has infringed.

10            As we talked about, Claim 1 is a method

11   patent, so we have to show that they actually use the

12   method to show infringement.

13                MR. STOCKWELL:  Objection.  I believe

14   there's a little too much colloquy from Counsel, Your

15   Honor.

16                THE COURT:  Well, state your question,

17   Counsel.  Let's move on.

18        Q.     (By Mr. Eichmann) In your assessment of the

19   evidence in the case, did you consider how many times

20   Google has actually performed the method, all the steps

21   of Claim 1?

22        A.     Well, these steps would be performed

23   essentially for every message that goes through there.

24   The number we have from Google is 11 billion times a

25   day.  We'd have to back some of those out, because we

1  don't know about every single detail of every single

2  one, but we know just the top ones there are almost 10

3  billion.

4      Q.   And this is a pull-up of the document we

5  showed yesterday with their top 10 applications.

6  Hopefully, you can read a little better this time.

7      A.   Yes.

8      Q.   Tell us what this shows.  You kind of started

9  to, and I didn't have the slide up quick enough.

10     A.   This is a list of the frontend.  This is from

11  Google of -- by their logging or their recordkeeping,

12  who is the biggest users of this GCM or C2DM system.

13  Facebook, not surprisingly, seems to be the big winner.

14  But this list goes down and shows on a per-day basis, is

15  my understanding, how many times a message is sent from

16  that Facebook server or what's app server through the

17  GCM or the C2DM system to an Android phone or tablet.

18     Q.   In your opinion, when the application provider

19  and the Google servers that receive the requests are

20  located in the U.S. and the message is sent to an

21  Android phone or tablet in the U.S. through the GCM and

22  C2DM, does each time that happens, in your opinion,

23  infringe Claim 1.

24     A.   Almost all of them, yes.

25     Q.   What do you mean almost all of them?

     A.    There are a few cases that I would expect to
be relatively rare where I have not analyzed that
particular path, but that should not be the -- the
standard -- well, is not the standard case.

     Q.    This document here shows, as you pointed out,
11 billion requests -- send requests made for the top 10
applications.

          Over -- what's this -- for what period of time
is this for?

     A.    This is for one day.

     Q.    And which day was that?

     A.    Oh, that I couldn't tell you.

     Q.    You actually --

     A.    I think we've got a date on here.  July 25th
of 2013, so it's relatively recent.

     Q.    And this is on the board, Exhibit 272 and 275.
Can you tell us what's shown here?

     A.    This is actually, again, from Google
documents.  In this case, this is something that they
provide to encourage developers to use the GCM or C2DM
system, and they're actually advertising it as a
reliable end-to-end solution for Cloud Messaging and --
and they gave their -- their test results here.
11 billion messages a day; 450 million active users;
30,000 active applications; and a 25-percent growth each

1    month.

2        Q.    And in the bottom part of that document?

3        A.    These are some of the features of it.  250

4    million-plus Android devices that optimizes the battery

5    life of telephones.  It's easy to use because they

6    provide these what's called APIs.  That's an application

7    interface there.  And used by dozens of Google

8    properties, thousands of external apps.

9        Q.    Now, those were worldwide numbers, if you

10   recall.

11           Do you have an opinion on how many times

12   Google infringes Claim 1 of the '914 patent in the

13   United States, using all the U.S.-based equipment?

14       A.    I have no direct metrics.  Having looked at

15   the list of -- of top 10 and things like that, marking

16   some of them pretty much out and keeping others, I made

17   a very, very conservative estimate.  It's got to be

18   hundreds of millions, if not billions of times per day.

19       Q.    Let's turn briefly to the remaining claims

20   that are alleged to be infringed in this case.  And

21   that's Claims 2, 3, 7, and 22.  These are dependent

22   claims.

23           Can you explain to the jury what a dependent

24   claim is generally?

25       A.    Yeah.  You can think of a dependent claim

1    as -- as an add-on.  It's dependent on some other claims

2    that -- what we call an independent claim.  We saw Claim

3    1 earlier.  That's an independent claim.  You have to do

4    all that.

5              A dependent claim means you still have to do

6    whatever independent claim it refers to, but in

7    addition, it adds an additional what we call a

8    limitation.  So it might -- the independent might say it

9    has to transmit, and the dependent claim might be a

10   particular way.  You still infringe the independent one

11   regardless, but in order to meet this dependent claim,

12   you have to do this additional restriction for it.

13   That's my layman's version of it.

14       Q.   Up here is Claim 2 of the '914 patent, which

15   in the patent comes right after Claim 1.

16             Can you tell us what this patent -- excuse

17   me -- what this claim of the patent requires?

18       A.   Well, first thing it requires, it says the

19   method claimed in Claim 1.  So we still have to in order

20   to infringe Claim 2.  We still got to do Claim 1 like we

21   went over yesterday.

22             But in addition to that, we have this

23   requirement wherein said step of transmitting to data

24   blocks to said information gateway for building data

25   blocks, assigning addresses to said data blocks.  That's

1    pretty much out of what we saw yesterday.

2         Further comprises the step of building data

3    blocks and assigning addresses to said data blocks based

4    on an -- I'm sorry -- based on information in a

5    subscriber database.  That's our new requirement here.

6         Q.   Subscriber database, is that a term that the

7    Court gave a special definition to?

8         A.   No.  Database is a standard term, and

9    subscriber just means like a newspaper or anything else.

10   The Court did not give a definition for it.

11        Q.   And what is the ordinary meaning, in your

12   opinion, of the term database?

13        A.   Well, a database is kind of like a filing

14   cabinet, a collection of data where you can put things

15   in and file them away and then retrieve them.

16        Q.   In electronic form?

17        A.   In this case, since it's a computer, yes.

18        Q.   Did you find that Claim 2 and its requirement

19   of a subscriber database that you used to build the data

20   blocks and assign addresses was met by the GCM and C2DM

21   services?

22        A.   That's correct.  I did.

23        Q.   And what led you to that conclusion?

24        A.   We mentioned yesterday that -- that Buzz has

25   to figure out which MCS end point to send this message

1    to.  And he looks that up in a database.  It's a big

2    list of all the phones that are currently connected

3    through MCS, and he looks that up on -- he has an

4    internal copy, but he can also look it up on this thing

5    called Kansas.  Kansas is just a big storage -- big

6    filing cabinet.

7              Now, that would make it a database because he

8    looks up the phones's Android ID, and he gets out a

9    piece of information about which MCS's end point.  What

10   makes it a subscription database is that there are flags

11   in there saying which applications actually are

12   currently requesting to receive these alerts.  This

13   registration ID basically identifies both -- essentially

14   think of it as a combination of the application and the

15   phone.

16             So if, for example, a -- CNN goes to send a

17   message to -- to this phone, but the guy has requested

18   not to receive notifications for CNN, then it won't be

19   in that database and the -- the message will not be sent

20   on.  So it's a database of those people who have

21   subscribed to those types of messages.

22        Q.   So in summary, in your opinion, is Dependent

23   Claim 2 of the '914 patent infringed by Google when it

24   uses the GCM and C2DM to process and send messages for

25   both first and third-party applications?

1          A.    That's correct.   In both cases, it looks up

2    that MCS end point address by looking it up in a

3    subscription database.

4          Q.    And does it assign that address to the data

5    blocks?

6          A.    Yes, so it can send it on to the MCS end

7    point.

8          Q.    We've got two additional claims on the board.

9    This is Dependent Claim 3 and Dependent Claim 7, and

10   they relate to each other.   Can you walk us through what

11   these claims describe?

12         A.    Well, Dependent Claim 3 is dependent on Claim

13   1.   And it has -- I'll read it quickly.   The method

14   claimed in Claim 1, wherein said step of transmitting

15   preprocessed data to the remote receivers communicating

16   with said devices -- basically our transmission gateway

17   -- further comprises the step of wireless transmitting

18   said preprocessed data to the remote receivers.   In

19   other words, instead of an Ethernet cable plugged into

20   the back of the device, that somewhere in between the

21   two there's a wireless or radio communication.

22         Q.    And does the patent describe how that

23   transmission can be made using a wireless connection?

24         A.    It gives several descriptions, yes.

25         Q.    Is this -- this is an example shown from

1  Figure 1?

2      A.   That's the picture, yes, that's out of Figure

3  1 from the patent.  And the radio tower there is just

4  kind of a -- what we call a clipart of a -- of a

5  wireless transmitter.

6      Q.   And did you find that the GCM and C2DM

7  service, when Google uses those services to send

8  messages for both first-party and third-party

9  applications, that they do so wirelessly as Claim 3

10  requires?

11      A.   Yes, that would be true for both WiFi and for

12  what we refer to as cellular -- cell phone usage.

13      Q.   Did you find that there was infringement of

14  Claim 7 and its additional requirements?

15      A.   Yes, Claim 7 is dependent on Claim 3, which,

16  of course, is dependent on Claim 1.  So we've got our

17  Claim 1.  We've added that it has to be wireless this

18  time.  And then we add a further limitation that the

19  wireless method of transmitting said preprocessed data

20  utilizing an FM subcarrier, a digital carrier, an analog

21  carrier, a cellular carrier, a GCM carrier, or a PCS

22  carrier.  Those are different types of wireless

23  transmissions.  Specifically in this case, these are

24  types that -- that would typically relate to a cell

25  phone.  GSM is -- for example, AT&T uses the GSM system.

1  The analog carrier is out of service in the United

2  States.  PCS, I believe, may still be used by some of

3  them.  But these are just typical what we think of as

4  the cell carriers.

5      Q.   Well, there's several different options here.

6  Which of these types of carriers, in your opinion, does

7  Google utilize to send messages for the GCM and C2DM?

8      A.   The cellular carrier and the GSM are the most

9  common ones that are used in the United States.

10      Q.   And under what circumstances does that happen?

11      A.   Pretty much any time your phone is not logged

12  in or connected to a WiFi hot spot.  If I just had an

13  AT&T cell phone in my pocket, Android, that's what it

14  would use.

15      Q.   The last dependent claim we're going to

16  discuss is Claim 22.  Can you explain what this claim

17  requires?

18      A.   Yes.  Again, this is a dependent claim back on

19  the Claim 1 -- the method claimed in Claim 1, wherein

20  said step of instantaneously notifying said devices of

21  receipt of said preprocessed data, whether said devices

22  are online or offline from the data channel associated

23  with each device -- and here's the new limitation --

24  further comprises the step of providing at least one

25  alert which when activated allows display of data.

1    Q.   Now, can you explain what this -- how this

2  differs from the last element of Claim 1 which talks

3  about instantaneously notifying the remote computing

4  device?

5    A.   Yes.  All we -- all we said in Claim 1 in that

6  last step was that when that message comes down and is

7  received by the phone, that the CPU is notified that

8  that message has been received.  We didn't say anything

9  about what happened to it, what it did with it.  What

10  Dependent Claim 22 requires is an additional step here,

11  if you will, that after this CPU has been notified, that

12  it puts up some kind of alert on the screen or on the

13  device that can be activated, that -- in other words,

14  that you can do something with, that will allow the

15  display of data.  And I think we've got some examples of

16  that.

17    Q.   This is shown here -- there's an example.  One

18  is from the Gtalk application; is that right?

19    A.   That's correct, yes.

20    Q.   And this is -- can you explain what's shown --

21  the pull-up here in the middle?

22    A.   Well, the -- the thing --

23    Q.   This here?

24    A.   -- yeah, the big black rectangle in the middle

25  is the actual message that the user wanted to see.  In

```
 1  this case:  Mickael, what's up?
 2      Q.   And can you click on that to get more data?
 3      A.   Yes.
 4      Q.   In your opinion, does Google perform the
 5  method of Dependent Claim 22, providing at least one
 6  alert which, when activated, allows the display of data?
 7      A.   That would be correct.
 8      Q.   And what portion of the phone does that?
 9      A.   It involves the application, obviously,
10  because that's what has our data channel, but there is a
11  particular part of -- of the operating -- I'm sorry, of
12  Android that is provided by Google which knows how to
13  put up these alerts, how to recognize that somebody has
14  swiped them or touched them, depending on the device,
15  and then sends that response to the app so that it knows
16  that alert has been activated.
17      Q.   Move on to our last topic, which is
18  non-infringing alternatives.  First, can you explain
19  this concept of what a non-infringing alternative is?
20      A.   This is something that's done in -- in these
21  types of cases is we look at -- or I look at and Google
22  also provides some ways that they suggest they could
23  have worked around the infringement, that they could
24  have redesigned the system so that it would not
25  infringe.  It's called non-infringing alternatives.
```

1    Q.   And did you consider the non-infringing

2  alternatives that were available to Google instead of

3  using the infringing methods we just went through?

4    A.   I certainly considered a number of them.  The

5  first one that -- that came to mind was polling.  That's

6  the way this was done before -- well, before SimpleAir

7  or before this type of thing.  Systems used to always go

8  out and poll periodically to see if there was e-mail or

9  news or whatever.

10    Q.   So when the -- all right.  When the polling

11  technique to get new data is used, explain exactly what

12  happens.

13    A.   I think -- I don't know if I mentioned it

14  yesterday or not, but polling, it's like you -- you've

15  invited friends over, you're not sure when they -- when

16  they might arrive.  You go -- so every few minutes you

17  stop what you're doing, you go to the front door, you

18  open the front door, anybody there?  No.  Shut the door

19  and go back to what you were doing.  You have polled.

20  You have asked is anybody out there.  That's polling.

21  Real simple.  It's been done, again, for decades.  And

22  you check and see if there are any, in this case, new

23  emails or new breaking news stories, whatever, tornado

24  alerts.

25    Q.   In this diagram, what's depicted with respect

1  to polling?

2      A.   You have to ask the question.  You have to

3  send a request to the -- in this case, to the Gmail

4  server.  Do I have any new mail?  And the Gmail server

5  sends back either a yes or no, another message back to

6  you.

7      Q.   So on the top, what do we have and what do we

8  have on the bottom of the screen?

9      A.   Just an example, the top one, you asked is

10  there any mail, new unread mail; it came back no.

11          The bottom one, the same question, but at this

12  time, it came back and it said, yes, you have new mail,

13  in response to the question.

14      Q.   And can you explain what's shown on this next

15  slide?

16      A.   Yeah.  The problem is -- depending on I guess

17  how popular you are -- you may have to ask hundreds or

18  thousands of times and get the answer no, every time,

19  and just turn around and keep asking again and again and

20  again, wasting all this effort before you finally get an

21  answer that says yes.

22      Q.   And what's the problem with doing -- doing it

23  that way?

24      A.   Well, it's just like running to the door to

25  see if anybody's standing on your front porch.  It takes

1   energy.  In the case of you doing it, it makes you

2   tired.  In the case of the cell phone, it drains that

3   battery.  Every time you ask the question and get the

4   answer, you drain the battery a little.  If you have to

5   do it a whole lot of times, you drain the battery that

6   much more.

7        Q.   Now, what about if you have not just the Gmail

8   application that you're checking e-mails for but

9   multiple applications?

10       A.   Well, everything I just said is still correct.

11  Every time you go do it, it drains the battery.  If you

12  got not just Gmail but CNN, ESPN, Facebook, dozens of

13  other apps and you're having to do this with each

14  application server, then you're just draining the

15  battery that much faster.

16            If you were looking for 10 possible friends

17  and they might come to 10 different doors, you'd have to

18  run around opening 10 different doors every time you

19  just wanted to find out if somebody was there.

20       Q.   If you wanted to reduce the battery drain

21  caused by this polling technique asking for new data,

22  what could you do?

23       A.   Well, the cost is per asking.  Every time you

24  ask and get a reply, whether it's a yes or no reply, it

25  still has that cost.  If you ask every minute, you're

1    doing it 60 times an hour.  That's a lot of drain.

2    If you want to reduce the drain, you could ask less

3    often, maybe once an hour, for example.  And, you know,

4    of course, that leaves people standing out on your porch

5    for 59 minutes.

6         Q.   Well, on this slide, we were showing polling

7    from the phone to the server once an hour; is that

8    right?

9         A.   That's correct.

10        Q.   And what's wrong with that?  Why is that not

11   good enough?

12        A.   Well, you can do it, but you're only going to

13   get information back when you ask the question.  You're

14   only going to find people at your front porch when you

15   open the door.  If somebody shows up right after you

16   just looked, then a whole hour is going to go by before

17   you know again.

18             In this case, if you got email or if there was

19   a breaking news story or sports score or something,

20   you're not going to find out about it until almost a

21   full hour later when you ask the question again.

