<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                       MARSHALL DIVISION

 3   SIMPLEAIR, INC.              *    Civil Docket No.
                                  *    2:13-CV-587
 4   VS.                          *    Marshall, Texas
                                  *
 5                                *    March 17, 2014
                                  *
 6   GOOGLE                       *    8:20 A.M.

 7                     TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
 8                   UNITED STATES DISTRICT JUDGE

 9   APPEARANCES:

10   FOR THE PLAINTIFFS:     MR. GREGORY DOVEL
                             MR. JEFFREY EICHMANN
11                           Dovel & Luner
                             201 Santa Monica Blvd.
12                           Suite 600
                             Santa Monica, CA   90401
13
                             MS. ELIZABETH DERIEUX
14                           Capshaw DeRieux
                             114 East Commerce Avenue
15                           Gladewater, TX   75647

16   FOR THE DEFENDANTS:     MR. MITCHELL STOCKWELL
                             MR. RUSSELL KORN
17                           Kilpatrick Townsend & Stockton
                             1100 Peachtree Street, Suite 2800
18                           Atlanta, GA   30309

19
     APPEARANCES CONTINUED ON NEXT PAGE:
20

21
     COURT REPORTERS:        MS. SHELLY HOLMES, CSR
22                           MS. SUSAN SIMMONS, CSR
                             Official Court Reporters
23                           100 East Houston, Suite 125
                             Marshall, TX   75670
24                           903/935-3868

25   (Proceedings recorded by mechanical stenography, transcript
     produced on CAT system.)
</pre>

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:        MS. DANIELLE WILLIAMS
                          Kilpatrick Townsend & Stockton
                          1001 West Fourth Street
                          Winston-Salem, NC   27101

                          MS. JENNIFER PARKER AINSWORTH
                          Wilson Robertson & Cornelius
                          909 ESE Loop 323, Suite 400
                          Tyler, TX   75701


              *****************************************


                       P R O C E E D I N G S


          (Jury panel out.)

          THE COURT:  Okay.  Let's take up what at least I

know about before we start voir dire, and then if we have

other things I'm not aware of, you can fill me in.

          First of all, I understand there's objection from

Google as to these three slides that would be used by Dr.

Knox.  My understanding is that SimpleAir wants to use them

for the limited and sole purpose of providing some brief

background.  And as long as they're used briefly and for

that background purpose, I don't have a problem with them.

          So I'll -- I'll permit them for that purpose.

Don't go beyond that.

          MR. EICHMANN:  Yes.

          THE COURT:  Also, I've read the proffer with

1   regard to Plaintiff's Motion in Limine 12 that was asked for

2   at the final pre-trial hearing and filed the end of last

3   week.  I've read the response.  This -- my ruling on this is

4   as follows:  I'm not going to disturb the motion in limine

5   order on No. 12.  I'm convinced that the prejudice that

6   would be visited on the Plaintiff exceeds the probative

7   value that would be a benefit to the Defendant.  The fact

8   that Google implemented this change the 26th of January and

9   didn't advise SimpleAir until the end of February,

10  approximately a month later, the fact that documents in

11  regard to this were delivered to Google -- to SimpleAir

12  Wednesday of last week when a new witness that Google asked

13  leave to use was deposed for the first time all indicate to

14  me that to permit them now would be an unfair surprise and

15  an unfair prejudice.

16          This is a -- this is a limine.  It's not an

17  absolute bar.  If there's a point where Google feels

18  compelled to seek leave in the context of the trial, they

19  have the right to seek leave, but I'm going to leave the

20  motion in limine order in place.

21          MR. STOCKWELL:   Your Honor, may I be heard just

22  briefly on that?

23          THE COURT:  Well, if you're just going to

24  reiterate what you've said before, Mr. Stockwell --

25          MR. STOCKWELL:  No, sir.

1        THE COURT:  -- we don't have time to do that.  If

2   it's something new, I'll -- I'll listen to something new.

3        MR. STOCKWELL:  No, sir.  My only question was I

4   have a proffer as to what the testimony would be if you

5   allowed it.  Can I just file that by ECF instead of

6   interrupting the trial and making some proffer?

7        THE COURT:  Well, can you tell me when during the

8   trial you -- if you were given leave when you -- when in the

9   trial you would make that proffer.

10       MR. STOCKWELL:  Yes.  It would be during Mr. Man

11  -- Manolache's testimony and during Dr. Ugone's testimony,

12  Your Honor.

13       THE COURT:  Well, I'll grant you leave to file

14  that proffer, and I'll -- I'll -- I'll review it.

15       MR. STOCKWELL:  Thank you.

16       THE COURT:  Okay.  With regard to the most

17  recent -- the last few days' motion in limine by Google

18  regarding their acquisition and ownership of Motorola

19  Mobility, I'm going to grant that motion in limine.  But I

20  want it understood that if Google during the trial

21  represents to the jury directly or indirectly that it does

22  not manufacture phones, then I will consider that they've

23  opened the door and I will allow SimpleAir to go into the

24  Motorola Mobility issue and the ownership of it by Google.

25  I think that's only fair, but unless the door's opened, I'll

1    grant the motion in limine.

2         MR. EICHMANN:   Your Honor, a brief moment on

3    that.  I know we didn't file this response, but we oppose it

4    because in -- in the pre-trial conference the Court had

5    pre-admitted three exhibits that have to do with -- with

6    this -- with the Motorola acquisition, and it relates to two

7    issues, not just their representation or -- or theme about

8    not selling phones, but about them buying Motorola for the

9    value of their patents.  So it's -- it's also an impeachment

10   point for their damages expert who points to one Motorola

11   agreement where before they even bought the company, they

12   paid 5.5 million to get some patents, but then he cherry

13   picks that and doesn't address where they paid billions of

14   dollars to get the company primarily for the patents.  So

15   that's how it came up in the pre-trial, and that's the way

16   it would come up here, as well.

17        THE COURT:  Well, as with the -- as with the issue

18   on the Buzz routers, Mr. Eichmann, it's a motion in limine

19   and an order related to that.  If you want to approach at

20   that point in the trial and ask leave to go into it, you

21   have that right.  But I'll reserve a ruling on it until

22   we're at that point and I'll hear your request at the bench.

23        MR. EICHMANN:  Yes, sir.

24        MS. DERIEUX:  One thing further, Your Honor, I had

25   intended to ask the -- the jury panel whether they had

1   employment with Motorola, et cetera.  Would that be out

2   of -- would that be in violation of this motion in limine

3   now?

4           THE COURT:  Without more, Ms. DeRieux, I think

5   that's acceptable.

6           MS. DERIEUX:  Okay.

7           THE COURT:  As long as you don't try to explain

8   why you want to know.

9           MS. DERIEUX:  All right.

10          THE COURT:  I understand there are some disputes

11  with regard to a deposition clip or clips for tomorrow.  I

12  haven't seen those designations or counter designations.  If

13  you'll get those to my clerk during the course of the day,

14  we'll either take it up over the lunch hour or before we

15  just -- before we recess for the evening.  But that will

16  give me a chance to look at it probably over the noon hour.

17  But I need to get those designations and -- and have you

18  clearly mark what's objected to by whom.

19          MR. EICHMANN:  Your Honor, we'll certainly do

20  that.  There's one part of that, though, that the Court may

21  want to address now.  And it's not just depo testimony.

22  They intend to read testimony from Mr. Nerieri from the

23  prior trial, not his depo testimony, but from the trial here

24  in January.

25          We don't think that's proper for -- for a number

1    of reasons.  They asked for a substitute witness, somebody

2    who was going to give testimony on the same subject.  We let

3    them do that.  The Court gave us that deposition.

4              THE COURT:  No, I let them do that.

5              MR. EICHMANN:  I'm sorry.

6              THE COURT:  They asked for leave to substitute.

7              MR. EICHMANN:  Yes, sir.  Yes, sir.  We took that

8    person's deposition.  He's the one who's supposed to be here

9    testifying, and now they want to get both.  They want to

10   have Mr. Nerieri here not subject to cross.

11             There's also a hearsay issue, Your Honor.  We

12   opposed their motion to continue the trial on the ground

13   that he's not really unavailable.  He's just busy.  And as

14   we learned during Mr. Manolache's deposition, their proffer

15   and his declaration about why he couldn't come to trial is

16   very suspect.  They said he's got all these employee

17   reviews.  Mr. Manolache testified those things get moved all

18   the time.  They just take a few minutes.  We think that we

19   can show -- and -- and if you require papers on this, we can

20   do this, but he's not unavailable and furthermore that

21   they're trying to --

22             THE COURT:  Well, let me ask --

23             MR. EICHMANN:  Yes.

24             THE COURT:  -- let me ask the Defendant what --

25   what justification should there be for allowing his

1  deposition testimony when you asked for leave to substitute

2  a different fact witness to take his place and I granted it?

3      MR. STOCKWELL:   Your Honor, we have four

4  questions and answers that Mr. Nerieri -- that -- that we

5  wish to have Mr. Nerieri cover we'd like the Court to look

6  at.  Basically he explains what the cost would be if Google

7  had moved the servers.  Mr. Manolache took over that role

8  recently and was not familiar with that subject matter.  So

9  we would like to have -- to read in those four questions and

10 answers from Mr. Nerieri.  He is unavailable.  This is the

11 same situation as Dr. Srinivasan.  Mr. Nerieri is now in

12 charge of Google Cloud.  He has -- his declaration said --

13     THE COURT:  I'm -- I'm not going to litigate again

14 whether he's available or not available.  He's not here, and

15 I'm going to consider that that's settled.  I'll look at

16 your questions.

17     MR. STOCKWELL: Yes, sir.

18     THE COURT:  But I'll look at it with the

19 understanding that you asked to substitute and you

20 designated this person.  And if the person you designated as

21 a substitute doesn't know everything he needs to know,

22 that's really on you, not on the other side.  But given --

23 given that that's not coming in today, I'll look at it

24 between now and tomorrow.

25     MR. STOCKWELL:  Yes, sir.

1          MR. EICHMANN:  And just to alert you, Your Honor,

2    there's an additional issue with respect to the testimony

3    that they -- they plan to raise.  They want to designate his

4    testimony about this so-called study that they did about how

5    much it cost to move the servers.  As we learned from Mr.

6    Manolache's deposition, there is no study.  They didn't

7    produce any evidence of this.  They didn't produce any

8    documents or backup so there's a second level of prejudice

9    here.  And Mr. Dovel is actually a little bit more familiar

10   with, and I don't know if you want to hear from it now or

11   later.

12         THE COURT:  Let me -- let me see the questions and

13   answers.  We'll talk about it before it comes in or whether

14   it's kept out, whatever it is.

15         I had a visit this morning from counsel for

16   Microsoft asking me to seal the courtroom during openings.

17   I need you all to give me a brief update on what -- what I

18   can expect as far as requests to seal the courtroom during

19   the trial and how have you met and conferred and tried to

20   coordinate and minimize any disruptions that might cause.  I

21   really -- I really want a running heads-up of what's coming.

22         I don't want to wake up in the middle of the trial

23   and without warning, here you are asking me to kick

24   everybody out and seal the courtroom.  I want to know in

25   advance so I can monitor that as we go through the evidence.

1          Do you -- are you prepared to give me some kind of

2    an overview of what you're anticipating in that regard or is

3    that something you need to give me later?

4          MR. EICHMANN:  Later, Your Honor.  We've -- both

5    sides have disclosed their demonstratives, including the

6    openings to Ms. Smith, Microsoft's counsel, but we didn't

7    get any objections or indication in response to that.  At

8    least we didn't know that they plan to take certain action

9    with respect to sealing so we're not -- we're not as advised

10   as the Court is as to their position.

11         THE COURT:  Well, I didn't know about it until

12   about 10 minutes ago.  Let me ask it this way.  Is anybody

13   intending to ask the courtroom be sealed once we start the

14   evidence after the jury's selected and as a part of the

15   evidence today?  Is that coming at some point in the day

16   today?

17         MR. EICHMANN:  Well --

18         MR. DOVEL:   I mean, Microsoft is going to have a

19   problem when Mr. Mills' testifies which we might get to

20   today.

21         MR. STOCKWELL:  I think that's right.

22         MR. DOVEL:  The settlement agreements.

23         MS. AINSWORTH:   Your Honor, we had talked this

24   morning about the first witness is Mr. Knox, and we don't

25   anticipate there being any issues there.  We think the first

1   time it would come up would be with Mills which should be

2   later, possibly at the end of the day today or possibly

3   tomorrow morning.  There may be issues, though, in opening,

4   but we had just all assumed that --

5            THE COURT:  I'm not going to seal the courtroom

6   during opening.

7            MS. AINSWORTH:  So we hadn't really met and

8   conferred about that other than to provide Ms. Smith with

9   the slides.

10           THE COURT:  Okay.  Well, assuming we get to Mr.

11  Mills today, before he takes the stand, why don't you

12  approach and give me some idea about what to expect in that

13  regard, okay?

14           MR. EICHMANN:  Yes, Your Honor.

15           THE COURT:  Okay.  All right.  What else is

16  counsel aware of that needs to be considered before we begin

17  voir dire that we haven't talked about?

18           MR. EICHMANN:  One thing --

19           THE COURT:  Anything else?

20           MR. EICHMANN:  I believe so.  One thing, Your

21  Honor, we haven't seen as -- as was the case last time, the

22  Court's intended preliminary instructions.  I was wondering

23  if you could advise on whether you -- on this issue about

24  telling the jury that the last one hung on damages or -- or

25  anything to that effect.  We've given that a little bit more

1   thought since the pre-trial conference and have some

2   concerns that -- with -- with raising that.  We -- frankly,

3   we don't want the jury to think that that's an option, that

4   they can simply just not end up deciding here because that

5   happened the last time.  So we'd like to just kind of leave

6   it as prior jury found that the patent was valid and

7   infringed, you're here to determine the damages, and just

8   sort of leave it at that and not get into whether the prior

9   jury had this issue of damages.

10          THE COURT:  Well, I'm happy to read you the

11  section of my instructions to the panel that I intend to

12  give before counsel begins their voir dire examination this

13  morning.  And it's one paragraph, but I'll read it to you.

14  And then if you want to comment on it, you may.

15          I intend to tell the panel:  As I have told you,

16  this is a patent case arising under the patent laws of the

17  United States.  Having seen the patent film, you know more

18  about patent cases than most people do when they arrive at

19  the courthouse to serve as jurors in a patent trial.

20          Also, you should know that the trial in this case

21  will be somewhat different than the typical patent trial.

22  That's because this Court has previously presided over an

23  earlier jury trial in this case between SimpleAir and

24  Google.  In that earlier trial, tried this past January, the

25  jury there reached a unanimous verdict in favor of SimpleAir

1   on the issues of both infringement and validity of its

2   patent, U.S. Patent 7,035,914, which I'll refer to as the

3   '914.  This Court accepted that jury's verdict finding that

4   Google infringes Claims 1, 2, 3, 7, and 22 of the '914

5   patent and that each of those claims was not invalid.

6          As a result, this trial will be -- will not be

7   concerned with the issues of infringement or validity.

8   Those matters have already been established in favor of the

9   Plaintiff, SimpleAir, through the earlier trial in January.

10          However, the jury in the earlier trial was not

11   able to agree on the amount of damages to be awarded to

12   SimpleAir and paid by Google.  That remaining damages issue

13   is the sole reason for this second trial, the trial that

14   will take place before the jury we are about to select.

