1         IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF TEXAS
2              MARSHALL DIVISION

3 SIMPLEAIR, INC.            *   Civil Docket No.
                       *   2:13-CV-587
4 VS.                   *   Marshall, Texas
                       *
5                        *   March 17, 2014
                       *
6 GOOGLE               *   12:45 P.M.

7           TRANSCRIPT OF JURY TRIAL
    BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
8         UNITED STATES DISTRICT JUDGE

9 APPEARANCES:

10 FOR THE PLAINTIFFS:    MR. GREGORY DOVEL
                     MR. JEFFREY EICHMANN
11                    Dovel & Luner
                   201 Santa Monica Blvd.
12                    Suite 600
                   Santa Monica, CA   90401
13

                   MS. ELIZABETH DERIEUX
14                    Capshaw DeRieux
                   114 East Commerce Avenue
15                    Gladewater, TX   75647

16 FOR THE DEFENDANTS:    MR. MITCHELL STOCKWELL
                     MR. RUSSELL KORN
17                    Kilpatrick Townsend & Stockton
                   1100 Peachtree Street, Suite 2800
18                    Atlanta, GA   30309

19

APPEARANCES CONTINUED ON NEXT PAGE:
20

21

COURT REPORTERS:       MS. SHELLY HOLMES, CSR
22                    MS. SUSAN SIMMONS, CSR
                   Official Court Reporters
23                    100 East Houston, Suite 125
                   Marshall, TX   75670
24                    903/935-3868

25 (Proceedings recorded by mechanical stenography, transcript
produced on CAT system.)

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:        MS. DANIELLE WILLIAMS
                           Kilpatrick Townsend & Stockton
                           1001 West Fourth Street
                           Winston-Salem, NC   27101

                           MS. JENNIFER PARKER AINSWORTH
                           Wilson Robertson & Cornelius
                           909 ESE Loop 323, Suite 400
                           Tyler, TX   75701


            *****************************************


                   P R O C E E D I N G S


        (Jury out.)

        COURT SECURITY OFFICER:  All rise.

        THE COURT:  Be seated, please.

        MS. DERIEUX:  Your Honor, we were just trying to
get out of the way so the jury can get by.

        THE COURT:  I need to bring up an issue before the
jury comes in.  I understand there's a question about the
prior testimony of Mr. Nerieri.  Let me hear the party's
position on that, starting with Mr. Eichmann.

        MR. EICHMANN:  Thank you, Your Honor.

        This is testimony from Mr. Nerieri's deposition
last August that we plan to play.  It was played during the
last trial and he was -- it's two clips in dispute -- asked
whether Google ever actually considered moving the servers

1  to avoid SimpleAir's infringement, or whether they have ever

2  purposely located the service, whether it's the GCM or

3  anything else, outside of the United States for the purpose

4  of serving devices in the United States.

5  His testimony is on that. It's frozen in time in

6  August. This case is about infringement that occurred prior

7  to the jury trial in January 2014. We're presenting this as

8  if we're back upstairs January 2014, having this trial now

9  we're just finishing up the damages.

10  They contend that this opens the door about their

11  claimed changes that they've made recently. We don't think

12  that it does that at all. At most, Your Honor, what would

13  open the door is if we said -- and I'm not certain if this

14  does it either, but we're not going to go there.

15  If we said: All right, the jury just found you

16  liable for infringement. What about now? Have you moved

17  the servers now? That would probably open the door.

18  That's not what we're asking. We're saying what

19  did Mr. Nerieri testify in his deposition, and we're leaving

20  it at that. And for all the reasons we've explained, we

21  don't think they should be able to get in this last-minute

22  change, which is something different that they didn't

23  disclose before.

24  THE COURT: Do you have the actual transcript that

25  you can read me what exactly you're wanting to play?

1    MR. EICHMANN:  Yes, sir.  I can do two things.  I

2  can actually play it or read it for you.  When it plays, it

3  has the transcript, too, up there.

4    THE COURT:  All right.  How long is it?

5    MR. EICHMANN:  Oh, both clips are less than 30

6  seconds, so it's 15 to 20 seconds.

7    THE COURT:  Let's play it then.

8    (Video clip playing.)

9    QUESTION:  Has Google ever considered locating the

10  servers for the Google Cloud Messaging Service exclusively

11  outside of the United States so that it could avoid

12  infringing SimpleAir's patents?

13    ANSWER:  So we consider and we did move some

14  servers, not exclusively all, to some other countries.  And

15  we did, but that's because of where the capacity is.  That

16  was the only reason.

17    QUESTION:  Has Google ever properly designed a

18  service so that foreign servers will be used to deliver data

19  or messages to U.S. devices as a matter of course, not just

20  as a backup, if the closer one goes down?

21    ANSWER:  Could be.  I -- I don't know about it.

22    QUESTION:  Can you identify any time in which

23  that's ever happened?

24    ANSWER:  I just said could be.  I don't know about

25  it.

1          (End of video clip.)

2          MR. EICHMANN:  That's it.

3          THE COURT:  All right.  Let me hear from the

4     Defendant.

5          MR. STOCKWELL:  Your Honor, in both instances,

6     the jury is hearing this testimony in terms of ever,

7     could be, and ever happened.  And, in fact, the

8     evidence, as we've made in our proffers, shows that

9     Google has moved its servers.

10         I mean, we think this is going to open the door.

11    Candidly, Your Honor, it's not really an objection as much

12    as if they play this clip, we think we should be able to

13    respond and show that, in fact, Google has moved its servers

14    overseas.  If you listen to the language of the clip, we

15    think this opens the door.

16         THE COURT:  All right.  Well, the Court agrees

17    that if the Plaintiff plays the clip, they've opened the

18    door, and Defendants may show that they have, in fact, moved

19    the servers.

20         If the Defendant -- excuse me -- if the Plaintiff

21    elects not to play that, then the door's not opened.  The

22    decision rests with the Plaintiff, all right?

23         MR. EICHMANN:  Understood.

24         THE COURT:  All right.  Anything else we need to

25    take up before we bring in the jury, from the Plaintiff or

1    the Defendant?

2              MR. DOVEL:  Nothing, Your Honor.

3              MR. STOCKWELL:  Nothing, Your Honor.

4              THE COURT:  All right.  Let's bring in the jury,

5    Mr. McAteer.

6              COURT SECURITY OFFICER:  Yes, sir.

7              (Jury in.)

8              THE COURT:  Welcome back, ladies and gentlemen.

9    Be seated, please.

10             Ladies and gentlemen, I need to give you some

11   preliminary instructions before we proceed with the opening

12   statements from counsel and then get on to the evidence in

13   this case.

14             You have now been sworn as the jurors in this

15   case, and as the jury, you are the sole judges of the facts.

16   You will decide and determine what all the facts are in this

17   case.  As a judge, I'll give you instructions on the law,

18   decide questions of law, procedure, and evidence as they

19   arise during the trial.  And I will handle the flow of the

20   evidence and maintain the decorum of the courtroom.

21             At the end of the evidence, I'll give you a

22   detailed set of instructions about the law to apply in

23   deciding this case.  And I'll also give you a list of

24   questions you are then to answer.  This list of questions is

25   called the verdict form.  Your answers to those questions

will need to be unanimous, and those answers will constitute

your verdict in this case.

I now want to tell you briefly about what this

case is about.  This case involves a dispute relating to one

United States patent.  I know that you've seen the patent

video, but I want to give you some detailed instructions

here and on the record about how a patent -- about a patent

and how one is obtained.

Patents are either granted or denied by the United

States Patent and Trademark Office, sometimes called, for

short, the PTO.  A patent is a written document that

includes or ends with one or more numbered sentences.  These

numbered sentences are called the claims of the patent.  The

claims define the boundaries of what the patent protects and

give notice to the public of those boundaries.

A valid United States patent gives the patent

holder the right for up to 20 years from the date the patent

application was filed to prevent others from making, using,

offering to sell, or selling the patented invention with --

within the United States or from importing it into the

United States without the patent holder's permission.

A violation of the patent holder's rights is

called infringement.  The patent holder may try to enforce a

patent against persons it believes to be infringers by a

lawsuit filed in federal court.  That's what we have in this

1    case.  The patent involved in this case is United States

2    Patent No. 7,035,914.  For convenience, the parties and I

3    will often refer to this simply as the '914 patent.

4              The Plaintiff in this case is SimpleAir, Inc.  The

5    Defendant in this case is Google, Inc.  SimpleAir owns the

6    '914 patent, which is entitled A System and Method for

7    Transmission of Data.  In this lawsuit, SimpleAir has

8    accused certain Google messaging services known as the

9    Google Cloud Messaging, or GCM, and the Android Cloud to

10   Device Messaging service, or C2DM, of infringing the '914

11   patent.

12             In January of this year, this Court presided over

13   a jury trial between SimpleAir and Google in which the jury

14   reached a unanimous verdict in favor of SimpleAir on the

15   issues of infringement and validity.  The Court has accepted

16   the jury's verdict finding that Google infringes Claims 1,

17   2, 3, 7, and 22 of the '914 patent and that each of these

18   claims is not invalid.

19             However, the jury in the prior trial was unable to

20   reach a unanimous agreement on the amount of damages that

21   would fairly and reasonably compensate SimpleAir for

22   Google's infringing use of the '914 patent.  As a result,

23   this trial will not be concerned with the issues of

24   infringement or validity.  This trial will be focused solely

25   on the issue of money damages for Google's use of Claims 1,

1  2, 3, 7, and 22 of SimpleAir's '914 patent.

2        Your job is to decide what amount of money damages

3  are to be awarded to SimpleAir as compensation for Google's

4  infringement.

5        Now, my job in this case is to tell you what the

6  law is, handle procedure, oversee the conduct of the trial

7  as efficiently and effectively as possible.  I will instruct

8  you later with more detail on the law of patent damages that

9  you should apply in considering the evidence.

10        Generally, a damages award should put SimpleAir in

11  approximately the same financial position that it would have

12  been in had the infringement not occurred, but in no event

13  may the damages award be less than what SimpleAir would have

14  received had it been paid a reasonable royalty for the use

15  of its patent.

16        A reasonable royalty is the amount of royalty

17  payment that SimpleAir and Google would have agreed to in a

18  hypothetical negotiation taking place at a time period just

19  prior to when the infringement first began, which in this

20  case is May of 2010.

21        The damages you award are meant to compensate

22  SimpleAir and not to punish Google.  You may not decide --

23  you may not include in your award any additional amount as a

24  fine or a penalty above what is necessary to compensate

25  SimpleAir for the infringement.

1    SimpleAir has the burden to establish the amount

2   of its damages by a preponderance of the evidence.  In other

3   words, you should award only those damages that SimpleAir

4   establishes that it more likely than not suffered by

5   Google's infringement.

6           Now, you're going to be hearing from a number of

7   witnesses in this trial, and I want you to keep an open mind

8   while you're listening to the evidence and not decide the

9   facts until you've heard all of the evidence.  While the

10  witnesses are testifying, remember that you and you alone

11  will have to decide the degree of credibility and

12  believability to allocate to the witnesses and the evidence.

13          So while the witnesses are testifying, you should

14  be asking yourself questions like this:

15          Does the witness impress you as being truthful?

16          Does he or she have a reason not to tell the

17  truth?

18          Does he or she have any personal interest in the

19  outcome of the case?

20          Does the witness seem to have a good memory?

21          Did he or she have an opportunity and ability to

22  observe accurately the things they testified about?

23          Did the witness appear to understand the questions

24  clearly and answer them directly?

25          And, of course, does the witness' testimony differ

from that of another witness?  And if it does, how does it

differ?

These are the kinds of things that you should be

thinking about while you're listening to each witness in the

case.

The court reporter in front of me is taking

down everything that's said during the trial, but the

written transcription of that will not be ready in time

for your use during your deliberations.  That's prepared

in case there's an appeal of this case.  So because of

that, you're going to have to rely on your memories of

the evidence.

In a moment, you're each going to be given a juror

notebook.  One of the things in the back of that notebook is

a legal pad of blank pages for you to take notes upon.  It's

up to each of you to decide whether or not you want to take

notes; and if so, how detailed you want those notes to be.

But, remember, those notes are for your own

personal use.  You're going to have to rely on your memory

of the evidence, which is why you should pay close attention

to the testimony of each and every witness.  You should not

abandon your own recollection because somebody else's notes

indicate something differently.  Your notes are to refresh

your recollection, and that's the only reason you should be

keeping them.

1       I'm now going to ask Mr. McAteer, our court
2   security officer, to hand out those juror notebooks to each
3   of you.

4       In those notebooks, ladies and gentlemen, you'll
5   see that you have a copy of the '914 patent.  You'll also
6   see that you have pages with witness photographs and names
7   for the witnesses that are going to testify in this case.  I
8   think that we have a page in there for every witness who's
9   going to testify.  If we find during the trial that we do
10  not, we may supplement those pages, if it becomes necessary.

11      When you leave the courthouse each day during the
12  trial, I'm going to ask you to leave those juror notebooks
13  on the table in the jury room.  You should either have them
14  with you in the jury box as you do now, or they should be on
15  the table in the jury room when you leave for the day.  But
16  they shouldn't be anywhere else.

17      Now, it is possible during the course of each
18  day's trial we'll take a short recess from time to time, and
19  I may tell you you may leave your notebooks in your juror
20  chairs there.  But other -- other than the times I give you
21  specific instructions, they should either be in your
22  possession or on the table in the jury room.

23      Now, if you'll just put those down for a second,
24  you'll have plenty of time to look at those in greater
25  detail later.  I want to give you my final instructions

before we hear the opening statements from the lawyers.

Each side is going to make an opening statement in just a moment. You need to understand that each side's opening statement is not evidence. What the lawyers tell you is not evidence. It's simply their explanation of what they hope and expect that the evidence will show. The evidence in this case is the sworn testimony of the witnesses, together with the exhibits that are admitted into evidence for your consideration. That and that alone constitutes the evidence in this case.

As the Plaintiff, SimpleAir has the burden of proof on the damages issue by a preponderance of the evidence. When a party has the burden of proof by a preponderance of the evidence, it means that you, the jury, must be persuaded by the credible or believable evidence that the claim being made is more probably true than not true. This is sometimes talked about as being the greater weight and degree of credible testimony.

We just had jury selection earlier today. I gave you the illustration about the scales of justice to describe the preponderance of the evidence. I'm not going to go through that again. I know that you all remember that. But, again, preponderance of the evidence means that a claim is more probably true than not true, the greater weight and degree of credible testimony.

1          Now, I want to talk to you briefly about expert

2     witnesses.  When knowledge of a technical or financial

3     subject matter may be helpful to you, the jury, a person who

4     has special training or experience in that particular

5     field -- we refer to as an expert witness -- is permitted to

6     testify to you about his or her opinions on technical or

7     financial matters.

8          However, you're not required to accept those

9     opinions at all.  It's up to you to decide whether you

10    believe what the expert witnesses tell you or what any

11    witness tells you for that matter and whether you believe it

12    to be correct or incorrect.

13         I anticipate there will be expert witnesses

14    testifying in support of each side in this case, but it will

15    be up to you, the jury, to listen to their qualifications.

16    And when an expert -- expert witness gives you an opinion or

17    explains the basis for it, you will have to decide what they

18    have said and whether you believe it and what extent or

19    degree to any -- if any, that you want to give it any

20    weight.

21         Now, during the trial, I anticipate that you're

22    going to be also given testimony from what are called

23    depositions.  In trials such as this, ladies and gentlemen,

24    it's nearly impossible to get every witness to appear

25    physically in open court.  So before the trial begins, the

lawyers for each side take depositions of the witnesses.

In a deposition, they have a court reporter present; the witness is there; the witness is sworn and placed under oath just as if he or she were personally in court; and the parties, through their counsel, ask them questions and receive their answers. And it's all recorded. Portions of these video recordings of these questions may be played back to you as a part of this trial so that you can see the witness and hear the testimony. That deposition testimony is entitled to the same consideration by you, the jury, in the same way as if the witness had been physically present in open court and given the same testimony live from the witness stand here.

Now, during the course of the trial, it is possible that lawyers from either or both sides will make objections from time to time. And I'll make rulings on those objections. It's the duty of an attorney for each side of the case to object when the other side offers testimony or other evidence that attorney believes is not proper. Upon allowing the testimony or other evidence to be introduced over the objection of an attorney -- in other words, if I overrule the objection -- the Court does not, unless expressly stated, indicate an opinion as to the weight or effect of that evidence.

As stated before, you, the jury, are the sole

1  judges of the credibility of all the witnesses and the

2  weight and effect to be given to all of the evidence.

3  It's possible that objections will arise during the course

4  of the trial.  If I sustain an objection to a question

5  addressed to a witness, then you must disregard the question

6  entirely, and you may draw no inference from its wording or

7  speculate about what the witness would have said if they had

8  been permitted to answer the question.

9        Some evidence may be introduced for a limited

10  purpose.  If I should instruct you that a particular item of

11  evidence has been admitted for a limited purpose, then you

12  must consider it only for that limited purpose and for no

13  other purpose.

14        If I overrule an objection, you should consider

15  the question and the answer just as if the objection had not

16  been made.

17        Also I'll pause now and remind you that we have

18  work going on in the other part of the courthouse.  And

19  we're probably all going to hear noises during the course of

20  this trial that don't have anything to do with what's before

21  you, the jury.  But don't let that distract you, and if they

22  get too loud, I'll take a break or pause.

23        During its -- during the trial also, ladies and

24  gentlemen, it's possible that one of the parties may ask the

25  Court to seal the courtroom.  This could happen if some of

the evidence is of a highly considerable nature or
proprietary to one or more of the parties or some third
party.  In that case, if the Court orders the courtroom
sealed, the general public will be asked to exit the
courtroom and remain outside of the courtroom while that
considerable or proprietary information is presented.

Sealing the courtroom will not affect your duty as
jurors.  You are not to draw any inferences about the nature
of the evidence or give it any greater or lesser weight
based on whether or not it was presented when the courtroom
was sealed or not sealed.

Now, the law of the United States permits a United
States District -- United States District Judge to comment
to the jury on the evidence in the case.  But those comments
are only an expression of the Judge's opinion as to the
facts.  And the jury can disregard those comments in their
entirety, because as I've told you, you, the jury, are the
sole judges of the facts.

Whether or not I have that right to comment on the
evidence or not, I can tell you that if I did during voir
dire, I am going to work very hard through this trial so
that you do not have any idea of what I think about the
evidence.  That's your decision and not mine.

Sometimes juries have been referred to as the
Supreme Court of the facts, and I think that's an accurate

1    phrase.  You are the sole and only persons in this courtroom

2    who, at the end of this trial, will tell us what the facts

3    are or what the facts aren't.

4            We're going to get started with opening statements

5    in a few minutes, but before we do, I want to give you a

6    brief roadmap or timeline of how the trial will be conducted

7    and what you should expect.

8            After the opening statements, SimpleAir will

9    present its evidence in support of its damages contentions.

10   Google will then, after SimpleAir rests, present its

11   evidence on the issue of damages.  And after that, after

12   Google rests, SimpleAir may put on additional evidence

13   responding to the evidence of Google.  That additional

14   evidence from the Plaintiff is referred to as rebuttal

15   evidence, and that portion of the case is called the

16   rebuttal case.

17           SimpleAir's rebuttal evidence may respond to any

18   evidence offered by Google.  At the end of the rebuttal

19   case, when SimpleAir rests, then all the evidence will have

20   been presented at that time.  Then I will give you

21   additional and final instructions in this case.  Then the

22   lawyers will present their closing arguments to you, the

23   jury.  After that, you will retire to the jury room to --

24   to -- to deliberate on and reach your verdict in this case.

25   Again, your verdict must be unanimous.

1          Also, to repeat my earlier instructions to you,

2    you're not to discuss the case among yourselves during the

3    trial.  Only when all of the evidence has been presented and

4    I instruct you to retire to the jury room to deliberate upon

5    your verdict only then may you discuss the evidence in this

6    case among each other -- among yourselves.

7          Also, I will remind you, as I did just before

8    lunch, counsel and the parties are instructed not to

9    communicate with the jurors so if you see them or pass them

10   in the hallway, don't consider any action on their part to

11   be rude or unfriendly.  They're simply doing what the

12   Court's instructed them to do by not entering into

13   conversation or discussion with you.

14         All right.  I will call for announcements on the

15   record at this time.  What says the Plaintiff in the case of

16   SimpleAir versus Google?

17         MR. DOVEL:  Your Honor, SimpleAir is ready to

18   proceed.

19         THE COURT:  What says the Defendant?

20         MS. AINSWORTH:  Your Honor, Google is ready to

21   proceed.

22         THE COURT:  All right.  If we have witnesses in

23   the courtroom that are prepared to testify in this case, I'm

24   going to ask that all of the witnesses come forward at this

25   time and be sworn as a group.  If you'll all come forward,

1    our courtroom deputy will administer the oath -- oath to

2    you.

3              (Witnesses sworn.)

4              THE COURT:  All right.  Does either side wish to

5    invoke the rule?

6              MR. DOVEL:  Yes, Your Honor, we'd like to invoke

7    the rule, except for experts and party representatives.

8              THE COURT:  All right.  The rule has been invoked,

9    except as to expert witnesses or party representatives.  So

10   if you are a fact witness in this case, you're not a party

11   representative or you're not an expert witness, then you

12   should excuse yourself from the courtroom at this time and

13   you'll be brought in when it's appropriate for you to give

14   your testimony.

15             Anyone that that applies to should exit the

16   courtroom at this time.

17             All right.  We'll now proceed with opening

18   statements.  First we'll hear from the Plaintiff.

19             Would you like a warning on your time, Mr. Dovel?

20             MR. DOVEL:  Yes, Your Honor, I'd like a warning at

21   three minutes, please.

22             THE COURT:  All right.  You may proceed.

23             MR. DOVEL:  Good afternoon.

24             A patent is property.  Google is using SimpleAir's

25   patented property.

1    Now, Google's competitors, Apple and Microsoft,

2 also use SimpleAir's patent, but they paid Google for the

3 right to use those.  Google has refused to pay SimpleAir for

4 the recommended patent.  That's why we're here.

5    THE COURT:  Mr. Dovel, let's stop just a minute.

6 It's not fair for you to have to talk over that noise.

7 We'll try to find out if that's going to be 30 seconds or 30

8 minutes.

9    Let's wait until the Court Security Officer gets

10 back and lets me know whether that's a break or otherwise,

11 because if we don't find out, then as soon as you start

12 again, it will start back.  So let's wait until I hear from

13 the Court Security Officer.

14    MR. DOVEL:  Yes, Your Honor.

15    (Pause in the proceedings.)

16    THE COURT:  All right.  Mr. Dovel, let's try

17 again.  You've used about 30 seconds.

