<pre>
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
2                      MARSHALL DIVISION

3   SIMPLEAIR, INC.              *   Civil Docket No.
                                 *   2:13-CV-587
4   VS.                          *   Marshall, Texas
                                 *
5                                *   March 18, 2014
                                 *
6   GOOGLE                       *   1:00 P.M.

7               TRANSCRIPT OF JURY TRIAL
        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
8                UNITED STATES DISTRICT JUDGE

9   APPEARANCES:

10  FOR THE PLAINTIFFS:      MR. GREGORY DOVEL
                             MR. JEFFREY EICHMANN
11                           Dovel & Luner
                             201 Santa Monica Blvd.
12                           Suite 600
                             Santa Monica, CA   90401
13
                             MS. ELIZABETH DERIEUX
14                           Capshaw DeRieux
                             114 East Commerce Avenue
15                           Gladewater, TX   75647

16  FOR THE DEFENDANTS:      MR. MITCHELL STOCKWELL
                             MR. RUSSELL KORN
17                           Kilpatrick Townsend & Stockton
                             1100 Peachtree Street, Suite 2800
18                           Atlanta, GA   30309

19
    APPEARANCES CONTINUED ON NEXT PAGE:
20


21
    COURT REPORTERS:         MS. SHELLY HOLMES, CSR
22                           MS. SUSAN SIMMONS, CSR
                             Official Court Reporters
23                           100 East Houston, Suite 125
                             Marshall, TX   75670
24                           903/935-3868

25  (Proceedings recorded by mechanical stenography, transcript
    produced on CAT system.)
</pre>

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:     MS. DANIELLE WILLIAMS
Kilpatrick Townsend & Stockton
1001 West Fourth Street
Winston-Salem, NC   27101

MS. JENNIFER PARKER AINSWORTH
Wilson Robertson & Cornelius
909 ESE Loop 323, Suite 400
Tyler, TX   75701

*****************************************

P R O C E E D I N G S

(Jury out.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Be seated, please.

All right.  Is there anything from the Plaintiff or the Defendant before we bring the jury back in?

MR. EICHMANN:  No, Your Honor.

MR. STOCKWELL:  Your Honor, just for the record, we had talked yesterday about Google filing an offer of proof on the implementation by ECF instead of reciting it in Court.  We ECF'd that over the lunch hour, and I have copies for Your Honor and the clerk, if Your Honor wishes.

THE COURT:  If you'll hand those up.

MR. STOCKWELL:  Thank you.

THE COURT:  All right.  If there's not anything

1   further, we'll bring in the jury, Mr. McAteer.

2           COURT SECURITY OFFICER:  Yes, sir.

3           All rise for the jury.

4           (Jury in.)

5           THE COURT:  Be seated, please.

6           Welcome back from lunch, ladies and gentlemen.

7   Is the Defendant prepared to call their next witness?

8           MS. AINSWORTH:  Yes, Your Honor.  As the next

9   witness, Google calls Dr. Ravi Dhar.

10          THE COURT:  All right.

11          MS. AINSWORTH:  And he has been sworn, Your Honor.

12          THE COURT:  All right.  If you'll come have a

13  seat, Dr. Dhar.

14          THE WITNESS:  Thank you, sir.

15          (Noise.)

16          THE COURT:  It was quiet the entire noon hour.

17  All right.  Ms. Ainsworth, proceed.

18          MS. AINSWORTH:  Thank you, Your Honor.

19  RAVI DHAR, Ph.D., DEFENDANT'S WITNESS, PREVIOUSLY SWORN

20                  DIRECT EXAMINATION

21  BY MS. AINSWORTH:

22  Q.  Good afternoon, Dr. Dhar.

23  A.  Good afternoon.

24  Q.  Could you introduce yourself to the jury, please?

25  A.  Sure.  My name is Ravi Dhar, and I'm a professor of

marketing at Yale University.

Q.   Do you hold any other positions at Yale University?

A.   Yes.  I have what's called a secondary appointment as professor of psychology at Yale University as well, and I direct a center, director of the center, Yale Center for Customer Insights, it's called.

Q.   Could you tell us what the Yale Center for Customer Insights is?

A.   Sure.  It was started around seven or eight years ago roughly, and the idea is that academics is very rigorous, but it's often not seen as very relevant to the real world. And we thought how do we do rigor and relevance to work jointly with companies.

So the mission of the center is to advance the frontiers of understanding consumer behavior, and that's what the center does with a lot of different companies.

Q.   Okay.  Dr. Dhar, let me ask you a little about your educational background, and I might ask you to slow down just a tiny bit in your answers, please.

Could you tell us about your education?

A.   Sure.  My undergraduate degree was in engineering back in India.  I also did an MBA from India, and I came to this country around when I was 25 to go to graduate school.  So I came to University of California at Berkeley where I received an MS, which is a degree you get in -- in sort of

on the way to getting a Ph.D.  So I have an MS and Ph.D.
from the University of California.  So those are my three
degrees.

Q.  Why did you end up coming to this country -- to the
States?

A.  Basically, you know, I was one of those few people who
wanted to do more research on understanding consumer
behavior.  Many MBAs, really both in this country and in
India, go to what we call the real world.  I wanted to
understand and do more research in the area.  And U.S. is
the best place to do research in most -- in most fields.

Q.  What did you do after you completed your studies?

A.  So typically after Ph.D. many of us become professors.
I became an assistant professor at Yale University.

Q.  How long have you been teaching at Yale?

A.  I just finished my 20 years.  I joined in '92 after
finishing my Ph.D.  So 21 years, I guess.

Q.  What courses do you teach or have you taught in the
past?

A.  Sure.  Over the 20 years, I've taught a lot of different
courses.  I can give you some of the titles:  Consumer
behavior, marketing management, marketing strategy.  I also
taught what I call advanced courses on marketing leadership,
the role of a chief marketing officer.  I've taught courses
on marketing and financial services, and then I've also

taught what's called courses for Ph.D., which tend to be more specialized courses.

And my expertise is in decision-making, so I teach two Ph.D. courses on judgment and decision-making.

Q. Do you have any areas of expertise within the field of marketing?

A. Sure. So broadly, the area of expertise is really what's called judgment decision-making, how do people decide, how do people make choices. But I also study branding, marketing management, marketing strategy, so I have a range of sort of areas in which I've worked over the last 20 years.

Q. Have you ever done any consumer survey work?

A. Yes, I have both for my academic and for my consulting and litigation consulting that I do.

Q. And have you done consulting work with companies on consumer issues?

A. Yes. That's my specialty, so my research is in this area and the work I do with companies is also broadly in the area of how do we understand consumer behavior.

Q. Do you have any experience with what's called conjoint surveys?

A. Yes, I do.

Q. And what experience is that?

A. So I have taught in my master's classes and in my Ph.D.

1    classes, and also in my litigation work and consulting work

2    I have, you know, supervised surveys done for conjoint, not

3    as much as Dr. Srinivasan has done, but I'm fully

4    experienced in the technique.

5    Q.   Have you published any papers in your career?

6    A.   Yes.  I've published over 50 papers.

7    Q.   And have you received any academic honors or awards?

8    A.   Yes.  Over the -- the 20 years, I have won some best

9    paper awards for my research.  I've -- also last year, I won

10   what's called Lifetime Research Award in the area of

11   consumer psychology.

12   Q.   Are you being compensated for your time in the work that

13   you've done in this case?

14   A.   Yes, I am.

15   Q.   And what is your rate?

16   A.   My rate is 700 per hour.

17   Q.   And did you provide the parties with your resume or CV

18   that sets out all your qualifications and your papers that

19   you've written and those things?

20   A.   It's part of my report.  Yes.

21   Q.   Okay.

22        MS. AINSWORTH:  And for the record, that's at

23   Defendant's Exhibit 357.

24   Q.   (By Ms. Ainsworth) Now, Dr. Dhar, shifting gears, can

25   you tell us what were you asked to do in this case?

1  A.   Sure.  As you heard yesterday, Dr. Srinivasan came up

2  with a number for the value of this feature.  I think it's

3  around $12.23.  And what I was asked to do is really look at

4  Dr. Srinivasan's report and give my opinion on whether it

5  was valid and reliable to what Android in the marketplace

6  could charge for this feature.

7  Q.   Can you describe in general terms what you did to form

8  your opinion?

9  A.   Sure.  So I did -- you know, I looked at

10 Dr. Srinivasan's report.  I looked at his deposition

11 testimony -- testimony -- sorry.  I sat yesterday in the --

12 in the courtroom and listened to his trial testimony as

13 well.

14      And he had a very complicated formula that you saw.  So

15 I looked at the formula, applied that formula to some other

16 features off the formula that he had.  And in addition, what

17 I did is I looked at websites of companies that sell

18 smartphones.  I wanted to look how much do they talk about

19 notification according to the website.

20      I also went to what's called third-party websites or

21 third-party organizations.  They don't have to be websites.

22 They could be consumer reports, and I wanted to see do those

23 places talk about notification; and in particular, do they

24 talk about battery life, infringing technology.

25      So I just wanted to see what consumers might see in the

1   process of making a smartphone purchase decision.

2   Q.  What did Dr. Srinivasan estimate to be the market's

3   willingness to pay for Google's messaging service?

4   A.  So he had a lot of different numbers, but, roughly, I

5   think one of the numbers he had was $12.23 as the value for

6   this feature.  What that means is if the phone is sold with

7   this feature, it will charge or it can obtain $12.23 more

8   than a phone without that feature.

9   Q.  And did he have an opinion also on if that feature were

10  available at that price, what percentage of Android users

11  would purchase it?

12  A.  Yes, he did.  I think it was around 42 percent, if I

13  remember correctly.

14  Q.  Now, do you have any opinion about these estimates by

15  Dr. Srinivasan?

16  A.  I do.

17  Q.  And what is your opinion?

18  A.  So my opinion is that Dr. Srinivasan is a fine academic,

19  and he did an academic exercise.  I don't think it's

20  relevant to the marketplace of how people buying the

21  smartphones.  And I want to talk a little bit about that.

22  Q.  And did you prepare a slide that sets out a summary of

23  your opinions?

24  A.  I did.

25          MS. AINSWORTH:  And if -- Mr. Barnes, if we could

1  put up Slide 2.

2  Q.  (By Ms. Ainsworth) Dr. Dhar, let me point you to the

3  slide that's on the screen.  And could you tell the jury

4  briefly what your three major opinions are in this case?

5  A.  Sure.  So there are essentially three reasons why I

6  think this was an academic exercise.  The first reason is

7  that Dr. Srinivasan's formula, what was called Formula 14

8  yesterday, fails to consider competition.  What we know is

9  that competition drives down prices.  And so if you had

10 competition in the marketplace, that number would be far

11 lower.  That's the first reason.

12      The second reason is really related to -- I mentioned

13 earlier I went to the websites to look at do the companies

14 talk about notification.  And I looked at the third-party

15 reviews.  So what -- the second point is really about how do

16 people buy smartphones.  And a smartphone has over a hundred

17 features.

18      And consumer psychology shows when a product has

19 hundreds of features or more than a hundred features, you

20 don't consider all the features when you buy a phone.  Most

21 of us would look at several -- you know, subset of features.

22 Is it an Apple?  Do I like the design?  You know, all that

23 kind of stuff, WiFi.

24      And so my point is, when you look at it in the real

25 world there's a hundred features, you would not be likely to

consider notification when you buy a phone.  And so what's
important here is the following:  If you don't consider a
feature when you're buying the phone, then it has zero value
for the consumer at that time.

So my point here is the following:  When you're buying
a phone with lots of features, you're unlikely to consider
notification, and as a result, notification and choice will
have very little value for people.

Q.  What was the third opinion?

A.  Oh, I just want to finish that opinion a little bit.

The second sort of issue is that not only do people have
to be aware of notification, they also have to be aware of
that this infringing technology is better for battery life.
If they don't know that, how do they know what the
difference is between one way of notification and another
way of notification if nobody tells them this is better for
battery life.