22        Q.   What's -- what's so bad about that?

23        A.   Well, depends on what the question is.  For

24   some things, it might not be so bad, but for a lot of

25   other things, it could be really unacceptable.  You

1  could be getting emails that are critically important

2  that you get them in a timely fashion.

3          This is Marshall, Texas.  I, like I say, grew

4  up not far from here.  We're at the bottom of Tornado

5  Alley.  The Weather Channel might go years with you

6  asking every -- every hour, is there a -- you know, for

7  weather alerts.  And then it issues a tornado warning or

8  a tornado alert and you don't get it for 58 minutes.

9  That's probably about 48 minutes after it crushed your

10  house.  That's just not acceptable.

11      Q.   What was the next non-infringing alternative

12  that you considered?

13      A.   Something called persistent connection, and a

14  persistent connection just means we open this connection

15  and we keep it open in this case between the phone and

16  the app provider.  That's -- gets around part of the

17  problem of the -- of the polling.

18      Q.   When you're talking about a persistent

19  connection, are you talking about these connections from

20  the phone to the application servers?

21      A.   Yes.  We're trying to get around the

22  infringement of the GCM or C2DM system.  So we're

23  bypassing all of that and going directly between the

24  phone, and in this case, the third-party server.  So it

25  would have a persistent connection between those two.

1          Q.    How is this different from what we ended with

2    yesterday about the online or offline?  What's required

3    by the -- the patent?

4          A.    This would -- would actually be a connection

5    between the two.  So it would be, in effect, online to

6    the application server.

7          Q.    All the time?

8          A.    All the time.

9          Q.    And would it use that whole system, the GCM

10   system?

11         A.    Not what you've got shown up there.  It would

12   bypass all the Google stuff, except for the Android

13   operating system.  It would bypass the infringing

14   system.

15         Q.    In your opinion, what problem is there with

16   maintaining this connection?

17         A.    Well --

18         Q.    I'm sorry.  The direct connection to the app

19   providers?

20         A.    We need to -- we need to say two things about

21   that.  First, these connections are kind of like an

22   elderly aunt who's not too good with remembering things.

23   So you remind her of something, but you have to keep

24   reminding her; otherwise she forgets.

25              We call it a persistent connection, but in

1  order to make it persist, we have to keep reminding

2  the -- the communications channel that we're still there

3  about every 15 to 30 minutes.  It's called a Keep-Alive.

4  That's the same thing we have to do for keeping a

5  persistent connection between this phone and the -- the

6  GCM system, except that -- and -- and there's a drain.

7  Just like everything else, it drains the -- the battery,

8  but when we did it with GCM, we only had that one drain.

9  When we do it with a whole bunch of app providers, we've

10 got that drain again times every single app provider we

11 want a connection to.

12      Q.   Let me back you up a moment.  You referred to

13 a Keep-Alive.  What is a Keep-Alive signal and how does

14 it relate to a persistent connection?

15      A.   The Keep-Alive is just a really short little

16 packet of information, and it's just a reminder, hey,

17 I'm still here.  Some of you may have seen the term

18 inactivity disconnect on your computers.  It's that sort

19 of thing.  If that connection is idle for too long,

20 various positions along the way will drop it, will

21 decide that it's no longer valid.

22           But it is a connection.  It does require you

23 to send information, in this case to Gmail, and it

24 requires Gmail to acknowledge back that it got that

25 message.  So there's a battery drain every time that

1  happens.

2      Q.   And what if you have multiple applications on

3  the phone; do you still have Keep-Alive signals?

4      A.   You have to have a Keep-Alive for every one of

5  those connections, because they're separate connections.

6  Even though they're all simultaneously there, each one

7  has to have its own Keep-Alive.  So if we do that, then

8  we've got -- we've got that battery drain times that

9  number of -- that number of channels.

10     Q.   Of -- of connections you mean?

11     A.   That's right, however many are up there.

12     Q.   Were there other alternatives, non-infringing

13  alternatives, that you considered in your work on this

14  case?

15     A.   There were.

16     Q.   And how did you identify those?

17     A.   These were ones that Google themselves

18  suggested.  They said, you know, we could do this or we

19  could do this and so on.  And they sent a whole long

20  list of them in what's called an interrogatory response.

21     Q.   What's that exactly?

22     A.   Oh, it's an answer to a question that's

23  legally asked of them, and they legally respond.

24     Q.   And now, Mr. Nerieri, Google's corporate

25  witness, sat for a deposition earlier in this case.  You

1  read his testimony?

2       A.   I did.

3       Q.   When he was asked about the alternatives that

4  Google identified in their interrogatory response, what

5  did he say about those?

6       A.   He said they'd never considered any of them.

7       Q.   And did you find that to be relevant?

8       A.   Yes, to some degree.  It meant that they had

9  not found any of those to be useful when they were

10 designing the system.  They had not looked at those as

11 viable alternatives.

12      Q.   One of the alternatives they identified -- and

13 it was touched on by Google's counsel in the opening

14 statement -- was this idea of putting the whole system

15 outside of the United States so that they could avoid

16 infringing our United States patent.

17           Did you look into that issue?

18      A.   I did.

19      Q.   And first -- we talked a little bit about this

20 in infringement -- but does Google have servers for the

21 GCM and C2DM within the United States?

22      A.   They do.

23      Q.   And when you were providing your opinion on

24 how many times Google infringes Claim 1 and you said

25 hundreds of millions of times, were you talking about

1  the use of those servers, the ones in the U.S.?

2      A.   Yes.   I was eliminating -- for instance, one

3  of those users is primarily a Russian company, and I was

4  trying to eliminate all that and still be very

5  conservative as to what would be in the United States.

6      Q.   Now, what do you have to say about this

7  alternative, and -- I'm going to ask a new question.

8           First, let me ask you this:  In his deposition

9  testimony, did Mr. Nerieri, Google's witness, give any

10 indication that Google actually locates its servers here

11 or there based on whether it might infringe people's

12 patents?

13     A.   No.   In his testimony, what he said was they

14 simply looked at where they had capacity.

15     Q.   And what does that mean?

16     A.   It actually means several things.   It means

17 where they've got enough of these machines to be able to

18 keep up whatever loads those machines are expected to

19 handle.  But it's more than just the machines.  It's the

20 facility, the personnel to run them, the power and the

21 data lines.  All of that goes into capacity.

22     Q.   Mr. Nerieri was also asked whether Google in

23 the whole company's history has ever purposely designed

24 a service so that they're going to use foreign servers

25 to send messages, for example, to people who are in the

1    U.S.

2            Do you recall reviewing that part of his

3    testimony?

4        A.   I do.

5        Q.   And what was his answer to that?

6        A.   He didn't know of any.  He said I don't -- I

7    just said it could be.  I don't know about it.

8        Q.   Based on the evidence you've seen in this

9    case, including the deposition testimony, in your

10   opinion, is it Google's practice to put servers in the

11   U.S. or outside the U.S. based on whether it's going to

12   infringe people's patents?

13       A.   I've seen no evidence of that.

14       Q.   Now, there's another response that you address

15   in your report to this idea of putting the servers

16   offshore.

17           Can you explain that one and how it relates to

18   what's shown here?

19       A.   I can explain it in -- in layman's terms.  I'm

20   not a patent lawyer.  In addition to the '914 patent

21   that we've been discussing here, there's a thing called

22   the '279 patent also owned by SimpleAir, and it's what's

23   called a system patent.  It's very similar in what it --

24   what it does.

25           But my understanding of the way a system

patent works is that if the ends in this case are in the

United States, that even if you moved those GCM servers

offshore, this patent would still be infringed.

Q.    This is Exhibit 7 and this is a copy of the

'279 patent?

A.    Part of it, yes.

Q.    Which part is shown here on the right?

A.    Claim 1.

Q.    And what's shown in the highlighting?  What's

the highlighting supposed to indicate?

A.    The highlighting is, again, these -- these

Buzz words or these terms that we've got a system.

Remember '914 said a method, but it's got a central

broadcast server, an information gateway, a transmission

gateway, and a data channel associated with each remote

computing device.  Pretty much reads the way the '914

did, but this is a system patent, not a method patent.

Q.    Did you reach the opinion in one of your

supplemental reports about whether this system patent

would be infringed by Google?

A.    Based on what I've been informed is -- is the

patent law relevant to this?  Yes, it would still

infringe.

Q.    Even if they moved some of the servers outside

the U.S. but use it to use the system to serve U.S.

```
 1  devices?

 2       A.    That's correct.

 3       Q.    And when did this patent issue?

 4       A.    This is recent, October 29th, 2013.

 5       Q.    So we heard a little bit about the re-exam

 6  proceeding where the Patent Office was asked by another

 7  company, another Defendant, to look at '914 patent

 8  again.

 9            Do you recall that from the opening?

10       A.    Yes.

11       Q.    And the patent found that the '914 patent

12  was -- was valid?

13       A.    That's correct.

14       Q.    And then this -- again, this is a separate

15  patent at the Patent Office just recently issued?

16       A.    That's correct.  This is one they -- an

17  application they examined -- accepted and issued a

18  patent on.

19       Q.    Which of these non-infringing alternatives did

20  you find would be the best one for Google to use, if

21  they couldn't do the infringing method of the GCM and

22  C2DM?

23       A.    Of these basic types -- and there are a lot of

24  combinations of ingredients here -- but basically, I --

25  I think their best option would be to go to this
```

1  persistent connection but to each individual application

2  server.

3       Q.   Is that actually something that they could

4  actually do on the -- with the Android phones?

5            Let me ask the question differently.  I'll

6  withdraw it.

7       A.   Okay.

8       Q.   Currently, do the Android phones allow

9  applications to maintain a persistent connection to the

10 third-party application servers?

11      A.   Allow it, yes, but I'm not aware of any

12 applications that actually have the software in them to

13 do it.  So those applications would have to be modified.

14      Q.   Now, in your opinion, are any of these

15 non-infringing alternatives actually acceptable as

16 compared to the infringing method that Google actually

17 uses?

18      A.   I don't think any of them would be -- would be

19 very good.  The persistent connection, what I describe

20 here is -- is the best of a bad lot -- is still going to

21 reduce the battery life substantially.

22      Q.   So basically, you're saying this is the best

23 choice out of a bunch of bad choices?

24      A.   Yes.

25      Q.   Now, let's talk about the benefit of using the

1  infringing method, the one they currently use, compared

2  to what you found to be the best non-infringing method.

3  And on the left, this depicts the non-infringing method?

4      A.   That's correct.

5      Q.   These are the persistent connections to each

6  of the app providers?

7      A.   That's right.

8      Q.   And then this is just the system that they use

9  to infringe on the right?

10     A.   Yes, that's correct.

11     Q.   Now, generally from a top level, what are the

12 benefits to Google of using the infringing method as

13 opposed to that non-infringing method of -- of

14 persistent connections to the app providers?

15     A.   Well, this list isn't necessarily in an order

16 that I would put it in.  I think the biggest one is that

17 battery-life issue.  That's the biggest benefit.

18          It also -- it says here saves network

19 resources.  Every time one of these Keep-Alive signals

20 goes out, every time you poll, you're using part of your

21 data plan.  So it not only eats into your budget for

22 data, but it eats up the capacity of these cell towers

23 and all.  So it slows everything else down.

24     Q.   You're -- you're talking, sir, about this

25 slowing things down, these connections?

1        A.     Doesn't matter.   Every one of those

2    connections slows it down.   If you're doing it for three

3    of them, you're slowing it down three times as much.

4    You're putting three times the load on it.

5             The other advantage -- whereas going through

6    the GCM, you're only doing it once.   And we should

7    probably say more about that.   But -- and the other

8    things, it says up here -- it says give Google -- or

9    gives Google control.   And there's a number of things

10   there that that does.

11             And I probably can't remember all of them at

12   the moment, but one of the things is it isolates the --

13   the app provider from the user's phone.   The app

14   provider can't spam the user, whether he wants to be or

15   not, with just endless floods of these.   Google can

16   always shut the thing down if -- if the app provider

17   doesn't obey the terms of service.   Google gets to sit

18   there as the middle man.   And they get to be the good

19   guys providing this service.

20       Q.   By offering the infringing service, does

21   Google get to keep metrics, sort of data files, on the

22   use of the system?

23       A.   Yes.   They -- they log everything from the

24   number of good messages to the number of bad ones.   You

25   saw those charts we had earlier that are -- those

1  actually came from Google.  When I went through the

2  code, there's a ton of stuff in there for that.

3      Q.   Would they have access to all that

4  information, things like which apps are sending

5  notifications and how many phones are getting them, if

6  they didn't offer this system and just have this happen,

7  the direct connection?

8      A.   Well, they wouldn't have anything.  They'd be

9  completely out of the loop.

10      Q.   Now, let's focus on the one you said is most

11  important, saving of the battery life.  Up here at the

12  top, again, we have the infringing system.  And as you

13  said, it has one connection.  Explain, please, what's

14  shown on this -- this slide.  What's on this slide?

15      A.   Well, we said that this connection draws

16  battery power.  Just keeping it alive puts a certain

17  small but noticeable drain on the battery.  And we said

18  if you had a bunch of these connections, you'd drain the

19  battery that many times faster.  If you had a user and

20  he's only got one app and he -- you know, maybe it's his

21  Gmail and that's the only thing he ever sets up that

22  wants alerts, then if he had this one persistent

23  connection direct to Gmail instead of to -- to GCM, it

24  actually wouldn't make any difference, frankly.  He's

25  got one connection.  It eats up one amount of network

1  capacity.  It eats up one amount of -- of battery.

2        The trouble is most people have lots of apps

3  and they want to make lots of -- or want to get lots of

4  alerts.  With the GCM system that we're talking about

5  there, the infringing system, it's what we call

6  scalable.  No matter how many of these apps and how many

7  different types of alerts you may be getting, you've

8  only got one connection.  You're only paying for it once

9  in terms of battery.

10     Q.   And this is the non-infringing method where

11  you have multiple --

12     A.   Yes, just straight arithmetic.  You'd have to

13  multiply it by however many of those you've got.

14     Q.   So this is the comparison that you made

15  between the infringing method and the non-infringing

16  method?

17     A.   That's correct.

18     Q.   And how did you go about measuring the battery

19  life savings that is achieved by using the infringing

20  method of Claim 1, as compared to their best

21  non-infringing alternative?

22     A.   As I say, in some ways it's just simple

23  arithmetic.  What you need to know first and foremost is

24  how much energy is taken out of that battery every time

25  you keep this connection alive, every 15 to -- to 30

1    minutes.  And that was one of the first steps that I

2    did.

3        Q.   How did you go about measuring the battery

4    drain that results from that Keep Alive signal?

5        A.   I did three separate things.  One of the first

6    things I did was looked at the phone specification.  The

7    -- the people who sell these phones actually market

8    these phones with a little sheet either online or in the

9    back of the box the phone comes in or whatever, and it

10   has a lot of information, including what you see up

11   there is called the standby time.  And that gives you an

12   idea of how long the phone will last when you're not

13   getting a movie or something.  It's just sitting there

14   waiting to get a phone call or waiting to get an alert

15   or something.  So that gives us a measure of hours, and

16   then we can also look and see what size battery, how

17   much capacity is in that battery, multiply or divide one

18   into the other, and you get a measure of the rate at

19   which that battery discharges.

20       Q.   Did you also consider internal documents from

21   Google when you were trying to measure the impact on

22   battery?

23       A.   Yes, they've spent a lot of time and effort on

24   this, according to Mr. Nerieri.  They've got their own

25   battery team, as I recall.  And they have published

1 their own data internally on this -- on how much load

2 each one of these Keep Alives will cost on the battery.

3       Q.    And shown here is Exhibit 146 and Exhibit 54.

4 Are these documents that you considered in your

5 analysis?

6       A.    Yes, those are Google documents.  And the --

7 the first one there, the 146 is one of the especially

8 nice ones.  In addition, the little excerpt you have

9 there, they have drain curves and they had some really

10 nice fill traces that they had taken.

11       Q.    Did you also perform your own testing as part

12 of this analysis?

13       A.    Yes.  I mentioned earlier that I have a little

14 research and development company there in Austin shown

15 in the upper right-hand corner, our building.  Little

16 red car up there used to be mine.  And we have an

17 electronics lab in the back that I use standard test

18 equipment, oscilloscopes.  The power supply in the lower

19 left that --

20       Q.    Actually slow down for a second, sir.  Maybe

21 you can tell us first what's the one up on the left?