15          This trial will be focused solely on the issue of

16   money damages.  If selected for the panel, you will receive

17   more detailed instructions from the Court regarding the

18   issue of damages later.

19          So as I indicated during pre-trial, my intent is

20   to give a -- just a factual and more or less chronological

21   overview of how we got to where we are today.  If either

22   side has strong objections to that type of instruction,

23   speak now.  I don't intend to tell them they have the option

24   of just deciding not to decide.

25          MR. EICHMANN:   Your Honor, of course, I

1   understand that.  But I think that indicating that that is

2   what happened the last time implies that --

3            THE COURT:  I have to --

4            MR. EIGHMANN:  -- that's an option.

5            THE COURT:  -- I have to give them a reason why

6   they're here.

7            MR. EICHMANN:  Well, Your Honor, if we were

8   sitting in a Court that typically bifurcates, for example,

9   they would -- they would just -- hey, they're -- this has

10  already been determined to be infringed and valid, you're

11  here to determine damages, and just leave it at that.

12           THE COURT:  SimpleAir have a comment on this?

13           MR. STOCKWELL:  Google, Your Honor.

14           THE COURT:  I mean, Google?  Google have a

15  comment?

16           MS. AINSWORTH:  If the Court is going to provide

17  the factual background of the fact that there was an earlier

18  trial, that there was a unanimous verdict on the two

19  liability questions, we think that it, therefore, is fair to

20  also say that the jury was not able to determine the damages

21  question.  If that part is left out, then the jury here only

22  hears half of the story.

23           THE COURT:  Well --

24           MR. STOCKWELL:  And we have no objection.  I mean,

25  the Court's giving a factual recitation of what happened and

1  why we're here.  I don't see how that's prejudicial to

2  either side.

3          THE COURT:  I -- I have -- I have minimal concern

4  that this jury is going to think they have the option to

5  just not attempt to reach a verdict.  And I do think that

6  you can't tell part of this without telling all of it.  I'm

7  going to leave -- I'm going to leave the instructions as

8  I've got them.

9          MS. AINSWORTH:   Your Honor, may I ask one

10  question for purpose of voir dire.  That instruction would

11  be given after the actual jury is seated.  That's my

12  understanding.

13          THE COURT:  No, that's the instruction I'm going

14  to give them before you examine the panel.

15          MS. AINSWORTH:  Okay.  Thank you, Your Honor.

16          THE COURT:  I'm going to give --

17          MS. AINSWORTH:  I misunderstood that.

18          THE COURT:  -- I'm going to give them a similar

19  instruction once the jury's selected before you do your

20  opening statements.

21          MS. AINSWORTH:  Okay.  Okay.  Thank you.

22          THE COURT:  And it will be substantially the same

23  as what I've just read you.  Quite honestly, I don't want

24  you to have to use your limited time for voir dire and

25  opening statements explaining what I can explain to them as

1    to how we got to where we are.  And I think it -- it opens

2    the door to them being confused if they don't hear that from

3    me to begin with, so that's my intention.

4           Do we have anything else we need to take up before

5    we examine the panel?

6           MR. EICHMANN:  Not from the Plaintiff.

7           THE COURT:  Anything from the Defendant?

8           MR. STOCKWELL:  Not from the Defendant.

9           THE COURT:  Okay.  I -- I -- again, I apologize

10   for our makeshift quarters this morning.  Probably the best

11   place that I can ask you all to congregate is just outside

12   the entrance to the courtroom.  And I -- I assume the Clerk

13   has the panel in the courtroom qualifying them now.  I'll

14   try to keep you posted by way of information through my

15   clerks as we go.  But that's probably the safest place for

16   you all to be staged will just be near the -- the entrance

17   of the courtroom there at the base of the stairs and near

18   the elevator.

19          And if there's nothing else, I'll allow you to

20   adjourn to that place right now.

21          MR. STOCKWELL:  Thank you.

22          MS. AINSWORTH:  Thank you, Your Honor.

23          (Recess.)

24          COURT SECURITY OFFICER:  All rise.

25          (Jury panel in.)

1          THE COURT:  Thank you.  Be seated, please.

2          Good morning, ladies and gentlemen.  Thank you for

3  being here.

4          My name is Rodney Gilstrap, and I am the resident

5  United States District Judge for the Marshall Division of

6  the Eastern District of Texas.  I practiced law here in

7  Marshall for just over 30 years before I became a federal

8  judge.  I've been on the bench here since 2011.

9          I grew up in Florida, but as they say, I got to

10 Texas as soon as I could.  I came to Texas to go to college

11 at Baylor University and stayed there to go to law school.

12         I began my practice in Marshall after graduating

13 from law school in 1981.  I'm married.  I have two grown

14 children.  And my wife owns and operates a retail floral

15 business here in Marshall.

16         Now, I tell you all these things because in a few

17 minutes, I'm going to get to learn the same type of

18 information from each of you, and I think it's only fair

19 that you know as much about me as I'm about to learn about

20 each of you.

21         We're about to engage in the selection of a jury

22 in a civil case involving patent infringement.  I know

23 you've seen the film this morning about patent cases since

24 they do involve some things that other civil cases do not.

25         In a civil case such as this one, the United

States is the only country in the world that guarantees the right to a trial by jury in a civil case.  And by each of you being here this morning and participating in this jury selection process, you are doing what you can as ordinary citizens to preserve, protect, and defend our Constitution, and in particular, the Seventh Amendment to our Constitution, which is a part of our Bill of Rights, which guarantees the right to a trial by jury in a civil case.

I always tell jurors, and I believe it more each time that I say it, that jury service, in my opinion, is the second highest form of public service that any ordinary American citizen can perform for their country.  Of course, in my view, the highest form of public service are those young men and women who serve in our armed forces and place their lives on the line to guarantee our rights each day.

Now, when the lawyers address the members of the jury panel in a few moments this morning, I want you to understand that they will not be seeking to inquire into your private affairs unduly.  They're entitled to ask questions to secure a fair and impartial jury to hear the evidence in this case.  I don't know if it will happen today.

It rarely does, but I want the members of the panel to understand that if you are asked a question by the lawyers in the jury selection process that you view it to be

1    so personal and so private that you are very uncomfortable

2    answering that question in front of the remaining members of

3    the panel, then you have the right to simply say you'd like

4    to discuss that with Judge Gilstrap.

5         And if that happens, I'll make arrangements for

6    you to answer that question outside the presence of the rest

7    of the members of the panel.  Again, I don't expect that to

8    happen.  It's not common, but I want you to know that

9    that -- that option does exist.

10        The important thing this morning, ladies and

11   gentlemen, is that the answers you give to the questions you

12   are asked are full, complete, and truthful answers.

13        Remember, there are no wrong answers as long as

14   the responses you give are full, complete, and truthful.

15        The trial in this case, beginning with the opening

16   statements and then going into the evidence, will begin

17   later today after we've selected this jury, probably

18   depending on how jury selection goes immediately after lunch

19   today.  And the trial, I expect -- this is my best

20   approximation -- but the trial, I suspect, will run from

21   today through Wednesday of this week.  So I want you to know

22   about that timeline.

23        And I need to ask at this point if there are any

24   of the members of the panel who have either a surgery

25   scheduled during Monday, Tuesday, or Wednesday of this week

1    or have paid-up, non-refundable airline tickets to go

2    somewhere that you can't get out of.

3          Is there some -- is there some event that would

4    prevent you from being able to serve as a juror, if you were

5    selected in this case?  If that applies to any of the

6    members of the panel, if you'd raise your hands, let me make

7    a note of it.

8          I don't see any hand.  It's -- I see one hand.

9    Yes, ma'am.  And I need to see your number, please.

10   15.  Okay.  Thank you.

11         Anybody else besides Panel Member No. 15?

12         All right.  All right.  At this time, I'm going to

13   call for announcements in the case of SimpleAir, Inc.,

14   versus Google, Inc.  This is Case No. 2:13-CV-587.

15         And, counsel, as you give your announcements, if

16   you would introduce everyone at your counsel table and on

17   your trial team and also any corporate representative that

18   you have with you.

19         What says the Plaintiff?

20         MS. DERIEUX:  Elizabeth DeRieux on behalf of the

21   Plaintiff SimpleAir, Your Honor.  With me today is Jeff

22   Eichmann, Simon Franzini, Greg Dovel.  And seated back here,

23   we have our corporate representatives, John Payne, Tim von

24   Kaenel.

25         And we're ready to proceed, Your Honor.

1          THE COURT:  Thank you, Ms. DeRieux.

2          What says the Defendant?

3          MS. AINSWORTH:  Good morning, Your Honor.

4          Jennifer Ainsworth on behalf of Google.  And with

5  me today on our trial team is Mr. Mitch Stockwell, Ms.

6  Danielle Williams, and Mr. Russ Korn.  And also here today

7  with us from Google is Mr. Jon Gold, who will be our

8  corporate representative, and will also be testifying at

9  trial.

10          THE COURT:  All right.  Thank you.

11          MS. AINSWORTH:  And I believe that's all of our

12  team here in the courtroom.

13          THE COURT:  Thank you, Ms. Ainsworth.

14          Ladies and gentlemen, as I've told you, this is a

15  patent case arising under the patent laws of the United

16  States.  And having seen the patent film this morning, you

17  already know a great deal more than most jurors know when

18  they're called to serve in a patent case.

19          Also, I want you to know that the trial in this

20  case will be somewhat different than in the typical patent

21  trial.  That's because this case has previously been

22  presided over by an earlier jury trial in this same case

23  between SimpleAir and Google.  And in that earlier trial

24  that took place in January of this year, the jury there

25  reached a unanimous verdict in favor of the Plaintiff,

1   SimpleAir, on the issues of both infringement and validity

2   of the patent at issue.  And that's U.S. Patent No.

3   7,035,914, which I, and I suspect most of the people in this

4   trial, will simply refer as the '914 patent.

5        This Court accepted the verdict from that earlier

6   jury trial finding that Google does infringe Claims 1, 2, 3,

7   7, and 22 of the '914 patent and that each of those claims

8   was not invalid.  As a result, this trial will not be

9   concerned with the issues of infringement and validity.

10  Those matters have already been established in favor of the

11  Plaintiff, SimpleAir, through the earlier trial in January

12  of this year.

13       However, the jury in that earlier trial was not

14  able -- despite diligent efforts, they were not able to

15  agree unanimously on amount of money damages to be awarded

16  to SimpleAir and paid by Google.  That remaining damages

17  issue is the sole reason for this second trial, and the

18  reason that the trial will take place with the jury that's

19  about to be selected.

20       This trial will be focused solely on the issue of

21  money damages.  So if -- if selected for -- from the panel

22  for the jury, I will give members of the jury more detailed

23  instructions about the issue of damages later.

24       Now, the lawyers from both sides are going to ask

25  questions of the panel in a few minute -- minutes to gather

1    information in order to exercise their peremptory challenges

2    and finalize the process of selecting the eight jurors that

3    will serve as the jury in this case.

4            As I've already said, there are no wrong answers

5    to the questions that you'll be asked as a member of this

6    panel as long as your answers are full, complete, and

7    truthful.

8            As I mentioned earlier, the lawyers are not

9    here to try and pry into your personal affairs, but

10   simply to gather information with the goal of selecting

11   a fair and impartial jury.

12           If for any reason you're asked a question that I

13   don't think the lawyers are entitled to ask, I will

14   certainly tell them so.  However, you should understand that

15   these are all experienced lawyers.  They're familiar with

16   this Court's local rules and the rules of federal

17   procedure -- Federal Rules of Civil Procedure, and I don't

18   expect that to happen.

19           One thing that I want to call your attention to,

20   ladies and gentlemen, is about the question regarding the

21   burden of proof that will be applied in this case, because

22   this is a damages case in a patent suit.  The jury that's

23   chosen and selected to hear the evidence will be required to

24   apply a burden of proof, which is called a preponderance of

25   the evidence.

1      When responding to the lawyers' questions about

2  the burden of proof, I need to instruct you that the party

3  who has the burden of proof on any claim or affirmative

4  defense by a preponderance of the evidence means that the

5  jury must be persuaded by the credible and believable

6  evidence that the claim or defense is more probably true

7  than not true.  I'll say that again.  More probably true

8  than not true.

9      Sometimes this is talked about as being the

10  greater weight and degree of credible testimony.  Let me

11  give you an illustration in this regard.

12      I think all of you can see the statue to my left,

13  of the goddess of justice, Lady Justicia, she's called.

14  You'll notice that she holds the sword of justice in her

15  right hand.  You'll notice that she's blindfolded, and

16  you'll notice that in her left hand she holds the raised

17  scales of justice.

18      I call your attention to the fact that those

19  scales are exactly balanced, exactly equal.  And you should

20  consider that during the trial of this case, the jury

21  selected, as you hear the evidence, that evidence will be

22  placed on those scales of justice.  And when the evidence is

23  complete and the jury is asked to answer the questions in

24  the verdict form, you will consider whether the party who

25  has the burden of proof has met that burden of proof by a

1    preponderance of the evidence.

2           And you can simply think about placing all the

3    evidence on those scales of justice.  And if, after all the

4    evidence is placed on those balanced scales, if those scales

5    tip in favor of the party who has the burden of proof by a

6    preponderance of the evidence, even if they tip ever so

7    slightly, that party has met the burden of proof by a

8    preponderance of the evidence.

9           Now, none of this is to be confused with what you

10   probably have heard about on TV and in the media called the

11   burden of proof of beyond a reasonable doubt.  That's a

12   burden of proof that applies in a criminal case.  It has

13   absolutely no application in a civil case such as this one.

14   I give you these instructions because it is possible that

15   during the questioning, some of the lawyers may ask the

16   panel if they are able and willing to apply the burden of

17   proof in this case fairly, and that burden of proof is by a

18   preponderance of the evidence.

19          Now, before the lawyers address the panel and ask

20   their questions, I'm going to let each one of you on the

21   panel stand and give the answers to the questions that

22   are -- the nine questions that are on the screen here.  As

23   we do this, I'm going to ask you to do it one at a time.

24          We'll start with Panel Member No. 1, and I'm going

25   to ask you to stand as you give your answers.  Also, if

1    you're asked questions during the remainder of this jury

2    selection process, please also stand whenever you give an

3    answer.

4           Additionally, we have a handheld microphone, Mr.

5    Potts?  In your hand.

6           I'm going to ask each person to use the handheld

7    microphone as they give their answers both now and during

8    the remainder of the jury selection process.  So we'll start

9    with Panel Member No. 1, and if you'll give the answers to

10   these nine questions, please, ma'am.

11          JUROR BENTON:  My name is Katherine Benton.  I

12   live in Ore City, Texas.  I have five children.  My place of

13   employment is actually at home.  I'm a housewife.  I have

14   lived -- well, my educational background is high school

15   diploma.  And my husband's name is Garth.  He works at the

16   Spring Hill School District, and he is a mechanic, and he's

17   worked there almost a year and a half how.  And I have been

18   in a criminal and a civil jury one time.

19          THE COURT:  Thank you.  If you'll pass that to Mr.

20   Pyle.

21          Mr. Pyle?

22          JUROR PYLE:  My name is James Pyle.  I've lived in

23   Marshall, Texas, all my life, which is 67 years.  I have one

24   grown child.  I am retired.  I had a -- my own private

25   business.  It was a bottling plant.  We worked there for

1    about 25 years and -- and I retired.  My education --

2    educational background is I've had some college.  My wife

3    was named Anita.  She's deceased now.  And I've not

4    served -- served in any civil or criminal lawsuits.