18    MR. DOVEL:  Thank you, Your Honor.

19    Mr. Eichmann pointed out that I had misspoke when

20 I started.  I said that Apple and Microsoft paid Google.

21 What I should have said is that Apple and Microsoft paid

22 SimpleAir for the right to use SimpleAir's patents.  And

23 we're going to prove to you how much Goggle should pay to

24 SimpleAir, and I'm going to do that using real world data,

25 real world data showing you how much more Google infringes

1 than its competitors.  How much Google's Android users value
2 the notification service based on real world data and real
3 world data showing you how much additional profits Google
4 has earned as a direct result of using SimpleAir's
5 invention.
6        This data -- this data is going to be presented to
7 you by some top experts, and it's going to show you that the
8 royalties due to SimpleAir up through the end of last year
9 total between $126 million and $146 million.
10       Now, to get started, I want to tell you a little
11 bit about how Google uses SimpleAir's invention, just so you
12 have an overview of it.
13       This I've placed on the screen is a Google Android
14 phone, and what that means is it's -- it's a smartphone.  It
15 has a computer inside of it that runs Android software --
16 Google's Android software.  And on this Android software,
17 people can install apps, such as the -- this is an app for
18 ESPN, The Weather Channel, and CNN.  And what's particularly
19 useful about these apps is that people can get notifications
20 about relevant information that relates to the app.  For
21 example, here is a notification about a just completed
22 basketball game.  That's from ESPN.  Here's an example of a
23 weather alert from weather -- the weather channel.  Here's
24 an example of a breaking news story from CNN about this
25 missing airliner and the latest news on that.

1    Now, the way that those notifications appear on

2  all of the Android phones is by using SimpleAir's patented

3  method.  Google uses it.  I've placed on the screen Claim 1.

4  That's one am of the claims that Google infringes, and it's

5  a method for providing notifications to -- to computer

6  devices.  And it makes use of something called a central

7  broadcast server.

8    And let me just explain to you a little bit about

9  the patented central broadcast server method that Google

10 uses.  The way it works is this.  We have an example here of

11 CNN.  They're an information source.  And they've got

12 information that they think that this particular phone would

13 like -- user would like to get.  But they don't have any

14 connection with that user.  So they've got the story, an

15 update on this Malaysian airliner, but they don't have any

16 way to get it to the user directly.  Well, what CNN can do

17 is they can make use of Google's Cloud Messaging Service.

18 This is a service that Google provides so that Android users

19 can be updated with additional information.  This is

20 Google's central broadcast server.

21    Now, you're going to learn that there are two

22 infringing systems that Google has.  This is one of them,

23 GCM.  This is one they started in the middle of 2012 after

24 the lawsuit was filed against them.  The -- they had another

25 one, C2DM, that they used before the lawsuit was filed

1    against them, but both of them infringe the patent.

2         Now, the way this works is CNN can send this

3    notification over to Google's system and then Google's

4    system can transmit, process, and address it.  Why?  Because

5    Google's system has a connection to this phone, a persistent

6    connection.  So using this central broadcast server method,

7    even though CNN doesn't -- is not connected with the user,

8    the user doesn't -- is not connected to CNN, the user can

9    get information from CNN.  In this case, here's the update

10   about Flight 370.

11        Now, Google doesn't just use this for CNN.  They

12   use it for thousands of apps and for millions of Android

13   users for billions of notifications, literally over a

14   billion notifications per day.  In the time it takes me to

15   say this sentence, Google infringes the patent over 100,000

16   times.  They are a big infringer.  The biggest infringer

17   around.

18        Now, we're also going to show you that Google

19   makes money from using SimpleAir's invention.  Google and

20   its witnesses are going to tell you that Google doesn't make

21   any money.  In fact, we give away this Android software for

22   free.  We give away this notification service for free.  We

23   don't charge anybody for it.  But we're going to show you

24   that Google makes a lot of money from Android users.  It

25   gives away the software for free, but that's because it

sells a lot of things to those Android users.

One of the things it sells is advertising that appears on every Android phone.  It sells apps for Android phones.  It sells music and moves digital downloads.  It even sells Android phones.  From all the Android revenues that it collects, it amounts to billions and billions of dollars.  Last year alone, more than $4 billion in just one year, and they've been doing this for several years.

Now, we're also going to show you that the way they collect this revenue is by having Android users.  Every time there's Android phone in use, Google can make money from it.  That's how they make money.  The more Android phones are in use, the more Android users, the more Google Android revenues there are.  We're going to prove that to you, and it will be undisputed.

So what does that mean here?  That means that if we -- that means that from Android users, Google makes a lot of money.  They're not simply just somebody who gives away software, charges nothing to the user, and makes no money.  They make billions of dollars, and a good chunk of that, not all of it, not even most of it, but a good chunk of it is directly the result of using our infringing notification.

Let me explain to you why that is, why the notifications were so important.  This is a chart that shows the growth in the -- in the use of notifications over time.

1   When notifications were first introduced, there were only

2   available on a few apps and there were only a few users.

3   But over time, more and more people began to understand the

4   unique advantages of these notification apps.  Information

5   would come for -- come to them without them having to search

6   for it, and it could come to them in a timely manner, within

7   seconds of the information being available.  And more and

8   more people found that notification apps were very important

9   to them.

10        By 2012, most Android users had at least one

11   notification app, and 20 percent of Android users had 6 to

12   20 different notification apps.  Notifications became very

13   important for many social media apps like Twitter and

14   Facebook and Instagram where providing the instant

15   information was really important to many users.

16        Now, we're going to show you that it was very

17   important for Google to provide this notification service

18   because Google has competitors.  Google sells Android

19   phones, but it competes with others.  It competes with

20   Apple, Microsoft, and Blackberry.  All of Google's

21   competitors, all three have their own app notification

22   service -- an app -- an app notification service that makes

23   use of SimpleAir's patented invention.

24        For Google to be competitive, it needed to also

25   provide an app notification service.  If there's an Android

1  user -- and there are many of them that think notifications

2  are very important.  And if Google did not have app

3  notifications available to them, many of them would switch

4  and use a different phone -- not all of them, not even most

5  of them, but a large percentage of them would.  That means,

6  remember, the more Google phones, the more Android phones in

7  use, the more Google profits.  Without notifications, fewer

8  Android phones in use, fewer Google profits.  Use of

9  notifications directly added to Google's profits.

10         We're also going to provide you specific evidence,

11 based upon real world data, about how much additional profit

12 Google earned just from using our infringing system.  This

13 is -- this is profit they earned, not from all the other

14 good things about Android, the profit that's directly

15 attributable to just the notifications using our infringing

16 system that they would not have received if they didn't have

17 the access to our patent.

18         Now, how are we going to do that?

19         Well, Google, as we said, they don't charge a

20 separate fee for this notification service.  And so in order

21 to figure out what Google's additional profits are from that

22 service, we have to use something called conjoint analysis.

23 And conjoint analysis, it's a consumer survey technique

24 that's used by major companies when they want to find out

25 how much extra profit they can expect to get when they add a

new, important feature to a product or service. They want
to figure out how much extra profit they could get. So it's
used by real-world companies every day, more than 10,000
times a year.

We're going to present to you Dr. Seenu
Srinivasan. He's a Stanford professor. He's a consultant
for major companies, and he is one of the world's leading
experts on conjoint analysis.

Now, he did a detailed study that made use of data
from real-world smartphone users, and based on his conjoint
analysis, which he'll explain to you, he determined that on
average, the market willingness to pay for this notification
feature, if it were sold separately, would be about $12, a
little more than $12, and about 42 percent of Android users
would purchase it at that price.

Now, those numbers may not seem like very much.
They may seem like they're not that big, but there are so
many Android phones in use in the United States that it adds
up real fast. In fact, we'll show you that as a result of
this, Google made a billion dollars -- just under a billion
dollars in additional revenue as a result of the
notification system. About $600 million in additional
profits, profits they would not have earned but for using
SimpleAir's patented invention. Extra money.

$600 million is a lot of money, and for Google

1   it's a lot of money too, but it's just a fraction of what

2   they get from Android revenues.  And this is the fraction

3   that's attributable to just using our invention.

4          Now, we're going to show you that Google had to

5   use the '914 invention to provide these notification apps.

6   There's a reason why all of its competitors use the '914

7   patent, and there's a reason why Google did.  And that's

8   because there isn't an alternative that's acceptable.

9          We're going to present to you the testimony of Dr.

10  James Knox, and he'll explain to you why any alternative way

11  of trying to provide notifications would have bad

12  consequences and wouldn't be acceptable.  For example, there

13  are other methods that could be used, but they cause a drain

14  in the battery life of the phone that's unacceptable so you

15  can't use them.

16         Now, we're also going to show you that Google's

17  own expert admits that there's no good alternative to using

18  the '914 patent to provide notifications to smartphones.

19  You've got to use the SimpleAir central broadcast method.

20         THE COURT:  Three minutes, Counsel.

21         MR. DOVEL:  Thank you, Your Honor.

22         In addition, we're going to present the testimony

23  to you of economist Robert Mills.  He's an expert in

24  applying economic principles to determine royalties, and he

25  will explain to you based on the data why a reasonable

1 royalty would be about 93 cents per Android phone and why

2 that would total about $146 million.

3 The last topic I'm going to discuss with you here

4 in my final two minutes is the additional evidence from Mr.

5 Mills, the economist. He's going to discuss SimpleAir's

6 patent licenses for you. He'll place them on the boards

7 here. You'll get to hear more about them in the trial.

8 But they fall into two groups. There's the -- the orange

9 group and the green group. The orange group, they paid

10 SimpleAir a lot less money for a license. The green group

11 paid a lot more. Up to $30 million was paid by Apple.

12 Now, Google says, well, we think we should be

13 compared to the orange group; that we think we're comparable

14 to those, so compare us there. And we agree that Google is

15 the biggest infringer around. We should pay much more than

16 anybody else, but compare us to the orange group. Compare

17 us to Facebook and Yahoo.

18 And we say that Google should be compared to Apple

19 and Microsoft, its competitors, and that it should also pay

20 more than anybody around.

21 To show you which group they should fall in, we're

22 going to show you that they need to be compared -- Google

23 needs to be compared to other companies that do the same

24 thing, that provide an app notification service. They get

25 benefits from the patent by providing this service. Those

companies are Apple, Microsoft, and BlackBerry.  The

evidence is going to show you that the others do not.  They

need to be compared to Apple and Microsoft.

What happens when we do that comparison, Google

uses a lot -- the invention a lot more than anybody else,

about 5 times more than Apple, about 40 times more than

Microsoft.

Mr. Mills will explain why we make the appropriate

adjustments to account for the -- the relative use and the

differences between these companies that while Microsoft

paid 7.25 million and Apple paid 30 million, based on this

comparison, Google should pay at least $127 million.

You'll see evidence based upon real-world data,

hard facts, including Google's own documents, that Google's

damages are between 127 and $146 million.

Thank you.

THE COURT:  All right.  The Defendant may offer

its opening statement.

Mr. Stockwell, would you like a warning on your

time?

MR. STOCKWELL:  Yes, Your Honor, three minutes.

THE COURT:  All right.  You may proceed.

MR. STOCKWELL:  Mr. Barnes, could I have the

screen?

Good afternoon.  I want to thank you for your time

and attention in advance.  You're here to help the parties

resolve the last part of their dispute, the damages part.

You already know that the first jury was not able

to reach a verdict on the damages issue.  And you're going

to hear a lot of the same evidence that that first jury

heard and ultimately decide the amount of money that Google

owes SimpleAir for using the '914 patent.

Now, at this point of the dispute, we don't

dispute that we owe SimpleAir money, but we sure dispute how

much money we owe SimpleAir.  That's the issue that you're

being asked to resolve.

Now, for you to decide that, you have to determine

what's fair and reasonable to both parties, because the

award in this case is a reasonable amount of damages, a

reasonable royalty.  And the Judge already told you about

the hypothetical negotiation that has to occur.

The other issue you have to keep in mind is that

under the patent laws, you can be liable for infringement,

even if you didn't know about the patent.  So in the trial

establishing that Google infringed, there wasn't even an

allegation that Google had copied the patent or willfully

infringed the patent.  That's not the situation here.

In fact, Google independently developed its

messaging service.  And you heard Judge Gilstrap tell you

this morning that this trial is to determine damages in the

1  form of a reasonable royalty and that the damages are not to

2  punish Google.  And that makes sense.  That's the law, but

3  it's also common sense.  You don't punish someone who has

4  not done anything intentionally wrong.

5  Now, what is the evidence going to show about

6  damages?

7  One of the things that I -- I think you have to

8  keep in mind is that the damages here is for the use of the

9  patent, and what infringes is the Google messaging service.

10  Google thinks the evidence is going to show that the

11  reasonable damages in this case are $6 million.

12  And we don't think that SimpleAir can meet their

13  burden of showing the real-world evidence of damages of 145

14  to $160 million.  We don't think they're going to be able to

15  prove that.  We don't think the damages are anywhere close

16  to that.

17  Now, there's a big difference between the parties.

18  We spent a lot of time this morning picking a fair and

19  impartial jury.  Google trusts that you'll be able to get to

20  the right number and do justice to both sides and listen to

21  the whole story, not just SimpleAir's side of the story.

22  I want to preview Google's side of the story, talk

23  a little bit about Google and its business model and Google

24  messaging service.

25  If you could put up Slide 1, Mr. Barnes.

1          Google began when Mr. Page and Mr. Sergey Brin had

2     met at Stanford.  They were two students.  They set up shop

3     and they created a search engine.  You can see the search

4     engine that Google created today.

5          Those search -- those search engines, all the work

6     they did, they supported that by charging advertisers.  So

7     when you go search, you sometimes see a screen next to your

8     search result that tell you some folks that might want to

9     sell you something.  That's an advertisement.  That's how

10    Google makes money.  They don't charge consumers.

11         Over time, Google hired hundreds of engineers and

12    they came out with new products.  You can see many of them

13    there.  They've got the Gmail email service Gmaps, YouTube

14    video.  And they also introduced something called the

15    Android operating system that's used on mobile phones.

16    And you heard Plaintiff talk about that a little bit.  I

17    want to talk about some of the Android features.  Since

18    2008, when they introduced Android, they've introduced

19    multiple versions and hundreds of features of Android.  What

20    Plaintiff didn't allege and what you're not going to hear in

21    this trial is that Android infringes.

22         Android doesn't infringe.  The Android features

23    that are shown there are things that Google developed that

24    are entirely separate from this '914 patent.  Android is

25    distributed as a free and open source technology.  It's

1  freely available to everybody.  Google doesn't charge for

2  it.  It's the fact that it was free and the fact that it has

3  all these features that made it successful.

4          So where did the Cloud Message -- the Google

5  Cloud Messaging service come in and how does that really

6  relate to Android?

7          Well, you know that smartphones have applications,

8  apps.  And apps can be the games.  They can be the social

9  networking sites, like Facebook.  They can be the weather

10  site, like Mr. Dovel just showed you.  Those are apps.  You

11  can get news; you can get content.

12          An app is just one feature that an Android phone

13  offers.  For example, if someone comments on your Facebook

14  wall, you can receive an app on that.  After Android had

15  been introduced and was already successful, Google

16  introduced the messaging service in June of 2010.  And what

17  that messaging service did -- and you'll hear about this

18  from Mr. Manolache, one of Google's witnesses -- was allow

19  app providers to send messages to an app on an Android

20  phone.

21          The service was a way that they could just send a

22  little short ping to the phone.  Facebook uses it; Twitter

23  uses it; LinkedIn can use it; all sorts of app providers do

24  it.  They all do it for free.

25          And today, that Google messaging service over 90

1   percent of the billions of messages a day that it delivers

2   are delivered to those free apps as initiated by those app

3   providers.  So we just deliver those messages that they ask

4   us for.  We don't charge the app providers, and we don't

5   charge the users.

6          So how did we get to this situation?

7          Well, these notifications, they're just one

8   feature in an app.  So if you're getting -- if you're

9   playing a game in an app, it's just one feature that you

10  might get a notification in the game.  The app is just one

11  feature in Android.  After we had already introduced the

12  Google messaging service, about two years after that, we got

13  sued by SimpleAir.

14         Google hadn't heard of SimpleAir.  Hadn't heard of

15  the patents.  We started looking into it.  What we found is

16  that a company, AirMedia, had owned the patent, and they had

17  actually built a system under the patent.  They tried to

18  make a go of that business.  They tried to charge for

19  notifications.  It didn't work.  They went bankrupt.  People

20  would sign up for a trial subscription, but once they

21  started paying for it, they didn't want to pay for the

22  notifications.

23         So they borrowed some more money from a company

24  called Verus.  They made another go of it.  They went

25  bankrupt a second time.  Even though they were using the

'914 patent, people just didn't want to pay for those notifications.

Verus, the bank that loaned AirMedia money, they got the patents out of bankruptcy, and they got about 20 patents and patent applications, including the '914. And SimpleAir later acquired those patents from Verus. You'll hear them explain, Mr. Payne and Mr. von Kaenel. They formed SimpleAir. They went to Verus. They bought the patents. They didn't pay any cash.

What they did is they agreed to share some of any damages or royalties they could collect with Verus. Actually created a product, marketing it, supporting it, hiring engineers. That's -- that's kind of risky. You've got to spend a lot of money on it. It might fail. They knew that, because AirMedia had failed. They didn't want to take that risk. They don't create products. They don't have a lot of employees.

Their plan was to license and enforce the patent, and that's what we think is the real-world evidence. The licenses they granted. And if you look at some of these licenses, they didn't talk much about the amounts here.

When SimpleAir started licensing the patents, they started with AccuWeather, about $22,000. They went up to Verisign, about 500,000.

All of these licenses were for about seven

1   patents.

2          If you go to the next slide, Mr. Barnes.

3          They also licensed Yahoo!, Facebook, Microsoft,

4   RIM, and Apple.  And there is a dispute.  We do think we are

5   more like Yahoo! and Facebook than we are about Microsoft,

6   RIM, and Apple.

7          Before we talk about that reason, I just want you

8   to step back and think a little bit about what the damages

9   demand is in this case, and you'll see that they've got

10  about 13 licenses.  They've had about a total of $45 million

11  in revenue.  And they're saying they get 4 times that much

12  from just Google.

13         We don't think that makes any sense.  We don't

14  think that's reasonable.  And when you dig into these

15  licenses, we think you're going to see that Yahoo! and

16  Facebook licenses are the most relevant.

17         Yahoo!'s like Google.  It has a search engine.

18  Yahoo! makes money from advertising.  Yahoo! offers

19  software, email, and apps for free just like Google.  Yahoo!

20  paid $800,000 for 6 patents.

21         Facebook paid SimpleAir $900,000.  They got a

22  license to the '914 patent and 6 more patents.  Facebook

23  makes most of its money from advertising, and it also offers

24  software and free apps.  And you're going to learn that

25  those 14 billion messages they mentioned, 40 percent of

1  those are Facebook messages that we deliver.  So the very

2  messages that Facebook generates under this license, we

3  transmit on and send on to the -- to the end users.  We

4  think that makes Facebook very relevant and the most

5  relevant in this case.

6          You're going to hear from Dr. Ugone.  He's our

7  economic expert.  He analyzed these licenses, and he

8  analyzed licenses from Google where they took licenses up to

9  $5-and-a-half million for similar patents.  He adjusted all

10 of these licenses and he concluded that $6 million is the

11 reasonable damages in this case.

12         What about the Microsoft, the RIM, and the Apple

13 agreements that SimpleAir mentioned?

14         If we can go to the next slide.

15         They -- they showed you a slide about which phone

16 will the user choose.  And one thing that they didn't

17 mention is that Apple and RIM, you know, they -- they make

18 and sell smartphones.  We think Apple and RIM are different

19 from Google.

20         When you go to a Verizon store and you buy an

21 iPhone, Apple makes money or RIM makes money, if you buy a

22 BlackBerry phone.  When you buy a Samsung phone in that

23 store or a Samsung phone that runs our free operating

24 software, Google doesn't make money from that sale on that

25 store.

1    There's another huge difference between Google and
2  Apple.  They -- they said that Google had made billions in
3  Android revenue.  What they didn't tell you is that Apple in
4  just 2012, they made $80 billion selling 50 million iPhones.
5  Their revenue in just 2012 was 40 times larger than Google's
6  Android-related revenue.
7    And yet they say, oh, Google has to pay 5 or 6
8  times more than Apple did, which made 40 times more money.
9  That makes no sense.
10    SimpleAir accuses Google's messaging service that
11  provides free notifications to mostly free apps running on
12  the free Android system.  They say -- it says we should pay
13  millions of dollars in royalties for phones sold by other
14  people, and now they're saying that's real-world evidence.
15  I don't think -- I want you to listen carefully when you
16  hear Dr. Srinivasan's testimony about what they just
17  characterized as real-world evidence.  He went out and did a
18  survey, and he said, well, people would pay $12 for the
19  phones with these notifications.
20    THE COURT:  Three minutes, Counsel.
21    MR. STOCKWELL:  Thank you, Your Honor.
22    And they came up with this theory that Google
23  should have charged for notifications.  That's not
24  real-world evidence.  That's make-believe.  That's imaginary
25  revenue that they've come up with.

1    And the fact that they characterize it as

2    real-world evidence today, I want you to listen carefully

3    when you listen to that part of the evidence and think about

4    whether that's real or imaginary.  We think it's imaginary.

5    And the revenue theory doesn't make sense.  It requires

6    Google to change its business model and charge consumers $12

7    for notifications.  You're going to hear Mr. Gold.  He's

8    going to explain Google's business model.  He's going to

9    explain that it's successful because Android has hundreds of

10   features and are offered for free.  The '914 patent doesn't

11   cover Android and the many features of Android.

12        If you'd go to the next slide, Mr. Barnes.

13        57 percent of all the apps are free, and 80

14   percent -- over 80 percent of the notifications Google

15   delivers are for free apps.  The notion that we would

16   hypothetically change our business model and charge for apps

17   makes no sense.  When AirMedia tried it and they went

18   bankrupt, none of the other companies SimpleAir licensed

19   charged for notifications.

20        I want to talk a little bit about Microsoft.  What

21   about them?

22        You heard that comparison with the Microsoft

23   agreement where they multiply Microsoft's payment by 40

24   times to try to get to a Google number.  That's based on

25   Microsoft having less notification messages than Google.

1    Again, when you look at the real-world evidence,
2  you're going to see that Microsoft didn't pay any money
3  based on the number of notification messages.  When you
4  bought your computer that sends emails, you didn't pay based
5  on how many emails it can send and receive.  You bought the
6  equipment and paid one price.

7    Every single one of these license agreements
8  you'll see from SimpleAir, one payment for multiple patents
9  and for far more years in terms of a license to use those
10 patents than they're proposing for Google.