I never saw any communication advertising -- or
website -- which talks about that this technology is better
for battery life.  Yes, it is better for battery life.  I
think this -- I mean, maybe the lawyers have a dispute about
that, but I take it that it's better for battery life.
But if I as a shopper don't know that, it will never enter
into my value for the phone, because I don't know if one way
of notification is better than another way of notification.

1    Q.  And what's your third opinion, Dr. Dhar?

2    A.  So the third opinion is really, you know, if I think

3    notification is not considered when making a choice, why

4    does it appear that in Dr. Srinivasan's survey, consumers do

5    assign or respondents do assign some experience to

6    notification.

7        And the reason for that is Dr. Srinivasan's survey had

8    two flaws.  One is a survey methodology.  We'll talk about

9    that a little later.  And second, some of the instructions

10   that he gave are officially increased the importance of

11   notification.  And I think I'll explain that a little bit

12   more.

13   Q.  Okay.  So going back to the first point that you talked

14   about a minute ago, was that the Plaintiff's formula for

15   market willingness to pay failed to consider competition,

16   you said.

17       Why do you say that?

18   A.  Well, I think Dr. Srinivasan himself testified yesterday

19   he does not take into account competition.

20   Q.  Okay.  Can you explain what you mean by a competitive

21   response?

22   A.  Sure.  In general, in the marketplace, every action has

23   a reaction.  If one company does something, other companies

24   respond in other ways, and competition tends to bring down

25   the price that you can charge for things.

1    Q.   If he didn't take that into account, why is that a

2    problem with regard to his conclusions?

3    A.   Because as I said, competition tends to drive down

4    prices, so the number that you'll have will be inflated.

5    Q.   Can you give any example of how competition changes what

6    companies can charge for a feature or a product or a

7    service?

8    A.   Sure.  It's all the time.  I mean, I state when you go

9    to a cafe, several years ago, I would have to pay for using

10   the WiFi, or a hotel would charge me 10 or $15.  Now, many

11   of the hotels I stay in, the WiFi has become free.  In cafes

12   it has become free because all the cafes have WiFi.

13       If you look at newspapers, we know all over that

14   newspapers are having a very hard time charging for

15   newspapers online, but they can charge for newspapers

16   offline.  But they have less competition, because you can be

17   a local newspaper in a town, but when you go online, you're

18   competing with all the newspapers.  Competition is based on

19   prices.

20          THE COURT:  I'm going to ask you to slow down

21   a little bit, please, Dr. Dhar.

22          THE WITNESS:  Thank you, sir.

23          THE COURT:  And, Counsel, approach the bench,

24   please.

25          MS. AINSWORTH:  Yes, Your Honor.

1          (Bench conference.)

2          THE COURT:  Dr. Williams -- I've not excused

3    anybody.  Has he left or is he still here?

4          MR. STOCKWELL:  I believe he was having lunch over

5    at our offices.

6          THE COURT:  I just want you to understand that

7    witnesses are not excused until the -- the Court excuses

8    them.

9          MR. STOCKWELL:  Yes, I will.

10         MS. AINSWORTH:  Yes, Your Honor.

11         (Bench conference concluded.)

12         THE COURT:  All right.  Let's continue.

13         MS. AINSWORTH:  Thank you, Your Honor.

14   Q.  (By Ms. Ainsworth) So just to finish this point, Dr.

15   Dhar, according to Dr. Srinivasan, about 42 percent of

16   current Android users would pay $12.23 for Google's

17   messaging system, if they have the option to purchase that

18   feature.

19        What effect, if any, does competition have on that

20   conclusion?

21   A.  So as I said, competition tends to drive down prices.

22   So that number would be lower.

23   Q.  Now, going to the second reason that we talked about,

24   why do you say that people in the marketplace are unlikely

25   to consider notifications when they buy a smartphone?

1    A.  So as I mentioned, a smartphone typically has more than

2    a hundred features.  And I also looked at what companies of

3    smartphone -- what kind of features do they talk about,

4    whether it's companies' websites or third-party reviews.  So

5    I looked at both.

6    Q.  What work have you done to come to this conclusion that

7    smartphones have so many features?  You mentioned roughly a

8    hundred features.

9    A.  So what I did is I did a systemic search of many

10   different companies' websites, leading smartphones.  I also

11   did a review of third-party -- I -- there are many

12   third-party reviews.  So what I did, I typed in Google like

13   different types of key words:  Best smartphone reviews, and

14   I had a year like 2012, 2013, and so forth.

15        And I kind of looked at the 53 reviews, I think, at the

16   end, because it's just endless you can do.  So I looked at

17   the most -- you know, the ones that came out on top, and I

18   looked at the top 10 leading reviews.

19   Q.  Did you prepare a slide that showed what you found about

20   the -- the number of features that are available in the

21   marketplace?

22   A.  Yes, I did.

23   Q.  Now, I know that the type is a little small on here, but

24   can you tell the jury what this slide shows?

25   A.  So first, I want to start off with I also looked at the

1  websites I mentioned of the companies that sell the

2  smartphones.  And I found no mention of notification in

3  those.

4      Then I went to -- what the slide shows is the review

5  that I did basically be counted up, you know, how many times

6  a different feature was mentioned.  And so this is just an

7  example of like if you look at the -- if you look, the

8  operating system was mentioned 746 times.  The carrier was

9  mentioned 786 times.  And if you look at notifications, it

10 was mentioned 7 times.

11     And this is any mention of notification, not about

12 infringing technology.  Just the word notification was

13 mentioned 7 times.

14 Q.  And, Dr. Dhar, the fact that notifications were

15 mentioned 7 times that you saw in the literature --

16 A.  Right.

17 Q.  -- versus some of the other features such as operating

18 system, brand, carrier being mentioned in the hundreds of

19 times, what does that tell you about whether consumers are

20 considering notification when they buy a smartphone?

21 A.  Sure.  So I don't have a direct measure of how important

22 each of this feature is, so I'm using a proxy of how many

23 times does the people talk about it; does that tell me

24 something's important or not.

25     And what this tells me is that, first of all, there are

1 many features.  So as I said, consumer psychology says when

2 you buy something and the product has a hundred features,

3 you don't think about all of them.  You just think about a

4 few of them and buy.

5 And what this tells me is that it's highly unlikely

6 that most consumers will think about notification in

7 considering a smartphone purchase.

8 Q.  Now, when Dr. Srinivasan testified yesterday, he

9 explained that in his survey, he had a system where the

10 participant could adjust the numbers, and they could assign

11 a zero value to some features, for instance, notification.

12 Does -- the fact that you could potentially assign a

13 zero, does that address your concern here?

14 A.  It doesn't because his survey methodology and

15 instructions were biased.

16 Q.  Okay.  We'll -- let's talk about the survey in a minute.

17 But have you seen any evidence that consumers are aware of a

18 connection between notifications and battery life?

19 A.  No.  As I mentioned earlier, I haven't seen anything

20 that a consumer is aware that the infringing technology is

21 better for your battery life.  I haven't seen anything

22 there.

23 Q.  Okay.  Now, let's talk about the survey structure, Dr.

24 Srinivasan (sic), which was your third point.  I believe you

25 testified that Dr. Srinivasan's survey exaggerated the value

1     of notification in comparison to the other features that he

2     tested.

3          Why do you believe that?

4     A.  So there are two reasons for this.  One reason relates

5     to the survey methodology that he used, and the second

6     reason relates to the leading instructions.  I can explain

7     on both, if you'd like.

8     Q.  Well, let's -- let's look at -- at the next slide, which

9     I believe is a screenshot from the survey that Dr.

10    Srinivasan gave to the participants, and this shows his

11    instructions.

12         What is it in his instructions that you believe

13    exaggerates notification?

14    A.  Sure.  Before I go to his instruction, I want to talk a

15    little bit about the survey methodology, and then I'll come

16    down to the instructions.

17              THE COURT:  Let me interrupt, Dr. Dhar.  I know

18    you have a story to tell, but you're here to answer the

19    questions that are asked and not to launch into something

20    else that you thought of that you want to talk about.

21              So you're here to respond to counsels' questions,

22    and they'll certainly have a full opportunity to ask you all

23    the questions that they want to, but you're limited in your

24    responses to the questions asked.

25              THE WITNESS:  Thank you.

1          THE COURT:  Do you understand?

2          THE WITNESS:  I'm sorry.

3          THE COURT:  Okay.  Let's continue, Counsel.

4   Q.  (By Ms. Ainsworth) So, Dr. Dhar, in the survey

5   instructions, what is it that makes you believe that the

6   instructions exaggerated the importance of notifications?

7   A.  Sure.  If you look at the highlighted portion, that is

8   part of the instructions in the survey.  And I want to point

9   your attention to the second sentence, which says:  During

10  the next few screens, you'll be asked to rate the importance

11  to you of different attributes and the -- that previous

12  research has identified as important in choosing a

13  smartphone.

14       So basically, the respondents in the survey were told

15  that all the 16 attributes of features that are included but

16  important in choosing a smartphone, and that's considered

17  leading because now I've already told you this is important.

18       So in theory, while I allow you to or Dr. Srinivasan

19  allows you to assign a zero value, it's unlikely that you

20  will do that after you've been told it's important.  Some

21  will, but many will sort of get influenced by the

22  instructions.

23  Q.  Okay.  And if we could look at the next slide, which is

24  also a screenshot that shows on the left the 16 features

25  that Dr. Srinivasan tested.

1   What about these survey instructions where he describes
2   a notification issue gives you a concern?
3   A.  Sure.  So if you look at the 16 features, you will
4   notice that only 5 of them, I think, have some explanation
5   and have sort of more descriptions and details.  And one of
6   them happens to be the notification.  It also happens to be
7   the longest explanation in detail.
8       And so what we know from research is when you do that,
9   it draws attention, makes people think it's more important.
10  It also gives me an understanding -- I may not have an
11  understanding of what notification is.  And now it tells me,
12  oh, I can use it for different things.  So all of that
13  enhances the importance of notification in the survey
14  compared to in the real world.
15  Q.  Now, Dr. Dhar, moving on from the way that his survey
16  was structured, did you do any work to determine the
17  validity of Dr. Srinivasan's formula to determine market
18  willingness to pay?
19  A.  So as I mentioned earlier, I took his formula and I
20  applied it to the other features that Dr. Srinivasan had in
21  his report or in his survey.
22  Q.  Okay.  And let's look at the next slide.
23      Does this show what happens if you -- when you took the
24  Formula 14 and -- and applied it to another feature, which
25  was WiFi, what happened then?

A.   So basically, I took Dr. Srinivasan's formula and applied it to WiFi, and what the formula suggests is that the feature WiFi is worth around $300, just that feature alone.

Q.   Now, do you think that that is a valid result?

A.   It's not valid of what the feature's worth is in the marketplace, because the phone costs around 150, $200, many phones.

Q.   Now, you were here yesterday when Dr. Srinivasan testified, right?

A.   Yes.

Q.   And did you hear that -- that he objected to the way that you used his Formula 14 to apply it to other features?

     Do you have any response to that?

A.   So my understanding is that Dr. Srinivasan objects that I have used it and applied it to a feature that what he calls his large importance in the overall decision to purchase.

     And it should be used only for small changes, so I also applied it to smaller changes.

Q.   And do you have a slide that shows applying it to small changes?

A.   Correct.

          MS. AINSWORTH:  And if we can show the next slide.

Q.   (By Ms. Ainsworth) What -- can you explain what

1  happened when you took the Formula 14 and applied it to

2  a half-inch change in the screen size of a phone?  What

3  did you find?

4  A.  So the -- just to explain the numbers there, the

5  different numbers, which says how much people are willing to

6  pay for each change in the screen size.  And so when I

7  applied it to change in screen size from 2.4 inches to 3.2

8  inches, I get $83.