22       A.    That's an oscilloscope.  You always see it in

23 the mad scientist movies.

24       Q.    Okay.

25       A.    And it's used to -- to convert an electrical

1    signal into something you can visually look at.  We all

2    have a couple of traces in a moment, but you actually

3    get to see all the squiggles indicating what's happening

4    electrically to whatever it's connected to.

5         Q.    And what's this piece of equipment on the

6    lower left?

7         A.    That's a power supply.  We test the batteries.

8    We condition them.  We do all sorts of measurements on

9    them, but then when we go to check the phone, we don't

10   want how freshly charged or discharged the battery is to

11   impact -- impact our measurements so we use a power

12   supply.  And both the scope and power supply, I should

13   point out, were specifically chosen because they match a

14   testing standard from, I believe, AGM.  It's a -- an

15   organization that publishes how to measure these sort of

16   things on cell phones.

17        Q.    When you did your testing in the lab, did you

18   comply with generally accepted principles for testing

19   these sort of things?

20        A.    That's correct.

21        Q.    And what about this up at the --

22        A.    Well --

23        Q.    -- upper right?

24        A.    -- I'll take those two together.  Cell phones

25   use a different amount of power, depending on how -- how

1  strong the signal is.  You're standing near a cell

2  tower, it uses less power than if you're a long ways

3  away.  Same way with -- with the other signals.  So we

4  wanted, again, to be able to have a consistent, reliable

5  way of measuring this.

6          The thing in the -- the upper box there with

7  the two antennas sticking out of it is what we call a

8  WAP, a WiFi hot spot.  So we had our own dedicated --

9  there's never any other traffic when we were making

10  these measurements.  The only thing it does is handle

11  these Keep Alive signals for us.  Also allows me to

12  record that data and everything, and we have a known

13  strength of a signal we can use over and over.

14          Go back just a second, please.  And the thing

15  right beneath it is kind of neat.  That's our own cell

16  tower.  It's called a microcell.  But it's a cellular

17  tower, operates with AT&T, and that means our cell tower

18  was just a couple feet away from the phone.  So, again,

19  we had a known, consistent, reliable, and dedicated cell

20  signal so we never had to worry about delays from

21  somebody else, you know, occupying the thing or it being

22  so far away that the cell phone was using more power

23  than it should.

24      Q.   And is this an example of one of the phones

25  that you tested?

```
1        A.    Yeah, that's a Galaxy S3.

2        Q.    Is that an Android device?

3        A.    Yes, it is.

4        Q.    Did you --

5        A.    That's a boot screen.  And you see, in fact,

6   one of the -- a couple of the Google apps there on it.

7        Q.    Did you test other Android phones?

8        A.    Yes, we tested a number of them.

9        Q.    And what's shown on this slide?

10       A.    Remember we talked about that oscilloscope.

11  These are two traces that copied straight off the

12  screen.  On the left-hand side is an idle, and that's

13  pretty much just a -- a straight line.  You can't really

14  tell it from here, but that line is up above ground just

15  slightly.  That is to say the phone is consistently

16  drawing a little bit of power.  And that's mostly

17  keeping the receiver alive so it can recognize one of

18  these signals.  When the -- when the -- the signal or

19  when the message actually comes down, you get a trace

20  like what you see on the left.  This is a Keep Alive.

21  It's got two parts here.  The big pickup on the

22  left-hand side of that trace is the transmission from

23  the phone.  It's the processor waking up, making up this

24  transmission, sending it out, and saying, hey, we're

25  still here, don't drop my connection -- my persistent
```

1   connection to GCM.  And then there's a little hiccup on

2   the other end basically where it's acknowledged and the

3   phone shuts down.

4        Q.   So you did all this testing, and how did you

5   gather up all the data and figure out what to do with

6   it?

7        A.   Well, what you haven't seen is the hundreds

8   and hundreds of oscilloscope traces and -- and

9   measurements and everything else, but eventually put it

10  all in a spreadsheet and generated some formulas that

11  allowed us to plug in all the data that we got from the

12  testing for each phone, its battery type, how much

13  capacity, all these other numbers.  And from that, we

14  could derive a formula that allowed us to plug in

15  different conditions.  For instance, how often the Keep

16  Alive is sent or what's the impact of having multiple

17  Keep Alives versus just one.

18       Q.   Did that allow you to create a -- a worksheet

19  or a formula for the Android phone, something that you

20  could then use to decide how much battery life per

21  application was drained?

22       A.   That's right.  Reduced it down to obviously a

23  much simpler thing.  You see there that essentially just

24  looks at the impact of these -- these Keep Alives.

25       Q.   Well, let me back up.  What is shown on

1    this -- on the screen at this point?  It says Android

2    battery worksheet.  What -- what's that?

3         A.    This is a reduced spreadsheet, or just a

4    little thing.  The formulas are kind of buried down

5    under here, although I think it's given right at the

6    bottom where you probably can't -- can't read it well.

7    But it allows you to plug in different numbers of -- of

8    Keep Alives, different numbers of applications that want

9    these Keep Alives, and determine from that what drain

10   there is on the -- on the phone's battery.

11        Q.    So this is a Microsoft Excel spreadsheet?

12        A.    That's correct.

13        Q.    And you can actually enter in different

14   numbers to the spreadsheet?

15        A.    That's correct.

16        Q.    And then automatically the formula calculates

17   these numbers?

18        A.    That's right.  As I say, all the complicated

19   math is hidden here, but the formula is given down at

20   the bottom.

21        Q.    So right here there's the No. 2 provided.  Can

22   you tell us, if you change the number in that field,

23   what -- what's it do?  What's the spreadsheet do?

24        A.    That is the number of downloaded applications

25   with notifications.  In other words, how many of these

1    apps are going to want to receive these alerts.

2         Q.   And in the next column here, it says standby

3    time with no applications at all, not even having the

4    GCM or a connection to the app provider.  What's --

5    what's this about, this --

6         A.   Well, that's our -- what we call our baseline.

7    That's -- that's based on no notifications.  The phone

8    just sits there idle.

9         Q.   And in the next column, it says standby time

10   with connection to GCM.

11        A.   Right.  And that's equivalent, as we said, to

12   one -- keeping one of these connections open.  And even

13   that, as we said, draws some battery power.  It does

14   reduce the overall battery life.  This is consistent

15   with my measurements.  It's consistent with Google's

16   measurements.

17        Q.   So this first number down here under

18   percentage decrease, it says 14 percent.  What's that

19   the decrease of?

20        A.   That's the percentage decrease that you would

21   have in battery life if you set up one of these

22   notifications and set the phone down and just waited for

23   the battery to run down, as opposed to not having any

24   notifications at all and seeing how long the battery

25   would remain alive on the phone.

1     Q.   So this first one, the 14 percent, does that

2  measure the difference between a phone that has no

3  notifications whatsoever and a phone that's using the

4  infringing Google system?

5     A.   That's right.   One notification, one app

6  alert, or being connected to GCM, those are exactly the

7  same in terms of battery usage.

8     Q.   And in the third column here, it says standby

9  time with maintaining connection to each notification

10 app provider.   What information did you put in that

11 field?

12    A.   Well, you remember the thing on the far left,

13 we had a 2.   In other words, this was with a phone that

14 only had two applications that wanted alerts in this

15 case.   And on that right-hand column, what you're

16 looking at there is the decrease in standby time if you

17 had this non-infringing alternative of a persistent

18 connection to each of two apps or two application

19 servers.

20    Q.   So what does the 25 percent -- percentage

21 decrease number mean?

22    A.   You'd lose 25 percent of your -- of your

23 battery standby time.

24    Q.   If you had two applications?

25    A.   Well, and the non-infringing method.   If you

1  were going direct with these persistent connections from

2  each app -- two apps, each to their own respective

3  servers.

4      Q.    And in your calculations, what did you use as

5  the frequency for the Keep Alive signal?

6      A.    These were based at 30 minutes.

7      Q.    Once --

8      A.    That's --

9      Q.    -- every 30 minutes?

10     A.    That's the most conservative number that I --

11 I felt I could use.

12     Q.    Why was that the most conservative?

13     A.    That's the standard time out for -- for most

14 of these WAPs or for the cell carriers.  Some are --

15 some need it more often, but 30 minutes is the longest

16 normal one you see.

17     Q.    Can you give us briefly an example of how this

18 spreadsheet works?  And let's start first with if the

19 phone has just one application, how's -- let me back up

20 for a second.  Let's say you have a phone and it's going

21 to use the non-infringing alternative of maintaining a

22 persistent connection directly to the application

23 provider, instead of using the Google system.  How

24 does -- how do those two things match up in terms of the

25 battery life impact?

1    A.   Well, they're the same.  A -- a connection is

2  a connection in this sense.  As long as we're still

3  talking about these persistent connections with these

4  background Keep Alives, it really doesn't matter who

5  it's to.  That's not a hundred percent correct

6  statement.  If you go into a slow server, it might

7  actually increase it.  But for all practical purposes,

8  on the average it's going to be the same.  So one

9  connection to GCM draws a certain amount of power.  One

10 connection to CNN, for all practical purposes, draws the

11 same amount of power.

12    Q.   And if there are two applications on the

13 phone, both maintaining a persistent connection to the

14 two different application servers, how does that compare

15 to using just the one connection for the infringing GCM

16 service?  How does that impact the battery?

17    A.   Well, if we're going to two servers, like CNN

18 and ESPN, as opposed to just one, it's basically 2X.

19 It's two connections.  It's twice the power.  But if

20 we've got two of these servers we want alerts from and

21 we're using GCM, we've still only got one connection.

22 Whether it's one server or a hundred servers, it's still

23 only one connection.  So we see no increase in battery

24 drain in that case, other than having that one

25 connection.

1       Q.   And if you have five applications with five

2   separate persistent connections to the application

3   provider, how that does compare to the GCM as one

4   connection?

5       A.   We're basically looking at five times the

6   drain, if we're having five connections each to their

7   respective servers, but the GCM is still the same as

8   having one connection.  It is one connection.

9       Q.   Now, this worksheet, the -- the Android

10   battery worksheet that let's you plug in how many

11   applications you have, did you provide that to

12   SimpleAir's market research expert, Dr. Srinivasan?

13       A.   That's correct.

14       Q.   And he then incorporated the data he took from

15   his survey with that?

16       A.   That's my understanding.

17       Q.   Now, very briefly, we've just gone through and

18   explained the benefit of using the infringing system to

19   set up the non-infringing alternative and showed the

20   impact on battery life.  If you recall from opening

21   statements, Google said that our patent, the '914

22   patent, doesn't say anything about battery life.  In

23   your analysis, is that relevant?

24       A.   No, it's not.  When the '914 patent was

25   originally proposed, the -- the provisional, and it

1 talks about this in the patent, the big thing they were

2 trying to save was money, was time.  People logged on,

3 check to see if they had new e-mail, and logged back off

4 because they were paying by the minute.  But there's a

5 cost associated with doing that check, that polling, if

6 you will.

7        Now, with your cell phone, every time you

8 poll, you have a cost.  But the cost, instead of dollars

9 paid to AOL, is battery energy paid to running down that

10 cell phone.

11    Q.   So to summarize all the opinions you've

12 provided today and yesterday, I've got this slide here.

13        And can you just briefly walk through this for

14 the jury?

15    A.   Yes.  The result, first off, of all this

16 analysis and testing and everything is that Google does

17 infringe Claims 1, 2, 3, 7, and 22 out of the '914

18 patent.  They perform all of the steps for the

19 third-party apps and also for the first-party Google

20 apps, whether it goes through the frontend or the -- the

21 backend in the case of those first parties.

22        Google infringes hundreds of millions of times

23 a day.  I think that's exquisitely conservative, but I

24 don't believe it could possibly be any less.  And

25 Google's best non-infringing alternative, in my opinion,

```
 1  would be this persistent connection to each separate

 2  application server.  I don't consider that a good

 3  alternative, but I think it's their best one.

 4              MR. EICHMANN:  Thank you.  Nothing

 5  further at this time.

 6              THE COURT:  You pass the witness?

 7              MR. EICHMANN:  I do.

 8              THE COURT:   Approach the bench, Counsel.

 9              (Bench conference.)

10              THE COURT:  We had a pretty big

11  discussion yesterday about confidential information and

12  sealing the courtroom.  I have missed it if it happened

13  so far.  Is it still coming in?

14              MR. EICHMANN:  It hasn't come in yet.

15              MR. STOCKWELL:  No, that's the -- that's

16  for Mr. Mills.  Remember, on the source code, the

17  Court --

18              THE COURT:  We're not having it in on

19  Knox?

20              MR. EICHMANN:  Correct.

21              MR. STOCKWELL:   Well, except for the

22  source code.  We'd like to go back and redact anything

23  in the transcript where he's talking about the source

24  code.

25              THE COURT:  I'm not talking about a
```

1  motion to redact now.

2                      MR. STOCKWELL:  Right.

3                      THE COURT:  I'm talking about sealing the

4  courtroom per se.

5                      MR. EICHMANN:  Correct.  Yeah, that's --

6  that's later.

7                      THE COURT:  I thought it was coming in on

8  Knox.

9                      MR. EICHMANN:  No, not until Mills.  And

10 even after him, we've got Srinivasan and --

11                     THE COURT:  How long do you think your

12 cross is going to be?

13                     MR. STOCKWELL:  45 minutes to an hour.

14                     THE COURT:  Okay.  Let's go.

15                     (Bench conference concluded.)

16                     THE COURT:  All right.  Cross-examination

17 of the witness by the Defendant.

18                     MR. STOCKWELL:   Your Honor, I have some

19 materials for Dr. Knox that I might use during

20 cross-examination.  Can I have a colleague to provide

21 those to him?

22                     THE COURT:  You have leave to present

23 them to the witness.

24                     All right.  Let's proceed.

25                          CROSS-EXAMINATION

1  BY MR. STOCKWELL:

2      Q.   Good morning, Dr. Knox.

3      A.   Good morning.

4      Q.   The first thing -- I'll start where you left

5  off with the battery life.  The first thing you did when

6  you were hired in this case was to do some research in

7  battery life, right?

8      A.   Well, no.  The first thing was to review the

9  patent.

10     Q.   Okay.  But before you looked at Google's

11 messaging service or their documents, you started doing

12 your investigation into battery life, didn't you?

13     A.   That's correct.

14     Q.   Okay.  Now, you ended by critiquing my

15 opening.  Remember that?  You talked about how, well,

16 doesn't -- doesn't matter, but what I said in opening

17 was that the '914 patent doesn't say a single word about

18 battery live.  Do you remember that?

19     A.   I do.

20     Q.   Do you agree with me on that?

21     A.   That it doesn't use the phrase battery life,

22 yes, that is correct.

23     Q.   Okay.  So that's something we're in agreement

24 with?

25     A.   Yes.

1      Q.   Okay.  And when the patent was filed, it does

2  -- it didn't say anything about persistent connections,

3  did it?

4      A.   That is correct.

5      Q.   Okay.  So that's -- that persistent

6  connection, that's something that Google uses and Google

7  developed, right?

8      A.   Well, certainly something Google uses.  I'm

9  not convinced Google developed it.

10     Q.   It's standard technology -- standard modern

11  technology?

12     A.   Yes, at this point.  I don't believe it was a

13  term that was available at the time of the '914 patent.

14     Q.   And it was not -- a persistent connection was

15  not something used by this AirMedia Live service or

16  product that we heard about in opening?

17     A.   That is correct.

18     Q.   Okay.  Now, the reason you focused first on

19  battery life before looking into whether Google

20  infringes is that's what SimpleAir's lawyers asked you

21  to do?

22     A.   No, sir.  The reason I looked first at battery

23  life is I was able to order and receive Android phones

24  in a timely fashion.  It took many, many months to be

25  able to get information from Google and also to be able

1  to inspect their code.  So I started with what I could

2  do first.

3      Q.   So your testimony is that before you

4  understood Google Cloud Messaging and before you looked

5  at those documents, you investigated battery life

6  because you were waiting on Google, not because the

7  lawyers asked you to do that first?

8      A.   Well, we need to be clear here.

9      Q.   I'm just asking if that's your testimony, yes

10 or no?

11     A.   Well, I don't think I can answer that yes or

12 no.

13     Q.   Okay.

14     A.   There is some Google information.

15              THE COURT:  Just a minute, gentlemen.

16              First of all, I want to caution you both

17 about talking over the other.  I can see that we're

18 headed toward that already.

19              And, Dr. Knox, you'll need to limit your

20 responses to the questions asked.