5              THE COURT:  All right.  If you'll pass that to Ms.

6    Bean.

7              JUROR BEAN:  My name is Jennifer Bean.  And I have

8    one daughter.  My place of employment, my husband is a

9    self-employed plumbing contractor, and I take care of his

10   books and ordering his material, permit-pulling, that type

11   thing.  He's been in business since 1999.  We've been

12   married almost 30 years.  I have a high school education.

13             My husband's name is Mark.  And I've been on a

14   civil jury, and I live in Gladewater, Texas.  I think I

15   missed that.

16             THE COURT:  Mr. Calhoun?

17             JUROR CALHOUN:  Hi.  My name is Jeromy Calhoun.  I

18   live in Longview, Texas.  I have three children.  I am vice

19   president of sales for Olmsted-Kirk Paper Company.  I've

20   worked with Olmsted-Kirk for 14 years.  Educational

21   background:  High school and college; no degree.  My wife's

22   name is Penelope.  She's an art teacher at Hallsville

23   Independent School District.  She's been there six years.  I

24   have been on a criminal case.  It was -- it settled, so I

25   did not sit on the jury.

1          THE COURT:  Ms. Horace?

2          JUROR HORACE:  Good morning.  My name is Lora

3   Horace.  I live in Jefferson.  I have one child; she's 30.

4   I work for Gordon Alcox, MD, here in Marshall.  I've been

5   there 18 years.  I have some college.  I am divorced.  And I

6   have served on a criminal case.

7          THE COURT:  Dr. Oliver?

8          JUROR OLIVER:  Good morning my name is Samuel

9   Oliver.  I live in Marshall, Texas.  I have one child.  I'm

10  the president at East Texas Baptist University.  I've worked

11  there five years.  The highest degree I have is a Ph.D.  My

12  spouse is Susie.  She works at East Texas Baptist

13  University.  She's worked there four years.  And I've never

14  served on a jury.

15         THE COURT:  Ms. Gross?

16         JUROR Gross:  Good morning.  My name is Jennie

17  Gross.  I live in Gilmer, Texas.  Do not have any children.

18  I teach at Hughes Springs Independent School District, but I

19  am retired, but I continue to teach.  I've been there for

20  about a year and a half.  I have a BS.  My husband's name is

21  Bill.  He is retired as a horse trainer, but he works

22  part-time at the credit union -- East Texas Professional

23  Credit Union, for about three years.  And I have been on two

24  criminal cases before.

25         JUROR MERICLE:  I'm Kimberly Mericle.  I live in

1   Atlanta, Texas.  I have one daughter.  I work for Double Jay

2   Supply Company in sales.  I've worked there about eight

3   years.  High school, some college.  I am divorced, and I've

4   never served on jury service.

5            THE COURT:  All right.  If you'll pass it over to

6   Mr. Green.

7            JUROR GREEN:  Robert Green, Gladewater, Texas.  I

8   have four children.  Private investor.  I've been doing it

9   for about 11 years.  Attended Stephen F. Austin State

10  University.  My wife's name is Glenda Green.  She's a

11  housewife.  We've been married 37 years, a long time.  I

12  have served on a civil trial, but it's been about 35 years

13  ago.

14           THE COURT:  Mr. Tucker?

15           JUROR TUCKER:  My name is Glen Tucker.  I have

16  four children.  My place of employment is a retirement home.

17  I do home repairs.  I've been there five years.  My

18  education is high school.  My -- my wife's name is Rhonda

19  Tucker.  Her employment is DCOL in Longview.  She's a

20  medical assistant.  She's been there about three years.  And

21  I've served on, I guess, traffic tickets, I guess.

22           THE COURT:  Mr. Williams?

23           JUROR WILLIAMS:  My name is Ronnie Williams.

24  I live in Longview, Texas.  I work for FTS

25  International.  I've been there about eight years.  I'm

1   the HSE manager there.  I've just got a high school

2   education.  My wife's Glenda Williams.  She's retired,

3   retired as a CPA.  I've never served on a jury.

4           THE COURT: Ms. Pilcher?

5           JUROR PILCHER: My name is Lorie Pilcher.  I'm

6   from Gilmer, Texas.  I have two children.  I'm a housewife.

7   My previous employment, secretary to Judge Leonard Davis.

8   I've known Judge Davis since 1999.  I've worked there

9   since -- I think he's been in office since 2002.  I'm not

10  sure about that.  High school diploma.  My spouse is Bob.

11  He is a builder.  He's been doing it for over 35 years.  And

12  I have not served on any juries, although I've sure listened

13  to many of them.

14          THE COURT:  Thank you.

15          Ms. Perry?

16          JUROR PERRY:  Hello.  My name is Swindell Perry.

17  I have two sons, 43 and 35.  My place of employ is Linden

18  Elementary School District as a cook for 5 years.  My

19  husband worked at Sonoco in Jefferson.  He's been there 10

20  years.  And I have served on civil jury.

21          THE COURT:  Thank you, ma'am.

22          We'll pass that over to Panel Member No. 14, Ms.

23  Clubb.

24          JUROR CLUBB:  I'm Toni Clubb.  I have one son;

25  he's 26.  I work at Hughes Springs Elementary School.  I'm a

1   reading specialist.  I teach -- I teach dyslexic students

2   and I do reading intervention.  I've been there 5 years.

3   I've been teaching for 16 years.  I have a bachelor of

4   science from the University of Texas at Tyler.  I'm a single

5   mom; I've never been married.  And I've never served on a

6   jury case.

7          THE COURT:  Thank you.  If you'll pass that to Ms.

8   Hatch.

9          JUROR HATCH:  My name is Denise Hatch.  I have one

10  daughter; she's 34.

11         THE COURT:  Ms. Hatch, hold that microphone a

12  little closer so I can hear you.

13         JUROR HATCH:  Okay.

14         THE COURT:  Thank you.

15         JUROR HATCH:  Denise Hatch, one daughter, 34.

16  Worked for Crispy Chicken in Ore City for a year and a half.

17  Just recently quit because my mother was sick.  GED.

18  Took -- I've gotten one business course out of Gilmer I

19  took.  I'm unmarried.  And I've never served on a jury

20  before.

21         THE COURT:  Thank you.

22         Ms. Dellinger?

23         JUROR DELLINGER:  Celeste Dellinger.  I live in

24  Atlanta, Texas.  I have two children.  I am a middle school

25  science teacher.  I've been a teacher for 22 years.  Let's

1   see.  I have some postgraduate work.  My husband is Jack

2   Dellinger.  He works at Cooper Tire.  He's been there 27

3   years.  And I have served on a civil and a criminal case.

4           THE COURT:  Thank you.

5           Mr. Shirley?

6           JUROR SHIRLEY:  My name is Ed Shirley.  I'm from

7   Atlanta, Texas also.  I have five children.  I work at

8   International Paper at the Texarkana mill.  I've been there

9   33 years.  I do a salvage and recycling operation.  And I

10  have a high school diploma and 70 hours of college.  My

11  wife's name is Sherry, and she is a homemaker and has been

12  for 25 years.  And I have served on a civil case before.

13          THE COURT:  Thank you, sir.

14          Mr. Watson?

15          JUROR WATSON:  My name is Robert Watson.  I have

16  two sons.  I'm a self-employed painting contractor.  Been

17  doing it for 35 years.  And my education is high school.  My

18  spouse's name is Judy Watson, and she's a housewife.  We've

19  been married 44 years.  And I served on a civil jury years

20  ago.

21          THE COURT:  Thank you, sir.

22          Mr. Gonzalez?

23          JUROR GONZALEZ:  My name is Joel Gonzalez.  I live

24  in Big Sandy, Texas.  I have an 11-year-old daughter.  I'm

25  divorced.  I work in a soils plant making soils, compost.  I

1  run the loader and load the trucks.  I've been there since

2  high school, so about 25 years.  High school degree.

3  Divorced.  And I have not served on a jury before.

4          THE COURT:  Thank you, sir.

5          And we'll pass that microphone back in the corner

6  to Mr. Kirkpatrick.

7          JUROR KIRKPATRICK:  My name is Johnathan

8  Kirkpatrick.  I live in Pittsburg, Texas.

9          THE COURT:  Hold that a little closer, Mr.

10 Kirkpatrick.  You're about as far away from me as you can

11 get in this room.

12         JUROR KIRKPATRICK:  Johnathan Kirkpatrick.  I live

13 in Pittsburg, Texas.  I have three kids and one on the way.

14 I work at U.S. Steel in Hughes Springs.  I'm a maintenance

15 technician.  I've only worked there for about eight months

16 now.  I just have a high school diploma.  My wife's name is

17 Denise.  She works at Walgreens.  She's a pharmacy

18 technician, and she's worked there for five years.  And I've

19 never served on a jury before.

20         THE COURT:  Thank you, sir.

21         Mr. Edwards?

22         JUROR EDWARDS:  John Edwards from Hughes Springs.

23 I have no children.  I'm a registered nurse at Christus St.

24 Michael.  I've worked there about eight months.  I have a

25 bachelor of science in nursing.  No spouse.  And I've never

1    served on a jury.

2         THE COURT:  Mr. Dewoody?

3         JUROR DEWOODY:  My name is Christopher Dewoody.  I

4    live here in Marshall, Texas, with no children.  I am a

5    title examiner at Central Title Company here in Marshall,

6    and I have been there for about 10 years.  I have a high

7    school diploma and some college education but no degree.  My

8    wife's name is Monica.  She also works at Central Title

9    Company as a policy coordinator, and she has been about for

10   about five years.  I have never served on a jury.

11        THE COURT:  Next is Ms. Luckey.  It's a great name

12   on St. Patrick's Day.  Go ahead.

13        JUROR LUCKEY:  My name is Carabeth Luckey.  I live

14   in Omaha, Texas.  I have a law office there.  I'm

15   self-employed.  I've been there 15 years.  Prior to that, I

16   worked in Houston for a small firm, and prior to that, I

17   worked for the Internal Revenue Service for about 20 years.

18   My spouse's name is Larry and he's deceased.  And I've never

19   served on a jury.

20        THE COURT:  Thank you.

21        Mr. Shelton?

22        JUROR SHELTON:  Good morning.  My name is Robert

23   Shelton.  I live in Atlanta, Texas.  I have two daughters, a

24   seven-year-old and a four-month-old.  I work for Kansas City

25   Southern Railroad at a creosote plant, treating crossties.

1   I've worked there for about three years.  And I'm also in

2   the Air Force Reserves.  Prior active duty for about seven

3   years.  I have a high school diploma, some college.  I'm

4   married for 10 years.  Wife's name is Amy.  She's an LVN in

5   Golden Villa in Atlanta.  She's worked there for about a

6   year and a half.  And I've never served on a jury.

7        JUROR CARTER:  My name is Don Carter.  I live here

8   in Marshall.  I have one daughter.  I'm retired from the

9   Texas Department of Transportation as an engineering

10  specialist.  I worked there for 27 years.  High school

11  education.  My spouse is deceased.  And I've served on two

12  civil juries.

13       THE COURT:  Thank you, sir.

14       Thank you very much, ladies and gentlemen.  I need

15  to say a couple more things to you before I turn the

16  proceedings over to the lawyers to begin their questioning.

17       The jury that is actually selected from this panel

18  will serve in the role of the judges of the facts, and the

19  jury selected will make the sole determination about what

20  the facts are in this case.

21       Now, my job as the Judge is to rule on questions

22  of law, evidence, and procedure, and to control the

23  courtroom and maintain the flow and decorum of the trial.

24       I want to say a couple things to the panel about

25  our judicial system that will hopefully put things in a

1   proper perspective as we go from this point forward.  In

2   every jury trial, in addition to the actual parties in the

3   case, there are always three participants:  The jury, the

4   judge, and the lawyers.

5        With regard to the lawyers, I want you all to

6   understand that our judicial system is a system that is

7   based on an adversary process, which means simply that

8   during the trial, each of the parties will seek to present

9   their respective cases to the jury through their counsel in

10  the best light possible.

11       Now, lawyers are often criticized in the media

12  and in the public, and the Court has observed that this

13  criticism is often the result of a basic

14  misunderstanding of our adversary system in which the

15  lawyers act as advocates for the competing parties.

16       As an advocate, a lawyer is ethically and legally

17  obligated to zealously assert his or her client's positions

18  under the rules of our adversary system.  And by presenting

19  the best case possible on behalf of their clients, the

20  lawyers hopefully will enable the jurors to better weigh the

21  relevant evidence and determine the truth and arrive at a

22  just verdict based on that evidence.

23       This system of justice has served our nation well

24  for over 200 years, and America's lawyers are and continue

25  to be a critical part of that process.  So as we go forward

1   through the trial, even though I may occasionally frown or

2   growl at the lawyers from time to time, it's just because

3   I'm trying to make sure that their advocacy doesn't get

4   outside of the boundaries of our adversary system and its

5   rules and system.

6          But please keep in mind that they are simply doing

7   their jobs, and it's important for all of you to be aware of

8   that in the proper context as we go forward.

9          Also, ladies and gentlemen, I want you to

10  understand that during the course of the trial, I am going

11  to do my very best to make sure that the jury has no idea of

12  how I personally feel about the evidence in this case,

13  because evaluating the evidence is the job of the jury, not

14  my job in this case.

15         So the jury selected should not take any

16  expressions that they see or they think they see from me as

17  a factor to be considered in deciding what the ultimate

18  facts are in this case.

19         Now, at this time, the Plaintiff may address the

20  panel.  Ms. DeRieux, are you going to conduct the voir dire

21  for the Plaintiff.

22         MS. DERIEUX:  Yes, Your Honor.  Thank you.

23         THE COURT:  Would you like a warning on your time?

24         MS. DERIEUX:  Five minutes, please.

25         THE COURT:  All right.  You may proceed.

1          MS. DERIEUX:  Good morning.  I hope I can keep
2     close enough to this microphone and still see everyone.
3          First, I want to thank each and every one of you
4     for being here this morning.  We recognize that jury service
5     disrupts your lives and interferes with your other
6     obligations.  And I want to say first we appreciate everyone
7     being here this morning.
8          Just so we're kind of even, I'll start with the
9     information that y'all started with.  My name is Elizabeth
10    DeRieux.  I'm an attorney.  I work with a firm in
11    Gladewater, Texas, Capshaw DeRieux.  I have an English
12    degree, and I started out my career teaching English in high
13    school with a degree from Lamar University of Beaumont.
14    Later I went to the University of Houston and got a law
15    degree.
16          I am married.  My husband is Pete Adams.  He is a
17    retired attorney, and we own Gladewater Books.  And so his
18    full-time job now is running a bookstore.  We have four
19    children.  They're all grown now, and I've never been
20    selected to serve on a jury.
21          I want to start just by saying so that everybody
22    is sort of oriented about where we are here.  My client is
23    the Plaintiff, SimpleAir.  SimpleAir owns the patent that is
24    at issue in this lawsuit.  It's a company that was formed by
25    two inventors, and the gentlemen that you met earlier, John

1    Payne and Tim von Kaenel, are the inventors on the patent.

2         Google is the Defendant in this case.  As Judge

3    Gilstrap told you, in January of this year, a jury found

4    that a patent that's owned by SimpleAir is valid.  And

5    Google was found to -- was found liable for infringing that

6    patent.  If you serve on this jury, you'll determine the

7    amount of royalty that Google owes for its infringement of

8    SimpleAir's patent.

9         Judge Gilstrap has allowed me to tell you just

10   briefly about the facts of the case before I begin my

11   questioning.