11    Finally, you're going to hear about something
12 called a non-infringing alternative.  The Judge will
13 explain that.  And that refers to whether Google could
14 have implemented an alternative service that avoided
15 infringing the '914 patent.  If it had, the cost of the
16 alternative limits what the damages could be.

17    And you're going to learn that Google had such an
18 alternative.  It has data centers all over the world.  In
19 order to infringe this method patent everything has to be
20 done in the U.S.  It could have put the servers outside the
21 U.S.  It would have cost about 4.8 million bucks.

22    4.8 million, 150 million, which one would we have
23 done?  We would have chosen the 4.8 million.  That's why $6
24 million is the reasonable damages in this case, not the 145
25 million that they're claiming.

1          THE COURT:  Time's up, Counsel.

2          MR. STOCKWELL:  Thank you, Your Honor.

3          THE COURT:  Counsel, approach the bench, please.

4          (Bench conference.)

5          THE COURT:  Mr. Stockwell?

6          MR. STOCKWELL:  Yes, sir.

7          THE COURT:  There's an order in limine against

8     evidence or argument on lack of prefiling notice or

9     willfulness.  You talked directly about that in your

10    opening.

11         MR. STOCKWELL:  But, Your Honor, there was also --

12    you said we could actually talk about the fact that Google

13    independently developed, and you also said, Your Honor, that

14    you were going to instruct the jury on that issue.

15         (Noise interference.)

16         MR. STOCKWELL:  Your Honor, the other thing is I

17    said Google didn't talk about the patent.

18         THE COURT:  You talked about there will be no

19    willfulness in the prior suit.

20         MR. STOCKWELL:  Yes, Your Honor.  As I understood,

21    the Court was going to actually charge the jury on that.

22    That was a joint construction on both sides on the final

23    instructions, and that was agreed to in a stipulation.

24         THE COURT:  Well, what I'm going to charge them on

25    and what you're bound by in the in limine order are two

1  different things.  I want you to be particularly careful.

2          MR. STOCKWELL:  Yes, sir.  I'm sorry.  I thought I

3  was.

4          THE COURT:  That's all right.

5          (Bench conference concluded.)

6          THE COURT:  All right.  Is the Plaintiff ready to

7  call its first witness?

8          MR. EICHMANN:  Yes, Your Honor.  We call Dr. James

9  Knox.

10          THE COURT:  All right.  If you'll come forward,

11  Dr. Knox.

12          All right.  Mr. Eichmann are you ready to proceed?

13          MR. EICHMANN:  Thank you, Your Honor.

14  JAMES M. KNOX, Ph. D., PLAINTIFF'S WITNESS, PREVIOUSLY

15                          SWORN

16                   DIRECT EXAMINATION

17  BY MR. EICHMANN:

18  Q.  Good afternoon, Dr. Knox.

19  A.  Good afternoon.

20  Q.  Sorry I interrupted you.  Do you need to pour yourself

21  some more?

22  A.  It's hot back there.

23  Q.  It's hot up here, actually.

24      Can you introduce yourself to the jury, please, and tell

25  us why you're here today?

1  A.  Yes.  My name is Dr. James Knox.  And I've been asked to

2  come back today and just give you an extremely brief

3  overview of the -- the technical aspects of -- of the '914

4  patent and how GCM uses it.

5  Q.  GCM is a reference to Google's infringing service?

6  A.  Google Cloud Messaging, yes, the service that infringes

7  the patent.  Actually, there's two names.  C2DM is the other

8  one.

9  Q.  Were you also called to testify in the last trial that

10  happened in this past January?

11  A.  That's correct.  I was here in January upstairs in that

12  courthouse.

13  Q.  And what was the subject of that testimony?

14  A.  That was from my standpoint infringement of the '914

15  patent by the Google GCM and the C2DM, the Cloud to Device

16  Messaging.  And also testified on the validity aspects of

17  the '914 patent.

18  Q.  Did the jury agree with your opinions on those issues?

19  A.  Yes, on both, unanimously.

20  Q.  We won't get back into all the details of that, but I

21  just wanted, as you pointed out, to go briefly through some

22  of the background here starting with the invention.

23          MR. EICHMANN:  Is that actually up on the screen?

24          THE WITNESS:  Not that I can see.

25          MR. EICHMANN:  All right.

1    Q.  (By Mr. Eichmann) All right.  So these are the three

2    background topics we're going to start with, including the

3    invention.

4        Now, when did the invention in this case happen?

5    A.  The date that I've seen is January of 1996.

6    Q.  And where was the invention made?

7    A.  The company called AirMedia, you've heard mentioned

8    earlier, Mr. John Payne and Tim von Kaenel were inventors

9    there who developed the -- the technique, the central

10   broadcast server.

11   Q.  And Mr. Payne and Mr. von Kaenel are here today?

12   A.  That's correct.

13   Q.  What's their relationship to SimpleAir?

14   A.  They, as I understand it, formed SimpleAir.  They were

15   the inventors of the '914 discovery, the '914 patent, and

16   they -- they reclaimed their invention.

17   Q.  Tell us a little bit about what the technical world was

18   like in 1996.

19   A.  Well, '96 was approximately the same time that what had

20   been called ARPANET went public so that anybody who wasn't

21   military or university could start using it.  It was just

22   beginning what obviously was a meteoric rise in usage.

23   There were a lot of different ways that you could go out and

24   try to find information on it.  They were limited, and you

25   had to do it.  It wasn't easy to find.

1    And at that time, people were paying a large amount of
2    money for connection to the Internet.  I think I started at
3    $60 an hour, basically a dollar a minute just to be
4    connected to -- to do a search or to look for something.
5    Q.  Can you tell us what's shown on this slide?
6    A.  That's one of the very early indexing schemes that
7    Yahoo! used, and you can see the small numbers there.  It
8    gives you an idea how early this was.  They basically broke
9    up different pieces of information by different categories:
10   Business, computer, art.  Again, this is very early on.
11   Q.  And at this time, when people wanted to get on their
12   computers and get information from sources of information,
13   like CNN and The Weather Channel, how did they go about
14   doing that?
15   A.  Well, as you say, we had these information sources.
16   They were on the Internet, what we call online to the
17   Internet.  And you could go to these.  Today we call it
18   pull.  You could go to these and try to pull down
19   information.  So if you wanted to know today's weather, you
20   logged in; you went to The Weather Channel's Internet
21   connection, and you searched and pulled down that
22   information.  Same for CNN, ESPN.
23   Q.  And generally, can you tell us what the invention was
24   about?  How did that differ from the conventional way?
25   A.  Well, the problem with that, going to the sites and

1    pulling down the information is you had to -- first off, you

2    had to know there was something there to pull down.  The

3    example of the -- of the Malaysian airliner, you wouldn't

4    search for information on it if you didn't know there was an

5    issue.

6         What the invention did was it turned this whole thing

7    around the other way so that these information sources, when

8    they realized there was a piece of information that you had

9    previously indicated to them you would be interested in --

10   doesn't matter if it's Malaysia Airlines or a football

11   score, they sent that information out.

12        They couldn't send it to you.  They sent it to a

13   central broadcast server.  That central broadcast server

14   knew how to send these -- what we call these instantaneous

15   notifications, these alerts that say, hey, there's an

16   airliner missing.  If you were interested, you could get

17   more information in conventional ways or other ways.

18   Q.  So this shown here on the slide, does this generally

19   depict what they came up with?

20   A.  Yeah.  This is what we call push in today's terminology.

21   The information is pushed to you.  You don't even need to

22   know that there's information out there that you need to be

23   aware of.  Like a tornado alert the -- The Weather Channel

24   can tell you that there's a tornado alert.

25   Q.  And what about this arrow that's now depicted on the

1  left side, can you tell us what you're trying to convey with
2  that?
3  A.  Well, at the time of the invention, this was very, very
4  important.  You didn't have to be online to one of these
5  information sources to get this information.  You could be,
6  but you didn't have to be.  You didn't have to be sitting
7  there hour after hour paying a dollar a minute just to find
8  out that there might be a tornado alert.
9  Q.  What were some of the other advantages of this way of
10 doing things over the way it existed before?
11 A.  Well, in addition to the monetary issue, the main
12 thing -- the main next advantage was that, again, you would
13 find this out without asking for it.  You indicate that
14 you're interested in a particular type of information, and
15 when that information -- something in that category is
16 available, it was pushed down to you.
17      You got an alert on your computer.  These were desktop
18 computers at the time, and it would pop up.  Even if your
19 computer wasn't online, it would give you this notification,
20 and then you still made the final decision whether you
21 wanted more information or it was something you didn't care
22 about.
23 Q.  Now, how does all this relate to the patent in this
24 case?
25 A.  Well, as -- as common, when you have an invention,

1  you -- you get patent protection on it.  This is the rights

2  to use your invention or to license it to other people.

3  What you see here is a claim, and that's -- what you heard

4  this morning is just a part of a patent that kind of

5  delineates the ownership, the boundaries of your

6  intellectual property.

7      This is Claim 1.  This is the primary independent claim

8  that sets out those boundaries under what is called the '914

9  patent.

10 Q.  And is the patent limited to use the invention to

11 computers like the one that's on the screen?

12 A.  No.  It's limited by the scope and language of the

13 claim.  The claim can be much broader than what they call

14 the specific embodiment, which was the way it was used by

15 AirMedia.  That was simply an implementation of one form of

16 that property.

17 Q.  Does -- does the patent cover using the invention for

18 smartphones and other types of computers like the tablets?

19 A.  Yes.  You have to read the claims.  It covers whatever

20 that says.  AirMedia, in fact, had plans for that.  This is,

21 I believe, an advertising that came out at the time.  And it

22 shows it with handsets, essentially wireless telephones, but

23 also shows it with notebook computers, Palmtops.  This Palm

24 Pilot thing here is, again, what we would call a tablet

25 today.

1    Q.  And this is Exhibit 98?

2    A.  Yes, that's correct.

3    Q.  Now, let's turn to the infringing Android service in

4    this case.  I'd like you to explain a little bit about that,

5    and I'd like you to start with the Android operating system.

6    Can you tell us what the Android operating system is?

7    A.  Yes.  There's really two things, first off.  There's

8    what people kind of refer to as the Android system, and then

9    there's the kernel of it.  What really is a computer person

10   I think of as the operating system.

11        And those are the instructions that reside within that

12   phone that tell that phone exactly step-by-step how to do

13   what it does.  If you didn't have that in there, the screen

14   wouldn't even light up.  It would never -- well, it wouldn't

15   even make a phone call.  It certainly wouldn't get on the

16   Internet.

17        If you didn't have this Android operating system or

18   some equivalent operating system in there, it would just be

19   an expensive paperweight.

20   Q.  Let me back up for a moment.  How do you know about all

21   this stuff?  What's your area of expertise?

22   A.  I -- I designed my first operating system back in the

23   1960s at the University of Texas.  And I have a small

24   research and development company there in Austin.  Part of

25   our bread and butter is microprocessors, like are what are

1    in these smartphones, and designing both the hardware and

2    the operating system software for these.

3        In fact, we have our own operating system that TriSoft

4    developed that we put in most of our products.

5    Q.  And can you tell us a little about your educational

6    background, your formal training?

7    A.  As I have this gray hair, I'm old.  And so I've been

8    through a lot of it.  I have a bachelor in electrical

9    engineering.  I have a master's in computer science.  I have

10   a doctorate in electrical engineering with also a

11   specialization in biomedical engineering.

12       I've worked with the -- the Department of Defense,

13   Department of Homeland Security, major companies and

14   governments all over the world.  And we have designed both

15   commercial and civilian and military systems.  Literally, as

16   I told one person from -- we've designed systems from

17   submarines; we've designed systems for deep space.

18   Q.  And how much time have you spent looking over the Google

19   documents and the computer code for Android in this case?

20   A.  Way more than I ever wanted to.  I couldn't give you an

21   hour number, but it's been many, many months of work.

22   Q.  Let's turn back to the Android system.  And now, let's

23   talk about how they infringe.

24       What is it that Google is doing that infringes on

25   SimpleAir's patent?

1  A.  Well, the first part to notice here of this -- this

2  slide is that we've still got exactly what we had before.

3  We've got our information sources, and they're sending these

4  messages to a central broadcast server.

5      What Google's done is put in their own central

6  broadcast server.  The C2DM or THE GCM is a set of

7  computers, a huge bank of them, with a big set of software

8  that does what a central broadcast server does under the

9  patent.

10 Q.  And is there any difference between this and what

11 AirMedia's original idea was?

12 A.  No, not really.  The central broadcast server, just like

13 with AirMedia, pushes these notifications out.  The only

14 real difference is at the time of AirMedia, they were

15 primarily going to desktops.

16      Now, the big use -- you still could use it to a

17 desktop, but the big thing for Android is these tablets and

18 these smartphones.

19 Q.  And can these notifications come in through the Google

20 system, even if they don't have a connection -- the phones

21 don't have a connection to the information sources?

22 A.  Just like with -- with AirMedia or just like the '914

23 patent, you can have this connection certainly and it

24 certainly works, but you don't have to have it.  You will

25 get the notification whether you're sitting there connected

1  to The Weather Channel on your phone or not.

2  Q.  You mentioned the names of these services.  There's --

3  there's two names; is that right?

4  A.  That's right.  It's actually, I think, three now, but

5  Android Cloud to Device Messaging, C2DM, is the acronym

6  everybody uses, was the original in 2010, and then later,

7  they came out with upgrade to it called GCM, Google Cloud

8  Messaging.

9  Q.  Did the second version, the second service you just

10 pointed to, come out after this lawsuit was filed against

11 Google?

12 A.  That's my understanding, yes.  That, I think, was in

13 2012.  The lawsuit I believe was filed in 2011.

14 Q.  And when the lawsuit was filed, Google didn't stop

15 infringing?

16 A.  That's correct.  They developed and rolled out that code

17 after the lawsuit.

18 Q.  Well, let's walk just through a couple of examples of

19 this.

20     What do you -- what do you have here on this screen?

21 A.  As I say, these are examples.  Gmail is Google's email

22 server.  It -- when you get an email on the Gmail -- and

23 this is the Gmail server.  This isn't your phone.  This is

24 when that email arrives there at the machine that hosts that

25 email.  It sends a message to the central broadcast server.

1  The central broadcast server sends this notification to your

2  phone, and you get a little pop-up that -- an alert that

3  says basically you have mail.  You know, So-and-So just sent

4  you email.  It's just little piece of information, not the

5  whole message.

6      If you want to see more, you can do something with that

7  alert.  Slide it, tap it, depends on the phone you have, and

8  pick up your actual mail.

9  Q.  And briefly, sir, we have two more examples.  What's

10 the -- the second one here?

11 A.  Weather Channel, kind of a very important one -- though

12 hopefully not as common -- sending out things like severe

13 weather warnings, exactly the same deal, though.  It lets

14 the central broadcast server know, which lets your phone

15 know, which lets you know.

16 Q.  And this third one?

17 A.  Facebook, same sort of deal.  I think it was mentioned

18 earlier somebody posts something to you on Facebook and

19 rather than you having to check back every few minutes to

20 see if somebody's done this, you get this little pop-up

21 through the central broadcast server, through Google's

22 system.

23 Q.  Google produced records in this case about its use of

24 the service.  Did you have the opportunity to review those?

25 A.  For what they produced, yes, I have.

1    Q.   And what did the records show about how many of these

2    messages are going out on a daily basis?

3    A.   This is worldwide, which is the only information I have

4    here.  July 9th, 2013, and it's 14 billion of these

5    messages.

6    Q.   Just on a single day?

7    A.   Just on one day.

8    Q.   That was the worldwide number.  Did you, in preparing

9    your work in this case, come to an estimate of how much

10   infringement is occurring in the United States?

11   A.   Yes, I did.  I wasn't able to get specific numbers, so I

12   had to make an estimate based on the information I had.

13   Several hundred million is an extremely conservative number.

14   I would tend to believe several billion times a day in

15   today's dates.

16   Q.   Based on all the evidence that you reviewed in this

17   case, including Google's own -- own internal records and

18   their testimony, do you believe that it's more likely

19   that they're sending out several billion of these

20   messages each day in the U.S.?

21   A.   Yes, their own testimony set a minimum of 5 percent

22   of -- and the 14 million (sic) is a -- almost a year old

23   number, so based on that, we're up in the billions right

24   there.

25   Q.   And we walked through a couple examples of the different

1 information sources which now we refer to as apps.  Can you
2 tell me how many of these apps are using the service and how
3 many phones are out there receiving the messages?
4 A.  Well, there are tens of thousands of these apps.  I
5 think 60,000 something I saw at one count and millions and
6 millions of these Android phones.  And, of course, remember,
7 most of these phones are going to have multiple of these
8 apps.
9 Q.  And this is from Exhibit 120 and 121; is that right?
10 A.  That's correct.
11 Q.  Those were the lists of apps that use the service?
12 A.  That was provided by Google, yes.
13 Q.  And when you say millions of Android phones and tens of
14 thousands of apps, are you talking about in the U.S.?
15 A.  That's worldwide numbers is my understanding.
16 Q.  Let's go to this last topic, which is the topic of
17 alternatives.  Briefly can you explain what we're about to
18 discuss here?
19 A.  One of the things I looked at is -- well, if Google were
20 trying -- to try to not infringe, what else could be done?
21 What alternatives are there to getting information to the --
22 to the user?  And those would be considered alternatives
23 that wouldn't involve this Google central broadcast server.
24 Q.  Did you consider the different alternatives that were
25 available to Google if they wanted to avoid infringing and

1    not have a central broadcast server?

2    A.   That's correct.

3    Q.   What's depicted on this slide?

4    A.   Well, the first thing that -- that came to mind is you

5    simply go back to what there was in 1996, which is you poll

6    for this information.  It's what everybody did on the

7    Android phones before 2010 when they rolled out C2DM.  And

8    everybody could just repeatedly pick up their phone or they

9    could have their phone automatically go out and for every

10   information source they were interested in, say is there any

11   new information that I want to know about?  Most of the

12   time, of course, as you see here, you get back the answer,

13   no.  Every now and then you get back a yes.

14   Q.   What are the problems with using this method instead of

15   the central broadcast server method?

16   A.   Well, two very important problems, and they kind of

17   trade off against each other.  The first one is timeliness.

18   If you -- if you poll let's say The Weather Channel for --

19   for any severe weather warnings and two minutes after you do

20   that, a tornado watch is posted for your area.  I grew up

21   around here, so I know about tornadoes coming through here.

22   That was two minutes after you poll, but you're only going

23   to let's say bother to check once an hour.  Fifty-eight

24   minutes later you're going to find out that there's a

25   tornado two blocks down the street.  That just may not be

1  worth it.

2          The other problem is that every time you poll, you

3  use some of the battery life -- some of the -- the energy

4  out of your phone.  So the more often you poll, the quicker

5  you drain the phone.  The less often, the less timely you

6  get the information.

7  Q.  This is Exhibit 117.  Can you tell us what this document

8  is?

9  A.  This is actually a Google document that they presented

10  to their own Google developers to explain why you didn't

11  want to poll, why that was not acceptable if you had an

12  alternative.  And the numbers, I won't bother explaining on

13  the right, but essentially, it talks about how much of the

14  battery life that every single one of those polling

15  operations will take.

16  Q.  Now, on this slide, you've got something similar

17  depicted, and it says maintain multiple connections.  Can

18  you explain what's shown here?

19  A.  Yeah.  This is sort of an end run.  Without going into

20  too much detail, this is doing something similar to what

21  GCM, the Google central broadcast server does.  Only instead

22  of it having a central broadcast server, you maintain an

23  individual open connection to each individual information

24  source.

25  Q.  Does -- I'm sorry to cut you off, but does this way of

1  doing things, does that avoid -- excuse me, does that solve

2  the issue of timeliness, making sure you get the information

3  --

4  A.  Yes, it does because just like that instantaneous

5  notification under '914 and under GCM, once the information

6  is available, tornado alert, it can shove that notification

7  right down to your phone.  So it does solve that problem.

8  Q.  So then why wouldn't Google just do this instead of

9  using the central broadcast server?

10  A.  Well, first off, this isn't Google.  Except for the

11  Android phone, this takes Google out of the picture to a

12  degree.  But the big problem is that it drains the battery.

13  Every time you have one of these connections, you have to

14  maintain it.  Every time you maintain it, it takes some

15  energy.  And the problem is the more of these connections,

16  the faster you drain the battery.  When you only had one

17  connection to the Google messaging service, the central

18  broadcast server, that's one drain on the battery.  If you

19  have to do this instead of through the central server, but

20  to each information source, then every single one of those

21  just multiplies out.  It's a bigger drain on the battery.

22  Phone goes dead that much faster.

23  Q.  If you use the central broadcast server method, can you

24  send messages using just one connection?

25  A.  Yes.  It only requires that the phone maintains one

1  single what they call persistent connection to the central

2  broadcast server -- to Google's software.

3  Q.  Under the Google system, the way it infringes, is there

4  still a drain on the battery?

5  A.  There is because you've got to maintain that connection,

6  but that maintenance is only for one.  So I guess if the

7  only thing you cared about in your life was tornado

8  warnings, it would be equivalent, but that's not realistic

9  and it doesn't make it a viable alternative.

10 Q.  If a user had multiple applications on their phone and

11 wanted to get notifications from each of those, what's the

12 difference in the battery drain between the multiple

13 connections and the central broadcast server method?

14 A.  In the simplistic answer, it -- it's just straight math.

15 If you have 10 apps you want to get notifications from, you

16 maintain 10 connections.  It's 10 times worse than if you

17 only had one.

18 Q.  Did you do any measurements of exactly how much battery

19 drain Google is saving on the Android phones by using the

20 infringing method as opposed to this other one?

21 A.  Yes, I did.  I'm a lot happier in a lab coat than a suit

22 and tie.  And we have an electronics lab there in my

23 company.  We have all the standard electronics equipment.

24 Some of it's shown here.  Some of it is a little unique.

25     The lower right-hand corner, the kind of outer spacey

1    looking thing there is actually our own cell tower, so the

2    -- we can maintain a specific constant signal strength to

3    the phone, wireless access point.  We did all this, and we

4    tested each of these phones in a variety of different

5    conditions, determined the battery drain from polling,

6    determined it for persistent, determined from then

7    mathematically what it would be for multiple persistent and

8    polling connections.

9    Q.   And what's shown on the screen now?

10   A.   That's off an oscilloscope.  An oscilloscope's just

11   something -- you see it on all the mad scientist movies --

12   turns electronic signals into something you can visually

13   see.  On the left is an idle phone.  It's -- it's not even

14   hooked up to GCM or anything.  It's -- we think of it

15   usually with the phone as being off, but it's actually on so

16   it can get these alerts and so it can get phone calls and

17   all.  And you really can't tell it from this picture, but

18   it's just ever so slightly above zero.  There's a slow

19   gradual use of the battery.  That's why your battery runs

20   down every week or so.