9  Q.  Okay.  And did you consider a change in size of a half

10  inch on screen size to be a small change in the size a

11  feature?

12  A.  Well, it's apparently not small enough for Dr.

13  Srinivasan, because he kept -- first, he said two -- you

14  know, this was okay; subsequently, he said this is not okay.

15  Q.  So in your calculations, were you able to take Formula

16  14 and make it work and come up with a type of results that

17  Dr. Srinivasan did, or did you come up with illogical

18  results?

19  A.  I don't think -- I didn't see Dr. Srinivasan -- Dr.

20  Srinivasan apply it to other features, so I -- when I

21  applied it to it, I got this different prices.

22  Q.  So let's -- last, let's set aside trying to actually use

23  Formula 14 and just think about what this means using common

24  sense.  If the market is willing to pay $12.23 for

25  notifications, which that feature Dr. Srinivasan ranked next

1  to last of the 16 that he tested, what does that mean for

2  all those other features, the -- the 15 above that -- or the

3  14 above that?

4  A.  Sure.  So Dr. Srinivasan's survey had 16 features, and

5  the 15th ranked was around $12.23.  So by definition, that

6  means all the other features ranked higher than notification

7  would have been valued at more than $12.23.

8  Q.  But how many various features did you find in the

9  literature that there are in the average smartphone?

10  A.  Over a hundred features.

11  Q.  So if -- if one that was pretty far down the list, he

12  says the market would be willing to pay $12.23, what does

13  that mean for all these other features?  What would that do

14  for the cost of phone?

15  A.  Well, it would be much more than what the market price

16  for the phone is.

17  Q.  So to summarize, Dr. Dhar, if we could go to your last

18  slide again, go to your ultimate conclusions about Dr.

19  Srinivasan's estimates of the market's willingness to pay.

20  A.  So my conclusion is -- the three reasons why the $12.23

21  estimate I don't think is valid of what we find in the

22  marketplace.  One is, it doesn't take into account

23  competition, and competition can drive prices down.  It can

24  drive them all the way to zero sometimes over marginal

25  costs, what economists say.

1    The second is, are consumers aware or can take into

2  account notification when they buy a phone, because even if

3  the feature has some value, if that is not something I

4  consider when I buy a phone, that means in the pricing of

5  the phone it has zero value.

6    And the third is sort of trying to understand why if it

7  has zero value, I'm trying to reconcile why it might have

8  shown some experience in Dr. Srinivasan's survey.  And part

9  of the reason is related to the methodology and the

10  instructions that in my opinion advised.

11    MS. AINSWORTH:  And for the record, the exhibit

12  which sets out Dr. Dhar's summary of his opinions is

13  Exhibit 484.

14    And with that, I'll pass the witness, Your Honor.

15    THE COURT:  Cross-examination by the Plaintiff?

16  You may proceed, Mr. Eichmann.

17    MR. EICHMANN:  Thank you, Your Honor.

18                    CROSS-EXAMINATION

19  BY MR. EICHMANN:

20  Q.  Good afternoon, sir.

21  A.  Good afternoon.

22  Q.  I'll ask you as well to try to keep it a little bit

23  slower in your speech, because I'm not sure I can keep up

24  with you as well.

25    Now, the first point that you raised in your

1  presentation was this issue of competition, right?

2  A.  Correct.

3  Q.  You understand, sir, that Google has competition in the

4  Android smartphone -- excuse me -- Google has competition in

5  the smartphone marketplace, right?

6  A.  You mean in terms of different company?  Apple operating

7  system?  Are you talking about Google operating system?

8  Q.  Google has other competitors in the smartphone industry,

9  right?

10  A.  Yes.  They're competitors in the smartphone industry.

11  Q.  Apple, BlackBerry, Microsoft, they all are competitors

12  of Google when it comes to smartphone operating systems,

13  correct?

14  A.  Correct.

15  Q.  And you understand, sir, that each of those companies,

16  all the competition by Google has actually taken a license

17  to SimpleAir's patent on notifications, right?

18  A.  I understood that yesterday.  Yes.

19  Q.  That's not something that you knew when you were

20  preparing your report, is it?

21  A.  I might have known that.  Yeah, I think I knew that

22  there was -- I had seen some previous report.  Yes.

23  Q.  You didn't talk about how all these competitors licensed

24  the notification technology when you prepared and submitted

25  your report, right?

1    A.   That was not relevant.  My point is that competition

2    drives down prices.  So I'm not sure what the question is

3    here.

4    Q.   Sir, one way in which competition can drive down a price

5    would be reflected by how each of these competitors doesn't

6    charge for their notification services, right?

7    A.   One way competition can reflect is by not charging for

8    notification.

9    Q.   You understand, sir, that each of the companies that

10   have smartphone operating systems -- Microsoft, BlackBerry,

11   Apple, and Google -- they don't charge for the

12   notifications, right?

13   A.   Correct.

14   Q.   But that doesn't mean that they don't get value from it,

15   right?

16   A.   They don't get value from purchase.  There can be other

17   ways of getting value, sure.

18   Q.   Now, Dr. Srinivasan testified earlier this week, and you

19   were here for his testimony?

20   A.   Yes.

21   Q.   And you've reviewed his work in this case, right?

22   A.   Correct.

23   Q.   Dr. Srinivasan submitted not just one but two reports in

24   this case?

25   A.   Correct.

1    Q.   And he provides his analysis on what the market is

2    willing to pay for the infringing notification service,

3    right?

4    A.   Correct.

5    Q.   He provides very specific estimates that fall within the

6    parameters of what would be reasonable in his view?

7    A.   I'm not sure what you're asking when you said I disagree

8    with his number.  So how can I agree with the parameters

9    that he provided on that number.

10   Q.   Dr. Srinivasan provides estimates of what he believes

11   the market is willing to pay for the Android notification

12   service?

13   A.   Yes.

14   Q.   And he also provides opinions on how many users out

15   there would actually pay for the notification service if

16   they were asked to pay for it directly, right?

17   A.   Correct.

18   Q.   That's these numbers on the board --

19   A.   Correct.

20   Q.   -- 12 -- please just let me finish just for the

21   reporter.  12.23 and then 42.2 percent.

22   A.   Correct.

23   Q.   And now, in response to Dr. Srinivasan's report, you

24   were asked to perform your own work, right?

25   A.   Which was to, you know, as I mentioned to -- to look at

1 Dr. Srinivasan's work.  Yes.

2 Q.  And as you point out in your slide, you offer a critique

3 of Dr. Srinivasan, right?

4 A.  Correct.

5 Q.  That's what Google asked you to do?

6 A.  That's what the counsel asked me to do, yes.

7 Q.  They didn't ask you to go out and perform your own

8 survey, right?

9 A.  They did not ask me to do that.

10 Q.  And you didn't actually go out and perform your own

11 survey of smartphone users?

12 A.  Well, I looked at the other research, but what I think

13 when you're referring to survey, did you mean whether I did

14 my own calculation of price?  Is that -- because I looked at

15 the other survey of websites.  I don't think -- I think

16 you're referring to survey as similar to what Dr. Srinivasan

17 did.

18 Q.  Well, in your field of business, survey refers to going

19 out and actually talking to consumers, right?

20 A.  That's right.  I didn't do that.

21 Q.  You didn't talk to any consumers in the smartphone

22 industry to hear for yourself what they had to say about

23 notifications, did you?

24 A.  That would be a biased way to do it.  I didn't do that.

25 Q.  Now, sir, if the jury wants to know what your numbers

1  are, what numbers you think are relevant instead of Dr.

2  Srinivasan's, you don't have any other alternative numbers

3  for them, do you?

4  A.  So I tell the jury what I told in my deposition.  I

5  think the number is a lot lower, between 0 or a little more

6  than non-0 and $12.23.  I don't have a number; that is

7  correct.  But I have the reasons that is I provided to you

8  why I think the number is a lot lower.  And then, you know,

9  other experts might have numbers that will be -- you know,

10  we can look at, but I don't have a number.  That's correct.

11  Q.  Sir, I just want to bring you back to that question.

12  You do not have a number to present to the jury in response

13  to Dr. Srinivasan's numbers, do you?

14  A.  Correct.

15  Q.  And is that because you didn't have enough time to

16  perform a survey?

17  A.  Among other reasons.

18  Q.  Oh, so you do contend you didn't have enough time to

19  perform a survey?

20  A.  That was one of the reasons I gave.  Yes.

21  Q.  Well, Dr. Srinivasan performed his survey in February of

22  2012, right?

23  A.  I don't remember, but I know the survey was done -- you

24  know, it's the same survey done as was mentioned yesterday

25  for other cases.  So that might be correct, yeah.

1    Q.   And today, we're in March of 2014?

2    A.   Yes, that's correct.

3    Q.   Did Google at any point in those last two years conduct

4    its own survey of smartphone users so that they could come

5    here and present different numbers to the jury?

6    A.   Well, as I said in my deposition, I'm actually skeptical

7    a survey can be done in this case, and I'm sure that Google

8    would present other information of what can be done.  I

9    mentioned a few of these in my depositions.  If you'd like

10   me to elaborate, I'm happy to do that.

11   Q.   Sir, you agree that Google is certainly a big company

12   with a lot of resources, right?

13   A.   Yes, of course.

14   Q.   And even for Google, there's a lot of money at stake in

15   this case, right?

16   A.   I think so.

17   Q.   They certainly have a motivation, an incentive to come

18   here and present the jury with definitive evidence that

19   these numbers are wrong, right?

20   A.   I -- I think as I said, my understanding is other

21   experts would present some numbers.  I was not asked to do

22   that.  That's all I know.

23   Q.   Google certainly had the time and the resources to

24   carry out its own study of the Android smartphone users,

25   right?

1    A.   They could look at the market, sure.   Yeah.

2    Q.   And they could have had you do that, right?

3    A.   Well, as I said, I'm not sure survey is a right thing.

4    They could have done other things, and they might have done

5    other things that I'm not aware of.

6    Q.   Do you know whether Google actually did a survey of the

7    Android smartphone users on this issue of how important

8    notifications are?

9    A.   You keep coming back to survey.   As I said, I'm

10   skeptical survey is the right thing to do.   My understanding

11   is that Google might have done other things to look at the

12   market -- what happened to the market when this notification

13   was launched, what happened to prices, what happened to

14   sales.

15       And so -- but I don't have any, you know, direct

16   knowledge of what those -- what they could have done that.

17   Q.   As far as you know, sir, Google actually did their own

18   survey, and the numbers came out larger than Dr. Srinivasan,

19   right?

20   A.   I have no knowledge of whether Google did a survey or

21   didn't do a survey.   So that's all I know.

22   Q.   Well, sir, one benefit of Google going out and doing its

23   own survey would be that they could show that the numbers

24   actually come out much, much lower than what Dr.

25   Srinivasan's analysis shows, right?

1  A.  I think the survey is problematic, as I said, for many

2  reasons in my deposition.  And I said it today why a survey

3  is not appropriate.  It doesn't take into account

4  competition.  It artificially focuses your attention on 16

5  features as opposed to a hundred features.

6       And then I'm setting aside the instruction flaws that

7  Dr. Srinivasan had, because let's assume that Google could

8  have done a survey and improved on that.  So I think the

9  bigger point is I don't think survey is necessarily

10 appropriate, but I take your point that Google should do

11 something to show the valuation of the feature.

12       MR. EICHMANN:  Your Honor, I don't mean to be

13 disrespectful, but I have limited time here.  Perhaps if the

14 witness could stay a little bit more within the scope of my

15 questions.

16       THE COURT:  Well, I'll consider that's an

17 objection as non-responsive, and I'll sustain it.  And I'll

18 instruct the witness to answer the questions asked but not

19 stray from the question that's proposed.