21              Mr. Stockwell, go ahead and ask your next

22 question and then we'll proceed.

23              MR. STOCKWELL:  Yes.

24     Q.   (By Mr. Stockwell)  Dr. Knox, look at your

25 notebook.  It says deposition.  There's two notebooks

1   there.  It says deposition transcripts.

2       A.   Yes.

3       Q.   Okay.  Flip over to the deposition that was

4   taken of you in this case.  You remember you had your

5   deposition taken?

6       A.   Yes.

7       Q.   And you remember you swore under oath to

8   testify and tell the truth?

9       A.   That's correct.

10      Q.   Okay.  So turn in that deposition -- it's the

11  first volume -- to Page 20, Line 25.

12      A.   Yes.

13      Q.   Sorry, Page 20, Line 20 to Lines 24.  Do you

14  have that?

15      A.   I do.

16      Q.   Okay.  So here's my question.  So let me ask

17  this question.  We discussed that the first thing that

18  you did when engaged in this matter was battery testing,

19  correct?

20          23.  Answer:  To the best of my recollection,

21  that was the first thing I was asked to do.  Do you see

22  that answer?

23      A.   I do.

24      Q.   And the person -- the people that asked you to

25  do that were SimpleAir's lawyers, sir, correct?

        A.    That would be correct.

        Q.    Okay.  Now, the other thing that the -- that
you testified about is your test focused on battery
standby time, right?

        A.    That's correct.

        Q.    And standby time is how long the phone can sit
there and receive notifications, right?

        A.    Well, the standby time is how long it can sit
there and still be -- have enough power to be
operational.

        Q.    And receive notifications?

        A.    Actually, that's not part of the standby time.

        Q.    Well, you were -- some of the phones you were
testing, they were receiving notifications, you were
showing the battery life go down, sir, were they not?

        A.    That's correct.  That's the impact on standby
time.

        Q.    Thank you for clarifying that.  Okay.  So --
now, when you're doing those tests, the phone wasn't
being used in any other way, was it?

        A.    That's correct.

        Q.    So it wasn't being used to surf the Internet
or make a phone call or play a game?

        A.    That's correct.

        Q.    Okay.  And you didn't perform a usage study of

1  use of notifications or receipt of notifications while

2  doing other things on the phone, did you, sir?

3      A.   That's correct.

4      Q.   You focused only on standby time as it related

5  to receiving these notifications?

6      A.   That's correct.

7      Q.   And the reason you focused on that sort of

8  standby time is because SimpleAir's counsel asked you to

9  focus on that, didn't they?

10     A.   Well, that's the time that I was looking at

11 the impact on.

12     Q.   Is that yes or no, sir?

13     A.   I'm trying to decide if that's yes or no.

14          THE COURT:  Well, let him -- let him

15 finish his answer before you challenge it.

16          MR. STOCKWELL:  Okay.

17          THE COURT:  Let's -- let's try to --

18 let's try to move forward on a reasonable basis.  Let's

19 -- go ahead and answer the question, Dr. Knox.

20     A.   To my recollection, that was the basis that I

21 had to do the comparison on, yes.

22     Q.   (By Mr. Stockwell)  And the basis that you had

23 to do the comparison on was because the lawyers asked

24 you to focus on standby time, not usage studies?

25     A.   Well, I was certainly not asked to do a usage

1    study.

2        Q.    So if you would turn in your deposition, sir,

3    Page 253.  Let me know when you're there.

4        A.    I'm on the page.

5        Q.    And Line 11 -- and I'm going to read through

6    Line 15.

7            QUESTION:  Why did not -- why did you not

8    perform any usage study?

9            ANSWER:  Because that wasn't what I was asked

10   to measure or to determine.

11           QUESTION:  And who asked you to study standby

12   time?

13           ANSWER:  Counsel.

14           Did I read that correctly, sir?

15       A.    You did, sir.

16       Q.    Thank you.  Okay.  I want to focus a little

17   bit on if you had done a usage test, okay, not just a

18   standby test, you would have seen the usage affect

19   battery life far more than notifications.  You agree

20   with that, don't you?

21       A.    No, I can't answer that.

22       Q.    Okay.

23       A.    Because we'd have to talk about how much usage

24   of what kind, compared to how much standby time.

25       Q.    You would agree that normal uses of the phone

1  are going to use more power than sending those Keep

2  Alive messages that you showed us?

3      A.   If you're asking me if a certain number of

4  minutes wherein it may send one short Keep Alive uses

5  less power than the same number of minutes watching a

6  movie, for example, then the answer is yes.

7      Q.   So watching a movie is going to use a heck of

8  a lot more power than sending those Keep Alive messages?

9      A.   Per a unit of time.

10     Q.   Right.  Over -- over a minute.  Watching a

11 30-minute movie is going to send a lot -- use up a lot

12 more power than sending Keep Alives over that 30

13 minutes?

14     A.   Through the GCM -- through the --

15     Q.   Yes.

16     A.   -- infringing?  Yes.

17     Q.   And the spreadsheet that showed the percentage

18 impact, that percentage impact on battery life would

19 have been a lot smaller if you had took into account

20 normal uses of the phone, wouldn't it?

21     A.   Well, that spreadsheet was on standby time,

22 which is a published spec by -- by the phone

23 manufacturers.  The phone, if it's being used -- for

24 example, if you're talking on it, doesn't get the

25 standby time.  So to that extent, if I understand your

1  question, that's correct.

2      Q.   So, Dr. Knox, just to clarify, I'm talking

3  about your spreadsheet.  You mentioned the phone

4  manufacturer's spreadsheet.  You understand I'm talking

5  about your spreadsheet, the one you calculated.  Is that

6  clear?

7      A.   That's -- so far.

8      Q.   Okay.  And -- and that's how you answered my

9  last question was based on your spreadsheet?

10     A.   Well, my spreadsheet is for standby time.

11  That is published by the manufacturer of the phone.

12     Q.   Okay.

13     A.   The manufacturer gives also typically talk

14  times and other numbers like that.  They don't give what

15  you're referring to here, nor did my spreadsheet reflect

16  that.

17     Q.   Okay.  Dr. Knox, the percentage impact on

18  battery life that was in your spreadsheet that you

19  testified about today, that would have been smaller if

20  you had taken into account normal uses of the phone?

21     A.   If you're comparing the extra drain on the

22  battery under some usage that includes movie watching or

23  whatever, then since your total battery lifetime would

24  be less, the impact by the Keep Alives would be less.

25     Q.   So is that a yes, sir?

1    A.    It's the closest to one I believe that I can

2  honestly give you.

3    Q.    Fair enough.  All right.  Let's talk about the

4  patent.  So I think -- I'm hoping you and I can agree on

5  a couple of basic things before we dive into these

6  technical details.  All the asserted claims in this

7  patent, they're method claims, right?

8    A.    That's correct.

9    Q.    Okay.  And that means the claims have steps or

10  words and every one of those steps or words have to

11  actually be performed?

12    A.    That's correct.

13    Q.    So Google has to do every single word in the

14  claim, right?

15    A.    All of the methods -- I'm sorry, all the

16  elements in the method claim have to be performed.

17    Q.    Okay.  And -- and when we talk about actual

18  performance, we're talking about they actually have to

19  use every single word.  The -- the system is not just

20  capable of using, it actually has to be used, right?

21    A.    It has to practice the infringing element,

22  yes.

23    Q.    And it's not a question of capability.  It's a

24  question of actuality, right?

25    A.    Yes, it has to actually do it in order to

```
 1  infringe.
 2      Q.   Okay.  So --
 3              MR. STOCKWELL:  Can -- can I -- Your
 4  Honor, can I pull up -- put up a board here with the
 5  claim language just so the witness can refer to that
 6  while we go through some of this?  Do you mind if I do
 7  that?
 8              THE COURT:  On the easel.
 9              MR. STOCKWELL:   Yes.  Yes, sir.
10              THE COURT:  And where do you plan to put
11  that?
12              MR. STOCKWELL:  I was going to put it
13  right here.
14              THE COURT:  That will be fine.
15      Q.   (By Mr. Stockwell)  And -- and, Dr. Knox,
16  while I get this set up, if you can't see it real well,
17  I can move it closer to you, just as a memory aid.  You
18  know, we're going through this --
19      A.   I'll ask you if I don't --
20      Q.   There's a lot of terms.
21      A.   -- if I -- if I have a problem.
22      Q.   So --
23      A.   I can read that easily, except that I have to
24  lean around.
25      Q.   You may have to move around a little bit.
```

1   That's fine.  There's not much room here.  So let's

2   start at the -- the top here and I've -- I've

3   lettered -- we've lettered these elements on the board.

4   Other than B, we sort of broke up into B1 and B2.  Do

5   you see that?

6        A.   I do.

7        Q.   Okay.  So let's start at the top with Element

8   A or -- or this step A.  That's the transmitting data

9   step.  So you would agree that the -- the third-party

10  application providers, the Facebooks, Instagrams,

11  Twitters, I mean, they're not Google, right?

12       A.   The third parties, that is correct.

13       Q.   They're not owned by Google or operated by

14  Google?

15       A.   Google doesn't own them.

16       Q.   Right.  And you don't have any opinions that

17  they're -- somehow Google's agents or Google is somehow

18  liable for things they do?

19       A.   The -- we talked earlier about the control

20  that -- that Google exerts over them.  I have nothing

21  beyond that.

22       Q.   Okay.  Now, whether Facebook or other of these

23  third-party application providers -- whether they decide

24  to transmit a message to Google's messaging server,

25  that's a decision that they make.  It's up solely to

 1  them, right?

 2      A.   I would agree with that.

 3      Q.   And you would agree that Google doesn't direct

 4  or control Facebook's decision to send a message through

 5  the Google messaging service?

 6      A.   Not the decision to send one, yes, that is

 7  correct.

 8      Q.   And -- and you would agree that Google doesn't

 9  direct or control any other third parties' decision to

10  send a message through Google's messaging service?

11      A.   Not to my knowledge, no.

12      Q.   Okay.  And none of the things you listed as to

13  what Google was doing to direct or control, none of

14  those things goes to the third-party's decision to use

15  the service and send a message through the Google

16  service, does it, sir?

17      A.   That's correct.

18      Q.   Okay.  Now, let's take a look at the -- the

19  GCM diagram that you showed.

20           MR. STOCKWELL:  And if we can pull up,

21  Mr. Barnes, Knox Slide 44.

22      Q.   (By Mr. Stockwell)  This was a slide you used

23  yesterday.  So you had identified as -- as what you

24  contend to be the central broadcast server everything

25  within the red, right?

1    A.   That's one of two readings of the central

2 broadcast server.

3    Q.   One of two readings.  You've got two theories

4 on this, right?

5    A.   Well, there are two different -- I don't know

6 if I'd call it two theories.  There are two different

7 ways that you can draw that red line and still have a

8 central broadcast server within it.

9              MR. STOCKWELL:  Right.  Let's go to Knox

10 Slide 45.

11    Q.   (By Mr. Stockwell)  That's the other way?

12    A.   That is correct.

13    Q.   All right.  So in this second way -- I mean,

14 how -- what do you want me to call this, the second way,

15 the second theory, the second alternative?  I'll use

16 your --

17    A.   Call it the second central broadcast server.

18    Q.   The second central -- can we do something

19 shorter because --

20    A.   Second CBS.

21    Q.   Second CBS.  Okay.  Your second CBS omits the

22 GCM frontend, right?

23    A.   That's correct.  It omits it from -- it

24 doesn't omit it -- it omits it from the CBS.

25    Q.   Right.  Okay.  And if we go back to your --

1  your first theory?

2             MR. STOCKWELL:  Sorry, Slide 45.  That

3  slide right there.  Thank you.

4      Q.  (By Mr. Stockwell)  So in this slide, what

5  you're saying is doing the transmitting, the Step A,

6  you're saying Facebook is transmitting the message,

7  right?

8      A.   The information from the information source

9  would come from Facebook.

10      Q.   Okay.  In simple terms, Facebook is

11  transmitting the information?

12      A.   That's correct.

13      Q.   It's a simple concrete example?

14      A.   That's correct.

15      Q.   Okay.  And it's transmitting the information

16  to what you contend to be everything in the red, the

17  central broadcast server, right?

18      A.   That is correct.

19      Q.   Okay.  Now, let's go back to your -- to your

20  alternate theory.

21             MR. STOCKWELL:  Thank you.

22      Q.   (By Mr. Stockwell)  Now, what you're saying is

23  that even if Google doesn't control Facebook's decision

24  to send the message, Google can itself be viewed as

25  transmitting the message if you exclude the frontend

1    from the definition of central broadcast server?  That's

2    the essence of your theory, right?

3        A.   That sounds right, yes.

4        Q.   Okay.  Now, if you exclude -- or, excuse me,

5    if you go -- if you go back one.  If you include the GCM

6    frontend and the central broadcast server, this theory

7    is irrelevant.  It's only when the exclude the frontend

8    that this theory is relevant?

9        A.   I -- I'm sorry.  I'm going to have to ask you

10   to explain that.

11       Q.   Let me -- let me see if I can clarify.  So

12   under this theory, you're saying that Google's frontend

13   transmits the information to the rest of the central

14   broadcast server, what you've drawn in red here?

15       A.   That's correct.

16       Q.   Okay.  So in this case, you're saying Google's

17   transmitting Facebook's data?

18       A.   That's correct.

19       Q.   Okay.  Even though before you told us that

20   Facebook was the one that was transmitting the data?

21       A.   Well, that would also be correct.

22       Q.   Okay.  Okay.  So for this alternative theory,

23   what you're really saying is that Google is taking the

24   data from Facebook and transmitting it on to the central

25   broadcast server; is that fair?

1        A.    That sounds right, yes.

2        Q.    Okay.  And now you would agree with me that

3  the claim doesn't say transmitting data taken from an

4  information source to a central broadcast server, right?

5        A.    That's correct.  It says transmitting data

6  from an information source.

7        Q.    And -- and I think you can agree with me, sir,

8  that the way this claim works, no one -- no one should

9  add words to the claim?

10       A.    Nor did I.

11       Q.    So -- so your theory that Google is taking

12  data from an information source or -- or it's

13  transmitting data that is taken from an information

14  source, that's not adding any words to the claim; is

15  that your theory?

16       A.    I'm sorry, sir.  You've lost me there.

17       Q.    All right.

18       A.    You're the one that added the words to it.

19  What I see there is transmitting data from an

20  information source.

21       Q.    Sir, you just testified that under this

22  theory, Google is transmitting data that is taken from

23  an information source.  You're wanting to add the words

24  that is taken right there, aren't you, sir?

25       A.    I see no need to add any words.

1    Q.   Okay.  Well, we'll let the jury --

2    A.   I see transmitting data from an information

3 source.

4    Q.   We'll let the jury decide that.

5              THE COURT:  All right.  Mr. Stockwell, no

6 need to make sidebar comments about what the jury will

7 decide.

8              MR. STOCKWELL:  I will, Your Honor.

9 Thank you.

10              THE COURT:  Let's move this examination

11 along.

12              MR. STOCKWELL:  Thank you.

13    Q.   (By Mr. Stockwell) I think you can agree that

14 you read Dr. Williams' report?

15    A.   Yes, I did.  It's been a while back but I did.

16    Q.   And you understand that he says the claim

17 requires transmitting data from an information source to

18 a central broadcast server, and that a skilled person in

19 this field understands that claim means Facebook

20 transmits the data.

21              You understand that's his -- his view?

22    A.   I understand that's his view.  Yes.

23    Q.   And -- and I know you disagree with that view,

24 but you understand that's his view.  Is that fair?

25    A.   Yes, I thought I'd already -- I'm sorry.  I

1  thought I'd already answered that.

2      Q.   And you would agree that if the jury accepts

3  Dr. Williams' testimony on that point, then there's no

4  infringement for the messages that Facebook sends

5  through the GCM service, right?

6      A.   No.  I don't believe we -- we agreed to that

7  at all.

8      Q.   So you're saying if the jury accepts

9  Dr. Williams' view, there's still going to be

10 infringement when Facebook sends messages.  Is that your

11 testimony?

12     A.   That's my -- that is my understanding of the

13 law.  Yes.

14     Q.   Okay.  Let's talk about step B, parsing the

15 data with parsers.  It's kind of this B1 and B2.  Now,

16 we can agree on a couple of things.  The Court's

17 definition requires using multiple parsers, right?

18     A.   That's correct.

19     Q.   And those multiple parsers have to operate on

20 the said data?