12        We call SimpleAir -- SimpleAir's patent the '914,

13   and that's just the last three numbers of the patent number

14   that the PTO gave the patent when it was issued.

15        SimpleAir's patent is a type of property that we

16   refer to sometimes as intellectual property.  SimpleAir has

17   the right, during the life of the patent, to prevent others

18   from using the technology that's covered by the patent

19   without paying for it.

20        If someone uses SimpleAir's property without

21   permission, they're infringing the patent and owe SimpleAir

22   royalties.  SimpleAir's '914 patented technology allows

23   notifications or messages to be transferred -- excuse me --

24   transmitted, I believe is the right word, to computers and

25   smartphones by using what we call the central broadcast

1  server.  And you'll hear a lot more about that, if you're

2  selected for the jury.

3       The way the invention works, this allows a user to

4  receive information without having to go and search on the

5  Internet for that information.  And many of you probably

6  have had experiences with notifications.  The information

7  comes to the user, and the user is then alerted to the

8  information soon after its made available so that they don't

9  have to wait hours or days or whenever the next opportunity

10  is they might have to go and search on the Internet.

11       Google infringes SimpleAir's patent by operating a

12  notification service that transmits notification messages to

13  Android smartphones.  These notification messages are short

14  messages that pop up on the user's smartphone and alert the

15  user -- alert the user to the availability of the new

16  information.

17       THE COURT:  Ms. DeRieux, you've gone over your

18  three minutes.

19       MS. DERIEUX:  Thank you, Your Honor.

20       THE COURT:  So let's move on to questions.

21       MS. DERIEUX:  Let me begin by asking if there's

22  anybody on the -- the jury panel that has ever worked for

23  Google.

24       Has anyone on the panel ever worked for Motorola

25  Mobility?

1          All right.  And does anybody own stock in Google?

2          I see no hands.

3          So I want to move on and say that the individuals

4   that you met this morning from the Kirkpatrick Townsend firm

5   include Mitch Stockwell, Daniel Williams, Russ Korn, and I

6   see another attorney, Jessica Hannah, here in the courtroom.

7          Are any of you familiar or have done business with

8   the Kirkpatrick Townsend law firm?

9          Mr. Kirkpatrick, I have to ask you, any

10  relationship between you and any of the individuals at the

11  Kirkpatrick Townsend firm?

12         JUROR KIRKPATRICK:  No, ma'am.

13         MS. DERIEUX:  Thank you.

14         Jennifer Parker Ainsworth, the other attorney that

15  spoke with you this morning is from the Wilson, Robertson &

16  Cornelius firm in Tyler.  Is there anyone who knows Ms.

17  Parker or anyone at the Williams, Robertson & Cornelius firm

18  in Tyler?

19         Anybody had any business with that firm or knows

20  any of the attorneys?

21         You're Mr. Gonzalez; is that correct?

22         JUROR GONZALEZ:  Yes.  Robert Wilson.  Is that the

23  same -- he was my attorney for my divorce.

24         JUROR PILCHER:  I just wanted to go on the record

25  that I recognize almost all of the attorneys.  I don't

1    have -- I don't know you personally, but I've listened to

2    you in court quite often.

3            MS. DERIEUX:  Thank you.

4            Let me talk just a moment about voir dire, and

5    this is going to reiterate and perhaps amplify some of the

6    things that the Judge has already told you.  Some of you

7    might be thinking, if I stay real quiet, I can sort of stay

8    under the radar and no one will choose me; or perhaps you're

9    thinking I don't want to make a mistake or I don't like to

10   speak in front of people.

11           However, if you don't say anything, you are

12   statistically more likely to be on the final jury panel than

13   the people who talk to us.  So please talk -- I'm going to

14   ask you to -- if I ask a question and it's -- and it's

15   directed to everybody and it applies to you, please raise

16   your hand.

17           If I turn my head the other way, please get my

18   attention so that we can talk to everybody and get a better

19   idea of sort of what you're thinking and what -- what life

20   experiences and attitudes you bring to the courtroom this --

21   this morning.

22           And the Judge told you this, and I have to say it

23   again.  There are absolutely no wrong answers.  As long as

24   it's the truth and complete, there's nothing wrong -- no

25   wrong answers to any of the questions that I'm going to ask

1    today.

2         I'm sure that each of you came to the

3    courtroom today thinking, I want to be fair.  And part

4    of what we're asking you is what your experiences and

5    what your attitudes say about whether or not you would

6    be an appropriate juror for this case.  And that doesn't

7    mean that you would be not be an appropriate juror for

8    some other case.

9         What we're going to ask you is whether you are

10   leaning one way or the other toward one party or the other

11   before you even hear any of the evidence.  And the law

12   refers to that leaning as bias or prejudice.  And I

13   understand that those are words that you do not want

14   associated with you.  You don't want to be called biased or

15   prejudiced, because those are bad qualities perhaps that we

16   want to avoid.

17        But that's not what they mean in this situation.

18   It just means do you lean toward one party or the other

19   party before you hear the evidence in this case.

20        This morning, I believe you had the opportunity to

21   watch a film about the United States Patent Office.  The

22   film explained that the PTO issues patents, and it does not

23   enforce patents nor does it determine how much someone who

24   uses a patent without permission should pay as a royalty.  A

25   patent owner has to come to court to enforce its patents.

1    I want to ask -- let's start with Ms. Bean.

2            JUROR BEAN:  Yes, ma'am.

3            MS. DERIEUX:  Have you heard any media or perhaps

4    discussion in around our East Texas communities that there

5    have been too many patent lawsuits?

6            JUROR BEAN:  I heard it on the news.

7            MS. DERIEUX:  And do you believe that there are

8    too many?  Is that your belief?

9            JUROR BEAN:  No.

10           MS. DERIEUX:  And why is that?

11           JUROR BEAN:  Well, I don't keep up with -- I've

12   got too many other things going on at my house to keep up

13   with what's going on in the courthouse.

14           MS. DERIEUX:  I understand.  Thank you.

15           I'm going to ask Ms. Pilcher the same question.

16   Her experiences might be different than many of you, but I

17   just would like to see her view regarding whether or not

18   there's too many patent lawsuits.

19           JUROR PILCHER:  Well, Judge Davis had an emphasis

20   with patents, and so, yes, I think there are too many patent

21   suits.  But in -- in all honesty, if there's a complaint

22   that needs to be filed, then it needs to be heard.  That's

23   how I feel about it.

24           MS. DERIEUX:  Thank you.

25           Is there anybody else that agrees with Ms.

1   Pilcher, that there are too many patent cases being filed?

2        Yes, sir?

3        JUROR DEWOODY:  I'm aware that this court has been

4   accused by multiple people of having a rocket docket and

5   pertaining to patent cases, specifically software cases,

6   where plaintiffs have won majority of the cases.

7        MS. DERIEUX:  Just a minute.  Hang on to the

8   microphone for me just a second.

9        What are your personal views about that?  Do you

10  believe that you would start out as a juror leaning one way

11  or the other?

12       JUROR DEWOODY:  Not that I'd lean one way or

13  another, but my personal views is that software patents are

14  more appropriately protected under copyright rather than the

15  patent system.

16       MS. DERIEUX:  All right.  Thank you very much.

17       It has been said -- I think maybe those of you who

18  have heard the media reports regarding patent litigation,

19  you might have heard that some people have divided the

20  patent attitude sort of into two groups.  Group 1 folks

21  think that patents are great; they promote innovation and

22  that innovation is necessary for us to maintain a spot in

23  the world market.  Without intellectual property, you might

24  not have as much research, because people would be reluctant

25  to invest and justify the expenditures.

1          What I'm going to call Group 2 are people that

2    believe patents should not be protected by the Constitution

3    and congressional law.  Instead of protecting patents we

4    should have unlimited competition.  If someone can

5    manufacture a good product and sell it, it shouldn't matter

6    whether someone else already had the idea and got a patent

7    on it.

8          I'm going to start with Mr. Calhoun on this one.

9    Mr. Calhoun, would you say that you fell into Group 1 or

10   Group 2 or somewhere else?

11          JUROR CALHOUN:  Group 2.

12          MS. DERIEUX:  All right.

13          JUROR CALHOUN:  I believe they should be

14   protected.  Was that 2 or 1?

15          MS. DERIEUX:  That was actually Group 1.

16          JUROR CALHOUN:  How about Group 1.

17          MS. DERIEUX:  Tell me just briefly how -- why you

18   believe that's the right answer.

19          JUROR CALHOUN:  I'm not an inventor, but I wish I

20   was.  I wish I could come up with something, and I would

21   just try to put myself -- I would want it protected, if I

22   came up with something great that's going to change the

23   world.

24          MS. DERIEUX:  Thank you.

25          Mr. Pyle, same question.  Are you a Group 1 person

1  or a Group 2 person.

2       JUROR PYLE:  Well, I guess I'm Group 1 more so.

3  I'm not real big on Internet or any -- any of these things.

4  I do agree that -- that if someone comes up with a patent,

5  that it should be protected.  I think there are too many

6  lawsuits over everything, not just here, but everything.

7       MS. DERIEUX:  Thank you.

8       I'm going to skip around here.  Mr. Shirley, are

9  you a Group 1 person or a Group 2 person?

10       JUROR SHIRLEY:  I'm Group 1.  I believe a person

11  that can invent something should have the rights to it

12  through a patent.  If you invest a lot of money through a

13  lawyer to get that patent, then you should be able to not

14  have it infringed on.

15       MS. DERIEUX:  Thank you.

16       Do we have any Group 2 people?  We need somebody

17  to voice that other side.  No Group 2 folks?

18       Yes?

19       JUROR DEWOODY:  I am not --

20       MS. DERIEUX:  You have to wave harder.

21       JUROR DEWOODY:  I would not say I'm specifically

22  in Group 2.  I would say I'm a bit of both.  I do believe

23  patents are touted and they have their reason for existing,

24  but I also think that there should be competition after the

25  patent's expired, or if it can be proved invalid.

1          MS. DERIEUX:  Okay.  Thank you.

2          I want to follow up on the too-many-lawsuits

3     observation.  How many of you here today would agree that

4     there are too many lawsuits filed in our country?

5          I should have asked it the other way.

6          All right.  There are a lot of lawsuits, and there

7     are even frivolous lawsuits.  And I'm sure the one that

8     sticks in my mind is an inmate at a prison filed because he

9     wanted crunchy peanut butter instead of creamy peanut

10    butter.

11         I want to start with Ms. Burton (sic).  You

12    haven't -- you haven't talked to us today.

13         JUROR BENTON:  It's Mrs. Benton.

14         MS. DERIEUX:  Benton.  I'm sorry.  Thank you.

15         Do you believe you start out leaning toward the

16    Defendant in this case because of the information that you

17    have about frivolous lawsuits that have been filed in this

18    country.

19         JUROR BENTON:  No, not really.  I'm kind of

20    impartial for everything.

21         MS. DERIEUX:  All right.

22         JUROR BENTON:  I'd just rather listen to what I --

23    what's being said first and then make a decision.

24         MS. DERIEUX:  All right.  Thank you.

25         Is there anybody who would say that just starting

1   out this morning that you lean one way or the other based on

2   this -- this experience that we have in our country about

3   too many lawsuits being filed or peripheral lawsuits being

4   filed?

5         I'm going to pick on Dr. Oliver for my next

6   question.  I believe that you indicated that you had been a

7   defendant in a lawsuit previously; is that correct?

8         JUROR OLIVER:  Yes.

9         MS. DERIEUX:  Can you tell me just a little bit

10   about that case?

11         JUROR OLIVER:  It was an auto accident where

12   the -- the -- it was filed against our insurance company.

13         MS. DERIEUX:  Oh, okay.  Is there anything about

14   that experience that would start you out because you were a

15   defendant previously that -- do you feel that you would

16   start out leaning toward the Defendant in this case?

17         JUROR OLIVER:  No, I don't believe so.

18         MS. DERIEUX:  Anybody else that's been a defendant

19   in a lawsuit?

20         Yes, ma'am?

21         JUROR PILCHER:  During the '80s, my husband and I

22   owned a full-service marketing and advertising firm.  And

23   when the oil industry fell through the floor, a lot of

24   people were sued.  We sued to collect on debts, and we were

25   also sued to collect.

1              MS. DERIEUX:  Anything about those experiences to

2    make you feel you lean toward the Defendant because you were

3    a defendant?

4              JUROR PILCHER:  No.

5              MS. DERIEUX:  Thank you.

6              Yes, sir?  Are you Mr. Green?

7              JUROR GREEN:  Green, yes.  I own a 72-unit

8    apartment complex, and I've been sued in the past in a civil

9    case.  Really wasn't anything to it, but it was kind of one

10   of those frivolous kind of deals.

11             MS. DERIEUX:  Well, do you start out with your

12   attitude when walking into the courtroom thinking, I know

13   what it feels like to be a defendant and I feel like I'm

14   leaning toward the Defendant?

15             JUROR GREEN:  I know what it feels like, but I can

16   still be impartial.

17             MS. DERIEUX:  All right.  Thank you.

18             I think we had another hand.  Ms. Luckey?

19             JUROR LUCKEY:  I've been a defendant a couple of

20   times in lawsuits, probably the nature of my work, but I've

21   also been a plaintiff.  So that kind of evens it out, and I

22   don't have any predisposed ideas about the Defendant.

23             MS. DERIEUX:  Thank you.

24             Ms. Dellinger, I believe that you had expressed

25   some frustration about the number of frivolous lawsuits.  Do

1   you think that that starts you out leaning one way or the

2   other in this lawsuit?

3          JUROR DELLINGER:  No, not at all.

4          MS. DERIEUX:  All right.  Does anybody on the

5   panel this morning belong to one of the organizations whose

6   purpose it is to lobby the legislature to change the rules

7   regarding lawsuits?

8          Specifically, the examples that come to my mind,

9   there's an East Texas -- East Texans Against Lawsuit Abuse,

10  Texans for Law Enforcement Reform.  Are any of you familiar

11  with those organizations or belong to them?

12         Has anybody seen one of their ads or read any of

13  their literature?

14         Yes, ma'am?  Now, you're Ms. Gross.

15         JUROR GROSS:  Yes.  I've just heard of them.

16  That's all I can honestly say.

17         MS. DERIEUX:  All right.  And, Ms. Gross, just

18  keep the microphone for one second.  Let me ask you a couple

19  of things.  You have experienced -- have you worked for a

20  law firm before?  Is that correct?

21         JUROR GROSS:  No, I know an attorney.

22         MS. DERIEUX:  I see.  Okay.  Is there anything

23  about what you've learned in your experiences that would

24  start you leaning one way or the other as we start this

25  lawsuit?

1          JUROR GROSS:  No, ma'am.

2          MS. DERIEUX:  All right.  The Judge talked to you

3     briefly about the burden of proof, and you'll recall that he

4     told you that the burden of proof -- and we use the example

5     of the lady of justice with the scales being even -- and the

6     preponderance of the evidence, which is the burden of proof

7     that SimpleAir has to meet in this case.