21            On the right-hand side is the same thing, but

22   we've turned on these persistent connections.  And what you

23   see there, and it's highlighted with a red arrow and all, is

24   that many, many, many fold greater cost of one of these

25   maintenance signals, what we call a keep alive of

1  maintaining this persistent connection.  That's just one,

2  and it happens repetitively.

3  Q.  What were the -- well, let me back up.  When you did all

4  this testing, did you come up with some sort of a formula

5  that would allow you to do these calculations and determine

6  how much battery drain was caused by the alternative that

7  Google could use?

8  A.  I did.  And you see a whole lot of numbers in that

9  formula there.  Those are unique to particular batteries and

10  phones and stuff.  But basically, the bottom line is the

11  more connections, the more battery drain.

12  Q.  Can you give us a couple examples?

13  A.  Based on -- on the average measurements there, yes.  If

14  we had one connection, as we say, that still places a drain

15  whether it's to GCM or somebody else.  If we have two apps

16  and they were making these connections, bypassing this

17  central broadcast server, that's 12.4 percent.  If we had

18  five apps doing it, 36.2 percent more drain on the battery.

19  The battery is going to run down sooner.

20  Q.  Of all the different alternative ways that Google --

21  that Google could provide notifications and avoid infringing

22  the SimpleAir patent, did you still conclude that this one

23  was the best they could choose?

24  A.  Kind of the best of a bad world, but, yes.

25  Q.  So these results here show your measurements of how much

1  they would have to cause drain on the Android phone battery

2  if they used their best alternative to infringing?

3  A.  That's correct.

4  Q.  Did you provide the results of your testing and this

5  formula to Dr. Srinivasan?

6  A.  Yes, I did.

7  Q.  And who is he again?

8  A.  He's the gentleman who -- well-respected gentleman who

9  goes out and knows how to do surveys, how to estimate what a

10 consumer finds important and not.  He can explain it better

11 than I can.  But he's a person who can tell you how

12 important that these things are to the -- to the customer.

13 Q.  Did the information you gave him allow him to calculate

14 how much battery drain would be caused based on how many

15 applications the user has on their phone?

16 A.  Yes.  I gave it to him as a spreadsheet so he could plug

17 in his own numbers based on what his research showed.

18 Q.  Now, there was another alternative that Google had

19 identified.  It's something they said they could do to avoid

20 infringement.  Can you briefly explain what this one is?

21 A.  This is United States patent -- the '914.  And as such,

22 it requires that everything be done in the United States.

23 Google suggested that one viable alternative would be to

24 move their servers overseas or outside the United States.

25 Q.  And they actually do have servers that are overseas for

1  these services; is that right?

2  A.  Yes, that is correct, they do.

3  Q.  So is it their contention that they could just use the

4  ones that are overseas instead of using ones in the U.S.?

5  A.  Well, I don't believe that's quite what they contend.

6  They still have to have the capacity.  They have to have the

7  resource.  Their contention was they could make that

8  resource available.

9  Q.  Now, in your report in this case, the report that you

10 submitted on infringement and validity, you addressed this

11 issue and provide several reasons in response.  I want to

12 just focus on one, and that's this one.  It's this other

13 patent, the '279 patent.  Can you tell us why in your view

14 Google could not simply avoid infringement by using the

15 servers that are located in Europe and in Asia to send these

16 notifications?

17 A.  Yes.  And I -- I want to caution everybody.  I'm not

18 here to give legal testimony, but the '914 is what we call a

19 method patent.  And every one of those steps, as I

20 understand it, have to be done in the United States.

21 SimpleAir also has a patent that you see here, one of the

22 claims.  It's called the '279.  It's very similar -- central

23 broadcast server, but it's what's called a system claim.

24 And my understanding is -- I've been instructed by -- by

25 legal counsel -- is that the '279 system patent would still

1  be infringed as long as the end points are here.  So as long

2  as ESPN is broadcasting a -- a sporting event here in the

3  United States, the phone here in the United States, they'd

4  still infringe.

5  Q.  As you understand it, can a system patent like the one

6  SimpleAir got that's shown here, can that still be infringed

7  in the U.S. by putting servers into -- let me -- let me try

8  that one over again.

9  A.  Thank you.

10 Q.  As you understand it, sir, can a system patent be

11 infringed if the system is put into use in the U.S., even

12 though the servers, the components of the system are located

13 outside the U.S.?

14 A.  That is my understanding, yes.

15 Q.  And was it your opinion then that moving the servers or

16 simply using the ones overseas would not be an acceptable

17 alternative for Google?

18 A.  That would be correct because they would still infringe

19 the '279 patent.

20 Q.  And that patent is Exhibit 7?

21 A.  That's correct.

22 Q.  Thank you, sir.

23 A.  Thank you.

24          THE COURT:  Dr. Knox.

25          THE WITNESS:   Yes, sir.

1          THE COURT:  If you'd remain in your seat.  I
2    haven't released you.
3          THE WITNESS:  Oh, I'm sorry.  My apologies, Your
4    Honor.
5          THE COURT:  You passed the witness?
6          THE WITNESS:  I was so happy to be through.
7          MR. EICHMANN:  Yes, Your Honor, pass the witness.
8          THE COURT:  Well, contain your happiness.  You're
9    not through yet.
10         Cross-examination.
11                     CROSS-EXAMINATION
12   BY MR. STOCKWELL:
13   Q.  Very sorry to disappoint you, Dr. Knox.
14         MR. STOCKWELL:  Which button was it?  Three.
15   Thank you, Mr. Barnes.
16   Q.  (By Mr. Stockwell)  Dr. Knox, good afternoon.
17   A.  Good afternoon, sir.
18   Q.  I'll let you get your water straight there.
19   A.  Yeah.
20   Q.  So you mentioned you had spent several hundred hours on
21   this case?
22   A.  I don't believe I mentioned an hour number, no, sir.
23   Q.  You -- you have a feel for how many hours you've spent
24   working on this case?
25   A.  I have a good feel for the amount of calendar time, and

1  it was certainly quite a few.  I would not be surprised at

2  your number.

3  Q.  And you charged for your time, I assume, to SimpleAir?

4  A.  That is correct, by the hour.

5  Q.  $250 an hour sound about right?

6  A.  That does.

7  Q.  Thank you.  Now, the '914 patent that we've been talking

8  about, I think we can agree that that patent does not say a

9  single word about battery life?

10 A.  That is correct.

11 Q.  And in the preferred embodiment, the commercial

12 embodiment, the AirMedia embodiment, they used a pager to

13 implement that patent?

14 A.  That is correct.

15 Q.  And a battery life of a pager wasn't an issue back in

16 1996?

17 A.  I -- I -- I'm sorry, I may have answered your question

18 slightly misleading then.  What they used was a device that

19 they developed, that they invented which used paging

20 signals.  It was not a -- a pager like you clip onto your

21 shirt.  So I believe it actually had its own power source.

22 It didn't use a battery.

23 Q.  Thank you for clarifying that.  So battery life wasn't

24 an issue when they were implementing the AirMedia product

25 back in the 1990s?

1  A.  That's correct.

2  Q.  Okay.  Thank you.  Now, as I understand your testimony

3  about the -- the battery life comparisons you made, you --

4  you compared the impact of battery life on one connection to

5  an application versus multiple connections to multiple

6  applications; is that fair?

7  A.  That's certainly one of the comparisons I made, yes,

8  sir.

9  Q.  Sure.  One of the comparisons.  And you talked about

10  those connections in terms of a persistent connection.  Do

11  you recall that?

12  A.  That is one of the forms of connection, yes.

13  Q.  And when was the '914 patent was filed, it didn't

14  mention persistent connections either?

15  A.  That's correct.

16  Q.  A persistent connection was not something that was used

17  by AirMedia Live service that implemented the '914?

18  A.  That is correct.

19  Q.  And the persistent connection is something that

20  Google's -- Google uses that's kind of standard technology,

21  right?

22  A.  It is today, yes.

23  Q.  Now, the tests you ran focused on something you called

24  battery standby time, correct?

25  A.  Well, it's the standby time of the device, which is a

function, among other things, of the battery capacity.

Q.   Right.   And what -- what you mean by standby time is sort of how long if you have your phone on a table, you're not using it, how much battery power in terms of life the phone will have without -- without any use; is that fair?

A.   I'm not sure without any use is the -- the correct term because, of course, it is sitting there.   As I said a moment ago, it's actually drawing current out of the battery because it is keeping the receivers alive.   If it weren't, it couldn't get these notifications.   It couldn't get a phone call.   But it's without the user picking it up and looking at a video or doing these other interactive things himself.

Q.   And those other interactive things, like making a phone call or browsing the web or watching a video, they're going to use up a whole lot more battery power than these keep alive messages that you mentioned?

A.   That's not quite correct, sir.

Q.   Over the same --

A.   During -- during the interval that they're being used, they will use power at a much greater rate.   But, of course, this keep alive and all goes on even when the person is asleep.

Q.   Thank you for clarifying, Dr. Knox.   So over the same 30-minute period, if I'm watching a video over 30 minutes,

1    that's going to use a lot more power than over that same

2    period if I'm only sending keep alive messages?

3    A.   That would be correct, sir.

4    Q.   Okay.  So the -- the -- your study did not take into

5    account sort of normal consumer uses of the phone when

6    you're watching a video, browsing the web, doing e-mail,

7    talking to somebody on the phone, that's not the kind of

8    standby time study that you did?

9    A.   Well, that wouldn't be considered standby time, so that

10   is correct.

11   Q.   Okay.  And -- and -- so you didn't consider the impact

12   of normal usage on battery power -- battery standby time?

13   A.   You would have to define normal usage to do that.  For

14   myself, that frankly is not too different because I don't

15   use my phone for streaming videos.  Other people may.  So,

16   yes, I -- I compared it to what the manufacturer publishes

17   -- one of the things they publish is what is called standby

18   time, and that does not take these other things into

19   account.

20   Q.   And the percentage impact on battery life that you

21   testified about today, that would have been much smaller if

22   you took into account some normal uses, such as watching a

23   movie, browsing on the web, or talking on the phone?

24   A.   To the extent that those things reduce the available

25   standby time, then the percentage impact would be reduced,

1   yes.

2   Q.   Okay.  So I want to talk to you about one of the slides

3   you put up.  It was how many times that you believe Google

4   to have infringed and the basis for that view.  Do you

5   remember that testimony?

6   A.   I do.

7   Q.   And specifically you were trying to get to the issue of

8   how many times Google had infringed in the United States,

9   right?

10  A.   That's correct.

11  Q.   And that's because this is a U.S. patent?

12  A.   And because Google had provided with any information of

13  that.

14  Q.   Okay.  And -- and -- but the reason is you can't look at

15  just worldwide revenue.  SimpleAir has to get something in

16  as to what the U.S. -- sorry, you can't look at worldwide

17  usage, you got to get something in as to U.S. usage,

18  correct?

19  A.   The -- the infringement is for those messages that are

20  within the U.S.

21  Q.   Okay.  And when you looked at that, you have to look at

22  the messages -- the volume of messages for Google that

23  actually went through servers located in the U.S., right?

24  A.   That's correct.

25  Q.   And you have to look at the messages that were actually

1    delivered to the phones in the U.S.?

2    A.  That's correct.

3    Q.  Now, you understand that Google currently has some of

4    the servers that make up the central broadcast server

5    located outside the United States?

6    A.  I'm sorry.  Are you asking about for U.S. messages, or

7    are you simply talking about does Google practice GCM around

8    the world?

9    Q.  The latter?

10    A.  Yes, I am aware that GCM resides in foreign servers, as

11    well as domestic.

12    Q.  And you're aware that many of the messages that get

13    delivered to Google -- Google Android-based devices in the

14    United States, the messages are routed through servers

15    located outside the United States?

16    A.  I don't believe I have any evidence of that.

17    Q.  Okay.  We'll -- we'll -- we'll look at some of the

18    material you had.  Maybe I can refresh your recollection on

19    that.

20    A.  Thank you.

21    Q.  So let's look -- look at Plaintiff's Exhibit 99, if you

22    can go to Page 7.  You recognize this information that you

23    relied on in trying to determine how many messages Google

24    sent through servers located in the U.S., don't you, Doctor?

25    A.  I've seen that chart.

1    Q.  Right.  So this is a formal response that Google gave

2    that identified the location of various servers?

3    A.  Yes.

4    Q.  And the location on the left-hand column there, it says

5    the location of the sender I -- IP.  That's -- that's like

6    where Facebook or whoever generates the -- the message is

7    located?

8    A.  That would be correct.

9    Q.  And on the right-hand side where it says geolocate --

10   geolocation of device IP, that's where the target Android

11   device is located?

12   A.  Yes, that would be correct.

13   Q.  And those two entries in the middle, those are some of

14   the servers that make up the central broadcast server?

15   A.  It says data center.  Yes, I would expect that that

16   would be the servers that make up the central broadcast

17   server.

18   Q.  Right.  And you can see there are entries there that say

19   unknown, U.S., or non-U.S. that correspond to the various

20   rows and columns here?

21   A.  Yes.  Is there a title on this that says something like

22   per day, per year, per --

23   Q.  We can go back up, but I believe this is per day.

24   A.  Okay.

25   Q.  This is -- this is the per day --

1    A.   Thank you.

2    Q.   -- information that you were looking at.  Okay.  So if

3    we go down to --

4         MR. STOCKWELL:  There's a row, Mr. Barnes, that

5    has U.S. -- U.S., U.S., U.S. across all four columns.  I

6    think it may be on the next page.  Oh, sorry the last one.

7    Yes, thank you.  It was on the next page.

8    Q.  (By Mr. Stockwell)  All right.  So this row, you --

9    you -- you had said Google didn't tell you where all the

10   messages were in which all of the servers are located in the

11   U.S., but the line in this interrogatory response, sir, it

12   has U.S. location of -- of the sender.  It has U.S. location

13   of the data center handling the request.  It has the U.S.

14   location of the data center delivering the message.  It has

15   U.S. location of the Android device.  And if you could, how

16   many messages -- how many -- in that last column where it

17   says number of send requests, how many is that?

18   A.   Well, the number in that column that you've highlighted

19   there, I disagree with the supposition, but the number there

20   is just a little less than 200 million -- 193 million plus.

21   Q.   Okay.  And if you just look just above that, there's a

22   -- there's a number just above that, and it says location of

23   data center delivering the message non-U.S.?

24        MR. STOCKWELL:  No, Mr. Barnes, you were fine

25   where you were.  Thank you.

1  Q.  (By Mr. Stockwell)  The very -- the entry right there

2  above however many messages are there, those messages would

3  not infringe because they went through a non-U.S. server,

4  correct?

5  A.  Would not infringe '914, that's correct.

6  Q.  That's correct.  Okay.  Thank you.  Now, I wanted to go

7  back to your Slide 19 that you presented.

8         MR. STOCKWELL:  If you could pull up Dr. Knox's

9  Slide 19, Mr. Barnes.  If you could just blow up that

10  language.

11  Q.  (By Mr. Stockwell)  Your -- your testimony today in this

12  trial is Google infringes several hundred million, if not

13  several billion times per day.  Is that your testimony?

14  A.  That's correct, sir.

15  Q.  Okay.

16         MR. STOCKWELL:  Now, if you could pull up Dr.

17  Knox's original Slide 133.

18  Q.  (By Mr. Stockwell)  I think you mentioned you also

19  testified in the first trial, didn't you, Dr. Knox?

20  A.  That's correct.

21  Q.  Now, in the first trial, your testimony was as to how

22  many times has Google infringed, hundreds of millions of

23  times each day in the United States, you remember that,

24  don't you, sir?

25  A.  I do.

1   Q.  Now, one other question I have is you mentioned that

2   there is something called the '279 patent.  You would agree

3   that up through -- you would agree that in May of 2010 when

4   Google introduced the Google Cloud Messaging Service, that

5   they had data centers all over the world?

6   A.  That's my understanding.  I don't have hard evidence,

7   but, yes, I would accept that.

8   Q.  And they had servers in the United States, Europe, and

9   Asia?

10  A.  That is correct.

11  Q.  And you take the position that Google -- Google's

12  routing -- their alternative of routing the messages through

13  those servers outside the United States would not be

14  feasible because of the '279 patent, right?

15  A.  The '279 patent -- actually what I said was the '279

16  patent, as I understand it, not as legal expert, would still

17  be infringed even if those GCM servers, the central

18  broadcast servers, were moved outside of the United States,

19  either in part or in whole.

20  Q.  Right.  And -- and I'm asking -- let's go back in time

21  to May of 2010, okay?  You with me?  I'm asking you to make

22  an assumption.  Google had a choice.  They could have put

23  their servers in the U.S. or they could have put them in

24  their existing data centers outside the U.S.  Are you with

25  me so far?

1    A.   I believe so.

2    Q.   Okay.  Now, in May of 2010, when Google had that choice,

3    if it had chosen to put the servers for the Google messaging

4    center outside of the United States, the messages would flow

5    through those servers, they would be delivered to U.S.

6    customers, U.S. customers wouldn't notice any difference in

7    terms of quality of service; you would agree with that?

8    A.   No, sir.

9    Q.   Okay.  So do you know whether they would actually notice

10   a difference?

11   A.   Not based on the extremely limited amount of information

12   you've given me, no.

13   Q.   But, sir, we just looked at an interrogatory

14   response, and I thought we showed you a situation where

15   messages were being delivered to U.S. subscribers

16   already by Google with servers located outside the

17   United States, right?

18   A.   Yes, you did.

19   Q.   So that's some evidence that Google could move the

20   server outside the United States and still successfully

21   deliver messages to consumers; you would agree with that?

22   A.   The question's obviously much more complex than -- than

23   the way you're asking it.  And I disagree as a general

24   premise that you could do what -- what you suggest unless

25   you throw enough money at it to make up for that difference.

1  Q.  So are you saying that Google has never successfully

2  delivered messages into the United States through servers

3  located outside the United States?

4  A.  No, sir, absolutely not.

5  Q.  Okay.  Are you agreeing with me that the evidence in

6  this case, including the evidence that you reviewed in the

7  interrogatory response that we just went through, actually

8  show Google actually has successfully delivered messages to

9  users in the United States with servers located outside the

10  U.S.?

11  A.  Yes, I -- I do not question that at all.

12  Q.  Okay.  Thank you.  Now, going back to our hypothetical.

13  We're back in May of 2010.  Google put servers outside the

14  United States.  You say, well, there's this '279 patent.  I

15  want to ask you about that.  The '279 patent, it did not

16  exist in May of 2010, did it?

17  A.  That's correct.

18  Q.  In fact, it was not even filed until January of 2011?

19  A.  I believe that date is correct.

20  Q.  And it did not even issue until October 29th of last

21  year, 2013?

22  A.  That's consistent with what I recall.

23  Q.  And you understand that Google cannot have infringed a

24  patent that did not even issue?

25  A.  At -- until it issued, yes.

1  Q.  Right.  So from May of 2010 until October of 2013, there

2  could be no possible infringement of this '279 patent?

3  A.  You're getting perilously close to a legal question

4  there, but I believe you are correct.

5  Q.  Thank you.

6          THE COURT:  You pass the witness, Mr. Stockwell?

7          MR. STOCKWELL:  Oh, I apologize, Your Honor.  I

8  pass the witness.

9          THE COURT:  Mr. Eichmann, additional direct?

10          MR. EICHMANN:  Yes, Your Honor.

11                    REDIRECT EXAMINATION

12  BY MR. EICHMANN:

13  Q.  Dr. Knox, does it matter that SimpleAir's patent doesn't

14  talk about battery life?

15  A.  No.  In fact, there's a thing called unexpected benefits

16  when you -- when you talk about patents.  At the time of

17  AirMedia's patent -- I'm sorry -- yeah, AirMedia's patent,

18  the big thing was -- was money and -- and this thing about

19  having to stay connected.  My mother down off Lake Murvaul

20  here was on a party line.  And if you stay connected, not

21  only did you -- did it cost you a lot, but people got mad at

22  you.  Not long after that, which is one of the problems

23  AirMedia had, the world changed.  Instead of spending $30 an

24  hour for connect time, you were spending $30 a month, and it

25  became not a problem.  Then people started using cell phones

1   and things and battery life became important. The '914

2   addresses that.

3   Q. In the last trial when you were talking about why the

4   invention is valid, why it was a real invention, did you

5   identify this unexpected benefit of battery savings as one

6   of the reasons it was valid?

7         MR. STOCKWELL: Objection.

8         THE COURT: State your objection.

9         MR. STOCKWELL: Your Honor, beyond the scope and

10   goes afoul of the motion in limine.

11         THE COURT: Sustained.

12   Q. (By Mr. Eichmann) Dr. Knox, I want to pull up the

13   interrogatory response that counsel showed you about the

14   number of messages.

15   A. Thank you.

16   Q. Now, an interrogatory response, this is something that

17   Google provided in writing during the case; is that right?

18   A. That's correct.

19   Q. And this part here is what they had you focus on. Let

20   me just move it over a little bit. Now, what's shown there

21   says all U.S. messages, right?

22   A. Right. That's a line that we absolutely know we can

23   count because it starts in the U.S., it goes through the

24   U.S., and it ends in the U.S.

25   Q. But this here, this line, this is not the total number

1   of messages, not even for that day for the U.S., right?

2   A.  Very much so.  That's why I took exception to the -- to

3   the question the way he asked it.

4   Q.  And if we look up in the same document, there are other

5   lines that also identify U.S. notifications; is that right?

6   A.  There are lines for which all or part of those numbers

7   may also be infringing.  For instance -- well, wherever you

8   want to go.  The ones I suspect that you have highlighted

9   here are all potential infringing messages.

10  Q.  So when you performed your analysis and created an

11  estimate of how many times Google is infringing the

12  SimpleAir patent in the United States, did you consider all

13  this information?

14  A.  Yes.  I used Google's table and -- and applied what I

15  felt was reasonable.

16  Q.  And that's how you came to the number of several billion

17  per day?

18  A.  That's one of the things, yes.

19  Q.  Thank you.

20          MR. EICHMANN:  Pass the witness, Your Honor.

21          THE COURT:  Additional cross?

22          MR. STOCKWELL:  No, Your Honor.

23          THE COURT:   Now you may step down, Dr. Knox.

24          THE WITNESS:  Thank you, Your Honor, very much.

25          THE COURT:  All right.  Ladies and gentlemen,

1  before we call the next witness, we're going to take a brief

2  recess.  I expect us to be about 15 minutes.  You may leave

3  your juror notebooks in your chairs.  Once you get to the

4  jury room, stretch your legs, get a drink of water, don't

5  discuss the case among yourselves, and we'll have you back

6  in here shortly to take up with the next witness.  But

7  you're excused for recess at this time.