20       THE WITNESS:  Thank you.

21 Q.  (By Mr. Eichmann) Another possibility, sir, would be

22 that Google went out, did its own survey of the Android

23 smartphone users, and the numbers turned out to show Dr.

24 Srinivasan was not only right but he understated the value,

25 right?

1  A.  Again, I have no knowledge of it.

2  Q.  Google didn't talk to you about any of that?

3  A.  Correct.

4  Q.  Now, we presented Dr. Srinivasan's background and his

5  credentials, and you were here for that, right?

6  A.  Yes, I was.

7  Q.  And you agree, sir, that he's one of the foremost

8  experts in the world in this field of conjoint analysis,

9  right?

10  A.  Correct.

11  Q.  You don't contend that we've misrepresented him being

12  the top five people in this field, right?

13  A.  Correct.

14  Q.  In fact, you agreed with me in that when we had your

15  deposition?

16  A.  And I said it.  He's a great academic.

17  Q.  And he's actually more well-known in the field of

18  conjoint analysis than yourself, isn't he?

19  A.  Correct.

20  Q.  He's published more papers on the subject?

21  A.  Correct.

22  Q.  And you've published some papers that touch on the

23  subject but none that specifically address conjoint

24  analysis, right?

25  A.  In my research, that's correct.

1  Q.  And when Dr. Srinivasan was talking about all the

2  different awards that he received, you're aware that he's

3  received these awards, right?

4  A.  I'm sure that if he's listed them, then he's received

5  them.  I have no reason to doubt it.

6  Q.  And you certainly had heard of him; you're aware of him

7  before this case came along, right?

8  A.  Yes, of course.

9  Q.  You don't contend that Dr. Srinivasan is biased in

10  SimpleAir's favor or against Google, do you?

11  A.  I don't.  When you say biased, I think you mean intent.

12  No, I don't, of course.

13  Q.  Well, sir, when Dr. Srinivasan sat down to design his

14  study, you agree that he was doing the best that he could,

15  right?

16  A.  I -- I would assume so.  Yes.

17  Q.  You agree that he wasn't sitting down trying to figure

18  out a way to make the survey come out in SimpleAir's favor,

19  right?

20  A.  Again, I don't know that, but I would assume not.  Yes.

21  Q.  He has a very long and distinguished career, right?

22  A.  Correct.

23  Q.  You don't think that he would risk that career and his

24  representation just to come here for this case and present

25  inflated numbers, right?

1  A.   I -- I agree with that.

2  Q.   Now, I want to turn to one of your opinions here, which

3  is on your slide.  You said that there is no support that

4  when purchasing a smartphone in the real world, consumers

5  considered timeliness of notifications, right?

6  A.   That's right.

7  Q.   And now you talk about the real world.  Dr. Srinivasan's

8  survey occurred in the real world, didn't it?

9  A.   Well, it occurred in the real world, but it did not

10  reflect the real world of smartphone purchase.

11  Q.   He surveyed real-world users, right?

12  A.   But not the entire smartphone features.

13  Q.   These were real people, actual people taking the survey,

14  right?

15  A.   Oh, yes, but when we say real world, we mean the entire

16  methodology.  We don't mean literally that these were real

17  people.

18  Q.   And you didn't talk to real people, right?

19  A.   As I said, that would not be the proper way to do it.

20  Q.   You thought it was the proper way to go about looking at

21  articles and information on the Internet?

22  A.   As I said, I looked at the websites for the various

23  companies, what kind of features we were talking about.  And

24  then I did a systemic look at many websites to see what came

25  up the highest, and I looked at 53 different websites to get

1    a sort of overall sense of what's being mentioned.

2    Q.   And these are what you refer to as third-party reviews?

3    A.   That's right, like Consumer Reports and Gadget and so

4    forth.

5    Q.   Well, Consumer Reports and Gadget and other people who

6    are commenting on reviewing new products, right?

7    A.   Correct.

8    Q.   These were not reviews by the actual consumers of the

9    products, right?

10   A.   That's correct.

11   Q.   Now, in your research, did you have occasion to do a

12   Google search in order to find out how important

13   notifications are?

14   A.   When you say Google search, what do you mean -- you mean

15   literally type notification?

16   Q.   Well, sir, would it surprise you to know that if you go

17   onto Google and type in Android notifications, you get 295

18   million results?

19   A.   Well, I don't know what the 295 million means.  When I

20   type my name and I get like a million results, I don't think

21   they're all talking about me.  But I think -- I think I

22   mentioned this earlier that a lot of discussion that I found

23   of notification was happening in the software developer

24   websites and all that.

25        And -- but the short answer to your question is I

1  didn't look systemically about what consumers are talking

2  about or notification.

3  Q.  Now, the jury is able to disregard both parties'

4  experts.  You understand that, right?

5  A.  Sure.

6  Q.  They can look at the evidence for themselves, right?

7  A.  Sure.

8  Q.  And one thing they might want to look at would be the

9  records that Google keeps on how many of these notifications

10  are sent out, right?

11  A.  Sure.

12  Q.  That's not something that you looked at in your report,

13  right?

14  A.  That's correct.

15  Q.  And Google's records show that there are 14 billion

16  requests for this single day in 2013, right?

17  A.  I mean, the data is what it shows.

18  Q.  That's a lot of notifications, right?

19  A.  Yes.

20  Q.  But your contention is that people don't know about the

21  notifications or care about them?

22  A.  They don't care about them when they buy the phone.

23  It's not considered.  A phone has over a hundred features.

24  Think about yourself when you buy a phone.  How many

25  features did you consider when you buy a phone, and how many

1  of you consider all the different features.  That's what I'm

2  really looking at.

3  Q.  Well, sir, consumers today don't have to consider a

4  phone that has no notifications and one that does, right?

5  A.  I think you mean -- if I understand you correctly, you

6  mean because they all might have notifications?

7  Q.  Yes, sir.

8  A.  Yes.  It's possible, yeah.

9  Q.  When users go to the store and pick between smartphones,

10  all of them now have the infringing notification feature,

11  right?

12  A.  That's my understanding.

13  Q.  This study, Dr. Srinivasan's study, is about what if you

14  took the feature out, how would that affect things, right?

15  A.  That's right.  Looking at the feature if nobody else --

16  what the feature value is.  Yes.

17  Q.  And, sir, you also said that there's no evidence that

18  consumers are aware that -- that the technology improves

19  battery life, right?

20  A.  Right.

21  Q.  Now, you understand, sir, that this is what Dr. Knox

22  presented on the improvement in battery life between the

23  infringing notification service and the next best

24  alternative, right?

25  A.  Rough -- you know, I saw this version.  I don't know who

1    presented it, but I take your word for it.

2    Q.  And you understand that a user of the Android operating

3    system, they don't have to understand all the benefits that

4    are -- excuse me -- all the technology that's behind the

5    benefits of what they're getting, right?

6    A.  That is correct.

7    Q.  The user of the Android phone doesn't have to know about

8    the central broadcast server and how it has one connection

9    to the phone as opposed to multiple, right?

10   A.  Right.

11   Q.  They can still get the phone, really enjoy the

12   notifications, and not notice the impact on battery that's

13   being saved, right?

14   A.  That's not correct.  Because if a consumer doesn't know

15   what the benefit of notification is for battery life in the

16   real world, why would you ever pay for it.  It's like a

17   restaurant that serves great shrimp, and I love great

18   shrimp, but I would never value that restaurant unless I

19   knew that restaurant serves great shrimp.

20       So I think a consumer, to value this feature in choice,

21   needs to know that this new technology is better for my

22   battery life; otherwise, I won't value it.

23   Q.  Well, sir, if the company was forced to charge for the

24   feature, they could also tell the users, hey, this is why

25   you should buy it, because it saves battery life, right?

1  A.  They could, but as I said, I didn't see any mention of

2  anyone talking about it.  You're right.  They could talk

3  about it, but nobody does.

4  Q.  And, again, sir, you don't have your own survey of how

5  all these results would come out, if you took Dr. Williams's

6  battery test, instead of Dr. Knox's battery test, right?

7  A.  That's correct.

8  Q.  Now, you say that Dr. Srinivasan's instructions

9  exaggerate the importance of notifications, right?

10  A.  Correct.

11  Q.  And you point to this part of his survey, right?

12  A.  As one of the reasons, yes, sir.

13  Q.  And, sir, you had the ability to access Dr. Srinivasan's

14  survey to take it yourself online, right?

15  A.  He provided me all the -- yes.

16  Q.  And one thing that you could have done is taken his

17  survey and changed all the parts to it where you think

18  that he exaggerates the importance of notifications,

19  right?

20  A.  I wouldn't do the survey -- I mean, that's like

21  rearranging the deck chairs on the Titanic because I have a

22  lot of issues with it.  But if you wanted me to do that, I

23  guess I could do that, yeah.

24  Q.  And that's not something that you did, right?

25  A.  I did not.

1  Q.  You don't have any survey results to report to this

2  jury?

3  A.  I do not.

4  Q.  Thank you.

5          THE COURT:  You pass the witness, Mr. Eichmann?

6          MR. EICHMANN:  I'm sorry.  Yes, I do, Your Honor.

7          THE COURT:  Redirect, Ms. Ainsworth?

8          MS. AINSWORTH:  Yes, briefly, Your Honor.

9          THE COURT:  Proceed.

10                  REDIRECT EXAMINATION

11 BY MS. AINSWORTH:

12 Q.  Dr. Dhar, I want to ask you about two areas.  First, you

13 had some questions from Mr. Eichmann about saying that you

14 didn't talk to real people and you could have contacted

15 people or asked them whether they knew about notifications.

16 And you mentioned that, no, you didn't think that was the

17 right thing to do.  Why is it not appropriate to just call

18 up people and ask, do you think notifications are valuable?

19 A.  Well, it's just an inappropriate way to do research to,

20 you know, call up a few friends and what they would do.  You

21 could -- you know, so that's -- I thought that's what he was

22 asking so that's what I meant here.

23 Q.  And Mr. Eichmann asked you twice a question along the

24 lines of, well, for all you know, Google could have done

25 their own survey and that survey turned out to show that

1  notifications were worth much more or the market willingness

2  to pay was much higher than the $12.23. Have you seen any

3  evidence or information that Google did some survey that

4  came out with a higher number and has not reported it?

5  A.  I have no knowledge of anything Google has done on

6  surveys, no.

7  MS. AINSWORTH:  No further questions, Your Honor.

8  THE COURT:  Additional cross?

9  MR. EICHMANN:  No, Your Honor.

10  THE COURT:  You may step down, Dr. Dhar.

11  THE WITNESS:  Thank you, sir.

12  MS. AINSWORTH:  Your Honor, may Dr. Dhar be

13  excused?

14  THE COURT:  Is there objection?

15  MR. EICHMANN:  No objection.  We may call Dr.

16  Srinivasan in rebuttal.  I don't know if the Court has any

17  preference for him staying for that.

18  THE COURT:  Unless you have an objection -- unless

19  you intend to call him adversely in rebuttal --

20  MR. EICHMANN:  No, sir.

21  THE COURT:  -- then he'll be excused.  You're

22  free to leave or you're free to stay, Dr. Dhar.

23  All right.  Defendant, call your next witness.

24  MS. WILLIAMS:  Thank you, Your Honor.  We call Dr.

25  Keith Ugone.

THE COURT: All right. If you'll come forward, Dr. Ugone. You've already been sworn, correct?

THE WITNESS: Yes, sir.

THE COURT: Please come have a seat.

All right. Ms. Williams, you may proceed.

MS. WILLIAMS: Thank you, Your Honor.

KEITH UGONE, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MS. WILLIAMS:

Q. Dr. Ugone, will you please introduce yourself to the jury?

A. Sure. My name is Keith Raymond Ugone, and my last name is spelled U-g-o-n-e.

Q. Dr. Ugone, why are you here today?

A. Well, there was a prior trial where Google was found to have infringed the '914 patent, and so I'm here to talk about what the appropriate payment would be for that finding of infringement.