21     A.   Yes, that's correct.

22     Q.   That's -- that's this language, parsing said

23 data, right?

24     A.   Yes.

25     Q.   And the said data is talking about the data

1    that's from an information source, right?

2         A.    That's correct.   It refers -- when -- when it

3    says said data in a claim or said whatever, it refers

4    back to an earlier usage of the term.

5         Q.    Okay.   So the multiple parsers have to

6    correspond to the central broadcast system server --

7    excuse me -- and they have to operate on the data from

8    an information source?

9         A.    That's correct.

10        Q.    Now, you identified about seven different

11   software routines that you think are doing the parsing

12   in Google's service, fair?

13        A.    In terms of routine names, yes, I believe

14   there are actually many more than that that we showed.

15        Q.    Now, some of those routines are being done in

16   the frontend server, right?

17        A.    That's correct.

18        Q.    And so under your alternative theory where the

19   frontend server is not part of the central broadcast

20   server, those routines aren't going to matter?

21        A.    They would not count as parsers in the central

22   broadcast server.   That is correct.

23        Q.    Now, one of the other of the parsers you

24   identified was at the MCS.

25              MR. STOCKWELL:  And let's put up Knox

1  Slide 76.

2      Q.   (By Mr. Stockwell) Do you remember this

3  testimony?

4      A.   Yes, I do.

5      Q.   This was from yesterday.

6           MR. STOCKWELL:  And if we go to Knox

7  Slide 77.

8      Q.   (By Mr. Stockwell) This is what you said was

9  the source code at the MCS that did the parsing, right?

10     A.   This is part of it.  There was another slide,

11 but yes.

12     Q.   Okay.  And you're saying -- your testimony is

13 that this source code parses the said data; that is, the

14 data that comes from Facebook?

15     A.   Yes.  The -- the information that it

16 receives -- well, it parses.  It's a general parsing

17 routine that can handle both directions.  It says

18 itself, to/from the client.  The client in this case is

19 referring to the phone.

20     Q.   Okay.  So your testimony is that this is going

21 to parse the data from Facebook?

22     A.   Yes.

23     Q.   It's not going to parse the data that's coming

24 from a phone.  It's going to parse the data from

25 Facebook?

1        A.    Well, I believe it can do both, but, yes, the

2   relevant part we care about is the -- is the

3   transmission from the information source.

4        Q.    And if -- and that's fair.  If it was parsing

5   only the data from the phone -- as you said, the

6   client -- then this code wouldn't -- wouldn't be

7   relevant either, would it?

8        A.    Not for what we're talking about, no.

9        Q.    Okay.  Fair enough.

10              MR. STOCKWELL:  Now, if we can put up

11   Knox Slide 60.

12        Q.    (By Mr. Stockwell) Under all of your central

13   broadcast alternatives, your CBS 1, your CBS 2, and

14   under all of your parsing testimony you relied on

15   this -- this definition from the Court, right?

16        A.    That's correct.

17        Q.    But in doing that, in looking at the Court's

18   definition, you interpreted the Court's definition

19   breaking or dividing data received from an information

20   source into components as copying the data, didn't you,

21   sir?

22        A.    Actually, I relied on it exactly as it says

23   here.  But you have to understand the way computers

24   work.  When I extract or I break out or I divide this

25   data, it doesn't automatically erase what was there

1 before, a computer simply does not work.

2          I applied this definition the way I believe

3 that it is supposed to be to the way computers work.

4 Copying in the sense of taking a piece -- a component, a

5 subelement of that data and breaking it out into a new

6 variable and assigning that variable the value of that

7 piece of that data would meet my definition -- I'm

8 sorry -- would meet parsing as I understand the Court's

9 definition.

10     Q.   Right.  So you interpreted the Court's

11 definition of breaking or dividing as copying

12 information to a new place?

13     A.   I -- I can't accept that, sir, because if I

14 had a string and I copy that whole string, I would not

15 call that parsing under the Court's definition.

16     Q.   Okay.  Well, let's -- well, that's -- thank

17 you for that testimony.  Let's look at your deposition

18 again.

19          MR. STOCKWELL:  If you could turn to Page

20 168.

21     A.   I have the page.

22     Q.   (By Mr. Stockwell) Okay.  If you could go to

23 Line 8 through 16.

24          QUESTION:  So when you're saying breaking out

25 the information, how is that different from reading the

1  information?

2          ANSWER:  Because it's setting a copy of that

3  information in a new place.  It's breaking it up.  I

4  understand that one has to interpret the Court's claim

5  construction in light of how computers work, and I have

6  applied the Court's claim construction, I believe.

7          Did I read that correctly, sir?

8      A.   As far down as you read it, yes.

9      Q.   Well, let's keep reading.

10          The next question:  So you're interpreting

11  breaking to mean copying?

12          ANSWER:  To mean making a new copy of it

13  somewhere, yes.  I'm sorry.  A part of that data.  What

14  I think it's best illustrated in the negative way -- in

15  the negative what would not constitute parsing would be,

16  for example, simply checking a particular byte in that

17  message to see if it was a 1 versus a 2.  That might be

18  considered processing, but it's not -- certainly not

19  parsing.

20          That was your testimony, was it not, sir?

21      A.   Yes.  And I believe that's correct.

22      Q.   Okay.  So parsing is not simply deciding if

23  something in the message is a 1 or a 2.  In your view,

24  the Court's breaking or dividing means you copy

25  information?

1      A.    Okay.   We're -- we've got back to that same

2   problem again.   The first part of what you just said,

3   let's just get out of the way.   I agree.   This 1 or 2

4   thing, I do not consider nor did I take that as an

5   example of parsing.

6           The reason I asked you to continue reading was

7   to make sure that we got in what I just addressed with

8   you before, that parsing still has to have this breaking

9   or dividing, and hence, we're talking about copying, as

10  it says here -- I'm sorry -- a part of that data.

11     Q.    Right.   Copying.   You have to interpret the

12  Court's order as copying?

13     A.    That's the only thing a computer can really do

14  when it breaks or divides data, so yes.   But we're

15  talking about parsing here has to be part of that data.

16     Q.    Thank you.

17          So let's talk about how you applied your

18  interpretation of the Court's construction in light of

19  computers to Google's system or service, okay?   Now, you

20  relied on the testimony of Google's witnesses, like Mr.

21  Nerieri, correct?

22     A.    In part, yes.

23     Q.    And you relied on that in part to understand

24  how the source code in the Google service worked?

25     A.    Again, in part.   He was speaking on behalf of

1    Google.

2        Q.    And you looked at Google documents, right?

3        A.    I did.

4              MR. STOCKWELL:  Let's pull up Defendants'

5    Exhibit 204.

6        Q.    (By Mr. Stockwell) This is one of the Google

7    documents that you looked at, right?

8        A.    Yes.

9        Q.    And this is an Android Cloud to Device

10   Messaging framework.  It's for Google developers, right?

11       A.    Yes, it's something that if I were going to

12   write code for my own server, my third-party app server,

13   it's a document I would look at.

14       Q.    Okay.  And -- and this glossary has a number

15   of definitions within it that apply to Google's service,

16   correct?

17       A.    As I recall, yes.

18       Q.    Okay.  So let's look at some of these

19   definitions.

20             MR. STOCKWELL:  If we go down to Page 7.

21   If you can -- thank you.  Let's just blow up the --

22   the -- the data there.

23       Q.    (By Mr. Stockwell) I'm going to ask you about

24   that.  So it says field data.key.  Do you see that?

25       A.    I do.

1    Q.   And under description next to field, it says

2   payload data expressed as key pairs -- sorry --

3   key-value pairs, if present, it will be included in the

4   intent as application data with the key.  There's no

5   limit on the number of key-value pairs, though there is

6   a value on the total size of the message, optional.

7        Do you see that?

8    A.   I do.

9    Q.   Okay.  The data is the actual message content

10  that's coming from the application provider, right?

11   A.   I'm sorry.  Ask that again, please.

12   Q.   Okay.  So you talked about -- you kept talking

13  about how you'd like to get a severe weather warning.

14  That was one of your examples of an app?

15   A.   Yes.

16   Q.   Okay.  So, you know, a screen pops up, tornado

17  is heading our way.  Duck and cover; that's the message,

18  right?

19   A.   Except when I grew up, duck and cover had a

20  different meaning.

21   Q.   Well, that's probably true, sir.

22   A.   But --

23   Q.   So let's assume --

24   A.   -- that's the message.

25   Q.   -- that's the message, duck and cover.

1              Okay.  That's going to be in the data field,

2  right?

3       A.   I don't know that.

4       Q.   You don't know that?

5       A.   No, sir.

6       Q.   Okay.

7       A.   The --

8       Q.   I'm not asking a question.  I'm just

9  confirming.  You don't know that?

10      A.   Yeah.

11      Q.   None of the -- the routines that you

12  identified as parsing break or divide the data as

13  defined in this Google document that's in the message

14  from Facebook or another application, do they, sir?

15      A.   They don't do what I described as parsing of

16  this field that Google has chosen to call data.

17      Q.   Okay.  So that means that duck and cover is

18  never divided up into duck/cover, right?

19      A.   If that were what the app server put in this

20  field, then this field would be extracted out from the

21  data that was sent from the information source, but it

22  would not be broken further down below that, at least

23  until it reached the telephone.

24      Q.   Right.  And you gave the example -- I think

25  you had a slide up of parsing a sentence, something

1    about Jack eating an apple?

2         A.    Jack ate the red apple.

3         Q.    Ate the red apple, right.  So if that's the

4    message -- if that's the date Google sends, that data

5    stays intact all the way through the Google messaging

6    service, right?

7         A.    Well, we're going to have a problem if you

8    keep referring to that as the data without defining it

9    as this one field here.

10        Q.    Fair enough.

11        A.    This field is called data, but that's not what

12   I am calling the data from the information source.

13        Q.    And I understand that's not what you're

14   calling the data from the information source.  But data,

15   as Google defined the data, which was the message, okay?

16   You got that -- you got that in mind?

17               I understand you disagree with that, but do

18   you have that in mind, sir?

19        A.    Well, we still have a problem with that.

20   There is a field here which Google named data, just as

21   an arbitrary name.  It could be named X.  As long as GCM

22   recognized it as X, it wouldn't matter.  Google

23   themselves -- you kept saying Google defined it as data,

24   but data is used by Google to refer to not just that

25   field but many other fields as well.

1      Q.    Okay.  Fair enough.  Let's move on.  Making a

2    different point.

3            The message, duck and cover, if you're sending

4    that through the Google service, it never gets divided

5    up into duck and cover, right?

6      A.    That payload does not.  That is correct.

7      Q.    Thank you.

8      A.    It may get split when it does the stanza

9    splitting, but I did not count that as an example of

10   parsing.

11     Q.    Now --

12           THE COURT:  Let's -- let's take a -- let

13   me interrupt for just a minute.

14           We probably need to take a morning break,

15   ladies and gentlemen.  There's probably not a perfect

16   time to do it, but it appears that this

17   cross-examination is going to go on for some additional

18   time.  So I'm not going to wait any longer.

19           I'm going to give you a short recess, let

20   you return to the jury room, stretch your legs, get a

21   drink of water.  Don't discuss the case among

22   yourselves.  And we'll be back in here shortly and

23   continue with the Defendants' cross-examination.

24           You're excused to the jury room at this

25   time for recess.

```
 1                    COURT SECURITY OFFICER:  All rise.

 2                    (Jury out.)

 3                    THE COURT:  All right.  We're going to

 4   remain in recess for about 15 minutes.  I want to see

 5   Mr. Eichmann, Mr. Capshaw, Mr. Stockwell, and

 6   Ms. Ainsworth in chambers.

 7                    (Recess.)

 8                    COURT SECURITY OFFICER:  All rise.

 9                    THE COURT:  Be seated, please.

10                    All right.  Counsel, before I bring the

11   jury in, we -- did you have an opportunity to meet and

12   confer about the issue regarding invoking the Rule, and

13   was there any resolution?

14                    MR. STOCKWELL:  Not quite at this time,

15   Your Honor.  We agreed to wait until lunch break to

16   delve into it, because we need to get a proffer from

17   them on what they're covering on Mr. Payne.

18                    THE COURT:  So you're going to continue

19   to meet and confer over the lunch hour?

20                    MR. STOCKWELL:  Yes, Your Honor.

21                    MR. EICHMANN:  Yes, Your Honor.

22                    THE COURT:  So I'll expect an answer

23   after we reconvene after lunch?

24                    MR. STOCKWELL:  Yes, Your Honor.

25                    THE COURT:  Okay.  Let's bring the jury
```

1  back in, Mr. Floyd.

2              COURT SECURITY OFFICER:  All rise for the

3  jury.

4              (Jury in.)

5              THE COURT:  Be seated, ladies and

6  gentlemen.

7              All right.  We'll continue with the

8  Defendants' cross-examination of the witness.

9              MR. STOCKWELL:  Thank you, Your Honor.

10             THE COURT:  You may proceed, Counsel.

11             MR. STOCKWELL:  Thank you, Your Honor.

12      Q.   (By Mr. Stockwell) Dr. Knox, before the break,

13  we were on this data issue, and I just want to confirm

14  that the payload data that's described in this document,

15  that's the same as the actual content of the message

16  that's sent.

17      A.   I don't know what you mean by content of the

18  message that's sent.

19      Q.   We were talking about the notification being

20  something like duck and cover.

21      A.   Well, the -- what's sent is this entire string

22  of data.

23      Q.   Right.

24      A.   But within there, whatever the information

25  source puts in there in this field, if anything, is what

1  gets sent as that payload parameter.  Yes.

2      Q.   And so the payload parameter is the message

3  itself, duck and cover?

4      A.   It's information between the -- the server and

5  the application.

6      Q.   So is it not the message itself, Dr. Knox?

7      A.   That I really can't answer, because it could

8  be something that has a different meaning from what is

9  displayed on the alert.

10      Q.   So you don't know whether duck and cover, if

11  that's the message being displayed, is going to be put

12  into this field in Google's service?

13      A.   Ah.  In -- generally, it may or may not be.

14  That is correct.  It's information to the application.

15  What -- how the application displays it in an alert is

16  up to the application.

17      Q.   So, Dr. Knox, you read Dr. Williams' report,

18  correct?

19      A.   Yes, I did.

20      Q.   And you understand that he contends that

21  engineers in this field understand data to be the

22  message content itself.  You understand that?

23      A.   I understand that's the opinion he espoused.

24  Yes.

25      Q.   And would you agree that if the jury agrees

1  with Dr. Williams, there's not any infringement in this

2  case?

3      A.   Well, since I don't consider that to be

4  correct, it's not something I'd formed an opinion on.

5  The -- I do agree that while that may be divided within

6  the GCM code, I have not listed it as being parsed.

7      Q.   Thank you.

8           Let's move on to Step 2.  This is the -- the

9  information gateway step, and it talks about

10  assigning -- assigning addresses and building data

11  blocks.

12          Do you see that language?

13      A.   I do.

14      Q.   Okay.  So in the Google service --

15               MR. STOCKWELL:  If you could put up Knox

16  Slide 45, Mr. Barnes.

17      Q.   (By Mr. Stockwell) There is something called a

18  post-request or post-send request?

19      A.   Yes.

20      Q.   Do you see that?

21      A.   Yes.

22      Q.   Okay.  Now, within that post-send from the

23  third-party server, from Facebook, there will be

24  something called the registration ID, right?

25      A.   That's correct.

1     Q.    Okay.  Now, Google refers to the registration

2  ID as the address?

3     A.    I'm sorry.  Was that a question?

4     Q.    Yes.

5     A.    I'm aware that Google does that.  Yes.

6     Q.    Okay.  And you're aware that SimpleAir itself

7  identified the registration ID as the address in its

8  infringement contentions?

9     A.    No, I don't believe that I am.

10    Q.    Well, you're familiar with SimpleAir's

11 infringement contentions?

12    A.    Yes.

13    Q.    Okay.

14    A.    I just don't recall that.

15    Q.    Look in your -- one of your notebooks there

16 has some exhibits.  There's a Plaintiff's Exhibit 527.

17    A.    Can you tell me, is this the black one or the

18 white one?

19    Q.    I'm not sure.  It should have a cover that

20 says Exhibits on it.