8          If it's one tiny bit one way or the other is --

9     what we perhaps call it a peppercorn -- just a little bit

10    heavier on one side, SimpleAir has met its burden of proof.

11    Ms. Horace, I just need you to talk to me.

12         JUROR HORACE:  Yes, ma'am.

13         MS. DERIEUX:  On the burden of proof, do you

14    believe that you understand the burden of proof as it's been

15    explained, and do you believe that you can follow those

16    instructions from the Judge?

17         JUROR HORACE:  I believe so.

18         THE COURT:  Hold that microphone a little closer,

19    Ms. Horace, please.

20         JUROR HORACE:  I believe so.  Yes, ma'am.

21         MS. DERIEUX:  Well, let me just ask you.  Do you

22    believe that a company bringing a really big lawsuit -- and

23    I will tell you that there will be over a million dollars at

24    issue in this lawsuit -- do you believe that that changes

25    your attitude toward the burden of proof and you can still

1    follow the Judge's instruction regarding the preponderance

2    of the evidence burden of proof?

3              JUROR HORACE:  Yes, ma'am.  I believe I -- I

4    would.  I don't think the monetary figure would make a

5    difference.

6              MS. DERIEUX:  All right.  Anybody disagree with

7    Ms. Horace?

8              Ms. Clubb, I want to ask you to stand up and talk

9    to me a minute.

10             People feel that companies that provide useful

11   services should be treated perhaps differently or with more

12   respect than others.  And as you know, Google's a big

13   company, and I suspect that -- that it's possible that you

14   and all of us in the room have at some time used their

15   services.

16             Have you used Google's services?

17             JUROR CLUBB:  Yes.

18             MS. DERIEUX:  Okay.  Do you think that the -- that

19   the bigger the company or the more useful the service -- the

20   services it provides should change the rules regarding

21   whether or not they should respect other people's patents?

22             JUROR CLUBB:  Should it change the rules?  No.

23             MS. DERIEUX:  Okay.  You might have noticed in the

24   media or in -- or on television or something that Google has

25   taken positions on social or political issues.

1          Do you think that Google's like a really good

2    company, and for that reason they should -- that should be a

3    factor in how we consider the damages that are being

4    considered by this jury in this suit?

5          JUROR CLUBB:  No, I wouldn't take that into

6    consideration.  I don't watch a lot of TV, so I don't know a

7    lot of what's going on -- I'm a reader.

8          MS. DERIEUX:  All right.  Thank you.

9          Mr. Tucker?  I've lost Mr. Tucker.  There you are.

10   In addition to the large amount of damages, there's just

11   going to be a lot of big numbers in this lawsuit.  You might

12   hear, for example, evidence that Google has infringed a

13   billion times, for instance.  And some people say, oh, those

14   numbers just make my head spin and I'm just not comfortable

15   with that and I don't want to be responsible making a

16   decision, because those numbers make me uncomfortable.

17         Can you tell me sort of where you are on that

18   spectrum?

19         JUROR TUCKER:  Oh, gosh.  I don't think the

20   numbers would, like, reflect my decision on, you know, what

21   would -- the -- the outcome of the case would be.  You know,

22   it wouldn't confuse me at all.

23         MS. DERIEUX:  All right.  Thank you.

24         Is there anybody that would raise their hand and

25   say I'm that person; that -- big numbers, I'd feel

1    intimidated; I'd feel uncomfortable; that's not a decision

2    I'm going to be comfortable making?

3         Let's see if there's anybody I haven't talked to

4    yet.

5         Ms. Mericle?  Oh, look at her face.  She thought

6    the rule about everybody talking wasn't going to apply to

7    her.

8         JUROR MERICLE:  Okay.

9         MS. DERIEUX:  Okay.  And I want to be clear that

10   this is not a question about the damages in this case but in

11   any case, because I want to be a little more specific and

12   give you a little more information about these big numbers

13   and get your response to that.

14        Could you consider an award between 127 and $146

15   million?  Does that seem just too big or -- or un -- or

16   you're unable to feel like you're responsible when you come

17   in and make a decision in that realm?

18        JUROR MERICLE:  I don't know.  I mean, no, it

19   wouldn't bother me.  You know, I could make a decision on

20   something like that at the trial.  I'm for what's right for

21   the person.

22        MS. DERIEUX:  I'm going to ask you to stand up one

23   more time.

24        JUROR MERICLE:  Okay.

25        THE COURT:  This time hold the microphone a little

1    closer, please, ma'am.

2           JUROR MERICLE:  Yes, sir.

3           MS. DERIEUX:  In this trial, you're going to -- or

4    someone, the jury, will be hearing evidence about

5    out-of-court settlements that SimpleAir has reached with

6    other companies, like Apple and Microsoft, and you'll hear

7    that SimpleAir is seeking damages from Google that are much

8    higher than the amounts that it accepted from some of these

9    other companies.

10          THE COURT:  You have five minutes, Counsel.

11          MS. DERIEUX:  Thank you.

12          Do you think that it's unfair just categorically

13   for SimpleAir to seek more money against Google than it

14   accepted from settlements from other companies?

15          JUROR MERICLE:  No, because each situation is

16   different.

17          MS. DERIEUX:  Okay.  Thank you.

18          Let me ask you this:  Everybody look around.  Is

19   there anybody on the panel that knows another person on the

20   panel?

21          THE COURT:  Just a minute, Counsel.  Is that your

22   cell phone, Mr. Dovel.

23          MR. DOVEL:  It's mine, yes, Your Honor.

24          THE COURT:  If you'd give it to Mr. Potts.  You

25   can see him after the trial is over.

1              MR. DOVEL:  Yes.

2              MS. DERIEUX:  Yes, ma'am?

3              THE COURT:  All right.  Let's continue.

4              MS. DERIEUX:  Oh, I'm sorry.  Yes, ma'am?

5              JUROR BEAN:  I'm not sure, but I think I know

6    Glen.  I think he works at the retirement community that my

7    dad lives in.

8              JUROR TUCKER:  Yeah.

9              JUROR BEAN:  Okay.  I thought I recognized you in

10   the hall.

11             Just as passing acquaintances.

12             MS. DERIEUX:  Okay.

13             JUROR BEAN:  And then Dr. Oliver, my daughter

14   started to Baylor in 2005 when he was there.

15             MS. DERIEUX:  Yes, ma'am, Ms. Gross?

16             JUROR GROSS:  We worked at the same school

17   district and we saw each other in passing.  And we work at

18   the same school district now, but she's in elementary and

19   I'm in high school.

20             JUROR CLUBB:  Different campuses.

21             MS. DERIEUX:  All right.

22             JUROR GROSS:  Well, kind of.

23             JUROR CARTER:  I've known Mr. Pyle for many years.

24   Since about '72, I think.

25             MS. DERIEUX:  Mr. Pyle, okay.

1          Yes, sir?

2          JUROR SHIRLEY:  I know my neighbor here, Celeste.

3     And my wife used to keep her baby girl when she was little.

4     What she did as a homemaker was watch babies.  And I know

5     Kim.  We're all from Atlanta, so small town, small

6     community.

7          MS. DERIEUX:  Anyone else?

8          Same question for all of you folks that know other

9     people.  Were the relationships that you have such that you

10    could go into a room with a -- with seven other people and

11    that individual be in the room with you and you still

12    maintain your independent judgment?  I mean, frankly, if one

13    of -- you know, if there are individuals that I have perhaps

14    worked for that were my boss, it wouldn't make me very

15    comfortable to go in and have a real strong disagreement

16    about something in the -- in the confines of a jury panel?

17         That's completely human and normal.  And if any of

18    you that know one another feel like those relationships

19    would prevent you from being fair, open-minded, and

20    exercising your own judgment on the jury, I need to see your

21    hands.

22         I'm about out of time.  I want to ask one more

23    thing.  And this is the -- the -- the question that if that

24    lawyer had just asked me X, she would not want me on her

25    jury.  And so she just hasn't thought of it and I don't want

1    to say anything because it might not be appropriate, but if

2    she knew this and it -- or I'm just waiting for her to ask

3    this one question and then I'm going to stand up and tell

4    her.  Anything?  Anyone?

5         Yes, sir?  Wait a minute.  I have to write this

6    down so the next time I do this, I'll ask this question.

7         JUROR SHIRLEY:  I own two patents.  You never

8    asked anybody if they owned a patent.

9         MS. DERIEUX:  Thank you.

10        JUROR SHIRLEY:  And it has been infringed against,

11   but I didn't have enough money to take it to court.

12        MS. DERIEUX:  Are they -- are they expired now or

13   are they still --

14        JUROR SHIRLEY:  They are expired.  I had them in

15   '93 and '94.  It was actually a patent on the same device

16   and I'm making improvements.  I had to get another patent

17   for that, and so it's a fishing device.  It's not something

18   that's Internet --

19        MS. DERIEUX:  A patent is a patent.

20        JUROR SHIRLEY:  Yeah.

21        MS. DERIEUX:  Thank you very much.

22        Is there anyone else on the panel that -- that has

23   that she should have asked me this question?

24        JUROR SHELTON:  No, but in regards to No. 8's

25   question about monetary value of one company settling --

1          MS. DERIEUX:  Yes, sir.

2          JUROR SHELTON:  -- I do not think it's justifiable

3    if you accept a certain amount from one and ask more from

4    the other.

5          MS. DERIEUX:  And thank you for raising your hand

6    and following up.  I appreciate that.

7          Is there anyone else?

8          Thank you very much for your time.

9          THE COURT:  All right.  Ms. Ainsworth, you may

10   address the panel on behalf of the Defendant.  Would you

11   like a warning?

12         MS. AINSWORTH:  Yes, Your Honor, at five minutes.

13   And if possible, at one minute.

14         THE COURT:  All right.

15         MS. AINSWORTH:  Thank you.

16         THE COURT:  You may proceed when you're ready.

17         MS. AINSWORTH:  Thank you, Your Honor.

18         Good morning, ladies and gentlemen.  We met for

19   the first time just a few minutes ago, but my name is

20   Jennifer Ainsworth, and I am a lawyer over in Tyler.  And

21   I'm here with my team representing Google in this case

22   today.  I introduced you to some -- to some of the lawyers

23   on our team, and I missed Ms. Hannah who is back there in

24   the corner, but Jessica Hannah is also one of the lawyers

25   who will be working with us and helping us present the case

1  to the people that are on this jury.

2      Let me answer some of the same questions that --

3  that you had to, also.  I live in Tyler.  I'm originally

4  from Hallsville.  I graduated from Hallsville High School

5  and then went to University of Texas and got a law degree

6  back in the early '90s.  My -- I'm married.  My husband's

7  name is Charlie Ainsworth, and he's also a lawyer.  And I

8  have two boys who are ages 11 and 13, so 5th grade and 8th

9  grade.  And I have never served on a jury.  I would like to,

10 but Ms. Luckey, you may have run into this situation,

11 sometimes they don't pick the lawyers on the panel.

12     And Judge Gilstrap does allow us to tell you just

13 a little bit about the background of this case, so -- in a

14 couple minutes, so that you have a little perspective when

15 you're answering questions from us.

16     As you may know, Google started out as a small

17 company with a couple of guys who had an idea to index and

18 organize all the information on the Internet so that people

19 could look up and find things.  And some of you may have

20 used Google as a search engine when you're on the Internet.

21 But as you heard from Ms. DeRieux, this case involves some

22 phone technology, and she told you a little bit about it

23 involving notifications on smartphones.  And the technology

24 that you may hear some about is called Google's messaging

25 service.

1          Now, Google's come a long way from when it

2     started, and a few years ago developed what's called the

3     Android operating system.  The Android operating system

4     is -- it's an operating system that can be implemented into

5     smartphones.

6          Now, the smartphones are manufactured by other

7     companies like Samsung or LG or some other names you may

8     have heard of, but we provide the operating system to them.

9     And this case deals with how some kinds of notifications are

10    sent to apps on smartphones through Google's messaging

11    service.  So you may get -- I may ask you some questions in

12    a little bit about if you have apps on your phone.

13         This trial is a little different than many.  And

14    as you heard from Judge Gilstrap this morning, you're

15    only -- whoever's on the jury will only be dealing with one

16    issue, and that issue is damages.  So you're lucky in that

17    you don't have to hear all of the serious deep technology,

18    so consider yourself lucky there.  But -- but you will hear

19    some of the technology.

20         But one jury did determine that Google is using

21    SimpleAir's patent.  But what was not determined by anybody

22    is what is a fair and reasonable amount of damages to award

23    SimpleAir for Google using their patent.  And that question

24    and what the Judge will tell you the -- what the issue is,

25    is what a reasonable royalty is.  That question has not been

1    determined.  And there's a real dispute between us about

2    what amount of damages is fair and reasonable in this

3    situation.  And that's what we need your help with in this

4    case.

5         So before I go any further and ask you any

6    questions, I also want to reiterate what Ms. DeRieux said,

7    we really do appreciate you being here today and being part

8    of this process.  It's an important case to us and to

9    Google, and we appreciate the fact that you have taken your

10   time out to be a part of the legal system and to play an

11   important role in the legal system.

12        Let me follow up, if I could, and ask:  Is there

13   anybody on the jury panel that knows Ms. DeRieux or anyone

14   at her firm?  Her law partner is Calvin Capshaw, and another

15   attorney there is Mr. Jeff Rambin.  Has anybody worked with

16   them or been represented by them?  And I -- I know that she

17   does have a book store.  Is anybody a frequent customer of

18   the book store?

19        Her trial team also consists of Mr. Greg Dovel and

20   Mr. Jeff Eichmann and Mr. Simon Franzini.  Has anybody

21   worked with their firm before?

22        And let me ask you their -- the Plaintiff is a

23   company called SimpleAir, and you were introduced to Mr. Von

24   Kaenel and Mr. Payne earlier.  Has anybody ever worked with

25   SimpleAir, met any of these individuals before, or run

1    across this company before?

2          Okay.  Now, with regard to Google, we're -- our

3    name is probably a little more well known.  Let me ask it

4    kind of the opposite way.  Is there anybody here who has --

5    has not ever used any of Google's services, search engine or

6    advertising or anything like that who never dealt with --

7    never dealt with Google?

8          JUROR HATCH:  Excuse me.

9          MS. AINSWORTH:  Sure, Ms. Hatch, Number 15.

10         JUROR HATCH:  I have tried, but I couldn't get it

11   downloaded on my phone.

12         MS. AINSWORTH:  Okay.  There's probably some

13   engineers that can help you with that, but we'll see after

14   the case is over.

15         Let me ask you this.  For folks that have used

16   Google's services before, does anybody have any opinions

17   about Google or our reputation or our policies or any of our

18   services that would influence the way you would view the

19   evidence in this case?  Anybody have any opinions going into

20   it about things they -- they don't like or they're

21   uncomfortable with that might influence how you feel about

22   this case?  Anybody in the jury box?  Anybody out here?

23   Thank you very much.

24         Now, as I mentioned earlier, this case is starting

25   out in a different setting than many do because there was a

1    determination that Google uses SimpleAir's patent.  And I

2    need to really ask you some questions about how you feel

3    about that.  And there's a big dispute still between the

4    parties about what reasonable and fair damages would be.

5           But is there anybody who feels like, you know,

6    this case is starting out with Google's already been found

7    to use SimpleAir's patent, you know, they -- SimpleAir ought

8    to be able to recover whatever they want.  If Google's been

9    found to use the patent, they ought to be able to get

10   whatever they're asking for?  Does anybody start out feeling

11   like that?