8              COURT SECURITY OFFICER:  All rise.

9              (Jury out.)

10             THE COURT:  All right.  Be seated, please.

11             Counsel, we're getting a lot of feedback on the

12  court reporter's recording system when you are at the bench

13  for bench conference.  It's my suspicion that somebody or

14  more than one person has a cell phone in their pocket that's

15  close to this electronics that might be causing that.  If

16  you've got a cell phone in your coat pocket or some other

17  place on your person, try to not bring it with you when you

18  come to the bench next time and let's see if that makes a

19  difference on the feedback problem.  With those

20  clarifications, we stand in recess.

21             COURT SECURITY OFFICER:  All rise.

22             (Recess.)

23             COURT SECURITY OFFICER:  All rise.

24             THE COURT:  Be seated, please.

25             Let's bring in the jury, Mr. McAteer.

1    COURT SECURITY OFFICER:  All rise for the jury.

2    (Jury in.)

3    THE COURT:  Be seated, ladies and gentlemen.

4    Plaintiff, you may call your next witness.

5    MR. EICHMANN:  Your Honor, we're going to play

6 video testimony from one of the Google witnesses.  This is

7 very short testimony from Felipe Leme from one of the Google

8 engineers.  And this will last about one minute.

9    THE COURT:  All right.  Proceed.

10    (Video clip playing.)

11    QUESTION:  Would you please state your name for

12 the record?

13    ANSWER:  My name is Felipe de Almeida Leme.

14    QUESTION:  What is your job?

15    ANSWER:  I'm a software engineer.

16    QUESTION:  Who do you work for?

17    ANSWER:  Google.

18    QUESTION:  So the fact that the GCM uses the MCS

19 connection for all of these different third-party

20 applications, that optimizes battery life; is that correct?

21    ANSWER:  Yes, I believe so.

22    QUESTION:  Why would using the same MCS connection

23 rather than many different connections improve battery life?

24    ANSWER:  Because any connection, it's -- it's

25 expensive resource.  You need to keep the socket open, file

1  system.  So there -- there -- there is many work behind the

2  scenes that operation system has to do.  So the less

3  connections open you have, the less processing powers --

4  processing is done by the CPU and system, and then that --

5  that means less methodization.

6            (End of video clip.)

7            MR. EICHMANN:  That's the end of that.  We'd like

8  to call Dr. Seenu Srinivasan.

9            THE COURT:  All right.  This witness has been

10  sworn, correct, Counsel?

11            MR. DOVEL:  Yes, Your Honor.

12            THE COURT:  Okay.  Please have a seat, sir.

13  All right.  Counsel, you may proceed.

14            MR. DOVEL:  Thank you, Your Honor.

15       SEENU SRINIVASAN, Ph.D., PLAINTIFF'S WITNESS,

16                    PREVIOUSLY SWORN

17                  DIRECT EXAMINATION

18  BY MR. DOVEL:

19  Q.  Dr. Srinivasan, can you tell us what questions you are

20  here to answer for the jury?

21  A.  Good afternoon.  I am supposed to answer the question of

22  what is a smartphone market willing to pay for the

23  incremental benefit they get from the infringing technology

24  compared to the non-infringing technology.

25       And in addition, if this infringing technology were

1  offered as an option at the market willing to pay price,

2  what fraction or what percentage of Android users would buy

3  that option.

4  Q.  Did you find the answers to those questions in your

5  work?

6  A.  Yes.

7  Q.  Can you just tell us briefly what those answers are?

8  A.  The smartphone market is willing to pay $12.23 for

9  using the infringing technology compared to the

10  non-infringing technology.  And second, if the

11  infringing technology is offered at $12.23, 42 percent

12  of Google Android smartphone users will, in fact,

13  purchase that offer.

14  Q.  Was there a particular method or technique that you used

15  to find these answers?

16  A.  Yes.

17  Q.  What is that called?

18  A.  It's a type of survey called conjoint analysis.

19  Q.  Can you give us just a brief one- or two-sentence

20  description of conjoint analysis?

21  A.  Conjoint analysis is a customer survey method by which

22  you can determine what are the values customers attach to

23  different features of a product, even though those features

24  are not priced separately.

25  Q.  All right.  I want to ask you some questions about your

1  background and your education.  Let's start actually with

2  your education.

3      Can you tell the jury briefly about your educational

4  degrees that relate to your -- your ability to testify here

5  today about conjoint analysis?

6  A.  My undergraduate degree in bachelor of technology in

7  mechanical engineering was from the Indian Institute of

8  Technology in Chennai, India.  I got my master's and Ph.D.

9  from Carnegie Mellon University in Pittsburg, Pennsylvania.

10  Q.  And what was your Ph.D. in?

11  A.  My Ph.D. was in business administration.

12  Q.  After getting that Ph.D., what did you do at that point?

13  A.  I started my teaching career at the University of

14  Rochester in Rochester, New York.  For three years, I stayed

15  there before moving on to Stanford University.

16  Q.  Are you still at Stanford?

17  A.  Indeed.

18  Q.  How long have you been at Stanford?

19  A.  I've been a professor at Stanford for the past 40 years.

20  Q.  And did you do research and teaching at Stanford?

21  A.  Yes, indeed.

22  Q.  And now in the course of your work in your research, did

23  you develop a particular expertise?

24  A.  Yes.

25  Q.  What is your expertise in?

1    A.   My expertise is in this area known as conjoint analysis.

2    Q.   At Stanford, have you taught classes on conjoint

3    analysis?

4    A.   Yes.

5    Q.   Have you done research on topics related to -- or topics

6    involving conjoint analysis?

7    A.   Very much so.

8    Q.   Have you had any research publications that have been

9    published in peer-reviewed journals that relate to conjoint

10   analysis?

11   A.   Indeed.

12   Q.   Have -- about how many published research journals have

13   you had published that are in the field of market research

14   and market analysis?

15   A.   The total number of research publications is about 80,

16   8-0.

17   Q.   All right.  Now, have you also worked as a consultant

18   for companies to conduct conjoint analysis research?

19   A.   Yes.

20   Q.   And have you produced or created software that companies

21   can use to conduct conjoint analysis?

22   A.   Indeed.

23   Q.   What's the name of that software?

24   A.   The current software is called ASEMAP.  It can be

25   spelled A-S-E-M-A-P but ASEMAP.

1    Q.  Can you identify some of the companies that have used

2    your conjoint methods for their products and services when

3    trying to find out answers?

4    A.  For example, Colgate Palmolive, Johnson & Johnson, Wells

5    Fargo, and Philips.

6    Q.  What about -- what about eBay?

7    A.  EBay has used it; Marriott has used it.

8    Q.  What about Pfizer?

9    A.  Pfizer, too.

10   Q.  Have you conducted conjoint analysis research on

11   consumer electronics before you conducted the research on

12   smartphones in this case?

13   A.  Yes, indeed.

14   Q.  Can you give us examples of some consumer electronics

15   you've done conjoint analysis on before you did the

16   smartphone research?

17   A.  Yes.  I have done it on digital cameras, laptop

18   computers, and also as I mentioned, this Philips electric

19   toothbrush.

20   Q.  Now, in the field of market research, are there any

21   awards that are given to recognize outstanding work in the

22   field?

23   A.  Indeed.

24   Q.  What -- can you identify what those awards are?

25   A.  There are three awards in market research.  One is the

1  Hardin Award; another one called the Churchill Award; and a

2  third one called the Converse Award.

3  Q.  Dr. Srinivasan, were you fortunate enough to win any of

4  those awards?

5  A.  Indeed.  I've been lucky enough to get all three of

6  those.

7  Q.  Right.  Now, have you prepared a summary of your

8  experience and research publications which is Exhibit 33 in

9  this case?

10  A.  Yes.

11  Q.  Now, can you just tell the jury briefly -- well, where

12  do you live now?

13  A.  I live in Los Altos, California, which is right next to

14  Palo Alto, California.  We are 40 miles from San Francisco.

15  Q.  Can you tell the jury just briefly something about your

16  family?

17  A.  I'm married for the past 42 years.  And my wife and I

18  have two grown boys, and all of us are in the teaching

19  business.  My wife does the most important teaching to

20  kindergarten, and they all -- the two sons as well as myself

21  are professors.  My two sons are both professors at the

22  University of California; one in Los Angeles and another one

23  in Berkeley, California.

24  Q.  In doing your work in this case, before you got started

25  or at any point, were you told or instructed or guided in

1   reaching any particular results?

2   A.  No.

3   Q.  Were you told that the amount that you would be paid

4   would be greater or lesser depending on any -- any results

5   that you reached?

6   A.  No.

7   Q.  Were you -- how were you paid?  Was it by the hour, or

8   how were you paid?

9   A.  I was paid by the hour.

10  Q.  And at what rate?

11  A.  $900 an hour.

12  Q.  How does that compare to the rate when companies hire

13  you to do conjoint analysis on their products, do you charge

14  the same rate or a different rate?

15  A.  It's exactly the same rate.

16  Q.  If Google had hired you in this case to do a conjoint

17  analysis, is that the same rate that you would have charged

18  Google?

19  A.  Yes.

20  Q.  If Google had hired you to do this -- answer these

21  questions, would you have used this same approach or reach

22  the same results?

23  A.  Yes.

24  Q.  Do you have any particular bias against Google?

25  A.  No.

1  Q.  All right.  Let's talk about your survey.  Now, why --

2  in trying to find out answers to how important these

3  infringing notifications are, why can't you just ask people

4  directly, give them a survey, ask them what they would pay

5  for?

6  A.  What we have learned in research in the past is that if

7  you directly ask people how much they're willing to pay, you

8  get inaccurate answers.  In general, we get numbers too

9  high.  People say they are willing to pay, but then, in

10  fact, if they have to buy it, they don't -- they actually

11  are not willing to pay that much.

12  Q.  What does conjoint analysis do differently that allows

13  you to find correct answers?

14  A.  First, it puts this feature which you are questioning in

15  the context of other features so that you don't ask the

16  question directly only with respect to one feature.

17      Secondly, it asks you to trade off; in other words, is

18  this more important or that is more important.  How much

19  more important is this feature compared to that feature.  By

20  asking a series of questions like this, it gets more

21  accurate results.

22  Q.  Now, is it based on just asking one question?

23  A.  No, multiple questions.

24  Q.  And what's done when you get answers to those multiple

25  questions?

1   A.  So we take all those answers together, analyze it using

2   a computer program that I have done, and using that computer

3   program, you can determine how much importance customers are

4   attaching to the different features.

5   Q.  Is conjoint analysis recognized as good science in the

6   marketing research community?

7   A.  Indeed.

8   Q.  How do you know that?

9   A.  Well, the field has been around for about at least 40 --

10  35 years, let us say.  And a lot of research is published in

11  the top journals in the field, and it is routinely used.

12  Q.  Is it commonly used by companies, major companies who

13  had products or services that want to find out what will be

14  the result if they add a particular feature to a product or

15  service?

16  A.  Indeed.

17  Q.  Do you know about how many times it's -- it's used?

18  A.  Conjoint analysis itself is used more than 18,000

19  commercial applications each year all over the world.

20  Q.  In doing your work in this case, what particular feature

21  or features of smartphones were you trying to find out

22  information about?

23  A.  I needed to find out about three things.  One, the

24  notification feature, which we have been talking about;

25  second, battery life, which also we have been talking about.

1  And because I needed to answer the question in terms of

2  dollars and cents, I needed to also find out how much

3  importance customers attach to price itself.

4  Q.  Why is it that -- if you wanted to find out the value of

5  notifications, why were you focused -- why did you include

6  battery life in your analysis?

7  A.  Well, as I mentioned before, my task was to find the --

8  what -- how much the market is willing to pay for the

9  incremental benefit from the infringing technology compared

10 to the non-infringing technology.

11      If you use a non-infringing technology, that the

12 battery life, the drain on battery is going to be much more;

13 and, therefore, if I'm comparing the infringing technology

14 to the non-infringing technology, I needed to take into

15 account how much is that additional battery life lost by the

16 non-infringing technology worth to consumers.

17 Q.  What was the source of information for how -- how

18 notifications affected battery life?

19 A.  Dr. Knox had supplied to me two formula, one for the

20 infringing system and one for the non-infringing system.

21 Q.  Did you ask consumers just about those three things;

22 that is, notifications, battery life, and -- and the value

23 of a dollar or price?

24 A.  No.

25 Q.  Did you -- did you include other features?

1  A.  Yes.  I included 13 more features in addition to those

2  three features.

3  Q.  I placed on the screen a list of features.  Do you

4  recognize this?

5  A.  Indeed.

6  Q.  And what is this?

7  A.  This is the list of 16 features that I actually included

8  in my customer survey.

9  Q.  And why are you including additional features if you're

10  just interested really to the answer of about three of them?

11  A.  Well, if you ask a question only about those three

12  features, then you are kind of overemphasizing those

13  features, and you may get inflated answers.  So by putting

14  those three features in the context of 13 other features,

15  then you get more realistic answers.  This is what we have

16  learned in conjoint analysis.

17  Q.  Let's talk about how this survey was actually taken.

18  Was this done by calling up people on the phone?

19  A.  No.

20  Q.  How was it implemented?

21  A.  We took a scientifically sound random sample of U.S.

22  adults, asked them first questions about whether they own a

23  smartphone; in particular that it can connect to the

24  Internet, can receive email messages, and can -- and the

25  person can download applications on that smartphone.  And

1  then the questionnaire was administered to them on the web.

2  Q.  On the web, on the Internet?

3  A.  Yes.

4  Q.  How many participants or survey respondents did you use

5  for your research?

6  A.  623.

7  Q.  Is that a big enough sample to get reliable answers?

8  A.  Yes.

9  Q.  How do you know that?

10  A.  Well, the typical sample size in conjoint survey studies

11  is around 300 to 400.  So this is larger than that.

12  Q.  Did -- were you able to compute a margin of error as a

13  result of doing your work in this case?  That is, you could

14  give us an estimate of how far off your answer might be?

15  A.  Indeed.

16  Q.  Now, when you were -- when you were taking -- doing this

17  survey, was it limited just to Android phone users?

18  A.  No.

19  Q.  Why not?

20  A.  Because, in other words, you have to ask yourself, when

21  Android is considering whether -- whether or not they should

22  provide this infringing technology, one of the reasons that

23  they are actually doing this is to attract customers from

24  other telephone -- other smartphone companies, because

25  everybody is trying to increase their market share.

1    So if you're trying to do that, then I need to

2  understand how other customers who are currently not Android

3  customers would respond to this infringing technology

4  compared to the non-infringing technology.

5  Q.  When did you conduct this survey?  When was it

6  implemented?

7  A.  In February of 2012.

8  Q.  I want to ask you -- withdrawn.

9    In your survey, were the -- were customers asked to make

10  tradeoffs like you discussed earlier between two different

11  things?

12  A.  Yes.

13  Q.  I want to show you one of the screens that was from your

14  survey.  Do you recognize this?

15  A.  Let me just wear my other glasses, if you don't mind.

16  Yes, I do recognize it.

17  Q.  Can you -- is this -- can you generally describe for the

18  jury what this is?

19  A.  Here, for example, we're asking the customer -- the

20  consumer, is price more important to you or screen size more

21  important to you.  And initially, you are seeing these two

22  bars which indicate how important they are to you, kind of

23  their equal, 50/50.  The bar lengths are equal.

24    Now, if the customer feels one of them is more

25  important to that particular customer than the other one,

1  they will click on that thing which they think is more

2  important and drag it.  For example, in this particular

3  case, this customer thinks that price is more important than

4  screen size.  So his or she has dragged that to the right,

5  and as she drags it to the right, the other one drags itself

6  to the left so that you can't say both are important.  You

7  have to say how much more important one is compared to the

8  other.

9      In this case, it's like nine times more important,

10  price is, compared to screen size.

11  Q.  Here's another example.  What's being compared here?

12  A.  Here, too, other features are being compared.  One is

13  touchscreen and the other one is notifications.  And, again,

14  how much more important is one compared to the other.

15  Q.  Now, what if a customer concludes that a particular

16  feature is not important at all compared to something else

17  that the customer or the survey respondent is being asked to

18  compare?

19  A.  Suppose, for example, the customer thinks that

20  notifications and getting the notification quickly as

21  opposed to not getting it is not particularly important to

22  them, then -- this is the bottom feature in this particular

23  screen -- they will drag it to the left so that essentially

24  you can tell that that has no importance or main importance.

25  If they are to compare touchscreen to notifications,

1   touchscreen is much more important than notifications.

2   Q.  After the survey was completed and you calculated your

3   results, did you have any statistical test available to you

4   to determine how reliable the -- the data was that you

5   received?

6   A.  Indeed.

7   Q.  What's the name of that test?

8   A.  It is called the correlation coefficient.

9   Q.  When you analyzing -- did you analyze the correlation

10  coefficient in this case?

11  A.  Yes.

12  Q.  What did it tell you about the reliability of the data

13  from the respondents?

14  A.  If I -- I had the total sample as I mentioned of 623

15  people.  Of them, some of them are of higher quality data.

16  If I took the higher quality data, the average correlation

17  was 0.88.  That's like 88 percent.

18  Q.  What does that mean?

19  A.  That's a very high correlation.

20  Q.  Now, I'm going to ask you something about this concept

21  of market willingness to pay, and I'd like you to explain

22  what this concept is, what this -- what this means using

23  this diagram that's on the board now.

24  A.  Yes.  So in this board, currently we have a smartphone

25  without the feature, and the phone is currently selling for

1    $200.  Now, we can put an attractive feature on it, for

2    example, notifications, and that increases, of course, the

3    appeal of this smartphone at least for some users.  And,

4    therefore, the demand for that phone, if the price is kept

5    at $200, will go up.

6        Now, the question we ask ourselves is how much can I

7    increase my price and still keep the unit sales the same as

8    before.  That is, what is the increase in price.  What is

9    shown there a little bit of a red mark there, how much can I

10   increase my price because I have provided the desirable

11   feature so that we just make the total sales remain the same

12   as it was before.

13   Q.  And what is market willingness to pay?

14   A.  Market willingness to pay is that incremental price

15   which makes the unit sales remain the same before and after.

16   Q.  If price is not increased and a feature's added, what

17   happens?

18   A.  Then you have unit sales will increase.

19   Q.  What do you mean by unit sales?

20   A.  That is, the total number of smartphones, for example,

21   which have the Android operating system, will increase.

22   Q.  Is there a particular method that you used in order to

23   calculate the market's willingness to pay after you received

24   all your data?

25   A.  Yes.

1    Q.   And what's shown on the board at this point?

2    A.   This is a research paper I published with Professor

3    Ofek, who is a professor of Harvard Business School.

4    Q.   How does this relate to the method that you used to

5    calculate the market's willingness to pay?

6    A.   As the title indicates, it very much is to do with how

7    much the market is willing to pay for a feature.

8    Q.   And what is on the screen now this -- with this No. 14

9    at the end of it?

10   A.   There's a little bit of Greek and Latin, I apologize.

11   But it gives you a formula, a mathematical formula, for

12   calculating that market willingness to pay.  And it is

13   called Formula 14 in this particular paper.

14   Q.   Is this formula one that is recognized in the market

15   research field?

16   A.   Yes.

17   Q.   How do you know?

18   A.   Well, the market research -- the marketing science

19   community as it is called recognizes in each year the paper

20   which has had the biggest contribution that year, and this

21   particular paper won that award in that particular year.

22   Q.   What year was that?

23   A.   2002, I believe.

24   Q.   Is this formula or variations of it used in market

25   research commonly in order to calculate market willingness

1    to pay?

2    A.  Yes.

3    Q.  Well, let's turn to your answers in this case, and I put

4    on the board a chart that has a lot of numbers.

5        Do you recognize this?

6    A.  Indeed.

7    Q.  Okay.  I just want to focus on the first line and then

8    walk through it.

9        Can you tell us what is that first column, the one that

10   says O-S weights?

11   A.  Well, we just talked about that formula that Greek and

12   Latin formula I showed a minute ago.  So the question is

13   asking -- the first column is, did we use those, the exact

14   formula or variation thereof.

15   Q.  What is the second column smartphone price range?

16   A.  The second column is saying -- I want -- I want the

17   answer -- for any smartphone, which is in that price range,

18   $50 all the way to $300.  This is the price for a two-year

19   contract of a smartphone with a service provider such as

20   AT&T or Verizon.

21   Q.  And what is the next column, MWTP?

22   A.  The MWTP stands for what the market is willing to pay,

23   market willing to pay, and that is $12.23 for the Android

24   smartphones.

25   Q.  Is that the result of your research and use of

1  this -- the formula that you described earlier, the tech

2  sheet you described earlier?

3  A.  Yes.

4  Q.  Now, there's two more columns after this, after $12.23.

5      Can you explain to the jury what those are?

6  A.  This is the thing about margin of error we talked about.

7  So the question is, I want to be 95 percent confident that

8  the answer I give you is the right answer.

9      If you ask me -- to give me one answer only, I would

10 have told you $12.23.  But if you want to ask me -- I want

11 to be 95 percent confident your answer is right, I am

12 telling you here that the answer has to be $8.33 on the low

13 end to $16.14 on the high end.

14 Q.  How were you able to calculate this 95 percent

15 confidence?  Is that a statistical technique or what is it?

16 A.  Yes, it is a statistical technique.

17 Q.  Is it a technique that's recognized and used in the

18 market research community?

19 A.  Yes.

20 Q.  Let's go down to the next columns.  Can you -- without

21 walking through all of them, just barely explain what's

22 shown in those three other columns?

23 A.  Now, I'm asking the question, first of all, use the

24 more -- the full Formula 14; that is, the Greek and Latin

25 formula you saw before.  Suppose you use the full formula as

1  opposed to the variation that I talked about.

2      And number two, you know, the price of a phone is not

3  in such a wide range from $50 to $300, but let's first

4  consider one of these smartphones which are in the 50 to a

5  hundred-dollar range, then I'm considering what happens if

6  the price is between hundred dollars and $200; and finally

7  when the price is between $200 and $300.  And the market

8  willingness to pay changes depending on what the current of

9  the smartphone is.

10  Q.  Can you tell us what the range is between the market

11  willingness to pay of those other three columns?

12  A.  They're kind of varying about a dollar.  At the low end,

13  it is like $12.77; and at the high end, it is $13.32 is the

14  market willingness to pay.

15  Q.  And what -- what did you conclude would be your opinion

16  as to the market willingness to pay in this case for

17  using -- for using the infringing technology as compared to

18  the next best alternative non-infringing technology?