Q. Dr. Ugone, is that microphone --

A. Well, I'll work -- you can tell me if it's not sounding just right.

Q. All right. Thank you. Dr. Ugone, where do you live?

A. Actually live in Grand Saline. So if you've ever been to Trade Days by Canton, it's Mile Marker 528 so I live 75 miles west of here.

Q.  How long have you lived in Texas?

A.  Since 1994.

Q.  Do you have any children?

A.  I do.  Son No. 1, Kyle, is a Captain in United States Marine Corps, and Son No. 2, Casey, lives with me and goes to University of Texas at Tyler.

Q.  Dr. Ugone, what do you do for a living?

A.  So I call myself -- it's a fancy title, but I'm a forensic economist and damage quantifier.

Q.  All right.  So with the fancy title, can you help us understand what that means?

A.  All right.  So, you know, much like what's going on in the courtroom here, it's not uncommon for companies to get into commercial disputes.  And so when companies get into commercial disputes, somebody's got to figure it out -- figure out kind of what happened because of the alleged wrongful conduct that one side is usually contending the other side did, and somebody's got to figure out what would have happened in the absence of that alleged wrongful conduct.  So that's kind of a forensic economics part, so I do that sort of analysis from a financial and economic point of view, forensic economics.

    And then ultimately I reach a conclusion as to the amount of economic harm and whether a payment should be made as a remedy for that economic harm.  And that's the damage

1  quantification part.  So I call myself a forensic economist

2  and damage quantifier.

3  Q.  Dr. Ugone, before we get into the work that you did

4  specific to this case, can you describe for us your

5  educational background?

6  A.  Yes.  So I have an undergraduate degree in economics

7  from the University of Notre Dame, which I received in 1977.

8  I have a Master's degree in economics from the University of

9  Southern California, which I received in 1979.  And then I

10 have a Ph.D. in economics that I received from Arizona State

11 University in 1983.  So that was 10 straight years of

12 college.  Not quite sure how I did that.

13 Q.  Well, after you finished your 10 straight years of

14 school, did you eventually start working?

15 A.  Yes.

16 Q.  Can you describe for us what your work history is

17 briefly?

18 A.  After I got my Ph.D. in 1983, I taught for a couple of

19 years in one of the California State University system

20 schools -- Cal State Northridge.  That's just in the San

21 Fernando Valley, just north of LA.  So I did that for a

22 couple of years.  And then I joined -- in 1985, I joined

23 PricewaterhouseCoopers -- it was Pricewaterhouse at the

24 time.  And there's been some mergers, but I was with that

25 company for about 18 years to the very end of 2003.  And

1  then getting into 2004, I joined Analysis Group.

2  Q.  What -- now that you're working for Analysis Group, can

3  you -- now that you are working for Analysis Group, can you

4  please tell us what -- what that company is known for?

5  A.  Analysis Group does economic, financial, strategy-type

6  consulting services for businesses, for the government, for

7  law firms.

8  Q.  Do you specialize in economics and damages-related work?

9  A.  Right.  So that's -- that's my area of specialization,

10 as I described, and so that's what I -- that's what I do on

11 a day-to-day basis.

12 Q.  So is it fair to say that most of your time is spent

13 working in the litigation or dispute setting?

14 A.  Yes.  So virtually all of my time is in a setting where

15 there's a dispute between companies and somebody has to do

16 either financial or economic analysis, and that's the area I

17 specialize in.

18 Q.  Does that mean at times you have to testify in court?

19 A.  So if the dispute does not resolve itself, yes, then

20 there's times that I have to come to court to testify.

21 Q.  Have you testified in patent cases before?

22 A.  I have.

23 Q.  Have you testified in this court before?

24 A.  Yes, I have.

25 Q.  What rate does Analysis Group charge for your time?

A.  So the company I work for charges $600 an hour for my time.

Q.  Dr. Ugone, let's talk about the work that you did for this case specifically.  Would you please tell the jury what you were asked to do?

A.  Well, I was asked to do two things.  One, I was asked to independently evaluate the payment that should be made from Google to SimpleAir because of the finding of infringement in the prior trial, so that was sort of one task.  And then the other task was to evaluate the numbers that SimpleAir has presented as damages through Mr. Mills' testimony who testified yesterday and today.  So I've evaluated Mr. Mills' work, as well.

Q.  Will you please tell the jury what, if any, documents you reviewed as part of your work on this case?

A.  Yeah, as you -- as you can imagine, this is a big case, and there's a lot of documents.  There's some complicated things going on.  So there's legal documents.  There's the SimpleAir license agreements that you've heard about. There's the Google license agreements that you've heard about.  There's the profit and loss financial statements associated with the Android operating system that you've heard about.  So all of those documents are the types of documents that I reviewed in conducting my analysis.

Q.  Dr. Ugone, it sounds like you and Mr. Mills reviewed

1    some of the same documents?

2    A.   Yeah, it's true in a dispute setting that each of the

3    experts has access to the same documents so that's a true

4    statement.

5    Q.   Did you speak with anyone while doing your work on this

6    case?

7    A.   Yes, I spoke to some people at Google, so Mr. Francesco

8    Nerieri, I spoke to.  I also spoke to Dr. Williams who you

9    heard testify.  And I spoke to Dr. Dhar who you heard

10   testify, as well.  So I spoke to a number of individuals.

11   Q.   Did you issue any reports that contains your opinions in

12   this case?

13   A.   Yes.  So I provided the reports as to my conclusions.

14   Q.   Did you testify in the prior trial?

15   A.   I did, yes.

16   Q.   Have you been in attendance for the -- for the entirety

17   of this second trial?

18   A.   Yes, I have.

19            MS. WILLIAMS:  Your Honor, at this time, I request

20   that the courtroom be sealed.

21            THE COURT:  Is there objection from the

22   Defendant -- excuse me -- the Plaintiff?

23            MR. DOVEL:  No, Your Honor.

24            THE COURT:  All right.  And the Court will seal

25   the courtroom for the record.  If you're present and not

1  subject to the current protective order, you should exit the

2  courtroom at this time.

3         (Reporter's Note:  At this point in the

4  proceedings the courtroom was sealed.  That portion of the

5  testimony is filed under seal; Sealed Portion No. 4 in the

6  3/18/14 PM Session.)

7         (Courtroom unsealed.)

8         THE COURT:  You may continue, Mr. Dovel.

9         MR. DOVEL:  Thank you.

10 Q.  (By Mr. Dovel)  Now, one of the things you considered

11 was the subject of non-infringing alternatives, right?

12 A.  Yes.

13 Q.  And you said, well, Dr. Williams tells me there's this

14 non-infringing alternative.  We can just move everything

15 outside of the country, so we're no longer subject to U.S.

16 patent laws, and then it would only cost Google $4.8 million

17 to do that, right?

18 A.  It's a little bit beyond that, but I'll -- I'll accept

19 the spirit of what you're paraphrasing.

20 Q.  Thank you.  Now, you would agree, sir, that if what Dr.

21 Williams described is not actually a workable alternative,

22 then Google would not do it, right?

23 A.  If what Dr. Williams described was not workable for some

24 reason, if you're asking me to make that assumption, then I

25 can make that assumption.

1  Q.  All right.  If it's the case that this alternative of

2  moving all the servers overseas is not a viable alternative,

3  you would agree that the cost of implementing a

4  non-infringing alternative is not just $4.8 million, right?

5  A.  You're asking me if it's not a viable alternative, so if

6  you're saying that they can't do it for some reason.  Is

7  that what you're asking?

8  Q.  Yes.

9  A.  Okay.  So if they can't do it for some reason, then you

10  would take that out of the equation of the economics.

11  Q.  There would be no acceptable non-infringing alternative

12  for Google, right?

13  A.  I can't speak to that.

14  Q.  That's the only one that was identified for you by Dr.

15  Williams, right?

16  A.  Yeah.  You said something different.  So you take this

17  one away.  I can't speak to whether there's other ones that

18  exist or not.

19  Q.  Well, would you agree, sir, that if Google doesn't have

20  any available non-infringing alternative, if they want to

21  practice the central broadcast server method, if they want

22  to send notifications, there's no other way to do it, then

23  that's going to put SimpleAir in a much better bargaining

24  position than if Google did have alternatives, right?

25  A.  It will change the bargaining dynamics in the sense that

1  when I was talking about the real world facts, you would

2  take away that non-infringing alternative part of my

3  discussion.

4  Q.  Not just --

5  A.  I'm sorry, go ahead.

6  Q.  Not just change it.  It would mean that Google would --

7  or that SimpleAir would have a much stronger bargaining

8  position?

9  A.  I can speak factually the following way:  You would take

10  away the non-infringing alternative, but the other

11  negotiating points would still remain.

12  Q.  Let's talk about the cost of doing this non-infringing

13  alternative.  What you said was $4.8 million, right?

14  A.  Okay.  Now, let's be a little careful.  This is where I

15  was going with you before and with the spirit, but it's a

16  little bit more complicated.  That's the present value of

17  the cost differential over the life of the patent.

18  Q.  Okay.  The present value over doing it over the life of

19  the patent.  And to make that calculation, you assumed that

20  the cost would be 25 percent greater to do it overseas than

21  to keep the servers in the U.S., right?

22  A.  That's correct.

23  Q.  And that assumption, of course, it's essential to your

24  calculation.  If it's not 25 percent, if it's some other

25  number, then it's not 4.8 million.  It's some other cost,

1  right?

2  A.  That's always true with math.  If there's a different

3  input, then the number changes.

4  Q.  Well, for example, if it turned out the costs were

5  actually 500 percent more to do all this by moving all the

6  servers overseas, what would that do to your calculation?

7  A.  So you would -- that would be -- you'd have to take that

8  differential between the 500 and the 25 percent, so that's

9  20 times, so the number would change by -- by 20 times.

10  Q.  That would be 20 times $4.8 million?

11  A.  Roughly, yes.

12  Q.  What would that be approximately?

13  A.  20 times 5 -- 20 times 5 would be a hundred million

14  dollars.

15  Q.  So, sir, wasn't it -- it was critical for you to find

16  out whether this assumption was true, whether it was

17  actually going to be 25 percent more or 500 percent more or

18  some other number, right?

19  A.  That's an input into the calculation, yes.

20  Q.  Now, the way you got that input is somebody at Google

21  told you to use that number, right?

22  A.  Yes.  So I had some inquiries at Google, and I received

23  that -- that input, along with some other information.

24  Q.  Well, sir, for that input, that 25 percent number, you

25  didn't see any documentation showing or the supporting that

1    25 percent number, right?

2    A.  I didn't receive documentation.  I had discussions with

3    someone knowledgeable of what that cost differential would

4    be, and the indication was that there was a 25 percent cost

5    differential.

6    Q.  Well, the person you talked to, he didn't provide you

7    with any documentation or -- to show you how he got to 25

8    percent, to show you his calculation, show you his sources

9    of information, any of that, right?

10   A.  On -- on the 25 percent.  There were some other numbers

11   that I received, but not on the 25 percent.

12   Q.  On the 25 percent, you got no documentation, right?

13   A.  That's correct.

14   Q.  You got no calculations, right?

15   A.  I -- the information I got was based on his experience

16   and his knowledge of the systems.

17   Q.  Now, sir, did you ask him for his documentation?

18   A.  There was discussions I had with him.  I don't believe I

19   received any documentation.  I don't remember if I asked her

20   (sic) or not, frankly, as I sit here.

21   Q.  Did you ask to see his calculations?

22   A.  I don't recall ever asking him that question.

23   Q.  The truth is, sir, you did absolutely nothing to verify

24   that what this Google person was telling you was true,

25   right?

1  A.  That is not -- not correct.

2  Q.  Did you do any online search?

3  A.  No, no.  I'm saying along different dimension.  So I did

4  receive some documentation as an input into that

5  calculation, and I also inquired as to this individual

6  and -- you know, his experience to give that sort of

7  opinion.