21    A.    Ah, yes, the black one.

22          And what was that number again?

23    Q.    It's towards the very end of the notebook.

24 It's Plaintiff's Exhibit 527.

25    A.    I think I found it.

```
 1        Q.   Okay.  And that's Plaintiff SimpleAir's

 2   disclosure of asserted claims and infringement

 3   contentions under PR 3-1, right, at the cover there.

 4             Do you see that?

 5        A.   Yes, I do.

 6             MR. EICHMANN:  Your Honor, objection.

 7   May I approach?

 8             THE COURT:  Approach the bench.

 9             (Bench conference.)

10             MR. EICHMANN:  Your Honor, our

11   infringement contentions are not in evidence.  They're

12   not preadmitted and we're not impeaching that.  He's --

13   we've got alternative theories that we've set out in the

14   beginning of the case.  They're broad infringement

15   contentions.  They're not his opinions.  They're not

16   sworn testimony.  And they're not -- it's not

17   preadmitted.  He's just basically reading our

18   infringement contentions.

19             THE COURT:  What's the response?

20             MR. EICHMANN:  Well, the response is the

21   witness is agreeing with the contentions and they are a

22   party admission.  I mean, I can certainly impeach him

23   with his own client's infringement contentions, which he

24   just testified he's familiar with.

25             He said that he's aware -- he didn't say
```

```
 1   he wrote them and he's not -- he's not SimpleAir.  He's

 2   an expert.  He's not impeached by our contentions nor

 3   impeached by the complaint that we filed.

 4             THE COURT:  At this point, I'll allow it.

 5   If it continues or becomes a further problem, I'm not

 6   going to prejudice you from reurging this, but at this

 7   point, I'm going to allow it.

 8             MR. EICHMANN:  Okay.

 9             THE COURT:  Now, while I have you at the

10   bench, let's talk about these deposition clips that

11   follow Dr. Knox.  And you can either remember this or

12   one of you can go get a legal pad and write it down.

13             MR. EICHMANN:  I can remember.

14             THE COURT:  Well, since they've left,

15   we'll wait until they get back.

16             Okay.  On Clip N-16, Mr. Nerieri, you've

17   got Google's designation to the Plaintiff's

18   designation -- Google's objection to the Plaintiff's

19   designation on H-172.  I'm going to grant the objection.

20   I'm going to exclude the Plaintiff's designation.  And

21   consequently, I'm going to exclude the

22   counter-designation.

23             On Clip N-49, also Nerieri, there's an

24   objection by the Plaintiff to the Defendants'

25   counter-designation.  Basically, that it's remote and
```

1  that it's inadequate in as far as context.  I'm not

2  going to strike the Defendants' counter-designation,

3  which as designated it's from Page 345, Lines 14 through

4  18.

5           I'm going to expand the

6  counter-designation so that it now is Page 345, Lines 3

7  through 18.  I think that will put it in complete

8  context.

9           On Clip L --

10          MR. EICHMANN:  Your Honor, if we withdraw

11  our objection, can we just play the original counter and

12  just let it go, because otherwise we can't prepare that

13  clip?

14          THE COURT:  If you want to withdraw your

15  objection to the counter, you may.

16          MR. EICHMANN:  We do so.

17          THE COURT:  Okay.  Then apparently the

18  counter-designation is withdrawn and the designation

19  is -- the objection to the counter-designation is

20  withdrawn.  They'll play it as originally designated.

21          Now, No. 3 is Clip L-10, Nerieri.

22  Defendants objected to the Plaintiff's designation.  I'm

23  going to deny the objection.  The clip stays in.  And

24  the counter stays in.

25          On Srinivasan, there's a clip at

1  Pages 73, 74, 75 the Plaintiff's objected to, and I'm

2  going to grant that -- I'm going to grant that objection

3  and delete that counter by the Defendant.

4              Also there's a counter-designation by the

5  Defendant from Page 77 that's objected to as including

6  an incomplete answer, and I'm going to grant that

7  objection and exclude that counter-designation.

8              Any questions?

9              MR. EICHMANN:  No.

10             MS. AINSWORTH:  No, Your Honor.

11             THE COURT:  All right.  Let's continue.

12             (Bench conference concluded.)

13             THE COURT:  All right.  Let's continue.

14     Q.   (By Mr. Stockwell) So, Dr. Knox, if you could

15  turn to Page 5 of the document that's attached to

16  Exhibit 527.

17     A.   Yes.

18     Q.   There's a chart you may have to sort of rotate

19  it.  There's an element next to '914, Claim 1, element

20  (c).  Do you see that?

21     A.   I do.

22     Q.   And about middle of the paragraph, do you see

23  where it says the addresses?

24     A.   Yes, I do.

25     Q.   The addresses are met by the registration ID

1 that identifies the target application and the target

2 Android phone or tablet.

3          Did I read that correctly, sir?

4     A.   You did.

5     Q.   Thank you.

6          MR. STOCKWELL:  Now, if we go back to

7 Knox Slide 45, Mr. Barnes.

8     Q.   (By Mr. Stockwell) The -- the registration ID

9 that Facebook puts into a message and posts to Google's

10 messaging service, Google uses that to forward the

11 message, correct?

12     A.   It uses information in that to find

13 information to find information to eventually be able to

14 come up with an address.  Yes.

15     Q.   And if you -- if you don't have the

16 registration ID, Google can't do anything with the

17 message?

18     A.   That is correct.  Google will -- will drop the

19 message.

20     Q.   Okay.  So I want to talk a little bit about

21 the -- the patent.

22          The way you apply the addresses here, you say

23 anything -- any of these internal servers can be

24 addressed, right?

25     A.   I don't know if I say that, but, yes, each one

```
 1   of them will have an address.

 2       Q.   Okay.  And -- and the addresses you say Google

 3   assigns are the addresses for some of the Google

 4   servers, like the address of the MCS?

 5       A.   The thing that I specifically referenced in

 6   terms of addressing these data blocks was the address of

 7   the MCS, that is --

 8       Q.   Okay.

 9       A.   I'm sorry.  It should say a specific MCS end

10   point.

11       Q.   Fair enough.

12            And that's what you say is the addresses of

13   the specific MCS end point?

14       A.   For meeting that requirement, yes.

15       Q.   Okay.  Now, let's -- let's talk about the

16   patent.  The description in the patent is a paging

17   system, right?

18       A.   That's correct.

19       Q.   And the information gateway in the patent

20   that's described assigned something called cap codes,

21   right?

22       A.   In the preferred embodiment, yes.

23       Q.   And the cap codes are addresses for the

24   receivers, right?

25       A.   They are the things that the receiver compares
```

1    against, yes, to accept or not accept the message.

2        Q.   Okay.  So what -- what's being addressed in

3    the description of the patent is the actual receiver

4    next to the computer, correct?

5        A.   In the preferred embodiment, that is correct.

6        Q.   Okay.

7             MR. STOCKWELL:  Now, if we pull up Knox

8    Slide S85.

9        Q.   (By Mr. Stockwell) What I understand your

10   contention to be is that the Buzz router must assign

11   addresses, correct?

12       A.   Well, the requirement actually is that the

13   information gateway must assign addresses to the data

14   blocks.  I have identified the Buzz router as meeting

15   the requirements of the information gateway.

16       Q.   Fair enough.  I dropped a logic sequence out

17   of that.

18            So you agree -- you would agree with me that

19   the Buzz router doesn't assign the address of a

20   receiver, right?

21       A.   It does not assign an address that the

22   telephone itself recognizes.  It assigns an address that

23   is a one-to-one route to that receiver.

24       Q.   Okay.

25            MR. STOCKWELL:  If we go to Knox Slide --

1    let's stay there for just a minute.

2        Q.    (By Mr. Stockwell) The Buzz router, the way

3    you say it assigns an address, is it looks up the MCS

4    end point, correct?

5        A.    Yeah.  Well, it takes the Android ID and looks

6    up in the subscription database, and what gets back out

7    of that, what it pulls out of that file is the address

8    of a specific MCS end point.

9        Q.    Just one MCS end point?

10       A.    That's correct.

11       Q.    Just one address?

12       A.    That's correct.

13       Q.    Okay.  And there's a --

14       A.    One address at -- I'm sorry.  One address at

15   one time, yes.

16       Q.    That's right.  There's a -- there's a

17   one-to-one correspondence between the message that comes

18   in through the GCM frontend and the MCS address by which

19   it's routed to the MCS; is that fair?

20       A.    No, sir, not at all.

21       Q.    Okay.  Now, you read Dr. Williams' report?

22       A.    I did.

23       Q.    And you're familiar with his view that

24   engineers in this field would understand this patent

25   from reading the patent and the context to mean that the

1   addresses are the addresses of the receiver.  You

2   understand that's what he --

3        A.   I understand that that's what he says.  Yes.

4        Q.   And if the jury agrees with Dr. Williams, that

5   the address in this patent to skilled persons is the

6   address of a receiver, you would agree there's no

7   infringement?

8        A.   Well, I would agree that what I have

9   identified as the address that's assigned by the Buzz

10  router is not the address of the receiver.

11       Q.   Okay.  So let's move on to Step D.  Step D

12  requires the transmission gateway to prepare the data

13  blocks for transmission?

14       A.   That is correct.

15       Q.   Now, you identified the MCS as the

16  transmission gateway, correct?

17       A.   That's correct, or more specifically, the MCS

18  end point.

19       Q.   Okay.  So --

20       A.   We show it as MCS because they're all alike.

21       Q.   Right.  And the -- the -- the MCS is -- the

22  MCS end point is not the address of the phone, is it?

23       A.   I'm sorry.  That's confusing.  The MCS end

24  point is software.

25       Q.   Right.  Okay.  So the MCS end point is

1  software?

2      A.   Yes.

3      Q.   And it's not the address of the phone?

4      A.   It's -- well, the MCS end point is software.

5  It's not an address at all.  The address of the MCS end

6  point is just that, the address of the server and the

7  software running on it, which is the MCS end point for

8  that phone.

9      Q.   So the -- the -- the address of the MCS end

10  point is the address of the MCS server, not the address

11  of the phone?

12      A.   Yes.  And more specifically, instantiations,

13  the MCS end point and multiple copies of an MCS end

14  point may be running on one piece of hardware.

15      Q.   Okay.  Now, you would agree that when a single

16  message is transmitted by an application provider, it's

17  only forwarded by Google's messaging service to one

18  phone or tablet?

19      A.   I'm sorry.  Would you ask that again, please?

20      Q.   You would agree that when a single message

21  with a single registration ID is forwarded through

22  Google's messaging service, it's only going to go to a

23  single corresponding phone or tablet?

24      A.   Okay.  I believe that's a different question

25  than what you asked just a moment ago.

1          The latter question is yes.  The answer to the

2    former question is no.

3       Q.   Okay.  Now, let's turn to Step E.  You know,

4    when you were discussing this, you were showing us Knox

5    Slide 102.

6          MR. STOCKWELL:  If we could put that up.

7       Q.   (By Mr. Stockwell) And this Step E is the step

8    where you have to -- I'm sorry -- this is Step -- I'm

9    talking about Step D.

10          You have to transmit the data blocks to the

11   transmission gateway for preparing the data blocks,

12   right?

13      A.   That's correct.

14      Q.   Now, this is a slide that you showed us for

15   Step D, and it's your contention that the MCS prepares

16   the data blocks for transmission because it interfaces

17   with these other transmission resources that you

18   identified here; is that fair?

19      A.   No, sir.

20      Q.   Okay.  What's your contention under this

21   slide?  Because I thought I stated that fairly.

22      A.   No.  The MCS end point -- my contention is

23   that the MCS end point does both requirements under that

24   element.  It prepares the data blocks and it interfaces

25   with these other transmission things.  It doesn't

1 prepare the data blocks because it interfaces or vice

2 versa.

3     Q.   Okay.  And I -- I'm -- but I -- and I

4 understand you also talk about preparing data blocks.

5 I'm just focusing on the interfacing part.

6     A.   Okay.

7     Q.   Your contention is the MCS interfaces with the

8 other transmission resources.  You show this figure

9 right here.  That's the other transmission resources?

10     A.   Yes.

11     Q.   Looks --

12     A.   That's kind of cartoonishly shown, but yes.

13     Q.   It looks like a cell tower to me.

14     A.   It certainly could be.

15     Q.   Okay.  Now, let's look at a figure you

16 annotated in your report, the --

17            MR. STOCKWELL:  If you can pull up the

18 Defendants' Exhibit 458, Page 8.

19     Q.   (By Mr. Stockwell) You recognize this figure

20 from your report, correct, sir?

21     A.   Yes, sir.  That's Figure 1 out of the '914

22 patent.

23     Q.   And you added the markings here?

24     A.   Although that one says 433 on the bottom of

25 it, I point out.

```
 1        Q.    And it's the -- but it's the same figure in

 2   the '914 patent?

 3        A.    That is correct.

 4        Q.    Okay.  And you added the annotations?

 5        A.    Yes.  You're talking about the numbers?

 6        Q.    Right.

 7        A.    That's correct.

 8        Q.    And there's a No. 3 there that labels the

 9   carrier antenna, right?

10        A.    Yes.

11        Q.    And you labeled that because it was the key

12   element that transmits the data to the computer?

13        A.    It's where the -- the signal is turned into a

14   wireless form, yes, for transmission.

15        Q.    So the -- so does it transmit or not?

16        A.    Well, one could certainly say that it does.

17        Q.    Okay.

18        A.    But it's not the only element that meets that

19   requirement of transmit.

20        Q.    Okay.  So let's go to Step E.  You say

21   transmitting preprocessed data to receivers

22   communicating with said devices.

23              Do you see that language?

24        A.    I do.

25        Q.    All right.  I want to compare that to Google's
```

1  service.  You would agree that the actual transmission

2  of a message to an Android phone is going to be handled

3  by the cellular carrier or the Internet service

4  provider?

5      A.   Well, I would agree that the actual

6  transmission is handled by the MCS and the GCM, but it

7  does interface to intermediate resources in the act of

8  clearing out that transmission.

9      Q.   I'm not talking about the interfacing.  I'm

10  talking about the actual transmission.

11          Would you agree that the actual transmission

12  of a message to an Android phone is handled by a

13  cellular carrier?

14      A.   I -- I believe my answer is still the correct

15  one.  The MCS transmits that message.

16      Q.   So, sir, can you turn to your deposition?

17  Could you turn to Page 221?  And if you refer to

18  Line 20, I'm going to read through Line 25.

19          Do you have that -- are you there, sir?

20      A.   I am.

21      Q.   Now, I asked:  But the -- but the carriers and

22  ISPs do actually transmit the data, right?

23          And you answered:  They are one of the

24  people -- that's the wrong word -- one of the

25  installations that transmit the data.

1          That was your answer, sir?

2     A.   That's correct.  And it's still correct.

3     Q.   Now, the cellular carriers that are in

4 existence today, AT&T and Verizon, Google doesn't own or

5 operate those?

6     A.   No, sir.  They're what's called common

7 carriers.

8     Q.   Right.  And Google doesn't run a common

9 carrier?

10    A.   I have no knowledge one way or the other of

11 that.

12    Q.   And, again, you've looked at Dr. Williams'

13 report, right?

14    A.   Yes, I did.

15    Q.   And you understand he says, well, the way this

16 step works is it has to be transmitted by the cellular

17 carrier, and that's not happening in the Google

18 messaging service.

19         I know you don't agree with that, but you

20 understand he says that?

21    A.   I do.

22    Q.   And if the -- the jury accepts Dr. Williams'

23 testimony on that point, you would agree there's no

24 infringement by Google?

25    A.   In this case, I think I would disagree with

1 that.

2    Q.    Okay.  Let's move on to Step F.  Step F

3 requires instantaneously notifying the devices of

4 receipt when they're online or offline.

5         I know there's more words there, but I'm just

6 trying to orient you.  Is that a fair summary?

7    A.    That's correct.

8    Q.    Okay.  And the devices to be notified are the

9 phones or tablets?

10    A.    Just a moment.

11         Well, the devices in this case is the remote

12 computing device, the CPU.

13    Q.    Okay.  Fair -- fair enough.

14         And actually, let's pull up the -- your

15 report.

16              MR. STOCKWELL:  Page 177 of Dr. Knox's

17 report, if you could just blow that up.

18    Q.    (By Mr. Stockwell) This is a -- a tear-down of

19 an HTC phone in your report, correct?  It's one of the

20 ones you showed in your report?

21    A.    Probably.  I can't tell from just this

22 picture.

23    Q.    Okay.  But the -- the chip that's outlined in

24 orange, that's the CPU, and it's made by Qualcomm?

25    A.    That's correct.

1    Q.    And that's what you say is the device that

2  gets notified?

3    A.    Yeah.   The CPU, the remote computing device,

4  yes.