12          Let me ask it a little bit differently.  Does

13   anybody feel like if -- if we have been found to use their

14   patent, we should just -- just go ahead and -- and pay -- go

15   ahead and work out whatever it is that the Plaintiff is

16   seeking?  You know, we shouldn't bring this to Court and

17   take your time to work it out, we should just go ahead and

18   pay whatever the amount is that they're asking?  Does

19   anybody feel like we should not be bringing this dispute to

20   Court before a Judge and jury?  I don't see anybody feeling

21   like that.

22          Does anybody feel like Google should not challenge

23   the amount of money that the Plaintiff is seeking?

24          Anybody feel like that -- that's just not their

25   position to come in if we use a patent and -- and challenge

1  the amount of money that they're seeking?

2          Now, let me ask Ms. Perry, because I'm not sure

3  that -- that you got to talk much earlier.  Do you have any

4  feelings about whether it's okay for Google to challenge the

5  amount of money that the Plaintiff is seeking?

6          JUROR PERRY:  No.  I'm not off into all that

7  stuff.  I really couldn't say yes -- yes or no.  I really

8  don't understand all of that.

9          MS. AINSWORTH:  And you haven't heard any of the

10 evidence yet.

11         JUROR PERRY:  No, I haven't.

12         MS. AINSWORTH:  And let me ask you, you work at --

13 is it -- which school district are you working with right

14 now?

15         JUROR PERRY:  Linden-Kildare Elementary.

16         MS. AINSWORTH:  Elementary.  How long have you

17 been there?

18         JUROR PERRY:  Five -- three - five years.

19         MS. AINSWORTH:  And you're head of food services?

20         JUROR PERRY:  No, I'm just a cook.

21         MS. AINSWORTH:  And so that's the -- that's the

22 elementary school.  What type of work does your husband do?

23 You say he's at Sonoco?

24         JUROR PERRY:  Sonoco in Jefferson.  He's a

25 forklift driver.

1          MS. AINSWORTH:  Okay.  Thank you very much.

2          Let me -- let me pose an analogy to you.  Let's

3   say I've got two boys who are frequently doing sports, and

4   one of them plays baseball.  Let's say that my son is

5   throwing a baseball in the backyard and hits it into the

6   next door neighbor's yard and breaks a window.  And in case

7   you wonder, that actually has happened before.  Let's say

8   that, you know, both parents understand, you know, my kid is

9   the one who did it.  The neighbor knows that.  And I go and

10  look to see how much a window costs or how much it would

11  take to repair it, the wood, whatever needs to be done.  And

12  I find it's like $500, but let's say that the neighbor says,

13  well, no, I actually want about 30 times that.  Would anyone

14  have -- does anyone feel like that as -- as the parent of

15  the person who may have -- may have caused the injury, I

16  shouldn't be able to challenge the amount in controversy?

17         Anyone feel like that that's just not appropriate?

18  If my kid did something wrong, I should pay whatever it is

19  that the other side asks?  No one feels like that?

20         Let me ask you a different question.  We are --

21  you've heard that there was a prior trial in this case, and

22  that case actually -- and I think a lot of the trials that

23  take place in Marshall are reported on in the newspaper --

24  in the Marshall News Messenger, and I think there were some

25  stories about or some reporting about the first trial when

1    it happened in January.  Did anybody read any of those

2    reports in the paper in January?  And did anyone form any

3    opinions about the case from something that they might have

4    seen in the newspaper, or I don't know if there was anything

5    on TV, but anywhere in the media about the first trial.

6           Nobody has seen anything?  Okay.

7           The -- Judge Gilstrap mentioned to you the issue

8    of burden of proof, and I think that you'll hear more about

9    that in the case, but as the Plaintiff, SimpleAir, they bear

10   the burden of proof to show you by a preponderance of the

11   evidence that they're entitled to a certain amount of

12   damages that they're seeking.  But because we have an

13   unusual situation that there was already a finding of

14   infringement, does any -- does anybody feel like, well, you

15   know, they met their burden of proof once on that issue,

16   they shouldn't have to meet a burden of proof again in this

17   case?  Does anyone feel like that success in the first case

18   just transfers over and they shouldn't have to prove

19   something to you by a preponderance of the evidence?  Nobody

20   feels that way?  Okay.  Thank you.

21          Now, let me -- let me switch and ask some

22   questions about smartphones and notifications.  How many

23   folks here -- and I know some people filled out

24   questionnaires, and we appreciate that.  How many folks here

25   have a smartphone?  I see maybe two-thirds or three-fourths

1    of the people.  Okay.

2         Let me ask -- Mr. Calhoun, you raised your hand

3    that you have a phone.  When you made your decision to --

4    what kind of smartphone do you have?

5         JUROR CALHOUN:  I have an iPhone.

6         MS. AINSWORTH:  Okay.  When you decided to buy the

7    iPhone, what kinds of things did you take into account on

8    choosing that over, you know, maybe a Samsung or an LG phone

9    or whatever the others are?

10        JUROR CALHOUN:  My family.  I had a Blackberry

11   before and my three kids and wife all have iPhones and so

12   they convinced me I needed an iPhone.

13        MS. AINSWORTH:  So it made sense for y'all all to

14   have all the same system?

15        JUROR CALHOUN:  Family plan, family plan.

16        MS. AINSWORTH:  Okay.  Did -- do you know if you

17   get notifications from apps on your phone, or do you have

18   any apps on your phone?

19        JUROR CALHOUN:  Yes, I do have apps.  I -- I'm not

20   clear on these notifications y'all are talking about.

21        MS. AINSWORTH:  Okay.  And you'll hear some more

22   evidence -- whoever is on the jury will hear some more

23   evidence about that.  But let me explain, I'm not talking

24   about if you get a notice like on your calendar that

25   something is set for today or that you have an e-mail.  What

1    we're talking about is a notification that comes to an app

2    like Facebook.  If -- if people are on Facebook, if you get

3    a little notification that someone's written something on

4    your wall, that's the type of notification we're talking

5    about.  Do you know if you get those on your phone?

6              JUROR CALHOUN:  I have not seen it.

7              MS. AINSWORTH:  Okay.  And let me ask you one

8    other question.  When you chose the phone that you were

9    going to buy, did notifications come into your decision

10   making on which phone you were going to buy?

11             JUROR CALHOUN:  No, it did not.

12             MS. AINSWORTH:  Okay.  Thank you.  I appreciate

13   it.

14             JUROR CALHOUN:  You're welcome.

15             MS. AINSWORTH:  Did anybody else, when they were

16   choosing whatever phone you bought, did you make a decision

17   on -- on which phone to buy based on whether you got

18   notifications or what type of notifications you got?  Did

19   anybody take that into account in their decision making?

20             Okay.  Thank you.

21             And a couple of folks that may not have had

22   questionnaires.  Let me ask, Ms. Benton, No. 1, if I could,

23   what -- do you have a -- do you have a smartphone or

24   cellularphone?

25             JUROR BENTON:  No, ma'am, I don't.

1          MS. AINSWORTH:  Okay.  That's easy.  So you don't

2   have to deal with apps or any of that stuff?

3          JUROR BENTON:  No.

4          MS. AINSWORTH:  Let me ask.  You said that your

5   husband works for Spring Hill School District; is that

6   right?

7          JUROR BENTON:  Yes, ma'am.

8          MS. AINSWORTH:  What kind of work does he do?

9          JUROR BENTON:  He's a mechanic.

10          MS. AINSWORTH:  Okay.  With the buses or --

11          JUROR BENTON:  Yes, with buses.  Actually he takes

12   care of all of the equipment there.

13          MS. AINSWORTH:  For the whole school district?

14          JUROR BENTON:  Well, yes.  It's a small school

15   district, so he has -- I think he said there's 17 buses and

16   obvious other equipment.

17          MS. AINSWORTH:  Great.  Thank you so much.

18          And, Ms. Bean, No. 3, do you also have a

19   smartphone?

20          JUROR BEAN:  I have a Samsung.

21          MS. AINSWORTH:  Okay.

22          JUROR BEAN:  If that's considered a smartphone.

23          MS. AINSWORTH:  I think some of those are, and I'm

24   not sure exactly what the definition is of that, but -- but

25   it's sort of a phone that does a little bit more than just

1    making calls, things like you can get on the Internet, you

2    can search, you can put apps on it.  You have the type of

3    phone that does that?

4            JUROR BEAN:  Yes, yes.

5            MS. AINSWORTH:  And do you have any apps on your

6    phone?

7            JUROR BEAN:  I do.

8            MS. AINSWORTH:  Okay.  Let's say more than 10 or

9    15?

10            JUROR BEAN:  No.

11            MS. AINSWORTH:  Okay.  Let me ask you this.  The

12    apps that you have on your phone, did you have to pay for

13    them or were they the type that you could download for free?

14            JUROR BEAN:  I have no idea.  My daughter set it

15    all up for me.  I don't do anything like that without her

16    assistance.

17            MS. AINSWORTH:  Okay.  I understand.  I have a

18    13-year-old son, and he does all of the phone stuff and the

19    TV stuff now, so I understand that completely.  Thank you

20    very much.

21            Let me ask you that about apps.  Does anybody here

22    on the panel -- has anybody paid -- if you could raise your

23    hand first if you have bought apps, as opposed to the type

24    that you get for free.  Okay.  A few people have.  I have,

25    too, I bought a couple.  Has anybody paid more than, say,

1    $10 for an app?

2         Mr. Edwards?  So do you have at -- at least one

3    app that you've paid -- that you've paid a little bit more

4    for?

5         JUROR EDWARDS:  Yes.

6         MS. AINSWORTH:  Okay.  How many do you have that

7    you've paid say more than five or $10 for?

8         JUROR EDWARDS:  I have one that's required for the

9    nursing program.

10        MS. AINSWORTH:  Say that -- I'm sorry?

11        JUROR EDWARDS:  It was a required app for the

12   nursing program --

13        MS. AINSWORTH:  Okay.  Something that you had to

14   have --

15        JUROR EDWARDS:  -- pharmaceutical and stuff like

16   that.

17        MS. AINSWORTH:  Okay.  Thank you very much.  So

18   you're a nurse at Christus St. --

19        JUROR EDWARDS:  St. Michael.

20        MS. AINSWORTH:  -- in Texarkana?

21        JUROR EDWARDS:  Yes, ma'am.

22        MS. AINSWORTH:  Okay.  And do you have a -- a

23   specialty or a type of area that you practice in?

24        JUROR EDWARDS:  I'm Respiratory Care Unit.

25        MS. AINSWORTH:  Okay.  Were you in the service

1     before --

2               JUROR EDWARDS:  Yes, ma'am.

3               MS. AINSWORTH:  -- you were in nursing?

4               JUROR EDWARDS:  Yes, ma'am

5               MS. AINSWORTH:  How long were you in the

6     service?

7               JUROR EDWARDS:  Eight years.

8               MS. AINSWORTH:  And where did you serve?

9               JUROR EDWARDS:  I was a calvary scout.  I served

10    in Ft. Knox; Camp Casey, Korea; Ft. Wainwright, Alaska; and

11    Iraq.

12              MS. AINSWORTH:  Thank you very much.  I appreciate

13    it.

14              Let me ask some questions about -- and make sure I

15    didn't miss anybody.  Anybody else that's either been

16    required to or decided to pay more than, say, $10 for an app

17    on their phone?  Nobody else?  Okay.  Thank you.

18              There were some people that indicated in their

19    questionnaires that they either had a patent or knew

20    somebody that had a patent.  And I know, Mr. Shirley, you

21    had already mentioned that this morning.  Let me follow up

22    and ask you a couple questions, if I could?  You actually

23    had two patents?

24              JUROR SHIRLEY:  Yes.

25              MS. AINSWORTH:  Or have two patents?

1        JUROR SHIRLEY:  Yes.

2        MS. AINSWORTH:  And what are they on?

3        JUROR SHIRLEY:  It's a linear fishing device is

4   the technical name of it -- the patent name of it.

5        MS. AINSWORTH:  Is a linear fishing device like a

6   fishing line or trot line or --

7        JUROR SHIRLEY:  It's like a -- I don't know if

8   y'all are familiar with yo-yos that people fished with in

9   Texas for years, and the Texas Parks & Wildlife actually

10  prohibit them because they said it was wasting a resource.

11  So I invented a -- a device similar to that that you could

12  use legally, and so that solved that problem.  People like

13  to fish off of limbs.

14        MS. AINSWORTH:   Okay.  So you got one patent and

15  then you -- did you get a continuation?

16        JUROR SHIRLEY:  An improvement on the same device.

17  My patent lawyer said I need another patent.

18        MS. AINSWORTH:  Okay.  Did you ever have a

19  situation where you felt like your patents were being

20  infringed on by somebody?

21        JUROR SHIRLEY:  Well, not on a large scale, but I

22  had -- I had people that were copying my device and making

23  it themselves at home, but not -- I'm sure not to sell, but

24  just to use for personal use.  But I felt like that was an

25  infringement anyway.

1          MS. AINSWORTH:  Did you ever do anything like file

2     a lawsuit or send a letter to anybody telling them to stop

3     doing that?

4          JUROR SHIRLEY:  No.

5          MS. AINSWORTH:  Okay.  Let me -- let me tell you.

6     There's not going to be any evidence or any allegation that

7     Google copied something from SimpleAir, and there will be

8     evidence that the -- the Google messaging system, which is

9     at issue in this case, is something that we developed, but

10    that it still uses the Plaintiff's patent.  But the fact

11    that you have two patents kind of puts you in a similar

12    position to SimpleAir in this case.

13         Let me ask you.  Regardless of the specific

14    evidence in this case, whether you feel like you would lean

15    toward SimpleAir because you're an inventor and a patent

16    owner?

17         JUROR SHIRLEY:  That's a hard question.  I don't

18    know what it feels like to be infringed on, but, you know,

19    like I said, my company never really got off the ground like

20    SimpleAir.  Is that simple Simple A-I-R?

21         MS. AINSWORTH:  It is.  It's all one word.

22         JUROR SHIRLEY:  I've never heard of it.

23         MS. AINSWORTH:  And I tell you what, there's going

24    to be some discussion about how their company did, what the

25    success was.  Is that going to be something that would also

1    make you sort of lean toward them before we start this case?

2          JUROR SHIRLEY:  No.

3          MS. AINSWORTH:  Great.  Thank you, sir.

4          Anybody else on the panel either invented

5    something or has thought about getting a patent or knows

6    somebody that has a patent?

7          Ms. Hatch?

8          JUROR HATCH:  Yes.  My boyfriend has two patents.

9          MS. AINSWORTH:  Okay.

10         JUROR HATCH:  They are still, you know,

11   up-to-date.

12         MS. AINSWORTH:  Okay.  What kind of patents does

13   he have?

14         JUROR Hatch:  They're for fishing, also.  A break

15   line, and then the next one is a more up-to-date, a

16   different way to do it, you know, that would be better for

17   the boats -- yeah.

18         MS. AINSWORTH:  Okay.

19         JUROR HATCH:  I wish he was here to explain.

20         MS. AINSWORTH:   So it's -- it's your boyfriend

21   that -- that --

22         JUROR HATCH:  Yes.

23         MS. AINSWORTH:  -- has the patents, and he's the

24   inventor on those --

25         JUROR Hatch:  Yes.

1          MS. AINSWORTH:  -- is that right?  Okay.  And

2     they're still in effect?