19  A.  My opinion is what the smart -- the smartphone market is

20  willing to pay for the incremental benefit that they get

21  from the -- for receiving notifications using the infringing

22  technology compared to the non-infringing technology.  My

23  number will be $12.23 for smartphone.

24  Q.  And I placed another slide on the screen.  Did you --

25  can you explain to the jury what this depicts?

1    A.  So when we are thinking about this -- excuse me -- is

2    that suppose this infringing technology is offered only as

3    an option.  That is, it is not -- it is not put in every

4    form, but we offer it as an option, and the price it at

5    $12.23.  Suppose we do that.

6        What percentage of Google Android users will, in fact,

7    purchase that option.  And the number turns out to be 42.2

8    percent.

9    Q.  Did you also calculate a margin of error for that?

10   A.  Yes, indeed.

11   Q.  Is that what's shown on the screen in the columns just

12   to the right of it?

13   A.  Yes.  So it is saying that the number can vary anywhere

14   from -- if I want to be 95 percent confident, the number has

15   to be somewhere between 35 percent and 49 percent.

16   Q.  Now, there's a lot of numbers here.  Did you prepare a

17   summary of opinions or relevant opinions which is

18   Plaintiff's Exhibit 85?

19   A.  Yes.

20   Q.  All right.  I've got one more item I wanted to ask you

21   about.

22        Can you tell the jury what is shown here?

23   A.  So in the survey, we also asked questions to consumers,

24   first of all, how many applications they have downloaded on

25   their smartphones.

1       And number two, if they have downloaded applications,

2  how many of those downloaded applications had automatic

3  notifications.  And what is highlighted in yellow there are

4  those customers who say they -- they have six or more

5  applications which have automatic notification.

6       And if I sum those numbers under the column called

7  Android Operating System Users, that is a 15.5, the 3.7,

8  1.6, and 1.1, it's about 22 percent of Google Android users

9  that have six or more notification applications.

10          MR. DOVEL:  Your Honor, I have no more questions

11 of this witness at this time.  I'll pass the witness.

12          THE COURT:  All right.  Cross-examination?

13          MR. STOCKWELL:  Yes, Your Honor.

14                   CROSS-EXAMINATION

15 BY MR. STOCKWELL:

16 Q.  Good afternoon, Dr. Srinivasan.

17 A.  Good afternoon.

18 Q.  Now, you understand that Google does not sell the

19 smartphones that you actually surveyed in this case, don't

20 you?

21 A.  That's my understanding.

22 Q.  And those smartphones that you surveyed are not phones

23 that Google sells.  Instead, they are phones sold by third

24 parties like HTC, Samsung, LG?

25 A.  That's correct.

1  Q.  Okay.  Now, Google offers Android software that those

2  third parties can install in their phones, right?

3  A.  That's right.

4  Q.  You're aware that Google does not charge for that

5  Android software?

6  A.  That is what -- that's my understanding.

7  Q.  Okay.  And you're aware that Google does provide apps

8  that are used with Android devices by making its Google Play

9  Store available so app providers can put apps on the Google

10 Play Store?

11 A.  I'm not familiar with Google apps per se.

12 Q.  Well, you just mentioned -- your last slide actually

13 showed the numbers of apps that users had.

14 A.  But that's not Google apps, is it?

15 Q.  Correct.

16 A.  Okay.

17 Q.  But you're aware that those apps can be downloaded onto

18 an Android phone?

19 A.  Yes.

20 Q.  Okay.  And you're aware that many apps are free?

21 A.  Yes.

22 Q.  In fact, you surveyed, I think it was roughly 10 apps,

23 as to how users were using those apps, and every single one

24 of those apps were free?

25 A.  There were some questions with respect to the particular

1  apps they had received, and what you say sounds right.  I

2  haven't looked at it most recently, but it sounds right.

3  Q.  And are -- you're aware that when apps are priced --

4  that is, when somebody actually charges for an app, the

5  price is usually a buck or two?

6  A.  That's my understanding, too.

7  Q.  And you're aware that apps -- some apps, not all apps,

8  but some apps can receive notifications?

9  A.  Quite a few applications receive notifications, yes.

10  Q.  Right.  And some of the ones you surveyed like the

11  Facebook app, that receives notifications?

12  A.  Yes.

13  Q.  And you're aware that apps do things other than just

14  receiving notifications.  I mean, Facebook let's you

15  actually connect to your friends, connect to the Facebook

16  website.  You're aware of that?

17  A.  That's true.

18  Q.  So you mentioned you had a slide.  It was one of your

19  early slides about how many smartphone features you were

20  testing.  Do you remember that?

21  A.  Yes.

22  Q.  So if you looked at an app -- so if you looked at apps,

23  you have game apps; you have news apps; you have social

24  networking apps.  You would agree that apps also have

25  multiple features, and notifications is just one of many of

1   those features?

2   A.   The feature list I -- you saw earlier are features of

3   smartphones, not features of apps.

4   Q.   And I understand that, and thank you for clarifying

5   that.   But what I'm -- I'm making a different point.   If you

6   created a feature list for apps, there would be a number of

7   features on there:   Content, game, sports, news, weather,

8   notifications.

9         Is that fair?

10  A.   So your question is, if I did a conjoint study on apps,

11  would notifications be a feature of it?

12  Q.   Yes.

13  A.   Yes.

14  Q.   And you didn't do a conjoint study on apps.

15  A.   That was not my assignment.

16  Q.   In fact, nobody asked you to do a conjoint study on

17  apps?

18  A.   Correct.

19  Q.   And now you heard -- you were here through opening,

20  right?

21  A.   Yes, yes.

22  Q.   And you heard Plaintiff explain you were going to

23  testify, and then another person, Mr. Mills, was going to

24  testify --

25  A.   Yes.

1    Q.   -- right?

2         You don't know how Mr. Mills, the Plaintiff's damages

3    expert, actually used your survey in his damages analysis,

4    do you?

5    A.   That's correct.

6    Q.   Okay.  So you gave him -- you went off and did your

7    survey.  You calculated your $12.23 and your 42 percent, and

8    you just handed that off, and you're not -- you don't know

9    how Mr. Mills then used it?

10   A.   That's correct.

11   Q.   Okay.  So when you did that survey, that survey that

12   calculated this $12.23, I think you call it market

13   willingness to pay?

14   A.   That's correct.

15   Q.   That's based on your Formula 14?

16   A.   That's correct.

17   Q.   So that Formula 14 number -- Formula 14 is not the same

18   as conjoint analysis?

19   A.   Okay.  Conjoint analysis determines the importance and

20   values customers attach to different features.  You can use

21   that information for determining what the market is willing

22   to pay for your particular feature.  So Formula 14 is an

23   application of conjoint to determining market's willingness

24   to pay.

25   Q.   Right.  Formula 14 is sort of a subset of conjoint

1    analysis that you talked about in that paper you showed?

2    A.   I missed one word of what you said.

3    Q.   I'm sorry, a subset.

4    A.   Can you please repeat the question?

5    Q.   Yes, sir, I'm sorry.  Formula 14 is a subset of conjoint

6    analysis like what you talked about in your paper?

7    A.   It's a subset, yes.

8    Q.   Thank you.  Now, the survey you did in this case, it was

9    done in February 2012, and it was originally conducted for

10   the purpose of being used against Apple and RIM, right?

11   A.   It was used for another case, yes.

12   Q.   Right.  And Apple and RIM, Blackberry, they make and

13   sell smartphones?

14   A.   Yes.

15   Q.   And the price ranges you studied in this survey range --

16   the global price range was from 50 to $300?

17   A.   That's correct.

18   Q.   Apple and RIM, because they sell those smartphones, they

19   can set the prices for those smartphones?

20   A.   That's right.

21   Q.   They can increase it or decrease it?

22   A.   That's right.

23   Q.   The -- the Android phones you surveyed, you said Google

24   doesn't sell those.  You agree Google couldn't increase or

25   decrease the prices of those smartphones?

1    A.   That's what I said earlier.

2    Q.   Yes.  Now, the Formula 14 calculation you did on your

3    February 2012 results, that's not the same thing as an

4    optimal price that a company can charge for a product

5    feature, is it?

6    A.   They can make more profit if they charge possibly a

7    different price than market's willingness to pay, but not

8    less.

9    Q.   And, sir, you would agree with me then the Formula 14 is

10   not the same thing as the optimal price that a company can

11   charge for a product feature?

12   A.   Yes.

13   Q.   You cannot use your formula to determine what the

14   increase in price is for a feature?

15   A.   As I mentioned, it gives you the floor or the lower

16   limit of how much profit you can make with this feature, but

17   you can make more profit if you change -- if you have the

18   optimal price, yes.

19   Q.   So let me make sure we're in agreement because I'm

20   asking a very precise question.  You can't use Formula 14 to

21   determine what the increase in price is for a feature?

22   A.   That's correct.

23   Q.   Okay.  You certainly cannot use your Formula 14 to

24   determine the price Google could charge for a notification

25   application, could you?

1    A.   That relates to the previous question that you just

2    asked.

3    Q.   Well, I'm -- actually I'm switching gears a little bit.

4    A.   Okay.

5    Q.   We -- you -- the previous question was about whether you

6    could use it to price a feature.  And earlier, I think we

7    agreed, you did not survey notification features, right?

8    A.   I -- I -- I did not survey apps, which is what I think

9    you asked me before, not notification features, yes.

10   Q.   Okay.  Thank you.  So you -- your -- your Formula 14

11   cannot be used for Google to price a hypothetical

12   notification app that could be downloaded from Google's

13   website?

14   A.   Well, it depends on what you mean by a notification app.

15   For example, if you mean by a notification app that

16   something which will provide notifications using the

17   infringing technology, yes, you can.

18   Q.   You can't, so -- so, in fact, you're saying you did

19   survey apps and app features?

20   A.   No.

21   Q.   So, sir, let me make sure I understand your testimony

22   because this may be an important point for the jury --

23   A.   Sure.

24   Q.   -- to understand.

25   A.   Sure.

1    Q.  You did not go out and ask consumers, let's start with

2    an app, a one to two-dollar app, and figure out what the

3    value of the timeliness of notification feature is to all

4    the other features of that app, did you?

5    A.  I did not.

6    Q.  Okay.  So let's assume we've got a hypothetical app.

7    Let's assume it's a -- let's assume it's a Facebook app,

8    okay?  It's got all the social networking features.  You can

9    log in.  You can post things on the wall, but it doesn't

10   have notification.  You got that assumption in mind?

11   A.  Yes.

12   Q.  And let's assume you added notification to that app.

13   You could download something and add it to that app.  Your

14   survey doesn't tell you what price to charge for downloading

15   notification functionality into that Facebook app, does it?

16   A.  It does.

17   Q.  It does?

18   A.  Yes.

19   Q.  It tells you to charge $12 for downloading notification

20   functionality into a Facebook app?

21   A.  No, it doesn't say that.  You said something more.

22   Let's be very clear about it because I want you to restate

23   the question, if necessary.  What you said a minute ago is

24   that this particular app, this so-called notification app,

25   as you called it, actually will be able to deliver you all

1    apps, such as Facebook, such as other things, and in -- can

2    provide notifications of all those apps.  That's a very

3    different type of app compared to an app -- any other app

4    that I buy.

5    Q.  And your testimony under oath is that that's the survey

6    you conducted was for a hypothetical notification app --

7    A.  No.

8    Q.  -- that provided all features of notification to all --

9         THE COURT:  Just a minute, counsel.  I don't

10   believe he was through with his answer.  Let's make sure

11   that he finishes his answer before you proceed with your

12   next question.

13        MR. STOCKWELL:  Certainly, Your Honor.

14   Q.  (By Mr. Stockwell)  Let me -- if -- if you're not done,

15   I will re -- I will withdraw the question and restart, Dr.

16   Srinivasan, so we've got a clear record.

17   A.  Okay.

18   Q.  So --

19   A.  Let me put it this way.  If the particular app that you

20   just mentioned which can -- is an app, but is an app of a

21   very different kind, that app can actually provide

22   notifications of all downloaded applications that you

23   currently have on your smartphone.  This is not other app --

24   other apps are not like that.  The particular app that you

25   mentioned can deliver notifications of all other downloaded

1  apps that you already have.  If you are asking me -- let me

2  finish, please.  If you are asking me, can I determine the

3  value of the app, yes, because that is -- now becomes a way

4  I can enhance my smartphone experience and my survey wasn't

5  to smartphones.

6  Q.  And thank you, Dr. Srinivasan.  So your report talks

7  about downloading a hypothetical notification app that can

8  provide notification functionality across multiple apps.

9  Your report, not your testimony here?

10 A.  My report was about smartphones, as I mentioned.  It is

11 not about apps.  But you have just introduced a different

12 type of app, and I am telling you from my knowledge of

13 conjoint analysis, that -- that particular app that you

14 mentioned, which is different from all other apps, what is

15 the value that smartphone users will attach, I can determine

16 that using the survey I already did, although that was not

17 the direct questioning I did, you're absolutely right.

18 Q.  Thank -- thank you, Dr. Srinivasan.  Let me move on to

19 your market willingness to pay, the Formula 14.  That's

20 based on a theoretical assumption that competitors do not

21 react to the attribute and price changes made by the firm

22 offering that particular attribute.

23 A.  That is correct.  It is assuming what is called all else

24 remaining equal.

25 Q.  And if we could pull up a copy of your paper.

1    MR. STOCKWELL:  Mr. Barnes, Defendants' Exhibit

2  367, Page 1.

3  Q.  (By Mr. Stockwell)  Do you recognize this as your paper?

4  A.  Indeed.

5  Q.  And if we go to Page 10, if we go to the Section 4.3,

6  kind of bridges over to the next column.  Do you see that

7  Section 4.3, and then it bridges over to the next column?

8  A.  Yes, I see it.

9  Q.  And it says:  In many cases, it is more realistic to

10  assume that competitors will, in fact, react by adjusting

11  their own prices.  Do you see that?

12  A.  Yes.

13  Q.  Now, this was the paper that talked about your Formula

14  14, correct?

15  A.  That's correct.

16  Q.  And the paper actually modeled the price reaction of

17  competitors?

18  A.  This was a later section of the paper after the formula

19  was supplied.

20  Q.  And it actually modeled the price reaction of

21  competitors?

22  A.  Yes.

23  Q.  And your study in this case did not consider any

24  competitive reaction in the marketplace if Google were to

25  attempt to impose some fee that would result in consumers

1  paying this hypothetical $12.23?

2  A.  I did not do that study, yes.

3  Q.  So I want to talk a little bit about the features that

4  you included.  If we could go to your report at Table A1.  I

5  believe this was a slide that you put up that had the

6  features.

7         MR. STOCKWELL:  I think it's on Page 167, Mr.

8  Barnes.

9  Q.  (By Mr. Stockwell)  While Mr. Barnes is pulling that up,

10  I think you said you tested 16 features, correct?

11  A.  That's -- that's correct.

12  Q.  And timeliness of notification was the second least

13  important feature out of the 16, right?

14  A.  That's correct.

15  Q.  And the FM tuner feature was the least important

16  feature, correct?

17  A.  That's correct.

18  Q.  Okay.  Now, then this is the table we have.  That FM

19  tuner feature you studied was suggested by counsel, right?

20  A.  It was either by counsel or the economics expert.

21  Q.  And if FM tuner was not included, notifications would

22  have ranked last on the list of features here in terms of

23  attributes --

24  A.  That's correct.

25  Q.  And that would have reduced the value of your Formula 14

1    calculation?

2    A.  No.  In fact, it would have increased it.

3    Q.  Okay.  So let's talk about the features that you did

4    include.  The other features you included are listed

5    here.  You said there's a total of 16.  We can agree

6    that a proper conjoint study has to include those

7    features that consumers consider important in choosing a

8    smartphone?

9    A.  May I ask you to repeat the question, please?

10   Q.  Yes.  Can we agree that a proper conjoint study has to

11   include those features that consumers consider important in

12   choosing alternative smartphones?

13   A.  Yes.

14   Q.  And in deciding what features to include, you looked at

15   the 2011 Annual Buying Guide from Consumer Reports?

16   A.  That's correct.

17   Q.  And if we go to that Buying Guide --

18          MR. STOCKWELL:  It's Defendant's Exhibit 362, Page

19   6, Mr. Barnes.  If we can go to that Annual Buying Guide.

20   We may need to -- you may need to rotate that feature list.

21   Q.  (By Mr. Stockwell)  There are usability features listed

22   in the guide that you did not directly measure, right, sir?

23   A.  It was indirectly incorporated by a feature I had called

24   brand.

25   Q.  Brand?

1   A.   Yeah, it was not directly captured, you are right.

2   Q.   Okay.  Well, let's -- before we get to the brand issue,

3   let me just make sure I've got a list of features that you

4   didn't test.  So this is -- these are some of the features

5   listed in the Annual Buying Guide.  Your study did not test

6   navigation, right?

7   A.   That's correct, it did not explicitly consider that.

8   Q.   Voice quality?

9   A.   Correct.

10  Q.   Phoning?

11  A.   Correct.

12  Q.   Messaging?

13  A.   Correct.

14  Q.   Web browsing?

15  A.   Correct.

16  Q.   Multimedia?

17  A.   Correct.

18  Q.   And we can agree that the features in this Annual Buying

19  Guide are important to consumers?

20  A.   But they are captured by the brand attribute indirectly.

21  Q.   And that's not my question, sir.  My question is:  We

22  can agree that the features in the Annual Buying Guide are

23  important to consumers?

24  A.   Yes.

25  Q.   And if you leave out important features, that omission

1  is going to make your study less reliable?

2  A.  If I had omitted it, yes.

3  Q.  If you had omitted it.  Now, you keep saying brand.  So

4  it's your contention that brand includes all of these

5  features?

6  A.  I'm not saying that.  What I am saying is that brand

7  conveys to a good extent the usability of the smartphone.

8  In fact, one of the values people place on the Apple iPhone

9  is that it is -- it is easier to use.  So it kind of

10  indirectly captures the value of some of these things that

11  you mentioned like navigation and so on.

12  Q.  Okay.  And you can agree that if you left out important

13  features, your study is going to have less reliability?

14  A.  That's correct.

15  Q.  And you can also agree that your study did not measure

16  aesthetics?

17  A.  Aesthetics, it did not measure explicitly, only

18  implicitly it measured brand.

19  Q.  So the answer it didn't measure aesthetics.

20  A.  Explicitly it did not measure.

21  Q.  And aesthetics is an important consideration when

22  consumers purchase a smartphone?

23  A.  Yes.

24  Q.  And your study also did not measure the ability to sync?

25  A.  Sync between applications?

1   Q.  Yes.

2   A.  Yes, correct, it did not.

3   Q.  Okay.  So let's go look at some of the questions in your

4   survey, and I wanted to go to your -- your report where you

5   talked about your ASEMAP.

6           MR. STOCKWELL:  If you can go to Page 60 of 459,

7   Mr. Barnes.

8   Q.  (By Mr. Stockwell)  You gave some respondent -- some

9   general ques -- general instructions about the survey,

10  right?

11  A.  I did.

12  Q.  Okay.  Now, your general instructions told respondents

13  that all the features in the study are important features?

14  A.  I can read the exact words.  Previous research is

15  identified as important, yes.

16  Q.  Okay.  Previous research.  And it's -- it's well known

17  in the survey literature that if you tell someone a feature

18  is important, then survey respondents may inflate the value

19  they ascribe to a feature?

20  A.  That's true in general surveys, not in ASEMAP.

21  Q.  And timeliness of notification was not mentioned at all

22  in that Annual Buying Guide that you -- we looked at before,

23  correct?

24  A.  That's correct.

25  Q.  And you actually have no research indicating that the

1  notification feature was important?

2  A.  I do.

3  Q.  You do?

4  A.  Yes.

5  Q.  You're claiming to have research showing -- well, let me

6  ask -- let me ask you to look at your deposition, sir.

7        MR. STOCKWELL:  Can I have a colleague approach

8  and deliver some materials to Dr. Srinivasan?

9        THE COURT:  Yes.  Is this for me or the witness,

10 Counsel?

11       MR. STOCKWELL:  It's for -- it's for the witness.

12       THE COURT:  That's what I thought.

13       MS. WILLIAMS:  Ms. Lockhart, do you want me to --

14       COURTROOM DEPUTY:  Yes.

15 A.  Yes.

16 Q.  (By Mr. Stockwell)  Now, Dr. Srinivasan, you did give

17 testimony that was used in the prior trial, correct?

18 A.  This is against Apple and --

19 Q.  No, in this trial -- in the -- in the prior trial,

20 SimpleAir versus Google, you gave testimony, right?

21 A.  Yes.

22 Q.  You gave sworn testimony under oath?

23 A.  You're talking about the deposition?

24 Q.  Yes.

25 A.  Yes.

1  Q.  Okay.  I'm going to ask you to turn to the first tab.

2  A.  Yes.

3  Q.  Should be your -- the January 14th, 2014, transcript of

4  the trial.

5  A.  I do.

6  Q.  Do you recognize that?

7  A.  Yes.

8          MR. STOCKWELL:  If we could go to Page 100.

9  A.  Yes.

10         MR. STOCKWELL:  And if you go to Line 25 -- or

11  sorry, Line 21.

12  Q.  (By Mr. Stockwell)  It says, question:  And you have --

13  you actually have no research that showed the features are

14  important, did you?

15     ANSWER:  For many of them I did.

16     QUESTION:  But not for the notification feature, did

17  you?

18     ANSWER:  Except in an indirect way.

19     QUESTION:  You had no direct research that these --

20  this was an important feature, did you?

21     ANSWER:  I did not have any direct information, yes.

22     Did I read that correctly, sir.

23  A.  Yes, you -- you read that correctly, yes.

24  Q.  Okay.  So --

25  A.  I thought your question earlier was not that, though.

1  Q.  You have no source showing whether people considered

2  timeliness of notification in purchasing a smartphone, did

3  you?

4  A.  I have my own research.

5  Q.  Your own research?

6  A.  Yes.

7  Q.  It's not -- it's not any research that was reported to

8  us in your expert report, was it, sir?

9  A.  I thought the previous survey was reported to you in

10 my -- in -- in -- by -- by the attorneys to you, was it not?

11 The previous survey that was done in I think September of

12 2011, was it not reported to you?

13 Q.  Not reported to me, sir.

14 A.  Okay.  I do not know that.  Okay.

15 Q.  Now, you have no evidence that Samsung or the other

16 brands you surveyed advertised the ability of a smartphone

17 to receive notifications from app providers as a selling

18 feature of their products?

19 A.  One more time your question, please.

20 Q.  Okay.  So you understand Samsung advertises for

21 smartphones?  They advertise their brand?

22 A.  Yes.

23 Q.  And you have no evidence that Samsung has ever

24 advertised timeliness of notification as a selling feature

25 for a smartphone?