8  Q.  Oh, so it was an opinion he was giving you?

9  A.  Well, now -- I don't want to get into the words.  It's

10  his estimate as to what that cost differential would be.

11  Q.  He was giving you an estimate?

12  A.  Yes.

13  Q.  It wasn't a calculation, it was a guess?

14  A.  No.  No, I would not say that.

15  Q.  Well, it wasn't -- was it a calculation or not?

16  A.  Okay.  I received that input from him.  That's how I

17  would describe it.  So you can use whatever words you want

18  to use, but it was an estimate.  And I'll say it was an

19  estimate, that I received it from him, that gives us a

20  relevant range for that -- the cost of the non-infringing

21  alternative.

22  Q.  Now, you would agree, sir, that the jury sees no

23  evidence to put on the scale to support that 25 percent,

24  and they've got no basis to accept your

25  4.8-million-dollar number, right?

1  A.  Well, they have -- they have the testimony and my

2  explanation of how I derive that number, so I got that

3  number from various inputs where we received information and

4  I talked to people at Google.  And the question is if you

5  have to reroute the traffic to a foreign server, what are

6  the likely costs that would increase, including electricity

7  and maintenance and knowing the cost differentials of

8  electricity and maintenance on the foreign servers versus

9  the United States, the input I received is that cost

10  differential is 25 percent.

11  Q.  Did you check the cost differentials on electricity for

12  the United States, yes or no?

13  A.  No.

14  Q.  Did -- once the servers are located in Finland, right?

15  A.  One of them -- one server foreign, yes.

16  Q.  The electricity costs there are 500 percent of what they

17  are in the U.S., aren't they?

18  A.  Okay.

19  Q.  Yes or no?

20  A.  I -- I can't answer that question because that may not

21  be relevant to the -- to the electricity differential that

22  Google would face in a server farm versus just a

23  residential, so I don't even know -- when you say 500

24  percent, I don't know if you're talking about a residential,

25  commercial, industrial.  We all know those rates are

1    different.

2    Q.  Now, sir, I want you to assume that Dr. Srinivasan's

3    estimate of the number of users that would be willing to pay

4    $12.23 is correct -- that is 42 percent -- you assume that

5    is correct?

6    A.  Okay.

7    Q.  If so, then would you agree that Google's providing

8    notifications for Android phones caused an increase in sales

9    of Android phones?

10   A.  I'm going to need that question again.

11   Q.  If it's true, Dr. Srinivasan's, he's got it right or

12   approximately right, it's about $12 and 42 percent would

13   have purchased it, that tells you that adding notifications

14   increased the number of sales of Android phones, right?

15   A.  No, I don't -- I don't get that conclusion at all from

16   the predicate you laid out.

17   Q.  Well, if you add a feature like with the notifications,

18   it's worth $12.23.  As an economist, you know that's going

19   to increase demand, right?

20   A.  If you add a feature that's demanded and you keep the

21   price the same, it's likely you will sell more units, yes.

22   Q.  So there's two options.  One thing is the price could go

23   up in which case you wouldn't sell more units, right?

24   A.  I -- you may.  There's times you can increase -- you

25   wouldn't sell as many as you might have otherwise sold, I'll

1   agree to that.

2   Q.  But you would agree if the price stayed the same --

3   phone prices generally stayed the same, then that would tell

4   you that a market willingness to pay $12.23 means that the

5   notification feature resulted in more phones sold -- more

6   Android phones, right?

7   A.  I don't think you can just categorically say that.

8   Q.  Well, sir, if we add a feature that increases the value

9   of the phones, right, all other things equal, that's going

10  to tell us that if prices stay the same, more phones are

11  sold, right?

12  A.  Okay.  If -- if we're just going to stay with a

13  hypothetical, as opposed to the facts of this case and some

14  of the disagreements, generally speaking, if you add a

15  feature, that may cause more people to want to buy the item,

16  especially if the price is staying the same.

17       Now, I'll agree with that conceptionally.  The

18  disagreement comes in when we talk about the facts of this

19  case.

20  Q.  Well, in the facts of this case, you did a study and

21  determined, in fact, phone prices did not go up -- Android

22  phone prices stayed the same or went down a little bit,

23  right?

24  A.  So, yes.  So I looked at an HTC EVO phone before the --

25  the alleged -- or the infringement, then I looked after,

1   when the Android operating system had that feature and the

2   phone prices were the same.  So we did not see phone prices

3   increase, which Mr. Mills said that he expected would have

4   happened if it was valued to the feature.

5   Q.  Well, didn't what Mr. Mills say is that either the price

6   would increase or if the price stayed the same, more phones

7   would be sold, right?

8   A.  But he did say he would have expected the value of the

9   phone to increase by the $12.23.  I thought I recall that.

10  Q.  If the value of the phone increased and price stayed the

11  same, that means you're going to sell more phones, right?

12  A.  If the -- say that again.

13  Q.  If the value of the phone increases by $12 and the price

14  stays the same, you're going to sell more phones, right?

15  A.  Assuming that and holding everything else constant, you

16  may see an increase in the number of phones, but we know

17  phones are -- have a lot more attributes, but I don't

18  disagree conceptionally with what you're saying.

19  Q.  You did analysis to determine what happened in the

20  one-year period before notifications and what happened in

21  the one year after with respect to Android phones, right?

22  A.  Actually I think, as the jury can see, you cut this in

23  half.  I didn't do it with respect to Android.  I did it

24  with respect to Android and Apple, RIM, and there was one

25  other, Microsoft operating system.  So I actually had four

1  sets of two bars.  You've cut it off.

2  Q.   Right.  You've looked at all four of them, right?

3  A.   Yes.

4  Q.   This is -- this is what you did for Android, right?

5  A.   Yes, but you're -- you're distorting, frankly, the

6  analysis that I did.  I don't mean anything by that, but

7  this is not the analysis I did.

8  Q.   What you've got here is the sum total of the analysis

9  you did for Android, right?

10  A.   You're taking it out of context.

11  Q.   All right.  You put it in the context of Apple and RIM

12  and -- and Microsoft, right?

13  A.   Yes.

14  Q.   I'll get to that context.

15  A.   Sure.

16  Q.   Okay.  Let's talk about Android first, okay?

17  A.   Okay.

18  Q.   Now, if we talk about Android, when you did your

19  analysis, you -- you looked at the period before the

20  infringing service was intro -- introduced and you

21  discovered that Android's market share in terms of phones in

22  the U.S. was what?

23  A.   That was the 15.8 percent.

24  Q.   And after the infringing feature was introduced, what

25  happened to Android's market share?

1    A.   Okay.  You're drawing a correlation that is not

2    accurate, but factually speaking, the 51 percent is higher

3    than the 15.8.  You're drawing the correlation to just push

4    notification.  And I tried to explain to the jury that

5    Android had all those changes in the operating system, the

6    increased versions, all the new features, that's what's

7    explained this.  That's the rest of the chart you're not

8    showing demonstrates.

9    Q.   Well, the rest of the chart shows that Apple and

10   Microsoft didn't get as much benefit from the notifications

11   feature, right?

12   A.   Well, no.  What it -- no, I disagree.  I can explain,

13   but I disagree.

14   Q.   All right.  Well, let's talk about the market

15   willingness to pay, what that tells us.  If Dr. Srinivasan's

16   numbers are right, then Mr. Mills' calculation -- you don't

17   disagree with it.  That means that Google got an additional

18   $600 million in profits, right?

19   A.   I'm struggling a little bit because I think you just

20   asked me to do math again.  I don't -- I don't agree with

21   the $12.23, but if you said assume $12.23 and then do some

22   math and here's a number, I'm not going to disagree with the

23   math, but I disagree with the economics.

24   Q.   You disagree with -- starting with the 12.23.  That's

25   one thing you disagree with, right?

1  A.  I disagree with the $12.23, yes, and I disagree that

2  that's a driver of sales.

3  Q.  But you haven't seen any other analysis presented that

4  tells us what the market willingness to pay is for the

5  notification service, right?

6  A.  I have seen discussion that the number would be less, if

7  there was a number at all.

8  Q.  Would you agree, sir, that if it were the case that in

9  this negotiation -- by the way, the negotiation -- Mr.

10  Payne's going to be on one side, right?

11  A.  Either him or a representative of SimpleAir, yes.

12  Q.  Who's going to be on the other?

13  A.  Either Google or a representative of Google.  Is that

14  what you're asking?

15  Q.  Yeah.  What's the name of that person?

16  A.  It would be whoever does the negotiating for Google.

17  Q.  In your investigation, did you talk to the person who

18  does the negotiation for Google?

19  A.  No, I did not.

20  Q.  Did you make any assessment of whether Mr. Payne would

21  be a better negotiator than that person?

22  A.  I have not looked at the individuals.  I looked at the

23  data that the companies would use.  Google is a very

24  sophisticated company that has people that are very skilled,

25  and they're very prudent licensees and licensors.  And I

1  made the same assumption about Mr. Payne, that both of them

2  would be prudent negotiators.

3  Q.  Would you agree, sir, that in this negotiation between

4  Mr. Payne and Mr. or Mrs. Anonymous, that if SimpleAir

5  established to Google's satisfaction that it was going to

6  lose $600 million in additional profits, profits that it

7  couldn't get any other way without this license, SimpleAir

8  will be in a much stronger position than if they're only

9  talking about four or $5 million, right?

10 A.  If you're saying that in one negotiation there's only 5

11 million at risk and another one there's 600 million at risk,

12 that would change the dynamics.  I'm not going to disagree

13 with that.

14 Q.  If there's $600 million at risk and no non-infringing

15 alternatives, that means Google will risk losing $600

16 million in bottom line profits without that license, right?

17 A.  That in a sense is tautological, but that doesn't mean

18 that they would pay $600 million when you look at the other

19 value indicators.

20 Q.  By tautological, you mean true, yes?

21 A.  No.  What I mean is that you're assuming that they would

22 have an amount equal to what you're saying.  That's what I

23 meant by that.

24 Q.  Let's get an answer to the question.

25         THE COURT:  Let's approach the bench, first.

1          Counsel, approach the bench.

2          (Bench conference.)

3          THE COURT:  I just want to put the parties on

4    notice that as of right now, the Plaintiff has 10 minutes

5    remaining and the Defendant has 15.

6          MS. WILLIAMS:  Yes, Your Honor.

7          THE COURT:  All right.  Let's go.

8          (Bench conference concluded.)

9          THE COURT:  All right.  Let's continue.

10   Q.  (By Mr. Dovel) If Google stands to lose $600 million, if

11   it doesn't have a license, and it has no non-infringing

12   alternatives, that means the only way to get that 600

13   million is with a license, right?

14   A.  If you're saying to use a certain technology and there's

15   no alternatives, then they would need a license to use that

16   technology.  That doesn't mean that they couldn't make other

17   business decisions, but I will agree with you.  If they want

18   to use that technology, then they would need a license.  I

19   will agree with that.

20         MR. DOVEL:  Your Honor, I'll pass the witness.

21         THE COURT:  Additional direct?

22         MS. WILLIAMS:  Yes, Your Honor.

23         THE COURT:  Proceed.  You may proceed, Ms.

24   Williams.

25         MS. WILLIAMS:  Thank you, Your Honor.

1    REDIRECT EXAMINATION

2    BY MS. WILLIAMS:

3    Q.   Dr. Ugone, Mr. Dovel showed you a bar chart that showed

4    Android market percentages.

5    A.   That's correct.

6    Q.   Do you recall that?

7    A.   I do.

8    Q.   Let's look at your Slide 8.  And what does this tell you

9    about what caused that increase?