5    Q.    And the -- the -- the transceiver/receiver is

6  outlined.   It's hard to see the colors on here.   I guess

7  it's to the left after the yellow in red there.

8    A.    Yeah.   I think it's kind of a burnt orange,

9  being from UT.

10    Q.    Right there?

11    A.    But, yes.   The RTR is the receiver/transmitter

12  designation they use.

13    Q.    Okay.   And -- and we can agree that these

14  components, they're not -- Google doesn't make these

15  components, right?

16    A.    Yes, Google does not manufacture those

17  components.

18    Q.    And at least for this transceiver part here,

19  Google doesn't provide any software inside that

20  transceiver?

21    A.    That's the -- I don't know if that's an Exynos

22  or what, but that's a Qualcomm chip and that would be

23  correct.

24    Q.    Okay.   Now, Step F requires the device to be

25  instantaneously notified whether or not it's online or

1   offline from a data channel.  And just orienting to the

2   next limitation --

3        A.   Yes.

4        Q.   -- right?  Okay.  So to perform Step F,

5   SimpleAir has to show that an information source like

6   Facebook transmits even when there's a connection

7   between Facebook and the device, right?

8        A.   No, sir.

9        Q.   If you don't -- if you don't understand the

10  question, let me know and I'll try to rephrase it.

11       A.   I was making sure I did understand the

12  question.  I do.  And, no, sir, I don't agree with it.

13       Q.   Okay.  So let me -- let me see if I can set

14  this up.  So if -- if I'm on my phone and I'm talking to

15  my -- I've got my Facebook app open, okay?

16       A.   Uh-huh.

17       Q.   So there's a connection there?

18       A.   Yes, sir.

19       Q.   Are you with me?

20       A.   I'm -- I'm following you.

21       Q.   So that's an on -- I'm online with the

22  information source, right?

23       A.   I'll accept that as a hypothetical.

24       Q.   Okay.  Now, while I'm online with the

25  information source, in order for this Step F to be met,

1  Facebook also has to send a message to me through the

2  Google messaging service?

3      A.   No.

4      Q.   That's what you disagree with?

5      A.   That's what I disagree with.

6      Q.   Okay.  Well, let's -- let's talk about that.

7  Because you disagree with that, you didn't see any

8  evidence that Facebook, while the user's online to the

9  Facebook app, will send messages also through the Google

10 messaging service?

11     A.   If what you're asking me is did I check that

12 or did I try that, no, I didn't because it wasn't

13 necessary.

14     Q.   In your view it wasn't relevant?

15     A.   It wasn't.

16     Q.   Okay.

17     A.   The requirement is given down there in Element

18 F.  That requirement is met.

19     Q.   Okay.  And you didn't look for any other

20 evidence that when a third-party application provider

21 has a connection to a user through the application, they

22 will also send messages through Google's messaging

23 service to that user?

24     A.   Again, there was no reason to check that.

25     Q.   But you didn't check it?

1    A.    I did not.

2    Q.    Okay.

3    A.    That is correct.

4    Q.    So you -- you don't have any evidence that any

5  information source, while it's online to an Android

6  device, would transmit information through the GCM

7  service to that device?

8    A.    That's correct.  Since it's not part of the --

9  of the claim, I did not check that either way.

10    Q.    Okay.

11    A.    I certainly don't know that it doesn't, but I

12  don't know that it does.

13    Q.    You do agree that for purposes of the claim,

14  this -- this data channel has to connect back to the

15  same information source that's transmitting the data?

16    A.    That's correct.  You're talking about when

17  it's online?

18    Q.    Right, when it's online?

19    A.    Yes.

20    Q.    Okay.  Okay.  Thank you.  Now, I want to turn

21  to a topic that you had -- I think you identified it as

22  how many times Google infringes.  And you kind of went

23  through some statistics on the messages?

24    A.    I was asked about that, yes.

25    Q.    Okay.  So we can agree that in terms of your

1  looking at the message volume for Google, you've got to

2  look at messages that actually went through servers

3  located in the United States, right?

4       A.   That's correct.

5       Q.   And you have to look at messages that were

6  actually delivered to phones located in the United

7  States?

8       A.   That's correct.

9       Q.   And we --

10      A.   At least my understanding of -- the way the

11  law works.

12      Q.   And the reason you need to do that is all of

13  these steps have to be performed in the United States in

14  order for there to be any kind of infringement of Claim

15  1?

16      A.   Again, I'm not here as a patent attorney, but

17  I have been instructed in how the -- the law should be

18  read in this case, and that is my understanding, yes.

19           MR. STOCKWELL:  And could you bring up

20  Knox Slide 45, please?

21      Q.   (By Mr. Stockwell)  Now, you -- you understand

22  that currently Google has some of these servers, the

23  MCS, the Buzz, the backend, the frontend, located both

24  -- at data centers both within the United States and

25  outside of the United States?

```
 1        A.    Yes, I am.

 2        Q.    Okay.

 3        A.    That was based on testimony of Mr. Nerieri, I

 4   believe.

 5        Q.    Right.  And if -- if the frontend server is

 6   outside the United States, then your alternative where

 7   you keep the frontend server as part of the central

 8   broadcast server, none of the messages that flow through

 9   that are going to infringe?

10        A.    Make sure I understand your question.  If we

11   have the frontend server outside of the United States

12   and we're using the frontend server as a path for these

13   messages, I believe, to my understanding of the law,

14   that would be correct.

15        Q.    Well, let me just -- let me just do this.

16   Look in your notebook --

17              MR. STOCKWELL:  Or actually let's pull up

18   Defendants' Exhibit 458.

19        Q.    (By Mr. Stockwell)  I want to refresh your

20   recollection of this.

21              MR. STOCKWELL:  That's Knox report at

22   Page 53.

23        A.    One moment, I've got the wrong book open here.

24              MR. STOCKWELL:  Okay.  If you could

25   highlight --
```

1    Q.   (By Mr. Stockwell)  I've got it up on the

2  screen here, if you --

3    A.   Okay.  That may be easier.

4    Q.   Okay.

5         MR. STOCKWELL:   Let's -- see where it

6  says provided right here, Jason?  Let's highlight that

7  language and the -- and the two right there.

8    Q.   (By Mr. Stockwell)  Okay.  So these -- these

9  are the conditions that you identify in your report for

10  U.S. infringement to occur; is that fair?

11    A.   Yes.  And, again, as I say, that is my

12  understanding of how this is -- how the law is supposed

13  to be interpreted in this case.

14    Q.   You're -- you're not a legal expert, but you

15  were given these instructions?

16    A.   That is correct.

17    Q.   Okay.

18    A.   That's a good way to put it.  Thank you, sir.

19    Q.   But the way you applied the instructions were

20  you understand that the -- that the message has to flow

21  through a GCM frontend, a backend, and an MCS, each of

22  which has to be located in the United States?

23    A.   Yes.  And I'm going to make one correction

24  here.  Buzz should be listed there, as well.

25    Q.   And Buzz listed there, as well.  Oh, thank

1  you.  And the -- and the target Android was located in

2  the United States, also?

3       A.   At the time the notification was received,

4  yes.

5       Q.   Okay.  And you testified --

6            MR. STOCKWELL:  If we can go back up to

7  Page 51 in this report.  It's -- there you go.  One more

8  page.  Thank you.

9       Q.   (By Mr. Stockwell)  Now, you recognize this

10  data as some of the data that you pulled from Google's

11  -- I think you said it was their interrogatory response,

12  right?

13       A.   Well, that's -- I don't believe a -- a picture

14  we've seen here in Court yet.  But, yes, I do believe

15  that is from a Google interrogatory response.

16       Q.   You -- you -- you relied on this in trying to

17  determine how many messages Google sent through the

18  U.S.?

19       A.   That's correct.

20       Q.   Okay.  And for -- according -- and -- and just

21  on the -- the top --

22            MR. STOCKWELL:  Let's just sort of

23  highlight that top row there, Mr. Barnes, if you would.

24  No, no, no, the very top row, the -- the description.

25  Thank you.

1      Q.   (By Mr. Stockwell)  So the geo location of the

2  sender IP, that's -- that's where the application server

3  is?

4      A.   That would be correct.

5      Q.   And the location of the data center handling

6  the request, that's the frontend or the -- the

7  frontend/backend?

8      A.   At a minimum, yes.

9      Q.   And the location of the data center delivering

10  the message, that's the MCS?

11      A.   That's correct.

12      Q.   And the geo location of the device, that's

13  where the phone is?

14      A.   Yes, that's correct.

15      Q.   And if you -- you look down to this row right

16  here, you can see Google's already delivering messages

17  through non-U.S. servers to U.S. phones, right?

18      A.   Yes, that's correct.

19      Q.   And they're doing it here, right, because the

20  -- the frontend is going to be outside the U.S. right

21  here, right?

22      A.   Yes.

23      Q.   And they're doing it here, right?

24      A.   Yes.

25      Q.   So Google's already got data centers with some

1  of these servers, they're delivering millions of

2  messages to U.S. subscribers, no problem?

3      A.   Yes.  I'm aware they have some -- some data

4  centers outside of the U.S.

5      Q.   And what you -- what you focused on in trying

6  to determine how many messages they were delivering

7  through just U.S. servers, where -- where all three of

8  these --

9              MR. STOCKWELL:  If you could take the

10  other highlighting down, Jason?  I'm not sure how to

11  clear that off.  Can you take the other yellow down

12  there?  Thank you.

13      Q.   (By Mr. Stockwell)  All three of these right

14  here have to be in the U.S., right?

15      A.   Well, that's one line, yes.

16      Q.   That's -- I know it's one --

17      A.   Yeah.

18      Q.   I mean, there's other lines in here, and I

19  don't want to have to --

20      A.   Well, other lines that are relevant to this,

21  but, yes.

22      Q.   But those are -- the lines that you focused on

23  for determining how many U.S. messages Google actually

24  routed through U.S. servers were the ones where you

25  lined up the U.S. in these three columns?

1    A.    Well, those are certainly ones that would be

2  included.  They're not the only ones that certainly can

3  be part of what meets this requirement.

4    Q.    Right.  Would it -- would it surprise you,

5  sir, that if you added up all these U.S. lines, the

6  total messaging traffic that Google sends through only

7  U.S. servers is only 7 percent of those 11 billion

8  messages a day?  Would that surprise you?

9    A.    Actually, yes, it would.

10    Q.    Okay.  Now --

11        MR. STOCKWELL:  You can take that down.

12    Q.    (By Mr. Stockwell)  You take the position that

13  Google's routing all of its traffic through servers

14  outside the United States wouldn't be acceptable because

15  SimpleAir received the '279 patent.  It was one of the

16  last slides that you -- you showed in your presentation?

17    A.    It's not the only reason I feel that way, but,

18  yes, that -- my understanding is that that would simply

19  get them out of one frying pan and into another.

20    Q.    Okay.  And that patent issued in October of

21  2013?

22    A.    Yes, but it has a -- a date back to a much

23  earlier date, obviously.

24    Q.    Well, that particular application for the '279

25  patent, that wasn't filed until January of 2011,

1    correct?

2        A.    That sounds about right.

3        Q.    Okay.  And the -- the testimony that you're

4    providing on that, are you -- you're not a damages

5    expert, are you?

6        A.    Please, no.  No, sir, I'm not.

7        Q.    But have you -- have you -- you've talked to

8    Mr. Mills, Plaintiff's damages expert in this case,

9    right?

10       A.    Concerning the damages, I don't believe that I

11   have.  We have had data exchanged through the attorneys.

12       Q.    Do you -- do you have an understanding that

13   the -- the hypothetical negotiation date for determining

14   damages in your award in this case would be May of 2010?

15       A.    I'm aware of something roughly called the

16   Georgia-Pacific rule.  And I vaguely know how that is

17   applied.  As to what dates that would apply to, I

18   believe it's -- would be, yes, when you -- when you

19   started practicing the infringing action.

20       Q.    Okay.  So when you came up with your view that

21   Google would jump out of the frying pan and into the

22   fire, as you said, you -- your view was that Google

23   would also infringe the '279 patent, right?

24       A.    If we're -- well, I'm confused by your

25   question here.  If we're talking about these -- taking

1  these servers and moving them out of the United States

2  to avoid infringing '914 --

3      Q.    Right.

4      A.    -- then I believe what that would simply mean

5  is that they would still be infringing the '279.  They'd

6  still have a patent infringement problem.

7      Q.    Only after October 2013?

8      A.    That, I'm not aware of, sir.

9      Q.    You under --

10     A.    You're -- you're asking me something that I'm

11 not qualified to answer.

12     Q.    Okay.  So you don't -- you don't know whether

13 or not Google could have infringed the '279 patent

14 before it issued?

15     A.    You're asking me something that, again, is

16 outside -- I'm an electron pusher.

17     Q.    And I'm just -- I'm just confirming you're not

18 aware of that.

19           Okay.  Now, when you -- when you came up with

20 your view that Google might infringe the '279 patent, if

21 it moved all its servers outside the U.S. or had all its

22 traffic outside the U.S., you didn't write down any of

23 that analysis, did you?

24     A.    Well, first off, you say all of its traffic,

25 and I'm still considering stuff that both originates and

terminates in the United States.  My understanding is

that limitation would still apply.  The '279 was, as you

pointed out, recently issued.  And there's only been --

I think I did a short couple of page supplementals or

something on that, that's all.

    Q.   All right.  So we don't have an analysis on

that from you, do we?

    A.   Certainly nothing in detail.

    Q.   Thank you.

    A.   Just, I believe, a one-paragraph opinion.

    Q.   Thank you.

          MR. STOCKWELL:  Pass the witness, Your

Honor.

          THE COURT:  Redirect?  Do you need to

leave that board up, Mr. Eichmann.

          MR. EICHMANN:  It's fine.  Yes, actually.

          THE COURT:  All right.  General rule is

when you pass the witness, take your boards down, but if

you're going to use it, we'll leave it up.

                REDIRECT EXAMINATION

BY MR. EICHMANN:

    Q.   Dr. Knox, just a few brief points in response.

          First, on battery testing, now, you were an

expert in the case SimpleAir had against Apple and

Blackberry before, right?

1    A.   That's correct.

2    Q.   And in that case, did you do a bunch of

3 testing of their phones and how the battery life was

4 impacted by their accused systems?

5              MR. STOCKWELL:  Object to scope, Your

6 Honor.

7              MR. EICHMANN:  May we approach?

8              THE COURT:  Can you elaborate on your

9 objection, Counsel?

10              MR. STOCKWELL:  If I may approach, as

11 well, Your Honor.

12              THE COURT:  All right.  Approach the

13 bench.

14              (Bench conference.)

15              MR. STOCKWELL:  I didn't ask him any

16 questions about battery life testing he did in the Apple

17 and the RIM cases.  And, Your Honor, we have a charge

18 that we've proposed that they are over emphasizing the

19 fact that they had a case against Apple and Blackberry.

20 They raised it yesterday.  They're raising it again.

21 They're raising it with every single witness.  I would

22 like to get a -- an instruction to the jury generally

23 that this case has got to be decided on the facts of

24 this case, not what happened in an Apple or Blackberry

25 or Microsoft case, given the fact that they've settled.

1  They keep going back into those.  It's prejudicial to us

2  for them to over emphasize it with every single one of

3  their witnesses.

4          THE COURT:  That's two different things.

5          MR. STOCKWELL:   I understand it's two

6  different things.

7          THE COURT:  Let me hear a response first.

8  First, address his scope objection.

9          MR. EICHMANN:  Yes.  Your Honor, we

10 produced the portions of the prior reports from Dr.

11 Knox.  They asked for them, and we produced it where he

12 tested the Apple stuff and the RIM stuff.  They brought

13 of this issue of why did you start with the battery, why

14 did you start testing, because he knew it was an issue

15 from the last case and he knew he could get started on

16 it before they let him in to see the source code.

17         They're trying to act like he started

18 with the answer key first.  That's not true.  He started

19 with the battery because he already knew it was an

20 issue.  It was an issue last time and he knew how to get

21 going.  They have completely opened the door on this,

22 and they have all the evidence on this.  And I'm not

23 going to get into all specifics of it, just making that

24 point.

25         THE COURT:  Well, I'm going to overrule

1   the objection on scope.

2                   On the requested instruction, I'll carry

3   that.  And if Counsel continues to go in that direction,

4   I'll consider giving it, and my final instructions will

5   make it clear to the jury their verdict is going to be

6   based on the evidence in this case and this case only,

7   but I'll carry that for the time being, Counsel.