3          JUROR HATCH:  Yes.  Actually three.

4          MS. AINSWORTH:  Okay.  Three patents.

5          JUROR HATCH:  And one's a hunting thing.

6          MS. AINSWORTH:  Okay.  Now, the fact that your

7     boyfriend has three patents, that makes you a little similar

8     to SimpleAir because they're the patent owners in this case.

9          JUROR HATCH:  Makes me curious.

10         MS. AINSWORTH:  Okay.  And it makes you wonder and

11    -- and have an interest in the case; is that fair to say?

12         JUROR HATCH:  Exactly.

13         MS. AINSWORTH:  Okay.  Does that make you lean

14    more toward's SimpleAir's side before you've heard the

15    evidence in this case?

16         JUROR HATCH:  I'd like to know the law.  That way

17    I'll know all the way, you know, because it's important to

18    know.

19         MS. AINSWORTH:  Definitely.  And that's something

20    that the Judge will tell whoever is on the jury -- will give

21    you a lot of information about the law.  But before we get

22    there, before you've heard the rest of the evidence in this

23    case, the fact that your boyfriend has the three patents,

24    does that make you start out favoring SimpleAir over Google?

25         JUROR HATCH:  Like I said, it just makes me really

1     curious.

2          MS. AINSWORTH:  Thank you very much.

3          Did anybody else raise their hand that either has

4     a patent or knows somebody that has a patent?

5          I think Mr. -- Mr. Pyle, No. 2?

6          JUROR PYLE:  I have a friend that has a patent on

7     a wonder duck.  It's a decoy -- motion decoy, and he has

8     filed a suit and won his case.  This has been maybe two or

9     three years ago.

10          MS. AINSWORTH:  Okay.  Is that somebody that's

11     related to you?

12          JUROR PYLE:  No, no.

13          MS. AINSWORTH:  Or a friend?

14          JUROR PYLE:  No, just --

15          MS. AINSWORTH:  Okay.  The relationship that you

16     have with him as a friend and what you may know about his

17     case, does that affect in any way the way that you would

18     view this case?

19          JUROR PYLE:  No, ma'am, I don't think so.

20          MS. AINSWORTH:  Okay.  Does it make you favor

21     SimpleAir in any way starting out before you've heard the

22     evidence in the case?

23          JUROR PYLE:  No, ma'am.

24          MS. AINSWORTH:  Okay.

25          JUROR PYLE:  One thing I would like -- I don't

1  know if this --

2          MS. AINSWORTH:  Yes, sir.

3          JUROR PYLE:  -- will come up later on, but was

4  this infringed accidentally or more on purpose or is that

5  not --

6          MS. AINSWORTH:  Well, I think that we're not at

7  the point that we can go into a serious discussion of the

8  evidence there, but I do think it's safe to say that there's

9  not been an allegation that -- that Google knew about this

10  patent beforehand.

11          JUROR PYLE:  Okay.

12          MS. AINSWORTH:  But that you'll hear -- whoever's

13  on the jury will hear a lot more about the evidence once the

14  case starts.

15          JUROR PYLE:  You -- you were talking about your

16  son and the broken window.

17          MS. AINSWORTH:  Yes, sir.

18          JUROR PYLE:  I was just wondering if the kid

19  accidentally hit a ball over or if they --

20          MS. AINSWORTH:  I don't want to incriminate my son

21  there at all.

22          JUROR PYLE:  If you didn't know, did he throw the

23  ball?

24          THE COURT:  Thank you, Mr. Pyle.

25          MS. AINSWORTH:  I can't comment any further on

1    that --

2              THE COURT:  Let's move along.

3              MS. AINSWORTH:  Thank you, Your Honor.

4         Let me ask a question kind of opposite of what Ms.

5    DeRieux did earlier.  Has there been anybody else on this --

6    anyone on the jury panel who has been in the situation of

7    SimpleAir in that you were the party filing a lawsuit?

8              THE COURT:  You have five minutes, counsel.

9              MS. AINSWORTH:  Thank you, Your Honor.

10             That you -- you filed a lawsuit either in state or

11   federal court and went to court on your case?  Is anybody in

12   the -- in the jury panel been in a situation of filing a

13   lawsuit?  How about here in the audience, anybody been in a

14   situation -- Mr. Green?

15             JUROR GREEN:  I haven't actually had to file a

16   lawsuit.

17             MS. AINSWORTH:  Okay.

18             JUROR GREEN:  But much of my income comes from oil

19   royalties.

20             MS. AINSWORTH:  Okay.

21             JUROR GREEN:  And I've had to hire legal counsel

22   to deal with the oil corporations, and we were always able

23   to work it out.

24             MS. AINSWORTH:  Okay.  Thank you.  Anything about

25   that situation where you've had to -- to pursue an issue

1   that would make you lean toward SimpleAir over Google in

2   this case?

3          JUROR GREEN:  I don't think so in this case.

4          MS. AINSWORTH:  Thank you very much.

5          Anybody else who's been in a situation of either

6   making a -- a demand or a claim or filing a lawsuit?

7          Anybody here that we've missed?

8          Ms. Pilcher?

9          JUROR PILCHER:  Yes.  As I said, I have filed

10  for -- we filed to collect monies due us.  But we've also

11  been sued and had to pay out monies that we -- were owed to

12  others.

13         MS. AINSWORTH:  Okay.  So you've kind of been on

14  both sides of the fence there?

15         JUROR PILCHER:  Yes, yes.

16         MS. AINSWORTH:  Let me -- let me ask you one other

17  follow-up question.  You had a lot of years working with

18  Judge Davis in the Court in Tyler.

19         JUROR PILCHER:  Yes.

20         MS. AINSWORTH:  And you saw a lot of patent cases.

21         JUROR PILCHER:  Yes.

22         MS. AINSWORTH:  And I think that in your

23  questionnaire you indicated that you sort of have some

24  opinions about patent cases.

25         JUROR PILCHER:  Yes.

1          MS. AINSWORTH:  Does -- does that start you off in

2    -- on one side or another in this case?

3          JUROR PILCHER:  No, not at all.

4          MS. AINSWORTH:  Thank you.

5          I think I may have missed -- did Mr. Calhoun say

6    you had filed a case?  Sorry if I missed that.  Can you tell

7    us just in general what type of dispute it was or issue?

8          JUROR CALHOUN:  It was civil.  It was a vacation

9    home in Alabama, hurricane came, they canceled, tried to

10   redo the next year, told me to come back the next year and

11   the next year and it never happened.  So I filed a lawsuit.

12         MS. AINSWORTH:  Okay.  Were you able to work that

13   out --

14         JUROR CALHOUN:  Yes, we settled.

15         MS. AINSWORTH:  -- to your satisfaction?

16         JUROR CALHOUN:  Yes.

17         MS. AINSWORTH:  Was there anything about that

18   situation that would make you lean one way or the other

19   in this lawsuit?

20         JUROR CALHOUN:  No, it is not.

21         MS. AINSWORTH:  Thank you, Mr. Calhoun.

22         JUROR CALHOUN:  You're welcome.

23         MS. AINSWORTH:  Let me ask you a couple of general

24   questions.  Anybody here, as part of your work, that's a

25   member of a union in East Texas anywhere or that's -- or

1  that's done any collective bargaining on behalf of a union?

2  Mr. Kirkpatrick?  And you're at U.S. Steel now; is that

3  right?

4          JUROR KIRKPATRICK:  Yes, ma'am.

5          MS. AINSWORTH:  And I think you said -- had you

6  been there about eight months?

7          JUROR KIRKPATRICK:  Yes, ma'am, eight months.

8          MS. AINSWORTH:  Okay.  And what type of work are

9  you doing there now?

10         JUROR KIRKPATRICK:  I'm a maintenance technician.

11 They make oilfield pipe couplings.

12         MS. AINSWORTH:  And are you a member of the union

13 there at U.S. Steel?

14         JUROR KIRKPATRICK:  Yes, ma'am, United

15 Steelworkers Union.

16         MS. AINSWORTH:  Thank you.  And do you do

17 collected bargaining, or do you hold an elected or appointed

18 position?

19         JUROR KIRKPATRICK:  No, ma'am.

20         MS. AINSWORTH:  Thank you very much.

21         Anybody else that I might have missed --

22         THE COURT:  You have one minute, Counsel.

23         MS. AINSWORTH:  Thank you, Your Honor.

24         Ladies and gentlemen, I know that's a lot to

25 cover, and you've heard a good bit from both sides in a

1  short period of time.  But I want to thank you again for

2  your attention and for telling us some about your

3  experiences and what you feel.  And we look forward to

4  presenting our case to all the people that are chosen on

5  this jury.  Thank you very much.

6         THE COURT:  All right.  Counsel, approach the

7  bench, please.

8         (Bench conference.)

9         THE COURT:  We're going to have to talk real

10 softly given as close as we are to the jury.

11        Does Plaintiff have anybody they wish to challenge

12 for cause?

13        MS. DERIEUX:  The only individual is No. 22 who is

14 beyond strike.

15        MR. STOCKWELL:  Did you say 22?

16        MS. DERIEUX:  22, Dewoody.  He's beyond striking

17 range, so I don't think it's necessary.

18        THE COURT:  All right.  If it appears he can

19 possibly be reached, we'll come back to him.

20        MS. DERIEUX:  Thank you.

21        THE COURT:  Anybody else to challenge for cause?

22        MS. DERIEUX:  No, Your Honor.

23        THE COURT:  Does Defendant have anybody to

24 challenge for cause?

25        MS. AINSWORTH:  Yes, Your Honor.  No. 12, Ms.

1    Pilcher, based upon information in her questionnaire,

2    comments that she made here.  And I noticed that Ms. Hatch

3    said she might have a conflict.

4              THE COURT:  We'll talk to her about that.

5              Okay.  Obviously, you're going to go into what Ms.

6    Pilcher said in her questionnaire, if you ask her if that

7    would affect her ability, but she said it wouldn't.

8              MS. AINSWORTH:  Yes, Your Honor.

9              THE COURT:  If you want to be more specific, now

10   is the time to do it.

11             MS. AINSWORTH:  Yes, Your Honor.  She made written

12   comments in her -- in her questionnaire that I did not

13   believe were appropriate to raise in front of the entire

14   panel, because it could possibly taint the panel.

15             But she said that she believed:  That if a jury --

16   if a large company has infringed on a private person's

17   patent, I would be inclined as a juror to make sure it never

18   happened again, which I think is an indication that she's --

19   that's a situation where we have a small company and a large

20   company, and indicating intent to punish one side.

21             THE COURT:  All right.  Anything else in her

22   questionnaire that you believe gives you reason to challenge

23   her for cause that you likewise didn't go into during voir

24   dire examination?

25             MS. AINSWORTH:  No, Your Honor.  That's -- that's

1    her comment there.

2          THE COURT:  So we have Ms. Hatch with a scheduling

3    problem, and Ms. Pilcher challenged by Defendants.

4          Ms. DeRieux, even if both of them are excused,

5    we're not going to get to 22, so we won't take up your

6    challenge to 22.

7          MS. DERIEUX:  That's fine.

8          THE COURT:  How long do you need to -- well, we'll

9    get to that in a minute.

10         Okay.  Take a seat.

11         MS. AINSWORTH:  Thank you.

12         (Bench conference concluded.)

13         THE COURT:  All right.  Ladies and gentlemen, I'm

14   going to excuse the jury panel in just a moment, except

15   Panel Members No. 12 and 15.  I'd ask those two to remain

16   where they're seated.

17         Everyone else, I'm going to excuse you in just a

18   minute.  And given where we're conducting all of this this

19   morning, probably the best place for you to recess to -- the

20   panel members that I'm about to excuse -- is just outside

21   the courtroom at the bottom of the stairs and near the

22   elevator.

23         You'll notice there are water fountains there, and

24   there are two sets of restrooms, one facing you as you go

25   out and one around the corner.  And there are also chairs

1    against the walls in certain places.  So if you will as --

2    as each of you will remember when you came into the

3    courtroom, you came down a sloped decline walking toward the

4    doors of the courtroom.  If those of you that I'm about to

5    excuse will stay on the other side of that decline and stay

6    off that ramp, that will be the area where I'm going to ask

7    you to wait.  And then we'll have you back in here shortly.

8    That's everybody but No. 12 and No. 15.

9            Also as I excuse you, I want to remind you that

10   you have not heard any evidence in this case, and so I'm

11   instructing you not to discuss anything that happened during

12   the voir dire process while you were in the courtroom.  Talk

13   about the weather, talk about where the plane from Malaysia

14   really is or what you're going to cook for St. Patrick's Day

15   dinner tonight.  Talk about anything you want to, but don't

16   talk about anything that was talked about in the courtroom

17   today, okay?

18           With that, everybody except for Panel Member No.

19   12 and 15, you're excused at this time.

20           (Jury panel out.)

21           THE COURT:  All right.  Be seated, please.

22           Ms. Pilcher, would you come up, please, and I'm

23   going to ask you to join me up here.

24           And, counsel, you may approach as well.

25           (Bench conference.)

1        THE COURT:  Ms. Pilcher, you understand -- if it

2   works -- if you'll try to speak softly but speak into that

3   microphone.

4        JUROR PILCHER:  Sure.

5        THE COURT:  In your questionnaire, you indicated

6   that if you found that somebody had infringed a patent and

7   you were on a jury that -- I believe the language was

8   something you would make sure it didn't happen again.

9   I need you to explain to me what you meant by that and

10  whether that reveals an intent on your part to punish an

11  infringer or whether, if you were on the jury and were

12  directed to award damages solely to compensate the patent

13  owner, that you could follow my instructions and award

14  damages only to compensate but not to punish.

15        So that's the long question, if you could give me

16  a reaction, please.

17        JUROR PILCHER:  Sure, sure.  I don't believe that

18  punishment damages should occur.  It should be actual loss

19  and that's it.

20        THE COURT:  Okay.  So if I -- if you were on the

21  jury and I instructed you to award compensatory damages just

22  to compensate the Plaintiff --

23        JUROR PILCHER:  Yes.

24        THE COURT:  -- you could follow that instruction

25  and make that the basis upon which you reached your

1    decision?

2             JUROR PILCHER:  Definitely.

3             THE COURT:  Okay.  Any questions for Ms. Pilcher?

4             MS. AINSWORTH:  If I -- if I may follow up.

5    The way that you answered the questionnaire, you made a

6    distinction between --

7             THE COURT:  We've still got other jury panel

8    members in here.  Let's be as quiet as we can.

9             MS. AINSWORTH:  Yes, Your Honor.

10            You made a distinction between if a jury

11   determines infringement between two large companies that

12   an injured party should be compensated according to

13   income only.  But if a large company has infringed on a

14   private person's patent, I would be inclined as a juror

15   to make sure it never happens again.

16            So I've got a concern that we've -- that's the

17   exact situation we've got.  We've got a large company,

18   Google, my client, and a small company.  Before you've heard

19   the evidence in this case, does that make you lean toward or

20   feel like that regardless of the evidence, you would lean

21   toward the smaller company?

22            JUROR PILCHER:  Not necessarily, no.  I would have

23   to -- I'd have to hear the evidence.  It's just that in --

24   in my experience in some of Judge Davis' cases, there were

25   circumstances where there would be an individual who was

1    actually taken advantage of.  In this instance, all that's

2    already been determined, and so now it's just a matter of

3    the money.