1    A.  I have not looked at their advertisements in -- in great

2    detail.

3    Q.  And you haven't seen evidence that any other

4    manufacturer or seller of smartphones has advertised

5    timeliness of notification as a selling point?

6    A.  I have not looked at advertisements, so I can't answer

7    your question.

8    Q.  And you didn't survey how many of the people -- how many

9    people actually were aware of the notification feature

10   before they even purchased the phone, did you?

11   A.  Before they purchased the phone, no, I do not know the

12   answer.

13   Q.  And you didn't calculate or report the total number of

14   Android users that actually use the Google messaging

15   service?

16   A.  Well, I only asked them how many down -- on how many

17   downloaded applications have they received notifications.

18   Is that an answer to your question or is that not?

19   Q.  Well, you didn't ask -- you didn't ask the survey

20   respondents anything about the Google messaging service, did

21   you?

22   A.  But how else could they receive the message?

23   Q.  You asked questions about the Google messaging service

24   in your -- in your survey, sir?

25   A.  No, excuse me.  I did not ask the question -- as you

1  stated it, I did not ask the question exactly the way you

2  put it.  Yes, I did not ask that question.

3  Q.  Thank you.  Now, you've also, in fact, seen research

4  that tends to indicate receiving notifications are an

5  irritant and an annoyance to some people?

6  A.  Yes.  I con -- I consider myself as one of them.

7  Q.  Okay.  And when you gave the instruction on timeliness

8  of notifications, you made that instruction the longest

9  instruction of all of the features and you italicized some

10  of the words in that instruction, didn't you?

11  A.  That's correct.

12  Q.  Now, that detailed explanation was not provided for any

13  of the other features in your study?

14  A.  Because this was a legal matter.

15  Q.  Okay.  And it's well known in the survey literature that

16  if you emphasize the importance of -- importance of an

17  attribute, you can get an overinflated value for that

18  attribute?

19  A.  In general, yes.

20  Q.  Now, in the -- in the real world, we can agree that some

21  consumers would not take into consideration timeliness of

22  notifications in their purchase decisions at all?

23  A.  That happens in my survey, yes.

24  Q.  And your study assumes it's okay to ask consumers to

25  rate the desirability and importance of features even if

1  they don't have prior awareness of the features?

2  A.  That's right.

3  Q.  But in the real world, if somebody walks into a

4  store and buys a smartphone and they're not even aware

5  of the feature, that feature could not possibly have

6  influenced their decision?

7  A.  That they can tell me by saying it is not important at

8  all to them.

9  Q.  Okay.  And that's not my question, sir.

10  A.  Okay.

11  Q.  In the real world --

12  A.  Yeah.

13  Q.  -- if you -- if I walk into the store, I have no

14  knowledge of the feature.  I don't know about it directly.

15  I don't know about it indirectly.  I've never heard of

16  notifications.  No one's ever told me notifications.

17  There's no literature about notifications.  I buy the

18  smartphone.  The notifications didn't affect my purchasing

19  decision, did it?

20  A.  For some people, yes.

21  Q.  Now, I want to talk about some of the numbers on your

22  survey.  You said you had 623 respondents but only 187 were

23  Android users, correct?

24  A.  That sounds right.

25  Q.  And of the 623 respondents, you had some results that

1   indicated your customers highly valued -- your -- your

2   respondents highly valued a small battery life?

3   A.   There were -- there were some of them, yes.

4   Q.   So there were some people that thought, gee, having a

5   battery that didn't work as long was better than having a

6   battery that worked longer?

7   A.   The short answer is yes.

8   Q.   And that's nonsensical, isn't it?

9   A.   It's not nonsensical because I -- I asked them to hold

10  all other things constant.  So the question you asked me was

11  about battery life, right?

12  Q.   Right.

13  A.   Okay.  So I am telling them, hold everything else

14  constant, and in particular price constant, and tell me

15  which level of battery life would you prefer the most?  Now,

16  most of us in the real world through our experience, we know

17  generally things which we pay a higher amount also -- also

18  have better features, higher quality.  So some people were

19  not able to hold that constant, which was the instruction,

20  and hence gave answers like the -- and may have given

21  answers like the one that you just said.

22  Q.   And you also had results that indicated some of your

23  respondents wanted to pay more money for a phone that was

24  equal in all respects to a cheaper phone?

25  A.   That's also true, yes.

1  Q.  Okay.  And at the end of the day, you had some lower

2  quality data in your survey, right?

3  A.  There were some lower quality data and some higher

4  quality data.

5  Q.  And, in fact, you only had -- about 66 percent of your

6  survey had higher quality data?

7  A.  I don't have the exact percentage, but it is somewhere

8  in that ballpark, 409 out of 643.

9  Q.  And that's roughly 66 percent?

10  A.  Okay.  I thought you said 56, no?

11  Q.  And 66 percent in -- in a professor's class is a D?

12  A.  Now, remember this is not -- the other people are not

13  left out.  The other people are also carried on in my

14  research.  So you can't count a grade in a course to the 66

15  percent.  I don't think about it that way.

16  Q.  Fair enough.  So I want to talk a little bit about your

17  -- your Formula 14 as the -- the last topic here.

18       MR. STOCKWELL:  If we could go back to Dr.

19  Srinivasan's Slide 12, Mr. -- Mr. Barnes.

20  Q.  (By Mr. Stockwell)  Now, you understand that Google's

21  expert, Dr. Dhar, has criticized your Formula 14 as showing

22  that if you could actually use it to calculate the value for

23  the other 15 features you tested, you'd end up with a

24  smartphone that costs a couple thousand dollars.  You

25  understand that's one of his criticisms?

1    A.   Yeah.  He incorrectly used it, yes.

2    Q.   Okay.  He incorrectly used it, and the way -- the reason

3    you say -- you say he incorrectly used it is that you say

4    Formula 14 only works to measure features that have a small

5    change on the overall value of the product?

6    A.   That's correct.

7    Q.   It's a theoretical result that applies for small

8    changes?

9    A.   That's correct.

10   Q.   And you say Formula 14 is going to yield unreliable

11   results if you try to measure the market's willingness to

12   pay for large improvement level features?

13   A.   That's correct.

14   Q.   Now, let's go back to your Table A1.

15        MR. STOCKWELL:  Mr. Barnes, if you can pull that

16   back up again.

17   Q.   (By Mr. Stockwell)  This was the table that ranked the

18   order of importance of the various features.  Now -- so your

19   Formula 14, you would agree, it's not going to work on WiFi

20   access because that's 9.7 percent?

21   A.   That's correct.

22   Q.   That's too important of a feature for Formula 14 to work

23   on?

24   A.   That's right.

25   Q.   And we can agree that your study examined -- I think

1  it's that built-in video camera feature there, 4.8.  You see

2  that?

3  A.  Yes.

4  Q.  4.8 percent importance for the built-in video camera,

5  that's also too big for your Formula 14 to work on?

6  A.  That's correct.

7  Q.  And there's also a full physical QWERTY keyboard.  Do

8  you see that?

9  A.  Yes.

10  Q.  That's 6 percent importance, and you would agree that

11  your Formula 14 doesn't work for that either?

12  A.  That's right.

13  Q.  So when you calculated your Formula 14 calculations for

14  the -- the numbers that Mr. Dovel showed you, that $12.23 --

15  A.  Yes.

16  Q.  -- you used not only timeliness of notification, but you

17  used battery standby time in making those calculations,

18  right?

19  A.  Absolutely correct.

20  Q.  Right.  So the value for battery standby time, sir, in

21  this Table A1 --

22  A.  Yes.

23  Q.  -- can you read for us what percent battery standby time

24  says there?

25  A.  6.3 percent.

1  Q.  And 6.3 percent is greater than the 6 percent for the

2  QWERTY keyboard, right?

3  A.  Yes.

4  Q.  And it's also greater for the built-in video camera at

5  4.8, right?

6  A.  Yes.

7  Q.  And we know that your Formula 14 doesn't work for the

8  keyboard, and it doesn't work for the camera, right?

9  A.  That's right.

10  Q.  But you nonetheless use Formula 14 for the battery

11  standby time that's at 6.3 percent, didn't you, sir?

12  A.  Okay.  I have to explain.  I use it in a different way

13  than what I think you are -- you are suggesting.  In the

14  case of video camera, either you have the video camera or

15  you don't have the video camera.  In the case of the QWERTY

16  keyboard, you either have the QWERTY keyboard or you don't

17  have the QWERTY keyboard.  In the case of battery standby

18  time, though, I had four levels for battery standby time.

19  The current standby time, 20 percent only of the current

20  standby time -- I think it is 50 percent and 80 percent.  So

21  I had four levels.  So I can -- using that, I can ask the

22  question if my battery life is lost by only 10 percent --

23  for example, instead of 50 percent, I get 60 percent.  That

24  is not the full battery standby time.  It is only a small

25  amount of that range of values for battery standby time.  So

1   I'm perfectly legitimate to use battery standby time in that

2   way, compared to built-in video camera of the QWERTY

3   keyboard that you just highlighted.

4   Q.  But we will agree that if battery standby time is 6.3

5   percent, standing alone, you shouldn't use Formula 14 on

6   that?

7   A.  If you want to know what is the value for battery

8   standby time of a current standby time, compared to 20

9   percent, the whole range, then you should not use my

10   formula, correct.

11   Q.  Thank you.

12       MR. STOCKWELL:  I'll pass the witness, Your Honor.

13       THE COURT:  Additional direct, Mr. Dovel?

14             REDIRECT EXAMINATION

15   BY MR. DOVEL:

16   Q.  You were asked some questions about respondents who

17   appeared to reverse the order of preference -- that is,

18   respondents that appeared to have -- prefer lower battery

19   life or lower price.  Is it common to get those kind of

20   reversals when you do a conjoint analysis?

21   A.  Yes.

22   Q.  Does that mean that your conjoint analysis is

23   unreliable?

24   A.  No, it doesn't mean that.

25   Q.  Did you do any assessment to determine what would happen

1  if you were to remove the respondents that gave those

2  reversals, how that would affect your results?

3  A.   I did.

4  Q.   And when you did that analysis, what did it tell you?

5  A.   So I looked at two reversals, both -- the other attorney

6  just pointed out.  One was battery life, and the other one

7  was price.  In both of those there were -- there were some

8  consumers who had reversed what -- what was desirable.  So I

9  made -- I -- I took all those people out and used only the

10 remaining people who did not have those major reversals.

11 Then I found that the market willingness to pay went up from

12 $12.23 by another 54 cents.

13 Q.   All right.  So you were able -- were you satisfied that

14 your data was reliable?

15 A.   Yes.

16 Q.   You were asked some questions about Google's ability to

17 control the prices of smartphones that are sold by Samsung

18 and LG.  If the notification feature is added by Google and

19 if LG and Samsung choose to keep price the same, don't

20 increase price, then what happens in the market?

21 A.   Android phones -- the number of units of Android phones

22 that are sold will go up.

23 Q.   There will be more Android users?

24 A.   Yes, there will be more Android users.  Yes.

25      MR. DOVEL:  No further questions, Your Honor.

THE COURT: Additional cross-examination?

MR. STOCKWELL: No, Your Honor.

THE COURT: All right. You may step down, Dr. Srinivasan.

THE WITNESS: Thank you, Your Highness.

THE COURT: Ladies and gentlemen, before we call the next witness or have the Plaintiff call the next witness, we're going to take a short recess, about 10 minutes. This will probably be our last recess for the day. You may leave your notebooks in your chairs. Don't discuss the case among yourselves, and we'll have you back in here in approximately 10 minutes. So we'll make this one short. You're excused for recess at this time.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: All right. The Court stands in recess.

(Recess.)

(Jury out.)

COURT SECURITY OFFICER: All rise.

THE COURT: Be seated, please.

Let's bring in the jury, Mr. McAteer.

COURT SECURITY OFFICER: All rise for the jury.

(Jury in.)

THE COURT: Be seated, please.

1          All right.  Plaintiff, call your next witness.

2          MR. EICHMANN:  Your Honor, the Plaintiff calls

3   Robert Mills.

4          THE COURT:  All right.

5          MS. WILLIAMS:  Your Honor, at this time, the

6   Defendant would like to renew its pretrial objections to Mr.

7   Mills and to Professor Srinivasan.

8          THE COURT:  Those have already been raised and

9   ruled on, but so noted.

10          MS. WILLIAMS:  Thank you, Your Honor.

11          THE COURT:  Have a seat, Mr. Mills.

12          THE WITNESS:  Thank you, Your Honor.

13          THE COURT:  You have been sworn, correct?

14          THE WITNESS:  I have, Your Honor.

15          THE COURT:  All right.  Mr. Eichmann, you may

16   proceed.

17          MR. EICHMANN:  Thank you, Your Honor.  And just a

18   brief note to the Court.  About 30 minutes into his

19   testimony, there's been a request to seal the courtroom, and

20   I'll notify the Court when we reach that point.

21          THE COURT:   Let me know when we reach that point.

22   Let's proceed.

23     ROBERT MILLS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

24                    DIRECT EXAMINATION

25   BY MR. EICHMANN:

1   Q.  Good afternoon, Mr. Mills.

2   A.  Good afternoon.

3   Q.  Can you introduce yourself to the jury and tell him what

4   your role is in this case?

5   A.  Yes.  My name is Robert Mills, and I'm an economist from

6   Los Angeles, California.  I work for a firm called

7   Micronomics.  I'm a director there.  And my role in this

8   case is to offer opinions about the damages that should be

9   awarded to SimpleAir for the infringement by Google.

10  Q.  Can you tell us about your educational background and

11  how you got to be an expert in this field?

12  A.  Yes.  My undergraduate degree is from Portland State

13  University in Portland, Oregon.  I'm originally from the

14  Northwest, and I have a graduate degree in economics from

15  the University of California at Santa Barbara, and then

16  moved to Los Angeles a couple years after that, and became

17  involved with Micronomics my current employer.

18       And much of my work is in the area of what I'll call

19  dispute, which is where parties are having a dispute and I

20  am consulted for my economic expertise and financial

21  expertise to help -- offer opinions about valuation issues.

22  Q.  I'm just going to ask you to slow down a little bit in

23  your testimony so I can keep up with you, please.

24       Have you been called to testify as an expert in patent

25  cases before?

1  A.  Yes, I have.

2  Q.  Have you testified in this courtroom before?

3  A.  I have, yes.

4  Q.  And when you've been asked to testify, are you always

5  showing up on the side of the Plaintiff, the patent owner,

6  or do you sometimes provide testimony on behalf of

7  Defendants?

8  A.  On both, both sides.

9  Q.  In this case, does your compensation depend in any way

10  on how much the jury decides to award in damages?

11  A.  No, in no way whatsoever.

12  Q.  In this case, you submitted three expert reports; is

13  that right?

14  A.  Yes.  I submitted an initial report and then two

15  supplemental reports.

16  Q.  And just briefly, what is an expert report?

17  A.  An expert report is a document that I prepare with the

18  assistance of my staff that sets forth my opinions and all

19  the bases for those opinions.  And it's -- it's a narrative.

20  In this case, it ran more than a hundred pages of writing

21  and then a number of exhibits that show the figures -- the

22  financial figures in the charts that support those figures.

23  Q.  About how much time did you and your staff spend working

24  on this case to figure out what Google's damages should be?

25  A.  In total, I think I've spent about 300 hours working on

1    this case.  It wasn't all related to Google, but in this

2    case in general, and -- and my staff assisted me at least

3    that much as well.  I'm not sure of the exact hours for

4    staff, but it would be at least that much more.

5    Q.  When you were going about your work in this case, what

6    was the information -- what types of information did you

7    consider?

8    A.  I considered documents that were provided by SimpleAir

9    and from Google.  I considered deposition testimony.  I

10   considered certain legal pleadings and filings.  I

11   considered information that I and my staff had found through

12   our own research.  That's the type of information generally

13   that I rely upon in a case like this.

14   Q.  Did you also consider the testimony of the other

15   experts?

16   A.  Yes.  At the time that I wrote my report and my

17   supplemental reports, I didn't have their testimony, but I

18   had their reports, so I could rely on their reports.  And

19   I've done that.

20   Q.  Now, in a patent case, how do you determine damages for

21   infringement of a patent?

22   A.  So in a case like this, damages are what's called a

23   reasonable royalty.

24   Q.  What's a reasonable royalty?

25   A.  A reasonable royalty is a -- a royalty that's paid for

1  the use of the patent.  So it's a payment that Google would

2  make to SimpleAir in exchange for the right to use the

3  patent for a period of time.

4      And a reasonable royalty is -- it's sort of a legal

5  definition, but it's -- it's the royalty that would emerge

6  from a negotiation if Google and SimpleAir had actually

7  negotiated a license rather than the infringement occurring.

8  Q.  Now, we heard a little before about the prior trial in

9  January of 2014.  Does that date have relevance to your

10  calculations in this case?

11  A.  Yes, it does.

12  Q.  When you sat down to determine damages, what period of

13  time did you determine damages for?

14  A.  I determined damages for the period beginning in May

15  2010, when that first messaging service was introduced by

16  Google.  And I calculated damages through January 2014,

17  actually through the end of December 31st, 2013, which

18  roughly corresponds to the time of the first trial.

19  Q.  So is this the period that we're going to address with

20  you today, not what's happened after the last trial?

21  A.  That's correct, yes.

22  Q.  How did you go about approaching this assignment in

23  terms of which methods to use of calculating damages?

24  A.  Well, I looked at damages in two different ways that I'm

25  going to talk about today.  One is what's called a

1   Georgia-Pacific analysis, and the second approach that I've
2   used is what I'll call settlement analysis.
3   Q.  What is Georgia-Pacific?
4   A.  Georgia-Pacific is a company that was involved in a
5   famous patent infringement lawsuit, and the -- the judge in
6   that case established a number of factors, 15 factors, that
7   he felt were important to consider in determining how much a
8   reasonable royalty would be.
9        And these factors have become very important for people
10  like me that do this type of work.  These are factors that
11  we consider in determining how much a royalty should be paid
12  for infringement.
13  Q.  Did you consider each of the Georgia-Pacific factors in
14  your analysis in this case?
15  A.  I did.  I've addressed each of those factors in my
16  report, my initial report, and some of the factors in my
17  subsequent reports as well.
18  Q.  Under Georgia-Pacific, what's the central question that
19  you're trying to answer?
20  A.  Well, the central question is, how much would the patent
21  owner and the infringer agree to in terms of a royalty, if
22  they had negotiated a license agreement rather than the
23  infringement occurring.
24  Q.  So in this case, we know that SimpleAir and Google
25  didn't sit down to negotiate a license.  That never

1  happened.

2      Under Georgia-Pacific, are you saying we are supposed

3  to assume that that did happen and determine how they would

4  come out in that agreement?

5  A.  That's right.  In the real world, we know that didn't

6  happen.  That's why we're here.  So we're asked to think

7  about what would happen, if they had negotiated, and what

8  the outcome of that negotiation would be, if it occurred

9  back at the time the infringement began in May 2010.

10 Q.  That's when they offered the first of the services that

11 infringed?

12 A.  Yes.  C2DM, as I understand it, was first offered for

13 third-party applications in May of 2010.

14 Q.  What else do we know about this negotiation and how it

15 would -- how it would occur?

16 A.  Well, there's certain facts that we're asked to assume

17 in terms of understanding the parameters of the hypothetical

18 negotiation.  One of those is that Google admits that the

19 patent is valid, and Google admits that the -- there is

20 infringement.

21     So Google acknowledges that it needs a license in order

22 to keep doing what it wants to do, which is provide the

23 service.

24 Q.  What's this last item on the slide that you have?

25 A.  Yes.  So another assumption that underlies this analysis

1 is that the parties have access to all of the relevant

2 information, and this is very much different than real-world

3 negotiation where parties will keep things close to the vest

4 and not share information that they don't have to share with

5 the person they're negotiating with.

6     In the hypothetical negotiation framework, we assume

7 that the parties have everything out on the table for

8 everyone to look at so they both have access to all of the

9 relevant information.

10 Q.  And does that include what you have here as later

11 events, events occurring not only before but after this date

12 of first infringement?

13 A.  Yes.  Later events are often relevant in this kind of

14 analysis.

15 Q.  What types of later events or information can be

16 considered under Georgia-Pacific?

17 A.  Well, things like the extent to which the patent's been

18 used.  If the negotiation occurs at the time that the

19 infringement begins, by definition, we don't know how much

20 infringement will ultimately occur.

21     So we can look past that date to see how much

22 infringement actually occurred, and the parties in this

23 hypothetical framework can take that type of information

24 into consideration, even though it's not strictly known at

25 that time.

1  Q.  During Dr. Knox's testimony, he was -- we discussed the

2  '279 patent.  That's SimpleAir's system patent.  Were you

3  here for that testimony?

4  A.  Yes.

5  Q.  And on cross-examination, Google's counsel pointed out

6  that that patent was filed later and issued later than the

7  patent that's directly in this case; is that right?

8  A.  Yes.

9  Q.  Could the parties under Georgia-Pacific consider the

10  fact that SimpleAir had other patents coming down the

11  pipeline, such as that '279 patent?

12  A.  They could, yes.

13  Q.  The -- the law allows that?

14  A.  Well, I'm not here to speak -- speak about the law, but

15  that's my understanding.  Yes.

16  Q.  So we want to talk now about these two questions, and

17  can you tell me what we're going to address next in your

18  presentation?

19  A.  Yes.  So as I mentioned a bit earlier, I'm looking at

20  two different methodologies here.  One is the

21  Georgia-Pacific analysis, and the second is the settlement

22  analysis.

23      And under the Georgia-Pacific analysis, there really

24  are two different questions that I'm addressing under that

25  analysis.  The first one is, how much money has Google made

1   from the infringement, and the second one is, how much of

2   that money does Google owe to SimpleAir.

3   Q.  Let's focus on this first one about how much they've

4   made from infringing.  Now, we've heard a lot about the

5   Android operating system already and how Google doesn't

6   charge for it.

7       Did you consider that in your analysis?

8   A.  I did, yes.

9   Q.  If they don't charge for it, does that mean that they

10  don't make any money from it?

11  A.  No.

12  Q.  Does Google, in fact, make revenue, make money from

13  offering the Android operating system for all those

14  smartphones?

15  A.  Yes, it does.

16  Q.  And what are the ways in which it makes that money?

17  A.  Well, the primary way that it makes money is through

18  advertising, and Google generates the vast majority of its

19  revenue through advertising.  It also generates revenue from

20  the sale of applications to smartphone owners.  It also

21  sells smartphones itself and generates revenue that way.

22  And then also it sells digital content, like movies and

23  music and TV shows and things like that, that you can

24  download to your smartphone for a fee.