10   A.   Right.  So it tells me two things.  Like I previously

11   testified, Google comes out with updated versions of

12   Android, the operating system.  We see Froyo; we see

13   Gingerbread, Honeycomb, Ice Cream Sandwich, and Jelly Bean.

14   And it's just not the mere fact they're coming out with

15   increased or updated versions.  They're coming out with new

16   capabilities, new features, some of just a small amount of

17   which we've shown in this chart.

18        So you can't draw this inference that just push

19   notification caused that increase in share of handsets in

20   that one chart that it cut off that he was trying to show.

21   What he wasn't bringing into the analysis is everything that

22   Google's doing to achieve that higher share, which is coming

23   out with these updated versions of the operating system that

24   handset-makers and consumers find to be good-quality

25   products.

1  Q.  Dr. Ugone, do you recall when Mr. Dovel asked you a

2  series of questions about the comparable agreements --

3  excuse me -- Google's comparable license agreements?

4  A.  Yes.

5  Q.  And you indicated that you had an explanation.  What is

6  your explanation?

7  A.  Yeah.  So I'm trying to remember back to why I said

8  that, but there was the -- there was this sort of

9  extent-of-use issue, and Google found it in their best

10  interest to purchase certain patents for 5.5 million,

11  license other patents for 400,000.

12      And what you have to remember is Google is a high-tech

13  company.  And what are they doing?  They always have R&D.

14  They always have innovative ideas and new products.  So what

15  that type of company does will enter into license

16  agreements.  And even if they're not using the technology

17  today, they want to have that available so when they get an

18  idea, they can take that off the shelf and put it into a

19  product and not have to worry about now do I have to go back

20  and get a license.  So that's sort of Item No. 1.

21      And then I've also seen some clauses in some of the

22  other license agreements, and we were talking about Apple

23  where it wasn't talking about the extent of use.  It just

24  said that Apple can use this in any product they want.

25      Well, that's completely -- any Apple product.  That's

1  completely analogous to what I was saying of Google's use.

2  So that's an important consideration as well.

3  Q.  Dr. Ugone, as part of your work on this case, did you

4  look at actual phone prices?

5  A.  Yes.

6  Q.  And can you tell us what is shown up here on the screen?

7  A.  Yes.  So this is what I was describing to the jury, that

8  if you look at handroid -- Android handset, the HTC EVO 4G,

9  the handset price was $199.99 before the release of one of

10  the accused Android operating systems.  And then after the

11  release of one of the accused Android operating systems, if

12  you keep going along the yellow there, it still was $199.99.

13  Now, that was prices on an HTC model.  It wasn't Google

14  saying we're going to keep the prices the same.  This was an

15  HTC model, and the prices stayed the same.  When there was

16  that additional push notification feature, we did not see

17  the price of that phone go up.

18         MS. WILLIAMS:  Pass the witness, Your Honor.

19         THE COURT:  Additional cross?

20         MR. DOVEL:  Nothing further, Your Honor.

21         THE COURT:  All right.  You may step down, Dr.

22  Ugone.

23         MS. WILLIAMS:  Your Honor, may Dr. Ugone be

24  excused?

25         THE COURT:  Any objection from the Plaintiff?

1          MR. DOVEL:  No objection, Your Honor.

2          THE COURT:  You may be excused, Dr. Ugone.

3          THE WITNESS:  Thank you.

4          THE COURT:  You're welcome to stay or you're free

5    to leave.

6          Defendant, call your next witness.

7          MR. STOCKWELL:  Your Honor, Google rests.

8          THE COURT:  All right.  Does the Plaintiff have a

9    rebuttal case to put on?

10          MR. EICHMANN:  Yes, Your Honor.

11          THE COURT:  Call your first rebuttal witness.

12          MR. EICHMANN:  Your Honor, we'd like to recall Dr.

13    James Knox.

14          THE COURT:  Dr. Knox, I remind you, you remain

15    under oath.

16          THE WITNESS:  Thank you, Your Honor.

17          THE COURT:  Please have a seat.

18      JAMES KNOX, Ph.D., PLAINTIFF'S WITNESS, PREVIOUSLY

19                          SWORN

20                    DIRECT EXAMINATION

21    BY MR. EICHMANN:

22    Q.  Dr. Knox, I want to address one issue that came up when

23    their technical expert testified.  You were here for his

24    testimony?

25    A.  Yes, I was.

1   Q.  And I'm talking about Mr. Tim Williams.

2   A.  Yes.

3   Q.  He was talking about your battery testing, and he had

4   certain criticisms.  Do you recall that testimony?

5   A.  I do.

6   Q.  And he also made that -- those criticisms in the last

7   trial as well.

8   A.  That's correct.

9   Q.  None of his criticisms that -- the central one was that

10  you did your testing and used the battery standby time for

11  the phones; is that right?

12  A.  That's correct.

13  Q.  And what do you recall his criticism being about that?

14  A.  He felt that that wasn't representative or a useful

15  number because of other things that the phone is capable of

16  doing.

17  Q.  And what's your response to that?

18  A.  Battery standby time is something that is published for

19  the phones.  It's part of the sales literature to advertise

20  them.  Google has a team which studies increasing the

21  battery life, including by use of this infringing

22  technology.  They have published papers on it internally.

23      They have also presented those papers to their own

24  application developers and urged them to use this technology

25  in order to save battery life.

1    Q.   This is Exhibit 54.  This is one of the Google documents

2    that you considered in this case; is that right?

3    A.   Yes, that's correct.

4    Q.   And you'll see there's a reference here at the top to

5    Francesco's T-Mobile Galaxy Nexus.  Do you know who

6    Francesco is?

7    A.   Yes.  He's one of the people who's testified in this

8    case before from Google.

9    Q.   Is he the one that runs the infringing Google service?

10   A.   He's on that team.  I don't know if he runs it or not.

11   Q.   And what is shown here in this internal Google document?

12   A.   These are the -- some of the benefits, less wakeups,

13   extra standby.  I think that's supposed to say minutes.

14   Q.   And when Google does its own internal testing about

15   battery -- battery life, does it use battery standby time as

16   the -- the baseline to measure?

17   A.   According to all the documents I've seen, yes.

18   Q.   Including this one here?

19   A.   Yes.

20   Q.   Thank you, Dr. Knox.

21            MR. EICHMANN:  Pass the witness.

22            THE COURT:  Cross-examination?

23            MR. STOCKWELL:  No, Your Honor.

24            THE COURT:  You may step down, Dr. Knox.

25            THE WITNESS:  Thank you.

1    THE COURT:  Plaintiff have any additional rebuttal

2 case?

3    MR. EICHMANN:  Mr. Dovel was going to recall Dr.

4 Srinivasan.  Plaintiff recalls Dr. Srinivasan.

5    THE COURT:  All right.  Dr. Srinivasan, I remind

6 you, you're also under oath again.

7    THE WITNESS:  Indeed.

8    THE COURT:  Please have a seat, sir.

9 You have six minutes, Mr. Dovel.

10    MR. DOVEL:  Thank you.

11    SEENU SRINIVASAN, Ph.D., PLAINTIFF'S WITNESS,

12             PREVIOUSLY SWORN

13             DIRECT EXAMINATION

14 BY MR. DOVEL:

15 Q.  Dr. Srinivasan, I've placed on the screen a summary

16 slide from Dr. Dhar.  We've got limited time, so I just

17 wanted to ask you about one or two of these.

18    One of his criticisms is that the -- your instructions

19 exaggerate the importance of timeliness.  Do you agree that

20 that -- with that criticism?

21 A.  I do not.

22 Q.  Why is that?

23 A.  Because I asked people to compare notifications to all

24 other attributes, and people could have easily said -- I

25 mean, respondents could have easily said that this is not

1  important.  You recall the -- the two bars they were showing

2  yesterday and somebody could have pushed the bar all the way

3  to zero in which case notifications is not important -- so

4  there's no exaggeration, in my opinion.

5  Q.  What about the criticism that the formula fails to

6  consider competition in the marketplace, competition

7  drives down prices?  Do you agree with this criticism?

8  A.  I don't.

9  Q.  Why is that?

10  A.  Because competition is definitely true; that part of it,

11  I agree.  But if you want to take into account competition,

12  you should not take into account competition only in prices,

13  but you should also take into account competitions because,

14  in the smartphone market particularly, people are constantly

15  introducing new features.

16      So you have to take into account competition in

17  features as well as prices, and there's no technology

18  currently available to find out what the competitive equal,

19  as we call it, would be, if you take into account all of

20  those.

21  Q.  Now, the -- in doing conjoint analysis in the real

22  world, do real-world companies in order to predict their

23  actual profits in unit sales make use of the Formula 14 or

24  similar versions of it?

25  A.  Yes.

1   Q.  Now, the middle criticism here is that there's no

2   support that when purchasing a smartphone in the real world,

3   consumers consider timeliness and so on.  He's criticizing

4   that your approach doesn't model actual real-world

5   decision-making.

6        Do you agree with that criticism?

7   A.  I don't.

8   Q.  Why is that?

9   A.  There are actually two parts to this criticism.  One of

10  them has to do with considering the timeliness of

11  notification.  In my data, which I provided, I show that 14

12  percent of my respondents consider timeliness of

13  notification at least average in terms of importance of the

14  16 features; that is, it is at least 8 times higher or

15  better, higher in terms of importance.

16       So there are clearly people who think notification is

17  quite very important.  That is one.

18       Secondly, it is not so much that customers are in

19  question of the battery life.  It is not something that

20  customers currently are familiar with, whether this

21  technology will affect battery life or not.

22       What is really important is what could have happened?

23  If Google did not use this system, what would have happened

24  then?  Then they would have to connect all applications one

25  by one to the particular smartphone in which case the

1  battery life would be much less, and people will immediately

2  notice that battery life has gone down, because they are not

3  using the infringing system.

4          MR. DOVEL:  Your Honor, we'll pass the witness.

5          THE COURT:  Is there cross-examination for the

6  Defendant?

7          MR. STOCKWELL:  No, Your Honor.

8          THE COURT:  You may step down, Dr. Srinivasan.

9          THE WITNESS:  Thank you.

10         THE COURT:  Plaintiff, call your next rebuttal

11  witness.

12         MR. EICHMANN:  Your Honor, we recall Robert Mills.

13         THE COURT:  Same admonition, Mr. Mills, you remain

14  under oath.

15         THE WITNESS:  Thank you.

16         THE COURT:  Please have a seat.

17    ROBERT MILLS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

18                    DIRECT EXAMINATION

19  BY MR. EICHMANN:

20  Q.  Mr. Mills, there's been further talk by Google and their

21  experts about the notification being an app and that it's

22  too expensive if you use this model.

23      I ask you again, is the infringing service an app that

24  people are supposed to buy for $12.00?

25  A.  No.  The infringing service is something that comes on

1    the Android platform.

2    Q.  Is the infringing service at issue in this case

3    something that can provide notifications for all of those

4    60,000 applications that use the infringing service?

5    A.  That's right.  Yes.

6    Q.  When you addressed the Microsoft settlement agreement,

7    which was Exhibit 295, did you make a further adjustment for

8    the fact that Microsoft disputed infringement of the patent?

9    A.  No, I didn't adjust for that.  That would tend to have

10   an upward impact in terms of comparing it to Google, because

11   as -- as I mentioned during my testimony, when there's

12   uncertainty concerning validity and infringement, that has a

13   downward pressure.

14       And here we know that the patent is valid and infringed

15   by Google.

16   Q.  There's also been a lot of talk about worldwide

17   notification numbers versus U.S.  If we assume that Google's

18   numbers are correct about the percentage of notifications

19   that are within the United States as opposed to worldwide,

20   do we have to adjust in any way your damages calculations?

21   A.  No.  In my view, we don't, because I'm still comparing

22   apples to apples.  I'm looking at Microsoft's worldwide

23   notifications and comparing them to Google's worldwide

24   notifications.

25   Q.  And when you also gave the number for the cumulative

1   notifications sent by Apple, was that also worldwide?