8                   MR. STOCKWELL:  Thank you, Your Honor.

9                   THE COURT:  All right.  Let's continue.

10                  (Bench conference concluded.)

11       Q.   (By Mr. Eichmann)  Dr. Knox, just a recap.

12   You were an expert for SimpleAir in the prior case

13   against Apple and Blackberry, right?

14       A.   That's correct.

15       Q.   And they were accused of infringing for their

16   own notification services, right?

17       A.   That's correct.

18       Q.   And in that case you did your own testing on

19   the battery impact of the services on their phones,

20   right?

21                  MR. STOCKWELL:  Object, leading.

22                  THE COURT:  Sustained.

23       Q.   (By Mr. Eichmann)  In your work on the Apple

24   case, did you do battery testing on the Apple phones and

25   the Blackberry phones?

1    A.   Yes, very similar to what I did here.

2    Q.   When you started this case, before Google let

3  you in to see the source code and all their documents

4  and before they had their witnesses show up for

5  depositions, did you know that the phones and the

6  battery life was likely to be an issue in this case,

7  too?

8              MR. STOCKWELL:  Object, leading.

9    A.   Yes -- oh, I'm sorry.

10             THE COURT:  Sustained as to the leading

11 objection.

12             Rephrase your question, Counsel.

13   Q.   (By Mr. Eichmann)  Dr. Knox, how did you know

14 at the start of this case that you would want to test

15 the batteries of the Android phones?

16   A.   Obviously, I was already familiar with the

17 '914 patent, and I know that the '914 refers to this

18 sending of alerts through some set of servers -- in this

19 case, Google's -- just like it did previously in the --

20 Apple's APNS system.  And I knew that that would be an

21 issue because that's one of the key things -- you

22 remember we had a list, and I said the -- the battery

23 life was one of the ones I considered most significant.

24   Q.   And when you did the testing in the Apple

25 case, did you also test the standby time of the battery?

1    A.    In the Apple case, I did not condition the

2  batteries the same way I did in this one.  I believe we

3  used the -- the published battery capacity and the

4  specification sheet standby time the same as we did

5  here.

6    Q.    Sir, I wasn't talking about the conditioning

7  part.

8    A.    Okay.

9    Q.    Just -- counsel had asked you how can you use

10  standby time when the phone is not doing anything

11  versus, for example, talk time.  That's the -- that's

12  the testimony that I'm referring to.

13    A.    Ah, I understand.  I'm sorry, I misunderstood

14  your question.

15    Q.    So my question, sir, is when you did the

16  battery testing in the Apple case, did you also test the

17  impact on the standby time?

18    A.    Yes, very specifically that's what I was

19  looking at.

20    Q.    Why did you think that was appropriate?

21    A.    Well, because that is the correct way to -- to

22  do it.  The standby time is something published by the

23  manufacturer, and it says, hey, this is how long you can

24  charge your phone and then leave it before you have to

25  charge it again.  And the -- the keep alive directly

1   impacts that.

2       Q.   In the -- Google's internal documents, where

3   they were testing the impact on battery life themselves,

4   did they also take note of the impact on this standby

5   time of the battery?

6       A.   Yes.   Again, that's what they were using as

7   their baseline or their standard to compare against.

8       Q.   And that's in the very documents that we

9   showed you earlier, Exhibits 146 and 54?

10      A.   Right.   Those are Google's internal documents

11  from their team that tries to maximize the battery life.

12      Q.   They measure standby time, too?

13      A.   Yes.

14      Q.   You were asked about Element A, and this issue

15  about who does the transmitting.   And one question they

16  had is about who decides to transmit the message.   Does

17  Google decide or control the decision of Facebook, for

18  example, to send the message?   The question is -- is

19  there any step in this entire claim that requires making

20  a decision to transmit?

21      A.   No.   The only requirement is that it happen.

22      Q.   To show infringement, we have to show that all

23  of these elements of the claim are met, right?

24      A.   That is correct.

25      Q.   Is there also a step in here anywhere about

1   deciding to transmit a message?

2       A.   That's not in the claim language.

3       Q.   Do we have to show that to prove infringement?

4       A.   No, sir.

5       Q.   Element C is the one that deals with the

6   information gateway and addresses, and you were asked

7   about the AirMedia system.  That's the system that the

8   patent owner came up with back in '96.  An example of

9   that is shown in Figure 1; is that correct?

10      A.   That's correct.

11      Q.   This is -- excuse me, this is a diagram from

12  the patent; is that right?

13      A.   Yes.

14      Q.   And what does this diagram show?

15      A.   It's a -- we kind of call it a schematic or a

16  block diagram showing the major components.

17      Q.   In this example shown in the patent, do

18  they -- what kind of system do they use to actually

19  wirelessly transmit the message?

20      A.   Well, it was sent from the -- or it's

21  transmitted out of the central broadcast server, but it

22  went through a paging system, at least that was the --

23  one of the descriptions.

24      Q.   So if this diagram -- the example given in the

25  patent is about sending messages through a paging

1    system, and Google clearly doesn't do that, why is there

2    an issue of infringement?  Why are we even here today?

3        A.    Well, there's no requirement that it go

4    through a paging system.  The requirement is that it

5    transmit to the receivers.  And under the Court's

6    definition, it's certainly allowed to interface with

7    other resources to do that.

8        Q.    To prove infringement, do we need to show that

9    Google does exactly what's shown in this figure and

10   sends it through a paging system?

11       A.    No, that's -- that's an example, but it's not

12   part of this claim language.  I think there is a whole

13   different claim that says something about pagers.

14       Q.    You were also asked about the registration ID,

15   and Google's contention that it constitutes an address.

16   This is an example that we showed of a registration ID;

17   is that right?

18       A.    That's correct.

19       Q.    And you're --

20       A.    That's actually out of a Google document.

21       Q.    In your opinion, does this registration ID --

22   is that an address?

23       A.    No, it's exactly what it's called, a

24   registration ID.  It's -- which is just a Google term.

25   And it's an encrypted, you know, top secret piece of --

1   of code that means nothing to anyone other than Google.

2       Q.   Can the app provider use this to send a

3   message directly to the Google application --

4   application on the phone?

5       A.   No.  It means nothing to him, other than

6   here's something I was given, and I'm supposed to give

7   it back to Google when I send the message.

8       Q.   When Mr. Nerieri, Google's witness, was asked

9   what's contained within the registration ID -- we showed

10  this before -- did he describe its contents as being an

11  address?

12      A.   I'm not aware that he did.  What you see here

13  is the phraseology that he used, and you'll note there's

14  not -- it's not only the registration ID isn't an

15  address, there's not even an address within it.

16      Q.   In your opinion, does the MCS address that's

17  used by the Google system constitute an address, as

18  Claim 1 of the patent requires?

19      A.   I'm sorry, I -- I lost something in the

20  question.

21      Q.   Is the MCS end point address in the Google

22  system, in your opinion, does that meet the definition

23  of address under the claim?

24      A.   Yes, that is an address.  It happens to

25  specifically be the one that will get the message to the

1  phone, but even that's not required in the claim

2  language there.

3      Q.   And does Google itself refer to the MCS end

4  point address as an address?

5      A.   Yes, it does.  It's in their own code.

6      Q.   They touched on Element E which is the step of

7  transmitting the preprocessed data to receivers and

8  talked about how it actually goes through the -- the

9  cell phone carriers, not -- not there own system.  Sir,

10 does that matter for infringement?

11     A.   No.

12     Q.   Did we look at claim -- we looked at Claim 7

13 earlier, right?

14     A.   That's correct.

15     Q.   And what did that claim specifically require?

16     A.   Claim 7 is one of the ones that's actually

17 dependent on Claim 3 which says it has to be wireless.

18 And Claim 7 lists some of the different kinds of these

19 wireless carriers that could be allowed to be used.

20     Q.   Does this claim actually require that you send

21 the message through a wireless carrier, such as AT&T?

22     A.   Not through -- if I understand what you're

23 asking, not specifically through AT&T.

24     Q.   I'm sorry.  AT&T was an example.

25          Sir, does Claim 7 require that the message be

1  transmitted through one of these -- using one of these

2  types of wireless carriers?

3       A.   It just says utilizing.

4       Q.   And an example of that is a cellular carrier,

5  right?

6       A.   That's correct.

7       Q.   Now, Claim 7 is a dependent claim, right?

8       A.   That's correct.

9       Q.   And that means that we first have to show that

10 everything within Claim 1 is infringed before getting to

11 this one, right?

12              MR. STOCKWELL:  Objection, leading.

13              THE COURT:  Sustained.

14      Q.   (By Mr. Eichmann)  How -- what is the

15 difference, again, between a dependent claim and an

16 independent claim?

17      A.   An independent claim stands alone.  If you

18 assert this claim, you have to -- in order to show

19 infringement, do everything that's in there.  A

20 dependent claim is kind of a tack-on.  The dependent

21 claim says, yes, you have to do what it says here in

22 this claim, but you also have to do what it shows in

23 some other claim that it's dependent on.

24      Q.   Is Claim 1 broader than Claim 7?

25      A.   Yes, because Claim 7 properly -- probably

1  should have had Claim 3 in there, as well, but -- but,

2  yes, Claim 7 is a subset down.  It would only be some of

3  the things that satisfy Claim 1.  Could be all of them,

4  but it can't be more.

5      Q.    If Claim 7 allows you to send the message

6  through a wireless carrier, does Claim 1 also allow

7  that?

8      A.    No.  In fact, I've been taught -- again, I'm

9  not a legal expert -- something called claim

10  differentiation.  You can't put that requirement back on

11  the independent claim.

12     Q.    Sir, I think you misheard the question.

13     A.    Okay.

14     Q.    I said allow, not require.  So let me start

15  over.

16     A.    Okay.  Please, yeah.

17     Q.    Claim 7 allows you to send the message through

18  a wireless carrier, right?

19     A.    Yes.

20     Q.    Does Claim 1 also, because it's broader, allow

21  that, too?

22     A.    Oh, yes.

23     Q.    The last element was Element F.  This is the

24  one about transmitting the data and having the

25  notification on the phone occur whether connected or

1  not.  You remember this part of the claim?

2      A.   Yes, I do.

3      Q.   Was it your opinion that Google sends the

4  messages in both circumstances, whether it's -- the

5  device is connected to CNN or not connected to CNN, for

6  example?

7      A.   I have absolutely no evidence that it -- that

8  CNN doesn't send the messages.  Regardless, I do know

9  from my examination of the code and -- and the documents

10  and everything else, that messages from CNN will arrive

11  at the CPU even if you are connected to CNN.

12     Q.   Did Google tell us how many times it's sending

13  the message when the connection is actually established

14  versus how many times it's not?  Did they produce that

15  data to us?

16     A.   I don't believe so.  If you have a slide,

17  fine, but I don't recall it.

18     Q.   Well, that was my point actually, sir.

19  When you reviewed all Google's data, they told us how

20  many messages they sent in total, right?

21     A.   That's correct.

22     Q.   They didn't tell us how many times within that

23  number of messages there was a direct connection

24  established between a phone and the app provider, right?

25               MR. STOCKWELL:  Object.  Leading.

```
 1                    THE COURT:  Sustained.
 2        Q.   (By Mr. Eichmann) In the data that Google
 3   produced to us, did they specifically tell us how many
 4   messages were sent whether -- when it was connected and
 5   how many when it was not?
 6                    MR. STOCKWELL:  Object.  Leading.
 7                    THE COURT:  Overruled.  Answer the
 8   question.
 9        A.   I have no recollection of seeing that in there
10   anywhere.
11        Q.   (By Mr. Eichmann) Based on your review of all
12   the evidence, were you still able to conclude that in
13   both circumstances, both when the phone is connected to
14   the app provider and when it's not, that this
15   notification under Step F still occurs?
16        A.   Yes.
17        Q.   How are you able to reach that conclusion?
18        A.   Couple of different ways, but primarily by the
19   analysis of the code and the documentation that I was
20   given from Google.  The GCM or C2DM never even checks to
21   see if that connection exists.
22             Further, even hypothetically -- and I have no
23   evidence whatsoever that, for example, as I was asked,
24   that CNN doesn't send messages while there's a direct
25   connection, but even if it did not for some reason that
```

1  wouldn't change my answer because those messages have

2  been sent, many of which may be stacked up on Kansas

3  because of whatever delays, are still going to arrive at

4  the phone while this connection is established.

5          There is nothing in GCM nor is there anything

6  in the phone software, which I also reviewed.  We

7  haven't looked at any examples of that here, but I did

8  examine the code in the phone as well.  There's nothing

9  that will stop that message.

10     Q.   Last point:  This issue about how many times

11  they infringe, you were asked questions about the

12  location of the servers.  Some of them are in the U.S.

13  some of them are overseas; is that right?

14     A.   That's correct.

15     Q.   And Google provided worldwide data on how many

16  notifications they sent; is that right?

17     A.   That's correct.

18     Q.   If they provided worldwide data and some of

19  those messages are going through foreign servers and

20  others through U.S. servers, how are you able to reach

21  this conclusion that hundreds of millions of times each

22  day they're infringing?

23     A.   I looked at the information that they

24  provided.  You saw the charts a moment ago, and some of

25  those specified U.S.; some of those only partly

1 specified U.S.  And they didn't give us the information,

2 but the ones for which they didn't give us the

3 information, necessary to exclude those, were huge

4 numbers in the -- in the many billions.

5       So I tried to be very, very conservative,

6 recognized that the United States is a major user of

7 high technology, and I believe this number is

8 ridiculously conservative.

9     Q.   Thank you.

10         MR. EICHMANN:  Pass the witness.

11         THE COURT:  Recross-examination?

12         MR. STOCKWELL:  No, Your Honor.

13         THE COURT:  All right.  You may step

14 down, Dr. Knox.

15         THE WITNESS:  Thank you, Your Honor.

16         And, Your Honor, I have to ask this

17 invoking of the Rule.  Am I allowed to stay in?

18         THE COURT:  Well, if your counsel seeks

19 to have you released from the Rule or if Plaintiff's

20 counsel seeks to have you released from the Rule, we'll

21 see.  It depends on whether you may be used later in the

22 trial.

23         MR. EICHMANN:  Your Honor, the parties

24 have stipulated that the Rule doesn't apply to experts.

25 Experts can stay.

```
 1                    THE COURT:  You may stay.

 2                    THE WITNESS:  Thank you, Your Honor.

 3                    THE COURT:  All right.  Plaintiff, call

 4   your next witness.

 5                    MR. DOVEL:  Your Honor, we've got some

 6   videotaped witnesses to play.

 7                    THE COURT:  What is their approximate

 8   duration, Counsel?

 9                    MR. EICHMANN:  In total, about 32

10   minutes.

11                    THE COURT:  How about in segments?

12                    MR. EICHMANN:  The first segment is about

13   22 minutes.  I have the precise numbers at the table.

14                    THE COURT:  I tell you what we're going

15   to do.  It's 10 minutes until noon.  I'm not going to go

16   into the noon hour.  We'll recess for lunch at this

17   time.  We'll start the deposition testimony when we

18   reconvene.

19                    Ladies and gentlemen, I'm going to excuse

20   you for lunch.  I'm going to ask that you leave your

21   jury notebooks in the jury room.  And as you're at

22   lunch, you expect me to, so I'll tell you, don't discuss

23   the case among each other or with anyone else.

24                    Have a good lunch.  Try to be back about

25   5 minutes until 1:00.  We'll try to start as close to
```

1   1:00.   No, I take that back.   Try to be back about 10

2   minutes until 1:00.   We'll try to start about 5 minutes

3   'til.   That still gives you a little over an hour.   And

4   leaving before noon, you should beat the usual Marshall

5   lunch crowd, so you should be okay.

6                     You're excused for lunch at this time.

7                     COURT SECURITY OFFICER:  All rise.

8                     (Jury out.)

9                     THE COURT:  All right.  We're in recess

10  for lunch.  I'll check with counsel on your meeting and

11  conferring about 10 minutes 'til.

12                    MR. EICHMANN:  Thank you.

13                    THE COURT:  We stand in recess.

14                    (Recess.)

15                    * * * * * * * * * * * * * * * * * * * *

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

     I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/s/_____      __1-14-14_____
SHELLY HOLMES, CSR            Date
Official Court Reporter
State of Texas No.:  7804
Expiration Date  12/31/14

/s/_____   ___1-14-14_____
SUSAN SIMMONS, CSR           Date
Official Court Reporter
State of Texas No.:  267
Expiration Date  12/31/14