4              MS. AINSWORTH:  Right.

5              JUROR PILCHER:  But -- I don't know how else to

6    put it.  I've seen situations where there's two large

7    companies who can afford large, successful attorneys and

8    it's equal.  It seems like it's equal, but --

9              THE COURT:  Let me ask you this, Ms. Pilcher:  Can

10   you put out of your mind all the experiences in Judge Davis'

11   court that you've seen and witnessed, and can you serve as a

12   juror in this case based solely on the evidence that comes

13   in from the witness stand and from the exhibits that I

14   admit.

15             JUROR PILCHER:  Yes, yes.

16             THE COURT:  And you can -- you can follow my

17   instruction, if you're on the jury, to award an amount that

18   compensates but not punishes?

19             JUROR PILCHER:  Right.  I can.

20             THE COURT:  All right.  Any other questions?

21             MS. DERIEUX:  We have nothing, Your Honor.

22             MS. AINSWORTH:  No, Your Honor.

23             THE COURT:  Okay.  Ms. Pilcher, I'm going to let

24   you join the rest of the panel outside.  Just don't discuss

25   anything that's happened in here.

1          JUROR PILCHER:  Sure.

2          THE COURT:  Thank you.

3          (Juror Pilcher out.)

4          THE COURT:  All right.  I'm not going to excuse

5    Ms. Pilcher for cause.

6          (Bench conference concluded.)

7          THE COURT:  Ms. Hatch, would you come forward,

8    please.

9          (Bench conference.)

10         JUROR HATCH:  Yes, Your Honor.

11         THE COURT:  You indicated early on that you might

12   have a scheduling problem being able to serve through

13   Wednesday of this week.  Tell me about that.

14         JUROR HATCH:  Okay.  I'm hoping that there is no

15   problem.  I just got back from Kansas last night.  My

16   mother's been in the hospital, but right now, my daughter

17   and my sisters are with her.  We hope she's going to be

18   okay.  So I don't intend to go to Kansas until May the

19   5th -- or April the 5th for her birthday.  But I'm hoping --

20   right now at the moment, they just put her in a nursing

21   home.  That's the only thing I'm worried about.

22         THE COURT:  I understand she's not in the hospital

23   now.

24         JUROR HATCH:  No.  She has just -- they're just

25   placing her in a nurse -- she was in assisted living.  Now

1    they're going to have to go ahead and go a little further

2    with her, because she's not doing real good.  But I'm

3    praying.

4              THE COURT:  Okay.

5              JUROR HATCH:  That's the only thing that I'm

6    worried about.

7              THE COURT:  And knowing that none of us have a

8    crystal ball, I assume that her doctors haven't told you

9    that anything is imminent.

10              JUROR HATCH:  Well, we are already pretty well set

11    with it just in case.

12              THE COURT:  Okay.  But I mean, the doctors haven't

13    told you they're expecting some big change of circumstances?

14              JUROR HATCH:  No.  We still rented the room, yes,

15    so we're hopeful, okay?  I just wanted to make sure --

16              THE COURT:  Right.

17              JUROR HATCH:  -- that way I wouldn't look like I

18    was -- if anything did happen.

19              THE COURT:  I understand.  And -- and but for

20    that, there's not anything that would keep you from serving?

21              JUROR HATCH:  No, sir.

22              THE COURT:  Okay.  Any questions for Ms. Hatch,

23    counsel?

24              MS. DERIEUX:  I'd like to ask one question.

25              JUROR HATCH:  Yes, ma'am.

1          MS. DERIEUX:  Ms. Hatch, would the circumstances

2     with your mother --

3          THE COURT:  You're going to have to get near the

4     mic for the record.

5          MS. DERIEUX:  Would the circumstances with your

6     mother prevent you from being able to concentrate and listen

7     to the evidence and return a verdict based on the evidence

8     and the law that the Judge gives you?

9          JUROR HATCH:  I think I would be good, because if

10     anything happened to my mom right now, I've been with her

11     for eight days.  I mean, holding her hand.  So I think I can

12     do my job here and then go on home and do what I needed to

13     do.

14          MS. DERIEUX:  Okay.  Thank you.

15          THE COURT:  All right.  Ms. Hatch, I'm going to

16     let you join the rest of the panel -- I'm going to let you

17     join the rest of the panel outside.

18          JUROR HATCH:  Thank you.

19          THE COURT:  Just don't discuss anything that

20     happened in here.

21          JUROR HATCH:  Yes, sir.  Excuse me.

22          (Juror Hatch out.)

23          THE COURT:  All right.  Counsel, I'm not going to

24     excuse Ms. Hatch.  Obviously if there was an unexpected

25     problem, we'd still have enough jurors to return a verdict.

1          Given that we need to strike through 16, as I

2    count it, how much time do you need to exercise your

3    challenges, your peremptory challenges?

4          MS. AINSWORTH:  May we have 15 minutes?

5          THE COURT:  A quarter after 11:00.

6          MS. DERIEUX:  Okay.

7          THE COURT:  All right.  And you're welcome to find

8    any place in the courthouse that's available for you to

9    talk.

10          MS. AINSWORTH:  Four strikes?

11          THE COURT:  Four strikes per side.

12          MR. STOCKWELL:  Can we get 20 minutes so we can

13    get to the restroom?

14          THE COURT:  Talk one at a time.

15          MS. DERIEUX:  Go ahead.  I was going to say the

16    same thing you are.

17          MR. STOCKWELL:  And find a place.

18          THE COURT:  All right.  20 after.

19          MS. DERIEUX:  Thank you, Your Honor.

20          THE COURT:   All right.  You're excused.

21          (Bench conference concluded.)

22          THE COURT:  All right.  The -- the Court will

23    stand in recess while the attorneys exercise their

24    peremptory challenges.  Court's in recess.

25          COURT SECURITY OFFICER:  All rise.

1          (Recess.)

2          (Jury panel in.)

3          COURT SECURITY OFFICER:  All rise.

4          THE COURT:  Be seated, please.

5          All right.  Ladies and gentlemen, if you will

6    listen carefully when your name is called, if you'll please

7    come forward and take a seat here in the jury box.

8          And Juror 1 should be here; is that right, Ms.

9    Lockhart?

10          COURTROOM DEPUTY:  Yes, sir.

11          THE COURT:  Okay.  All right.  If you'll call the

12   members selected -- member of the panel who have been

13   selected as the jury.

14          COURTROOM DEPUTY:  I was going to call them 8

15   through 1.

16          THE COURT:  We'll call Jury Member 8 first, go

17   down and take the last seat, 7, 6 -- we'll call them in

18   reverse order.

19          All right.  Let's proceed.

20          COURTROOM DEPUTY:  Celeste Dellinger, Swindell

21   Perry, Glen Tucker, Lora Horace, Jeromy Calhoun, Jennifer

22   Bean, James Pyle, and Katherine Benton.

23          THE COURT:  All right.  Ladies and gentlemen,

24   those of you that were not selected for service on this

25   jury, I'm about to excuse you, but I want to excuse you with

1    the sincere thanks and appreciation of the Court and the

2    Court staff.  I know that every one of you had other places

3    you could have been this morning and other things to do that

4    are important in each of your lives.  The Court recognizes

5    that.  The Court values your service to be here when called

6    this morning to participate in this jury selection process.

7          Thank you for that -- that public service and for

8    your positive attitude in answering our questions and

9    participating this morning.  And even though you weren't

10   selected, you've served a very real and valuable purpose and

11   function in our court system today.

12         You are excused at this time.  If you need

13   anything for your place of employment or -- or

14   documentation, Ms. Martin in the Clerk's Office will help

15   you.  Again, thank you, and you are excused.

16         (Remaining jury panel members excused from

17   courtroom.)

18         THE COURT:  And those of you that would like to

19   return to the courtroom, feel free to do so.  If the last

20   one out would close the doors, please.

21         All right.  Be seated, please.

22         Members of the jury, if you will stand at this

23   time, Mrs. Lockhart, our courtroom deputy, will administer

24   the oath to you as jurors.

25         (Jurors sworn.)

1          THE COURT:  Be seated, please.

2          Ladies and gentlemen of the jury, I'm about to

3   excuse you for lunch.  I would -- it's 11:30 by my watch.

4   I'd like to give you an hour and 15 minutes, and I'd like to

5   start the evidence at 12:45.  I'd like you to be back in the

6   jury room, and the staff here will direct you in that

7   regard -- Ms. Martin will.  I'd like you to be back in the

8   jury room by about 11:35, about 10 minutes till, and we'll

9   start promptly at 12:45.  Be back in the jury room at 12:35.

10  I'm going to give you a few minutes more than an hour, let's

11  put it that way.

12          But before you leave for lunch, I need to give you

13  just a few additional instructions.

14          This case is going to be decided solely on the

15  evidence that you hear in this courtroom under oath from

16  this witness stand and in the exhibits that the Court admits

17  into evidence.  Up until this point, ladies and gentlemen,

18  you have heard absolutely no evidence.

19          One of the first instructions I will give you when

20  you come back from lunch is that what the lawyers tell you

21  in this case is not evidence.  Those are simply their

22  contentions of what they think and what they hope the

23  evidence will show, but it is not evidence.

24          It's up to you as the members of the jury in this

25  case to decide what the facts are in this case.  I will rule

1  on questions of law and evidence.  I will oversee the

2  procedures and maintain the decorum of the courtroom.

3         That's my role as the Judge, but your role as the

4  jury is to decide what the facts are in this case.

5         As a part of that, it is absolutely critically

6  important as we go through this trial that there be nothing

7  that would influence you outside of what you receive as the

8  evidence in this case in this courtroom.  We have to make

9  sure there are no outside influences.  So as you break for

10  lunch, or especially when you go home tonight, you are going

11  to in all likelihood be asked by whoever greets you at home

12  or somebody you may run into at lunch, I understand you're

13  on the jury down in Marshall in that federal court trial.

14  How's that going?  What's that about?  Just don't go there.

15  Don't answer those questions.  Don't ever start to give a

16  response, because if you do, you will invariably violate my

17  instruction to you and you will engage in communications

18  outside of the courtroom, and that is not permitted.  Just

19  simply say that federal Judge in Marshall told me not to

20  talk about the case with anyone.  And use me as your excuse,

21  but do not talk with anyone about the case in any way.

22         And when I say don't communicate about the case,

23  that means not only just oral communications.  Some of you

24  may be members and users of social media, like Facebook and

25  Twitter and MySpace and all the others that I can't name

1   here.  Don't post comments or make -- give electronic

2   messages on any social media or e-mails or instant messages

3   or any other type of communication.  That's just as

4   prohibited as talking with your spouse about what you heard

5   in trial that day.  So communication is used in the broadest

6   sense of the term.  Don't communicate with anyone about this

7   case or what you hear in this case.

8        Also, I'm going to instruct you to -- when you

9   come back from lunch and hereafter until your service as

10  jurors is over, leave your cell phones in your car.  Some of

11  you may use them to check e-mail and for business purposes

12  and there will be breaks, especially over the lunch hour and

13  at other times when, if necessary, you can check your

14  smartphone, but don't bring them into the courtroom.

15       It is my rule that we do not allow cell phones

16  with jurors in the courtroom, and I do allow counsel to have

17  electronic devices.  My rule is that they have to be silent.

18  That rule has already been tested once this morning, and the

19  device has been confiscated.  So you're -- you're not under

20  any different rule.  And if you would leave those cell

21  phones in your cars after lunch and throughout the rest of

22  the trial.

23       When I say that you're not to communicate about

24  the case, that also means you're not to communicate among

25  each other.  It doesn't just apply to third persons.  It

1   applies to any communications between yourselves until all

2   the evidence is in.  Only when all the evidence has been

3   completed and I excuse you to deliberate in the jury room on

4   your verdict, then and only then is it permissible for you

5   to discuss the case among yourselves.  At that time, it's

6   mandatory that you discuss the case among yourselves, but

7   until you are excused to retire and deliberate on your

8   verdict, when I prohibit you and direct you not to

9   communicate about the case, that not only means any third

10  party, that also means among yourselves as members of the

11  jury.

12          Also, I will need to give you this instruction.  I

13  do not think this is likely, but this is an important case

14  with a lot at stake for both of the parties, and it is

15  possible that some third party might approach you knowing

16  that you're a member of this jury and try to influence you

17  about your decision in this case.  I don't think it's

18  likely, but it is within the realm of possibility.  So I'm

19  telling you that if at any time during your service you

20  perceive that you've been improperly approached by anyone

21  about your service as a juror, then you should notify the

22  Clerk immediately so that I can deal with it directly.

23          Also, when you are outside the courtroom,

24  especially when you're at home in the evenings or at any

25  other place, I'm directing you not to try and do any outside

1    research about anything in this case.  Don't go online and

2    search about any of the issues in this case.  Don't review

3    the available information online about any of the parties or

4    the lawyers.  Don't do any investigation or research on your

5    own of any type, especially online or otherwise.

6            One other thing I want to say, and then I'm going

7    to let you recess for lunch.  During the course of the

8    trial, you can see that we're in fairly tight quarters here,

9    invariably you're going to pass by one or more of the

10   lawyers in this case and one or more of the corporate

11   representatives in this case.  I want you to understand that

12   my instructions to them will be that they are not to speak

13   with you.  So if you walk by one of the lawyers and they

14   don't smile, they don't say good morning, they don't try to

15   engage you in conversation, don't think they're being rude

16   or unfriendly.  Don't hold them against -- don't hold that

17   against them in any way.  That's simply them following my

18   instruction because it is so critical that there be no

19   outside influences and no improper communication in this

20   case.  So when that happens, that's because of me.  That's

21   not because of them.  Do not hold that against them in any

22   way.

23           Now, with those instructions and with me reminding

24   you again and, ladies and gentlemen, I promise you, before

25   your service is over, you will get very tired of hearing

1   this from me, but I will say it over and over again because

2   it is that important.  Do not discuss the case among

3   yourselves or with anyone else.

4          With that, I'll excuse you for lunch at this time,

5   and we'll be -- have you back in time so we can start the

6   evidence at 12:45.  You're excused.

7          COURT SECURITY OFFICER:  All rise for the jury.

8          (Jury out.)

9          THE COURT:  All right.  Be seated, please.

10         Mr. Dovel, you may see Mr. Potts over the lunch

11  hour.  You may retrieve your cell phone.  You may not bring

12  it back in the courtroom during the remainder of this trial.

13  You may have it on your person outside the courtroom, but

14  not in the courtroom.

15         MR. DOVEL:  Yes, Your Honor.  Thank you.

16         THE COURT:  All right.  With those instructions,

17  we stand in recess for lunch.

18         (Recess.)

19         **************************

1

2

3                              CERTIFICATION

4

5              I HEREBY CERTIFY that the foregoing is a true

6    and correct transcript from the stenographic notes of the

7    proceedings in the above-entitled matter to the best of my

8    ability.

9

10

11

12   /s/_Shelly Holmes_____                 _3/17/14_____
     SHELLY HOLMES, CSR                        Date
13   Official Court Reporter
     State of Texas No.:  7804
14   Expiration Date  12/31/14

15

16   /s/_Susan Simmons_____                 ___3/17/14_____
     SUSAN SIMMONS, CSR                        Date
17   Official Court Reporter
     State of Texas No.:  267
18   Expiration Date  12/31/14

19

20

21

22

23

24

25