25  Q.  Let's talk about the advertising parts since you say

1  that's the biggest amount.

2      Can you explain what's depicted on this slide?

3  A.  Yes.  This is a slide that shows three different Android

4  smartphones, and at the top of each of these home screens on

5  the smartphone, you'll see what's called the Google search

6  bar.  And that's -- that's something that's there so that

7  you can enter search terms and retrieve search results.

8  And advertisements are shown oftentimes in connection with

9  those search results, and when you click on those

10 advertisements, Google generates revenue.

11 Q.  Did you review in this case the agreements that Google

12 has with the manufacturers of the Android phones, people

13 like Samsung, LG, and HTC?

14 A.  I did, yes.

15 Q.  And those agreements were at Plaintiff's Exhibit 266 to

16 271?

17 A.  Yes, I believe so.

18 Q.  What was in those agreements that is relevant to this

19 issue of searching on phones and getting apps?

20 A.  Well, those agreements specify that if you want to add

21 Google applications to your phone, you have to do certain

22 things.  And one of those things is that you have to provide

23 this search bar in a certain location where it's easily

24 accessible to users.

25      And another -- another requirement is that you make

1    Google's search engine the default search engine for all

2    search entry points on the phone.  So what this is designed

3    to do is make sure that when you buy an Android phone,

4    you're more likely to use Google search engine than you are

5    to use, let's say, Microsoft search engine.

6    Q.  And explain this slide for us, please.

7    A.  Yeah.  This slide just shows that the more Android

8    phones Google sells, the more it generates in -- in revenue.

9    Q.  And did Google actually produce documents showing how

10   much money it makes from offering the Android operating

11   system?

12   A.  It did produce -- for -- for some period of time, not a

13   complete period of time up through today, but for a period

14   of time it did.  Yes.

15   Q.  What was the most recent period that they disclosed to

16   us?

17   A.  If memory serves me correct, I think it was the first

18   quarter of 2013, so about a year ago.

19   Q.  So for a quarter, that's a three-month period?

20   A.  It is, yes.

21   Q.  And they -- for the first quarter of 2013, how much

22   money did they make in total worldwide from the Android

23   platform?

24   A.  I'm sorry.  In the first quarter?

25   Q.  Yes, sir.

1          MS. WILLIAMS:  Your Honor, if -- if I'm -- I

2     apologize for interrupting, but I request that if the number

3     is actually going to be stated that we do need to seal the

4     courtroom.

5          MR. EICHMANN:  Your Honor.

6          THE COURT:  Mr. Eichmann?

7          MR. EICHMANN:  I can loop this back in later on in

8     the part that -- I didn't think we had an issue with this,

9     but I can loop this back in later so that we can address it

10    when we had planned to seal.

11         THE COURT:  Let's try to do it all at one time.

12         MR. EICHMANN:  Yes.

13         THE COURT:  Let's continue.

14    Q.  (By Mr. Eichmann) Exhibit 49 is the document that Google

15    produced on their Android revenues?

16    A.  It is, yes.

17    Q.  And did they disclose that they make billions of dollars

18    worldwide from the Android system?

19    A.  Yes.

20    Q.  And we also know that Google doesn't charge for

21    notifications either, but do they still make money from

22    those as well?

23    A.  They don't directly charge for notifications, but they

24    do indirectly benefit from providing them.

25    Q.  Can you explain how this works?

1   A.   Yes.  By providing a feature like app notifications

2   that's valued by consumers and then makes the Android

3   product better, Android is able to sell more phones -- or

4   Google's OEM partners are able to sell more phones, which

5   means that more people are using Android.  And if more

6   people are using Android, they're more likely to be

7   searching using Google's search engine able to be generating

8   revenue from Google for advertising.

9   Q.   Based on your analysis in this case and your review of

10  the evidence, did you conclude that they're offering of the

11  infringing notification service helps them make more money?

12  A.   Yes.

13  Q.   Now, did Google talk about in its internal documents the

14  importance of getting instantaneous notification on the

15  smartphones and tablets, the Android phones?

16  A.   Yes.  We have one example here on the screen where

17  Google is -- an internal Google document, but Google

18  recognized that -- that users see smartphones and tablets as

19  personal devices that are always connected, and they expect

20  to be notified of remote events at all times.

21  Q.   And how do the infringing C2DM Cloud to Device Messaging

22  and Google Cloud Messaging services relate to this service?

23  A.   Well, they fulfill that need.  They provide a framework

24  that provides these real-time notifications that people

25  expect to receive.

1    Q.  Do each of Google's major competitors, Apple, Microsoft,

2    BlackBerry, also offer notification services for

3    applications?

4    A.  They do, yes.

5    Q.  So let's turn, again, to quantifying this -- this amount

6    of money that Google has made from infringing.  We heard

7    from Dr. Srinivasan.

8        Did you rely upon him in your analysis?

9    A.  I did, yes.

10   Q.  And what is shown here on the slide?

11   A.  This is taken from Dr. Srinivasan's analysis.  This is

12   his market willingness to pay the $12.23 that we mentioned

13   earlier today.

14   Q.  Now, why did you rely upon Dr. Srinivasan instead of

15   perform your own conjoint analysis?

16   A.  I'm not an expert in the field of conjoint analysis, and

17   Dr. Srinivasan very much is an expert in that field, so I've

18   relied on him.

19   Q.  Is the field of conjoint analysis, the use of that

20   methodology, well regarded by economists?

21   A.  Yes.  It's -- it's being used more and more, I believe.

22   Q.  Now, can you explain to us, again, what this $12.23

23   number that came out of Dr. Srinivasan's analysis, what that

24   means?

25   A.  Yes.  This is a measure of the market's willingness to

1   pay for the infringing notification system relative to the

2   next best alternative.

3   Q.   I think there might be some confusion from the

4   cross-examination of Dr. Srinivasan.   Is this the amount

5   that Dr. Srinivasan is saying people would pay for a single

6   application for the phone?

7   A.   No.   This is the amount that people would pay for the

8   service, so to provide this notification service that you

9   could use for as many apps as you wanted to use it for.

10   Q.   And how much apps -- how many applications receive

11   notifications from the Google service?

12   A.   Well, I don't know today how many do, but I know for a

13   point in time -- I believe it was 2013 -- Google provided

14   information on a certain date in 2013.   At that point, I

15   think it was about 60,500 applications.

16   Q.   So the $12.23, that's paying for the infringing

17   notification service that provides notifications to 60,000

18   applications?

19   A.   Yes, as many applications as a user would want -- want

20   to have notifications for.

21   Q.   Dr. Srinivasan also talked about this number, 42.2

22   percent.   Can you explain the relevance of this number?

23   A.   Yes.   This is something that is sometimes called the

24   take rate, and that is the percentage of consumers that

25   would elect to purchase this service, if it were charged

1    separately at $12.23 per device.

2    Q.  Can you explain how these calculations work, the $12.23

3    and the 42 percent?

4    A.  Yes.  What I -- what I've done is I've started with the

5    $12.23 per -- per phone, and I've applied that 42.2 percent

6    take rate to get an average price per phone, average market

7    willingness to pay per phone.  So if you apply the 42.2

8    percent to the 12.23, it provides $5.16 revenue per phone.

9             THE COURT:  Would you -- would you speak up a

10   little bit, please, Mr. Mills?

11            THE WITNESS:  Yes, Your Honor.

12            THE COURT:  Thank you.

13   Q.  (By Mr. Eichmann) We've heard evidence that Google

14   doesn't actually charge for the notification service.  They

15   don't charge this $12.23 per phone, right?

16   A.  That's correct.  Yes.

17   Q.  And we've heard references to these numbers from Dr.

18   Srinivasan being imaginary or -- or not real.

19       Do you believe that that's a fair characterization of

20   what this analysis shows, that it's just simply imaginary

21   revenue?

22   A.  I'm not sure that I understood the question.  Could you

23   please state it again?

24   Q.  Were you here for Google's opening statement in the

25   case?

1  A.  Yes.

2  Q.  And there was reference there to imaginary revenue and

3  how we're focusing on imaginary revenue that doesn't really

4  exist?

5  A.  Yes, I understand.

6  Q.  Do you believe that that's a fair characterization of

7  what Dr. Srinivasan's analysis shows?

8  A.  No, I wouldn't -- I wouldn't call this imaginary

9  revenue.  It's -- it is true that Google doesn't directly

10  charge for the -- the infringing service, so there is no

11  direct revenue source, but Google generates value in -- in

12  other ways by distributing this -- this widely freely.  And

13  that's the -- the methodology it uses to distribute most of

14  its products in the market.

15      And that doesn't mean that it doesn't profit from those

16  products.  It's just a different way of monetizing them.

17  And economic logic tells me that Google must believe that

18  that -- that method of distributing its products is more

19  beneficial to Google than actually charging for the

20  products.  So the value is greater by distributing it widely

21  for free.

22  Q.  In your report, did you conclude that this is actually

23  the lower bound that they actually very likely make more

24  than this?

25  A.  Yeah, I think that's a fair characterization.  Yes.

1  Q.  Did you also do some further calculations to consider

2  the cost that Google incurs by offering notifications?

3  A.  I did, yes.  I calculated the cost, and this is a

4  conservatively highest cost, meaning that it could even be

5  lower, but I've used $2.06 per device.

6  Q.  And what does that come out to in infringing profits per

7  Android phone that has the notification feature?

8  A.  $3.10.

9  Q.  So we talked about these billions of dollars that they

10 make worldwide from the Android platform, but your analysis

11 doesn't focus on that part, does it?

12 A.  No.  I've not taken the billion dollars as a starting

13 place or the many billions of dollars as a starting place.

14 Q.  Is this the starting point, the infringing profit?

15 A.  Yes.  For this particular analysis, yes.  As I

16 mentioned, there are two methodologies, but for this

17 methodology, that is correct.

18 Q.  Is this number, $3.10 per phone, the answer to this

19 first question of how much money Google has made from

20 infringing?

21 A.  That's -- that's an estimate based on all the

22 information I have available to me.

23 Q.  What's the second step in your process after we figured

24 out how much money they made?

25 A.  The second step is to figure out how -- how the parties

1  would divide that money, if they were negotiating.

2  Q.  And when you say that money, how they would divide the

3  $3.10?

4  A.  The $3.10 per phone, yes.

5  Q.  So now that we've already isolated the infringing

6  profit, all the extra profit that they make from infringing

7  SimpleAir's patent, why did you just conclude that all that

8  profit should go to SimpleAir since it's their patent?

9  A.  Well, that would leave Google with no incentive to take

10  a license.  If SimpleAir took everything, then Google would

11  be no better off by not licensing.

12  Q.  SimpleAir has to also get some percentage, right, it

13  wouldn't -- would it be fair to give them zero percent of

14  the infringing profit?

15  A.  No.  That's sort of the other end of the spectrum, and

16  if Google were trying to say that we're not going to pay you

17  any of that profit, then there would be no incentive to give

18  Google a license.

19      So what that tells us is that we have to come out

20  somewhere in between.  There has to be some meeting of the

21  minds of how you divide this -- this money.

22  Q.  How did you decide where between those two ranges of

23  zero percent to SimpleAir and a hundred percent to

24  SimpleAir, where the reasonable point would be?

25  A.  Well, this comes back to the factors that I mentioned in

1  the Georgia-Pacific case, and I've looked at those factors

2  and thought about how they would influence the bargaining

3  positions and the bargaining power of the parties, the

4  relative bargaining power.  And I've looked at those factors

5  in that context to come up with my best estimate of how that

6  would be split.

7  Q.  This first item here that you consider for bargaining

8  power, can you explain this one and how it affected your

9  analysis?

10  A.  Yes.  So the first factor that I've considered here on

11  the screen is that Google -- as I mentioned, Google admits

12  that the patent's valid and infringed, and that's something

13  that would -- would favor SimpleAir in a negotiation,

14  because Google would recognize that it can't get this

15  benefit if it doesn't get the license.

16  Q.  And what about this second factor?

17  A.  This factor also would tend to strengthen SimpleAir's

18  relative bargaining position at the negotiation because

19  notifications are -- are important to the smartphone market

20  not only to users but to app developers as well.

21  Q.  Take us through this next one.

22  A.  Yes.  So the third factor is that the alternatives to

23  infringing have -- have major disadvantages.  We've -- we've

24  heard about the battery impact of the alternative that Dr.

25  Knox thinks is the next best alternative, but there are

1    other impacts as well that aren't considered directly in Dr.

2    Srinivasan's survey.

3        So if those were considered, the market willingness to

4    pay would presumably be higher.  That, too, would favor

5    SimpleAir in the negotiation.

6    Q.  Did you also consider the extent of use of the patent

7    that's made by SimpleAir in this consideration?

8    A.  Yes, not just the extent of use but how that's changed

9    over time.  And notifications -- we've heard numbers, 11

10   billion per day.  That's a run rate of about 4 trillion per

11   year, and that's not even a current number.  And the use has

12   been growing steadily over time.

13   Q.  Some of the factors obviously would favor Google as well

14   in the negotiation; is that true?

15   A.  Yes, certainly.

16   Q.  What's the first one that favors Google?

17   A.  SimpleAir is not a competitor to Google, and SimpleAir

18   doesn't offer its own messaging service.  And so this is

19   something that would favor Google, because Google would

20   recognize that -- I think Google is an important part of the

21   equation in terms of monetizing these patents.

22   Q.  What about this next item?  Explain this, please.

23   A.  Yeah.  So if Google were to charge a separate fee for

24   the service, it is possible that fewer devices would be

25   sold.  And that's something that Google would -- a position

1    that Google would raise at the negotiation, and that would

2    tend to favor Google as well.

3    Q.  Wasn't it your testimony earlier that they actually sell

4    more phones and make more money from offering the

5    notification service?

6    A.  Yes.  If you hold the price constant, that's right.

7    Q.  No. 7 on your list, explain this one, please.

8    A.  Yes.  So this factor relates to Google's contribution to

9    the equation.  So SimpleAir has a patent, but a patent

10   doesn't equal a product necessarily.  There -- there's

11   research and development that Google's also put into the

12   systems, and its engineers have developed the software

13   that's used.  And so Google has contributed significantly to

14   the success of this messaging service, and SimpleAir would

15   recognize that in a negotiation.  And that -- that factor

16   would favor Google.

17   Q.  And what about this last factor, No. 8?

18   A.  Yes.  So this factor relates to the property that's

19   being exchanged, and it's a license to a patent, a

20   non-exclusive license to a patent, meaning that SimpleAir

21   can also license to other parties like Apple and RIM.

22   And it's not providing anything other than a license to the

23   patent.  It's not providing its own software engineers or

24   its own know-how or -- or other property.  And this also

25   would favor Google.

1    Q.  So where in this range, between zero and a hundred

2    percent, did you decide would be reasonable?

3    A.  In my view, Google would have the stronger bargaining

4    position overall given its contributions to the service.  In

5    my view, it would be approximately a two-thirds and

6    one-third split.  In my view, 30 percent to SimpleAir in my

7    calculations.

8    Q.  So 30 percent of the infringing revenue that they make

9    from the infringing notification service, that would go to

10   SimpleAir as the royalty?

11   A.  No.  That's -- it's 30 percent of the -- of the profit

12   that I've calculated.

13   Q.  And what does that turn out to be?

14   A.  That turns out to be 93 cents per smartphone, per

15   Android smartphone sold in the United States.

16   Q.  So if we take a single phone that makes Google an

17   additional $3.10 in infringing profit, SimpleAir gets a 93

18   percent royalty on that -- excuse me -- a 93-cent royalty?

19   A.  Yes.  In my view, a royalty of 93 cents per device is

20   reasonable.

21   Q.  And Google gets to keep the rest of that infringing

22   profit?

23   A.  Yes.  Google keeps all of the rest of the value that it

24   receives from providing this service.

25   Q.  Now, what was the next step in determining how much

1  Google owes SimpleAir in royalties on this Georgia-Pacific

2  analysis?

3  A.  Well, now I have a rate and I need to apply that rate to

4  a base, and the base is U.S. sales of Android smartphones

5  that are capable of using the service.  And these are

6  smartphones that use the Android Version 2.2 or later.  And

7  so I've looked to market data to determine how many of those

8  phones were sold.

9  Q.  What was the data that you looked at?  I see up here we

10  have IDC data.  What's that?

11  A.  IDC is a company that -- an analyst firm that provides

12  estimates of sales for various high-tech products like

13  smartphones and computers, a very well-regarded firm.  I use

14  their data in my analysis very frequently.

15      I also had data directly from certain of the

16  manufacturers, though -- Samsung, LG, HTC -- and those are

17  the ones that come to mind.  I may have had one other

18  additional -- Motorola, I believe.  Yes.

19  Q.  And this data on the phones, that was at Exhibit 258,

20  305, 284 through 287, and 308; is that right?

21  A.  Yes, I believe that's correct.

22  Q.  Now, you mentioned something about Android Version 2.2

23  and above.  Explain why you focused on that particular

24  version of the operating system.

25  A.  That's the version of the operating system that came out

1    in May of 2010 when this service was first released.  And so

2    I focused on just phones that use that operating system or a

3    later version which also are compatible with the -- the

4    infringing systems.

5    Q.  When you made the decision to use that version of the

6    phone and the versions that came after, did you rely upon

7    Dr. Knox's infringement analysis in this case?

8    A.  Yes, I did.

9    Q.  When you totaled up all the number of phones that they

10   sold in the United States during this period of

11   infringement, how many Android phones were sold?

12   A.  Approximately 193 million with Version 2.2 or later.

13   Q.  And why did you consider all of the phones, even though

14   some people don't really care about notifications or use the

15   service?

16   A.  Because if you recall a few moments ago, I applied that

17   to get an average revenue per phone and an average profit

18   for phone.  So this analysis already has built into it the

19   understanding that some people either don't value

20   notifications or don't value them enough to be willing to

21   pay that much for them.

22   Q.  So when you decided to use the 193 million phones, you

23   considered the fact that notifications aren't important to

24   some people at all?

25   A.  Yes.

1    Q.  But are very important to others?

2    A.  That's right.

3    Q.  So turning back to this timeline, again, we're focused

4    on the period when infringement began, which was when?

5    A.  May of 2010.

6    Q.  Up until the last trial, which was in January of this

7    year?

8    A.  That's right.

9    Q.  And that's the period that they sold 193 million phones

10   with this notification feature in the U.S.?

11   A.  193 million phones that are capable of using the -- the

12   service, yes.

13   Q.  And just to be clear, Google itself doesn't sell most of

14   these phones.  It's the manufacturers that they contract

15   with, right?

16   A.  That's right.  OEMs as they're called, original

17   equipment manufacturers, manufacture most of these devices,

18   and they're companies like Samsung, LG, Motorola, and HTC.

19   Q.  When you apply the 93-cent royalty to the phones that

20   are able to use the infringing notification service, what do

21   the total royalties come out to be for this period of

22   infringement?

23   A.  Well, if you do that math, just the 93 cents times the

24   number of units, it comes out to $179 million.

25   Q.  Did you do a further adjustment of that number in your

1  report?

2  A.  I -- I did, yes.

3  Q.  Can you explain what you did there?

4  A.  Yes.  So what I've done is I've -- in my view, if the

5  parties had negotiated a license, they would have negotiated

6  very likely a lump-sum license.  They also may have

7  negotiated what's called a running royalty where royalties

8  are paid over time.

9      But given Google's other licensing practices and its

10 practices that I saw for SimpleAir, I think it's very likely

11 that there would be a lump-sum royalty negotiation, which

12 means that the money would be paid upfront, you know, a

13 one-time payment.  So if the money is paid upfront in the

14 one-time payment, I could expect the payment to be lower

15 because of the time value of money.  So I'm discounting of

16 $179 million to get that to the value as of May 2010, which

17 is $146 million.

18         THE COURT:  Mr. Mills, I'm going to ask you to

19 slow down a little bit.  Your speech is very rapid, and if

20 you can slow down.  And also, I'll remind you to speak up.

21         THE WITNESS:  Yes, Your Honor.

22         THE COURT:  Okay.  Go ahead, Counsel.

23         MR. EICHMANN:  Thank you, Your Honor.

24 Q.  (By Mr. Eichmann) So if they had paid royalties over

25 time as the infringement continued, that would be the prior

1  number, the 179 million?

2  A.  Yes.

3  Q.  But you said you saw evidence that Google actually

4  prefers to pay the money upfront?

5  A.  Yes, that's right.

6  Q.  And if they did that, that's how we get this number of

7  146 million?

8  A.  That's correct.  Yes.

9       MR. EICHMANN:  Your Honor, at this time, we've had

10  a request to seal the courtroom.

11       THE COURT:  All right.  Ladies and gentlemen, the

12  Court's had a request to seal the courtroom.  The Court's

13  going to grant that request.  I'm now sealing the courtroom,

14  which means that if you are in the courtroom -- I'm not

15  talking about the jury; I'm talking about everybody else --

16  and you're not subject to the existing protective order in

17  this case, then you should excuse yourself from the

18  courtroom.  Only those subject to the existing protective

19  order should remain.

20       MR. EICHMANN:  Your Honor, we're just conferring,

21  because one of the inventors' wives, Ms. von Kaenel -- Mrs.

22  Von Kaenel is in the courtroom.

23       Would it be acceptable to the Court -- yes -- we

24  consider her to be bound by the protective order, and -- all

25  right.  I'm sorry.

1    THE COURT:  We're either going to seal it or we're

2  not going to seal it.  If she's not subject technically to

3  the protective order, she needs to wait outside.

4    MR. EICHMANN:  I'm sorry.  I thought she was

5  allowed to stay, but it's -- sorry for the disruption, sir.

6    THE COURT:  Hang on just a minute.

7    Ms. Smith, do you see anybody else that needs to

8  be excused who hasn't left of the courtroom?

9    MS. SMITH:  No, Your Honor.

10    THE COURT:  Let's continue, Mr. Eichmann.

11    MR. EICHMANN:  Thank you, sir.

12    (Reporter's Note:  At this point, the courtroom

13  was sealed and the transcript for the rest of the afternoon

14  was filed under seal.)

15    ******************************

16

17

18

19    CERTIFICATION

20

21    I HEREBY CERTIFY that the foregoing is a true

22  and correct transcript from the stenographic notes of the

23  proceedings in the above-entitled matter to the best of my

24  ability.

25

1

2

3    /s/_Shelly Holmes_____          _3/17/14_____
     SHELLY HOLMES, CSR                    Date
4    Official Court Reporter
     State of Texas No.:  7804
5    Expiration Date  12/31/14

6

7    /s/_Susan Simmons_____         _3/17/14_____
     SUSAN SIMMONS, CSR                    Date
8    Official Court Reporter
     State of Texas No.:  267
9    Expiration Date  12/31/14

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25