2   A.  Yes.

3   Q.  Each of these companies -- Apple, Microsoft, Google --

4   they all have services that are worldwide, not just in the

5   U.S., right?

6   A.  That's right.  They have operations that extend far

7   beyond the United States.

8   Q.  It's not just Google that has some of these servers

9   overseas, right?

10  A.  That's my understanding.  Yes.

11          MR. EICHMANN:  Thank you, Your Honor.  Pass the

12  witness.

13          THE COURT:  Pass the witness.

14          Is there cross-examination?

15          MS. WILLIAMS:  No, Your Honor.  Thank you.

16          THE COURT:  You may step down, Mr. Mills.

17          THE WITNESS:  Thank you, Your Honor.

18          THE COURT:  Do you have anyone else to call?

19          MR. EICHMANN:  No, Your Honor.

20          THE COURT:  Does the Plaintiff rest its rebuttal

21  case?

22          MR. EICHMANN:  Plaintiff rests its rebuttal case,

23  subject to the admission of our exhibits.

24          THE COURT:  All right.  Ladies and gentlemen, the

25  parties have rested, which means that you heard all the

1    evidence that you're going to hear in this case.  That

2    brings us to a point where there are certain matters I need

3    to take up with counsel outside of your presence, and all of

4    this translates to what I hope you'll view as good news.

5    You get to go home early today, and you don't have to be

6    back as early tomorrow morning as you were today.  I'm going

7    to ask you to be back in the jury room ready to go by 10:00

8    o'clock in the morning.  So you get a late start in the

9    morning, and you get off early today.

10           I remind you as you leave today to leave your

11   notebooks on the table in the jury room, and I -- I

12   especially remind you not to discuss the case with anyone in

13   any way, including each other.  We're coming to a critical

14   point where you'll receive my final instructions and hear

15   closing arguments from the attorneys tomorrow.  And then I

16   will direct you to retire and to deliberate upon your

17   verdict.

18           Then and only then should you and must you discuss

19   the case amongst yourselves.  So I remind you as you go home

20   tonight, keep those instructions and all of my instructions

21   in mind.  Have a safe trip home, and we will see you back by

22   10:00 o'clock in the morning.  You're excused at this time.

23           COURT SECURITY OFFICER:  All rise.

24           (Jury out.)

25           THE COURT:  Be seated, please.

1     Does the Plaintiff have any motion to offer under

2 Rule 50(a)?

3     MR. DOVEL:  No, Your Honor.

4     THE COURT:  Does the Defendant have a motion to

5 offer under Rule 50(a)?

6     MR. STOCKWELL:  Yes, Your Honor.

7     THE COURT:  All right.  Proceed, Mr. Stockwell.

8     MR. STOCKWELL:  Your Honor, we would move for

9 judgment as a matter of law on the issue of damages.  If

10 you'd give me just a minute, Your Honor.

11     So first off, Your Honor, we have previously

12 briefed this in connection with the prior trial, and just

13 for the record, we'd like to incorporate those prior

14 motions, Document Nos. 593 and 638.

15     The general theories on which we move for JMOL is

16 that the royalties in this case include an evaluation that

17 includes noninfringing worldwide information.  And I want to

18 pick up where Mr. Mills left off, Your Honor, because at the

19 pre-trial conference in this case, you expressly warned the

20 Plaintiff that they had to -- they had the burden of

21 apportioning for U.S.

22     And what we heard was Mr. Mills say, well, I

23 compared worldwide Google to worldwide Microsoft.  Assume

24 for the moment that Google had 40 worldwide messages and --

25 or 400 worldwide messages and Microsoft had 10.  If the --

the Microsoft messages, if those 10 messages were all in the

U.S. and Google's messages, there were only 10 percent that

were in the U.S., you would have something like four over 10

or 40 percent.

If the Microsoft messages, if there's only one

that's in the U.S., you would obviously have a larger

proportion.  Either way, we don't know because of the

Microsoft -- because of Mr. Mills' inability to determine

what the Microsoft U.S. messages were relative to the

worldwide, they can't get to that apportionment.

THE COURT:  If you'd move just a little bit away

from the microphone, Mr. Stockwell, I'd hear you better.

MR. STOCKWELL:  Thank you, Your Honor.  I'm sorry.

THE COURT:  I'm getting a feedback.

MR. STOCKWELL:  I have a tendency to lean in.

So our contention is you can't simply do a worldwide to

worldwide and say, well, that's apples to apples,

particularly where there was evidence in this case that

Google's U.S. messages were only 193 million, which Mr.

Mills ignored.

Your Honor, we also addressed in our papers before

SimpleAir's licensing of the '914 patent.  We don't think

the Plaintiff has -- Plaintiff's theories have adequately

taken into account the other 12 licenses.  They only relied

on the Microsoft license and the Srinivasan theory.  And we

1  believe that the damages theory under the Srinivasan theory

2  bears no relationship to Google's actual use.

3        You heard Mr. Mills say that he's basing it on

4  Android phones sold by third parties that are capable of

5  infringing.  And we cited case law to the Court, the Cardiac

6  Pacemakers' case and the other cases, that say, you can't

7  base a royalty in a method claim -- and this was an en banc

8  Federal Circuit case, Your Honor, on capable -- capabilities

9  of using -- you actually have to use.

10        We think in light of that law, Your Honor, at

11  minimum, that theory has to be stricken and the jury has to

12  be instructed to disregard that theory.  It's legally infirm

13  under the Cardiac Pacemakers' case, the en banc case.

14        Your Honor, we also pointed out in our papers

15  various other grounds, the failure to account for the

16  noninfringing alternative, the fact that Dr. Srinivasan's

17  damages testimony should be stricken, and Dr. Mills'

18  testimony should be stricken pursuant to the Daubert motions

19  we filed earlier.

20        We understand that the Court denied that at

21  pre-trial, but we would renew those motions and believe that

22  if the Court struck those, there would be insufficient

23  evidence for the damages figures that are set forth.

24        Your Honor, I can elaborate on any of these, but

25  as I said, these are briefed in the papers before.  If the

1   Court wishes to hear more about the damages JMOL motion and

2   the grounds therefore, I'm happy to continue.

3           THE COURT:  The Court's aware of your briefing,

4   Counsel.  If you'd like to re-file the same or supplemented

5   briefing, you have leave to do so.

6           MR. STOCKWELL:  Thank you, Your Honor.

7           THE COURT:  Let me hear a response from the

8   Plaintiff.

9           MR. EICHMANN:   Your Honor, we oppose and we

10  assert the same reasoning and evidence submitted in Docket

11  No. 632 and 695.

12          With respect to the issue of apportionment, Mr.

13  Mills testified that it is reasonable as one factor within

14  his comparison of the Microsoft agreement to consider the

15  relative numbers of notifications that Microsoft sent

16  through its system and that Google sent through its.  He

17  provided that testimony at the last trial, he provided that

18  testimony in deposition, and in his supplemental report

19  served last year.

20          They served a responsive report from Dr. Ugone.

21  He didn't even address that issue.  He didn't even take

22  issue with comparing worldwide-to-worldwide as a proxy.  As

23  we've explained in our papers, these companies are all

24  worldwide operating, they are all using notifications

25  worldwide, and so that is a relevant comparison.

1    If there were a problem with this analysis, they

2 would have pointed to evidence or some reasoning, not just

3 attorney argument, from their expert saying, wait a minute,

4 we actually know and there is evidence here that it's not

5 rely upon worldwide-to-worldwide as a proxy is, but there is

6 no evidence of that, and we have Dr. -- Mr. Mills' evidence

7 that it is reasonable to rely upon it.

8    Furthermore, the Court did note at the pre-trial

9 conference that there needs to be an apportionment with

10 respect to U.S. and outside infringement.  And at every step

11 of the case, we've been very careful to do what the Court

12 says we need to do.  Point out when we're talking about

13 worldwide numbers and when we're talking about U.S. numbers,

14 and Dr. Knox specifically considered all of the information

15 that they presented through their witness and in discovery

16 about what percentage are U.S. versus outside and said that

17 his conclusion in reviewing that evidence was several

18 hundred million, if not billions, of infringements in the

19 U.S. per day.  Mr. Mills relied upon that in forming his

20 opinions.  And the evidence is sound on this perspective.

21 With respect to the apportionment, as well, that has only to

22 do with the analysis under the -- of the settlement

23 agreements.  That's the second approach that Mr. Mills

24 provided.  That doesn't affect in any way the first theory

25 that was provided under Georgia-Pacific because that

1  comparison was not something that was made.

2       Now, with respect to the Cardiac Pacemakers' case,

3  we'll address this more in our briefing, but the primary

4  issue there is one that comes up in many cases where you

5  can't just simply sell software and say, well, that

6  software, once it gets in the hands of the user, it's going

7  to be able to cause a direct infringement.  You can have a

8  contributory infringement case based on that, but it's not

9  infringement to sell software that can then be used to

10 practice a method.

11      Not at all what is happening here.  What is

12 happening here is they are infringing, and we are basing our

13 case on their infringement.  And Mr. Mills' testimony is

14 that the way they would have decided damages in this case at

15 the hypothetical negotiation is not to have a per message

16 rate but to look at the number of users of the service, and

17 the way to look at the number of users is how many of these

18 devices are out there with the infringing notification

19 feature.

20      Now, why are all of the phones included in there

21 even when some of them are not actually being used for

22 notifications, that's because as we explained, Dr.

23 Srinivasan's analysis takes into account that for some

24 people, notifications has zero value.  So if we had a

25 royalty base of two phones and we had two users out there

1   and one says, I don't care anything about notifications, I

2   wouldn't pay for it at all, his phone gets zero.  If we have

3   another user out there that says, I'll pay $24.00 for this

4   phone, he gets 24.  The average is the $12.00 per phone, the

5   starting point for Dr. Srinivasan's analysis, that all gets

6   accounted for, and then it's further cut down because we

7   take the take rate and say, okay, even if you charge for it,

8   only 42 percent would get it.

9          So we can certainly supplement our papers on this,

10  but we don't think there's any issue for either of Mr.

11  Mills' theories or for Dr. Srinivasan's under -- underlying

12  analysis.

13          THE COURT:  Well, I'll grant the Plaintiff the

14  same leave to file its prior briefing or to supplement its

15  prior briefing in this regard.

16          Based on the argument, the Court's familiarity

17  with the earlier assertions along the same lines, the Court

18  denies the Defendants' motion under Rule 50(a).  This denial

19  doesn't limit or hinder the Defendants' ability under the

20  rules to reurge the motion post-verdict.

21          I remind counsel that they have 20 minutes per

22  side for closing tomorrow.  I intend to hold an informal

23  charge conference in chambers in about 20 minutes.  We'll

24  say 20 minutes until 5:00.

25          If you are counsel in the case that are going to

1  be arguing tomorrow and your presence is not needed from

2  your trial team to discuss the charge, you're not required

3  to be in the informal charge conference.

4        Also, I will and do now here release the witnesses

5  from their attendance.  They're welcome to be here tomorrow,

6  but they're not required to be.

7        And with that, we stand in recess.  And I will see

8  you in chambers in about 20 minutes.

9        COURT SECURITY OFFICER:  All rise.

10        (Court adjourned.)

11        ***************************

12

13

14

15                CERTIFICATION

16

17        I HEREBY CERTIFY that the foregoing is a true

18  and correct transcript from the stenographic notes of the

19  proceedings in the above-entitled matter to the best of my

20  ability.

21

22

23

24  /s/_Shelly Holmes_____          __3/18/14_____

      SHELLY HOLMES, CSR           Date

25  Official Court Reporter

      State of Texas No.:  7804

1  Expiration Date  12/31/14

2

3  /s/_Susan Simmons_____              _____3/18/14_____
   SUSAN SIMMONS, CSR                      Date
4  Deputy Court Reporter
   State of Texas No.:  267
5  Expiration Date  12/31/14

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25